## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

DERRICK EDMOND, KATHERINE EALY,
EDDIE COOPER, JR., VICKI HILL,
ROBERT T. LAWS, JR., and ANTON
GLENN, individually and
on behalf of all others similarly-situated,

                             Plaintiffs,

        v.

THE CITY OF CHICAGO; RANDY
CONNER, acting Commissioner of the
Department of Water Management;
BARRETT MURPHY, former
Commissioner of the Department of
Water Management; WILLIAM
BRESNAHAN, former Managing Deputy
Commissioner of the Department of
Water Management; JOHN POPE,
Deputy Commissioner of the Department
of Water Management; ALAN STARK,
Deputy Commissioner of the Department
of Water Management; EDUARDO
SALINAS, Engineering of Water
Purification of the Department of Water
Management; and JOSEPH LYNCH,
Chief Operating Engineer of the
Department of Water Management,

                         Defendants.

No.  17 CV 4858

CLASS ACTION

Jury Trial Demanded

## AMENDED COMPLAINT

Plaintiffs, DERRICK EDMOND, KATHERINE EALY, EDDIE COOPER, JR.,

VICKI HILL, ROBERT T. LAWS, JR., and ANTON GLENN, individually and on

behalf of all others similarly-situated, complain against Defendants, THE CITY OF CHICAGO; RANDY CONNER, acting Commissioner of the Department of Water Management; BARRETT MURPHY, former Commissioner of the Department of Water Management; WILLIAM BRESNAHAN, former Managing Deputy Commissioner of the Department of Water Management; JOHN POPE, Deputy Commissioner of the Department of Water Management; ALAN STARK, Deputy Commissioner of the Department of Water Management; EDUARDO SALINAS, Engineer of Water Purification of the Department of Water Management; and JOSEPH LYNCH, Chief Operating Engineer of the Department of Water Management, and allege as follows:

## NATURE OF THE ACTION

1.     This is an action brought under 42 U.S.C. §§ 1981(a) and 1983, and the Illinois Civil Rights Act of 2003, 740 ILCS 23/1 *et seq.* to remedy acts of race discrimination carried out against African Americans working for the City of Chicago Department of Water Management ("Water Department").

2.     Defendants have a long-standing and widespread pattern and practice of discriminating against African Americans in their employment and in particular, but without limitation, of denying African Americans promotions, assigning African Americans the least amount of overtime, and unfairly and unevenly disciplining African Americans, which pattern and practice is so permanent and well-settled as to constitute an actionable "custom or usage."

3.     In addition, Defendants continue to engage in deliberate and unlawful policies, patterns, and employment practices to create and proliferate a hostile and abusive work environment based on race that includes violence, intimidation, retaliation, and constructive discharge against the Plaintiffs, and the Class.

4.     The racial discrimination alleged herein is systematic and emanates from the highest levels, and from those persons with supervisory and final policymaking authority within the Water Department.

## **JURISDICTION AND VENUE**

5.     Jurisdiction is proper pursuant to 28 U.S.C. § 1343(a)(3) & (4), which confers original jurisdiction in a civil action to redress the deprivation of any right, privilege, or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States under color of any State law, statute, ordinance, regulation, custom, or usage, and to recover damages or to secure equitable or other relief under any Act of Congress providing for the protection of civil rights.

6.     Jurisdiction is also proper pursuant to 28 U.S.C. § 1331, which confers original jurisdiction in a civil action arising under the Constitution or laws of the United States, and under 28 U.S.C. § 1367, which confers supplemental jurisdiction over the state law claims.

7.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and 1391(c), because the Defendants reside within this District, and because the events

or omissions giving rise to the claims alleged herein occurred and continue to occur within this District.

## PARTIES

8.     The plaintiffs are current or former employees of the City of Chicago.

9.     Derrick Edmond is African American and was employed by the City of Chicago, Department of Water Management from 1985 until 2017.

10.     Katherine Ealey is African American has been employed by the City of Chicago, Department of Water Management from 1999 through the present.

11.     Eddie Cooper Jr., is African American has been employed by the City of Chicago Department of Water Management from 1994 through present.

12.     Vicki Hill is African American and was employed by the City of Chicago Department of Water Management from 1983 until 2015.

13.     Robert T. Laws, Jr. is African American and has been employed by the City of Chicago Department of Water Management from 1988 through the present.

14.     Anton Glenn is African American and has been employed by the City of Chicago Department of Water Management from 1986 through the present.

15.     The City of Chicago is a municipal corporation organized under the laws of the State of Illinois.

16.     The Chicago Department of Water Management is a component of the City government.

17.     The Water Department operates under the direction of a Commissioner who is appointed by the Mayor and approved by the City Council.

18.     The Commissioner serves at the pleasure and direction of the Mayor, and sets policy and directs the culture of the Water Department, in consultation with the Mayor and other policymakers within the City government.

19.     The Commissioner is assisted by the First Deputy Commissioner, two Managing Deputy Commissioners, and five Deputy Commissioners.

20.     The Deputy Commissioners are all selected by the Mayor and possess and exercise policymaking authority.

21.     Each Deputy Commissioner is charged with overseeing a Bureau, and the Divisions that comprise that Bureau.

22.     The Commissioner along with the First Deputy and Deputy Commissioners have ultimate authority over promotions, transfers, discipline, and terminations within the Water Department.

23.     The policies and practices of the Water Department described herein were directed, approved, supervised, and implemented by the Commissioner, Deputy Commissioners, and other Water Department policymakers, including Chief Engineer, and Engineer of Water Purification (the "Individual Defendants").

24.     Each act or omission alleged herein was done under color of authority and color of law vested in the City of Chicago as a municipal corporation within the State of Illinois.

25.     The Individual Defendants are or were at relevant times employees of the City of Chicago and acted and act under color of law.

26.     The Individual Defendants' actions were within the scope of their employment and within the scope of their authority as managers and policymakers overseeing the operations of the Water Department.

## FACTS

27.     The primary function of the Water Department is the purification and transmission of potable water to the homes and business within Chicago and 126 suburban communities.

28.     The Water Department employs approximately 2,104 full-time personnel and has an annual operating budget in excess of $900,000,000.

29.     The Water Department has a centralized administration for promotions, transfers, and work assignments.

30.     Plaintiffs and Class members are members of a protected class.

31.     Racial discrimination toward African American employees of the Water Department is fostered, sanctioned, implemented, and endorsed by the Individual Defendants.

32.     African American employees are humiliated, harassed, denied opportunities for advancement and additional pay, and threatened daily as a result of the conduct of the Water Department policymakers, creating a hostile and abusive work environment that was and is perpetuated, sustained, and created by deliberate acts allowed, sanctioned, and encouraged by Defendants.

33. Defendants engaged in discriminatory acts against Plaintiffs and the Class, as defined below, of African American Water Department employees, including:

    a. assigning less desirable work assignments;

    b. assigning less overtime;

    c. denial of promotions - "Glass Ceiling";

    d. denial of transfers, shifts, and days off - "Glass Wall";

    e. subjecting them to unwelcomed racial intimidation and harassment;

    f. subjecting them to harsh and undue discipline; and

    g. subjecting them to retaliatory, adverse actions.

34. Plaintiffs and Class members were and are subjected to a hostile work environment also by the Defendants' use of, toleration of, and failure to remedy racially derogative language, including by calling Plaintiffs and Class members "niggers" or referring to them as "you people," and by physical intimidation.

35. The hostile work environment for African Americans created by Defendants is demonstrated by, among other things, email traded by Defendants on their City of Chicago computers and using their City of Chicago email addresses.

36. As was widely reported in the press, Paul Hansen, a Superintendent of the Water Department and a policymaker, sent an email that linked to an online video showing several Kenyans unsuccessfully trying to fly an aircraft they had built, stating: "They are human beings. Just like us! Only 100 years later."

37.     Other racist email exchanges involving the Defendants, Superintendent Hansen, and other policymakers, including:

a.   an email touting a fake "Chicago Safari" package, referencing the number of shootings during a July Fourth weekend, and guaranteeing that tourists would observe "at least one kill and five crime scenes" and also see "lots of animals in their natural habitat;"

b.  messages purporting to be in "Ebonics,[1]" and a "humorous" picture supposedly describing a swimming pool for a small African-American, but which actually depicted a child sitting in a bucket filled with water while holding a slice of watermelon; and

c.  "Watermelon Protection" email that featured a picture depicting a Ku Klux Klan scarecrow guarding a field of watermelons:





---

[1] "Ebonics," intended to be derogatory in this context, refers to the vernacular use of English by African Americans.

38.     The Water Department was and continues to be hotbed of racism, as documented by numerous exchanges summarized by the Chicago Tribune as follows:

> Another racially insensitive email dates back to February 2013, when Hansen was replying to an email that Murphy first forwarded to him. The original message concerned an 'urgent request' from ComEd to stop work near an alternate power line serving schools, a fire station and senior citizen homes until the main line was fixed so those facilities wouldn't lose their electricity feed if it were accidentally damaged.
>
> In response, Hansen wrote: 'I think the only thing that the line does not feed is the center for the severely challenged negro midgets, you know the place, its where we hired all those laborers from 7 years ago.' Murphy then forwarded that message to another department employee.
>
> Even an August 2015 note from Murphy describing an equation for calculating the circumference of a circle drew a convoluted, racially charged attempt at humor from Hansen.
>
> Hansen's message referred to the sex organs of white and black men, Caitlyn Jenner, Bill Cosby, a Confederate flag, and Dorothy and the Tin Man. Within minutes, Hansen then forwarded the same distasteful message to Durkin, whose response included: 'I'll have to get back to you with my answer after I discuss this with the All Powerful OZ.'

See Hal Dardick, Ray Long and Todd Lighty, *Newly released racist, sexist emails show scope of scandal at Chicago's water department*, Chicago Tribune, July 14, 2017, available at: http://www.chicagotribune.com/news/local/politics/ct-chicago-water-department-emails-met-20170714-story.html.

39.   African American employees are subjected to racist images, such as a hangman's noose in restrooms and Water Department vehicles:



40.   The racial slurs, insults, and intimidation were unwelcome by the Plaintiffs and the Class members.

41.   The hostile conduct fostered and encouraged by Defendants was sufficiently severe or pervasive to alter the conditions of the Plaintiffs' and the Class members' employment and create a racially abusive or hostile work environment.

42.   The hostile work environment is pervasive throughout the entire Water Department.

43.   The Plaintiffs and the Class members perceived the working environment to be abusive or hostile.

44.     A reasonable person in the Plaintiffs' and the Class members' circumstances would consider the working environment to be abusive or hostile.

45.     Defendants and the other supervisors and policymakers at the Water Department have a practice of discriminating against African American employees of the Water Department.

46.     In particular, Defendants have a practice, pattern or policy of not promoting, refusing to transfer, and assigning less overtime to African American employees.

47.     The opportunity for promotion, transfer, and overtime for employees within the Water Department is negatively affected by employees' race.

48.     Plaintiffs and Class members are, in effect, and as direct, proximate and forseeable result of Defendants' unlawful conduct, blocked by a "Glass Ceiling," a transparent barrier of racism obstructing opportunities for upward movement and advancement afforded to other employees of the Water Department.

49.     Defendants created a practice and scheme that requires African American employees to work far longer than Caucasians and apply more times than Caucasians in order to receive a promotion.

50.     Defendants refused and refuse to promote, or delay promoting, qualified African American employees because of their race, even though African Americans have sufficient seniority, experiences, and performance history to qualify for promotions.

- 11 -

51.    African Americans must, on average, apply for promotions to open positions more than a dozen times before they are promoted.

52.    Caucasians, by contrast, are typically promoted on the first attempt; and often, Caucasian applicants are selected for a promotion before applications are received or interviews are conducted.

53.    Instead of promoting and filling open positions fairly and without regard for race, Defendants deliberately and as part of a pattern, practice, and custom leave positions unfilled until a handpicked Caucasian candidate is designated.

54.    Defendants systematically deny African Americans the opportunity to advance as compared to Caucasian employees.

55.    African American employees are deterred from, and refrain from, applying for promotions and transfers because of the Defendants' practice of refusing to promote or transfer African Americans.

56.    Despite their desire to advance, many African American employees remain in the same position for extended periods of time because they applied for a promotion numerous times, but were denied a promotion on the basis of their race.

57.    Plaintiffs and Class members are blocked by a "Glass Wall," a transparent barrier of racism that prevents African American employees from obtaining preferred shifts, locations, or days off; something that is typically afforded to other employees with sufficient seniority

58.    Defendants have a practice of assigning African American to less-desirable work, locations, shifts, and denying desirable days off.

59.    For example, African American "station laborers" are assigned to perform harsher and more difficult work, while predominantly Caucasian "construction laborers" are not required to perform those tasks.

60.    Desirable shifts and locations, such as days with weekends off or at location closer to one's home, are assigned to Caucasian employees, even though more senior African American employees were entitled to those shifts and locations.

61.    Because promotions, changes in shifts, days off, or work location must be sought from or approved by Defendants and other supervising policymakers, Defendants are able to, and continue to, implement a practice of racial discrimination against African Americans.

62.    The Glass Ceiling and Glass Wall deprived Plaintiffs and Class members of the rights and liberties afforded non-African Americans to advance their careers and choose their own schedules and locations, in violation of their Constitutional rights under the color of law.

63.    As a result of the Glass Ceiling and Glass Wall, Plaintiffs and Class members were and are chilled and deterred from applying for promotions or transfers because of the Department-wide practice that they will not be promoted or transferred because of their race.

64.    Defendants have a practice of limiting the opportunity for African American employees to work overtime.

65.     Defendants determine who receives overtime and preferentially select Caucasian employees for overtime, instead of eligible African American employees.

66.     Defendants also have a practice of assigning Plaintiffs and Class members the duties of a higher position, while declining, because of their race, to pay them the corresponding higher compensation they are entitled to.

67.     Water Department employees who perform the duties of a higher position are eligible for increased pay ("acting up pay") for the period they perform the duties of the higher position.  For example, if an employee performs the duties of the next grade above theirs while someone is on vacation, the employee is eligible for acting up pay.

68.     Defendants determine who receives acting up pay and systemically deny Plaintiffs and Class members acting up pay, while approving acting up pay for similarly situated Caucasian employees.

69.     Defendants apply workplace rules and regulations in a racially-biased manner.

70.     Defendants maintain practices of disciplining African American employees in a manner different from and more harshly than Caucasian employees.

71.     African American employees receive disciplinary write-ups for the same conduct or actions that Caucasian employees engage in without consequence.

72.     Defendants use discipline against African Americans to adversely affect the employment prospects of African Americans and prevent and dissuade African Americans from raising legitimate work-related questions and from

complaining about or seeking to redress disparate treatment and racial discrimination.

73.     Defendants use their practice of over-disciplining African Americans as part of a practice and strategy to later deny, and justify denying, African Americans promotions, transfers, and overtime to which they are entitled by virtue of their seniority and qualifications.

74.     Defendants also use discriminatory discipline against African Americans as a means of "encouraging" or even forcing African Americans to retire prematurely, and as a basis to improperly terminate African Americans' employment.

75.     While trying to circumvent the Glass Ceiling and Glass Wall, African American employees of the Water Department are subject to racist conduct, speech, and images during their day-to-day activities.

76.     African American employees are humiliated, harassed, and threatened daily by co-workers, supervisors, and Water Department leadership, and such conduct condoned and encouraged by the Defendants, creating and proliferating a hostile and abusive work environment based on race.

77.     Instead of taking steps to remedy the systemic racial discrimination within the Water Department, which was not only known to but created by Defendants, the Defendants instituted a practice of retaliation against African American employees that complained about discrimination or racism.

78.     African American employees were and are systematically subjected to unfair, arbitrary, and capricious discipline in retaliation for speaking out against racism and discrimination.

79.     In retaliation for speaking out against racism and discrimination, African American employees were and are subjected to:  transfers to less desirable locations and/or work shifts; constructive discharge; or involuntary termination.

80.     The racially discriminatory practices maintained by Defendants are so pervasive, involve so many policymaking personnel, are so well known and have persisted for such a long time, as to create and constitute a policy of the City of Chicago.

81.     Defendants have maintained a systemic practice that willfully discriminates against and imposes disparate treatment upon a protected group based on race.

82.     Defendants' willful discrimination against African American employees of the Water Department represents a department-wide pattern and practice.  Indeed, given the emails quoted above, how could it be otherwise; when the top management of the Water Department freely write, circulate and exchange – without apparent concern or fear of retribution or discipline – the most hateful of racist images.  It strains credulity to suppose that such a rampant discriminatory work environment could exist without the City of Chicago's knowledge and consent.

83.     Defendants' systemic and willful racial discrimination has caused stress, anxiety and fear to the Plaintiffs and Class members, and denied the

Plaintiffs and Class members tangible job benefits which Caucasian employees were permitted to enjoy.

84.    The Defendants' systemic and repeated discriminatory acts resulted in Plaintiffs and Class members being compensated less than Caucasian employees.

85.    The discriminatory acts also adversely affect Plaintiffs' and Class members' retirement benefits, which are substantially less than they would have been but for the discriminatory acts.

86.    The discriminatory practices described herein are ongoing and constitute a continuing violation of the Plaintiffs' civil rights.

87.    The racially discriminatory practices uniformly harm and similarly affect African Americans employed at the Water Department.

88.    The City of Chicago was aware of all the foregoing conduct by virtue of, among other things, reports and internal grievances that were filed by numerous African American employees of the Water Department repeatedly over the course of years.

89.    The discriminatory conduct was so pervasive within the Water Department and the internal grievances so numerous, that decisionmakers within the City of Chicago were aware of the ongoing racial discrimination and hostile work environment within the Water Department.

### *Derrick Edmond*

90.    During his employment with the Water Department, Derrick Edmond was discriminated against on the basis of his race.  Edmond applied for promotions

for which he was qualified, successfully passed the prerequisite examinations, but was denied promotions because of his race. Edmond applied for transfers, but was denied those opportunities because of his race. Because of his race and despite his seniority, Edmond was given undesirable work assignments, shifts, and days off.

91.     For example, Edmond applied and interviewed for an operating engineer position, for which he was qualified, approximately eighteen times, but Defendants promoted less qualified Caucasian applicants despite Edmond's superior qualifications. Edmond was finally promoted after continuing to apply and interview for the position, in contrast to Caucasian applicants, who were promoted on the first attempt or were designated as promoted before the interviews were even conducted.

92.     Edmond performed the duties of an assistant chief operating engineer for approximately four years. Despite this, when the position of assistant chief operating engineer was opened for applications, Defendants told Edmond he was not qualified and hired Caucasians with less experience for the position.

93.     Edmond was treated differently because of his race. Edmond was unable to secure more desirable shifts, while Caucasians with less seniority were able to obtain those shifts.

94.     Edmond was called a "nigger" and referred to as "you people" during his time at the Water Department.

95.     Edmond was subjected to undue discipline in retaliation for speaking out against this racially disparate treatment, and was forced to retire early.

96.    Edmond's wages were suppressed, he lost income, and his retirement benefits were reduced because of racial discrimination.

### *Katherine Ealy*

97.    During her employment with the Water Department, Ealy was discriminated against on the basis of her race.  Ealy applied for promotions for which she was qualified, successfully passed the prerequisite examinations, but was denied the promotions because of her race.  Ealy applied for transfers, but was denied those opportunities because of her race.

98.    Ealy performed the duties of a chief operating engineer for a substantial period of time.  Elay applied for the open position of chief operating engineer two to three times over a period of several years, and successfully passed all tests necessary for the position.  Ealy was not selected for the position and a Caucasian with lesser qualifications, who never worked in a water purification plant before and was not hazmat qualified, was selected.

99.    Ealy was treated differently because of her race.  Ealy was denied the day shift and desired work locations, while Caucasian employees with less seniority were given preference for shifts and locations.

100.    Because of her race, Ealy is regularly called something other than her name, such as being called a fucking whore and a bitch.

101.    Ealy's wages were suppressed and she lost income because of racial discrimination.

### Eddie Cooper, Jr.

102.    During his employment with the Water Department, Cooper was discriminated against on the basis of his race.  Cooper applied for promotions for which he was qualified, successfully passed the prerequisite examinations, but was denied promotions because of his race.  Cooper applied for transfers, but was denied those opportunities because of his race.  Because of his race and despite his seniority, Cooper was given undesirable work assignments, shifts, and days off, and was denied overtime and acting up pay.

103.    Cooper was eligible to be promoted to the Water Chemist III position for approximately 20 years.  Cooper was not promoted to Water Chemist III because of his race, despite the position being funded and needed.

104.    Cooper was eligible for acting up pay for performing the duties of a senior chemist in the chemist's absence.  Despite completing the necessary paperwork, he was denied acting up pay.

105.    Cooper was subjected to undue disciplinary hearings in retaliation for speaking out against his treatment in the Department.  Cooper was treated differently because of his race, and Defendants, tolerated, encouraged, and sustained the disparate treatment.

106.    Cooper's wages were suppressed and he lost income because of racial discrimination.

### *Vicki Hill*

107.    During her employment with the Water Department, Hill was discriminated on the basis of her race.  Hill applied for promotions for which she was qualified, successfully passed the prerequisite examinations, but was denied the promotions because of her race.  Hill applied for transfers, but was denied those opportunities because of her race.

108.    Hill sought a promotion, and a less qualified Caucasian was selected for the position.

109.    Hill was treated differently because of her race.  For example, Hill was required to travel to different locations throughout the City and was not given a City vehicle, while a Caucasian employee performing the same duties was not required to travel as extensively and was given a City vehicle.

110.    Hill was denied overtime, while Caucasian employees with less experience were assigned overtime.

111.    Hill was subjected to disciplinary in retaliation for speaking out against racial discrimination.  Defendants used disciplinary proceedings to force Hill to retire six months short of receiving the maximum amount on her pension.

112.    Hill's wages were suppressed, she lost income, and her retirement benefits were reduced because of racial discrimination.

### *Robert T. Laws, Jr.*

113.    During his employment with the Water Department, Laws was discriminated against on the basis of his race.  Laws applied for promotions for

which he was qualified, and successfully passed the prerequisite examinations, but was denied promotions because of his race. Laws applied for transfers, but was denied those opportunities because of his race. Because of his race and despite his seniority, Laws was given undesirable work assignments, shifts, or days off, and was denied overtime.

114.    Laws applied for the open position of Caulker, and was denied the position even though he met the job requirements, while Caucasians were hired with little or no experience. Laws replied for the position on numerous other occasions, but was likewise denied the position because of his race.

115.    Laws was denied overtime, while similarly situated Caucasian employees were assigned overtime. The assignment of overtime to Caucasian employees, and not to African American employees, was endorsed and encouraged by the individual Defendants.

116.    Laws was subjected to racist messages and slurs, including "nigger" and "KKK" written in Water Department facilities.

117.    Laws wages were suppressed and he lost income because of racial discrimination. For example, positions that Laws applied for and was denied paid $10,000 more per year than Laws was paid.

*Anton Glenn*

118.    During his employment with the Water Department, Glenn was discriminated against on the basis of his race. Glenn was dissuaded from applying for promotions and denied promotions for which he was qualified by the racist and

discriminatory actions of the Defendants. Because of his race and despite his seniority, Glenn was given undesirable work assignments and was denied overtime.

119. Glenn applied for the open position of Construction Laborer, and was denied the position, even though he met the job requirements, because of his race.

120. Glenn was denied overtime, while similarly situated Caucasian employees were assigned overtime. The assignment of overtime to Caucasian employees, and not to African American employees, was endorsed and encouraged by the individual Defendants.

121. Glenn was humiliated, harassed, denied opportunities for advancement and additional pay.

122. Glenn's wages were suppressed and he lost income because of racial discrimination.

## <u>CLASS ALLEGATIONS</u>

123. Plaintiffs bring this action on their own behalf, and on behalf of a Class of all African Americans who were employed at the Water Department through the date of judgment in this action, and which Class contains or may be divided into three Sub-Classes under FED. R. CIV. P. 23(c)(5) of African American Water Department employees: a **Promotions Sub-Class** consisting of all African American Water Department employees who applied for a promotion; a **Transfer and Shift Selection Sub-Class**, consisting of all African American Water department employees who applied for transfers or better shifts; and an **Overtime**

**Sub-Class** consisting of all African American Water department employees who requested overtime.

124.     The discriminatory acts engaged in by Defendants were part of a pattern and practice that was centrally devised and commonly applied to Plaintiffs and members of the Class and Sub-Classes, including:

> a.  Creating a hostile work environment as alleged above for and affecting the Class of African American employees of the Water Department which adversely affected their employment and opportunities;
>
> b.  For the Promotions Sub-Class, denying promotions to African American employees of the Water Department or requiring African Americans to apply repeatedly before getting the promotion, despite equal or superior qualifications to Caucasian employees;
>
> c.  For the Transfer and Shift Selection Sub-Class, refusing to transfer or award selected shifts to African American employees, despite sufficient seniority to obtain those transfers and shifts; and
>
> d.  For the Overtime Sub-Class, denying overtime to African American employees of the Water Department and awarding overtime to Caucasian employees instead.

125.     The Class and Sub-Classes are each so numerous that joinder of all members is impracticable.    FED. R. CIV. P. 23(a)(1).   The Class includes all African Americans who worked at the City of Chicago Department of Water Management and is in excess of five hundred (500) members.

126.    There are questions of law and fact common to the Class and to each Sub-Class.  FED. R. CIV. P. 23(a)(2).

127.    The claims of the representative Plaintiffs are typical of the claims of the Class and each Sub-Class.  FED. R. CIV. P. 23(a)(3).

128.    The representative Plaintiffs will fairly and adequately represent the interests of the Class and each Sub-Class.   FED. R. CIV. P. 23(a)(4).

129.    The questions of law or fact common to Class and Sub-Class members predominate over any questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.  FED. R. CIV. P. 23(b)(3).

130.    Class and Sub-Class members do not have an interest in individually controlling the prosecution or defense of separate actions and the expense of such would be prohibitive; There is no other litigation the Plaintiffs are aware of concerning the controversy already begun by Class and Sub-Class members; it is desirable to concentrate the litigation of the claims in this, and Plaintiffs do not envision any significant difficulties in managing a Class action.

131.    The Defendants have acted or refused to act on grounds that apply generally to the Class and each Sub-Class, so that final injunctive relief is appropriate respecting the Class and Sub-Classes as a whole.  FED. R. CIV. P. 23(b)(2).

132.    A class action should be maintained because the prosecution of separate actions by individual Class or Sub-Class members would create the risk of

inconsistent or varying adjudications with respect to individual Class or Sub-Class members that would establish incompatible standards of conduct for the party opposing the Class or Sub-Class; or adjudications with respect to individual Class or Sub-Class members, as a practical matter, would substantially impair or impede their ability to protect their interests.  FED. R. CIV. P. 23(b)(1).

133.    Plaintiffs have retained skilled and experienced counsel to represent them in this litigation.  Fed. R. Civ. P. 23(g). Counsel have done substantial work in identifying or investigating potential claims in the action. Counsel have substantial experience in litigating class actions, and other complex litigation, and employment claims. Counsel have knowledge of the applicable law, and possess sufficient resources to represent the class.

134.    Alternatively, the issues determining liability and equitable relief are appropriate for issue certification under Rule 23(c)(4), as are other common issues.

## COUNT I

### (against All Defendants)

### HOSTILE WORK ENVIROMENT - SECTION 1983

135.    Paragraphs 1 through 134 are incorporated by reference.

136.    The Fourteenth Amendment to the United States Constitution protects persons from being subjected to hostile work environments based on race by persons acting under color of state law.

137.    The Defendants, under color of state law, set forth policies and/or practices that create, sustain, and proliferate a hostile and abusive work environment based on race.

138.   This hostile and abusive work environment is created, perpetuated, and sustained by the Defendants acting under color of state law.

139.   This hostile and abusive work environment is widespread throughout the Water Department, is permanent and well-settled to constitute a custom or usage with the force of law.

140.   Plaintiffs and Class Members were subjected to and harmed by the systemic hostile work environment for African Americans within the Water Department.

141.   Plaintiffs and Class Members were harmed economically by the hostile work environment, by, among other things, losing wages, income, and retirement benefits.

WHEREFORE, Plaintiffs pray that the Court:  certify the Class and Sub-Classes; designate Plaintiffs as Class and Sub-Class representatives and designate Plaintiffs' counsel as Class counsel; enter preliminary and permanent injunctive and other relief including, without limitation, enjoining the Defendants from creating and perpetuating a hostile and discriminatory work environment, enjoining Defendants to maintain a lawful work environment, and, if appropriate, appointing an independent and qualified Special Master or other qualified third-party to implement, supervise and train the Water Department personnel in such a manner as to eliminate employment discrimination in all its forms; award compensatory damages including without limitation lost wages, back pay, front pay, pre-and post-judgment interest, and compensation for lost benefits; award

reinstatement to former employees; award the costs of this action, including the fees and costs of experts, together with reasonable attorneys' fees; and award all relief to which Plaintiffs and the Class are or may be entitled, even if they have not demanded that relief in their pleadings.

## COUNT II

### (against All Defendants)

### HOSTILE WORK ENVIROMENT - SECTION 1981

142.    Paragraphs 1 through 134 are incorporated by reference.

143.    Section 1977 of the Revised Statutes, codified as 42 U.S.C. § 1981, prohibits harassment of workers based upon race.

144.    The Defendants created a hostile work environment for African American employees of the Water Department, in violation of 42 U.S.C. § 1981.

145.    The Defendants, under color of state law, set forth policies and/or practices that create, sustain, and proliferate a hostile and abusive work environment based on race.

146.    This hostile and abusive work environment is created, perpetuated, and sustained by the Defendants acting under color of state law.

147.    This hostile and abusive work environment is widespread throughout the Water Department, is permanent and well-settled to constitute a custom or usage with the force of law.

148.    Plaintiffs and Class Members were subjected to and harmed by the systemic hostile work environment for African Americans within the Water Department.

149.    Plaintiffs and Class Members were harmed economically by the hostile work environment, by, among other things, losing wages, income, and retirement benefits.

WHEREFORE, Plaintiffs pray that the Court: certify the Class and Sub-Classes; designate Plaintiffs as Class and Sub-Class representatives and designate Plaintiffs' counsel as Class counsel; enter preliminary and permanent injunctive and other relief including, without limitation, enjoining the Defendants from creating and perpetuating a hostile and discriminatory work environment, enjoining Defendants to maintain a lawful work environment, and, if appropriate, appointing an independent and qualified Special Master or other qualified third-party to implement, supervise and train the Water Department personnel in such a manner as to eliminate employment discrimination in all its forms; award compensatory damages including without limitation lost wages, back pay, front pay, pre-and post-judgment interest, and compensation for lost benefits; award reinstatement to former employees; award the costs of this action, including the fees and costs of experts, together with reasonable attorneys' fees; and award all relief to which Plaintiffs and the Class are or may be entitled, even if they have not demanded that relief in their pleadings.

## COUNT III

**(against all Defendants)**

**DISCRIMINATION - SECTION 1983**

150.    Paragraphs 1 through 134 are incorporated by reference.

151.    The Fourteenth Amendment to the United States Constitution protects persons from being subjected to racial discrimination by persons acting under color of state law.

152.    The Defendants, under color of state law, engaged in a pattern and in practices that treated African American employees differently because of their race.

153.    The disparate treatment of African Americans is so widespread throughout the Water Department, is sufficiently permanent and well-settled to constitute a practice, custom, or usage with the force of law.

154.    Plaintiffs and Class members were subjected to and harmed by the practices and custom of systemic racial discrimination in the Water Department.

155.    Plaintiffs and Class Members were harmed economically by the race discrimination, by, among other things, losing wages, income, and retirement benefits.

WHEREFORE, Plaintiffs pray that the Court:  certify the Class and Sub-Classes; designate Plaintiffs as Class and Sub-Class representatives and designate Plaintiffs' counsel as Class counsel; enter preliminary and permanent injunctive and other relief including, without limitation, enjoining the Defendants from discriminating against African Americans, and, if appropriate, appointing an independent and qualified Special Master or other qualified third-party to implement, supervise and train the Water Department personnel in such a manner as to eliminate employment discrimination in all its forms; award compensatory damages including without limitation lost wages, back pay, front pay, pre-and post-

judgment interest, and compensation for lost benefits; award reinstatement to former employees; award the costs of this action, including the fees and costs of experts, together with reasonable attorneys' fees; and award all relief to which Plaintiffs and the Class are or may be entitled, even if they have not demanded that relief in their pleadings.

## COUNT IV

### (against all Defendants)

### DISCRMINATION - SECTION 1981

156.    Paragraphs 1 through 134 are incorporated by reference.

157.    Section 1977 of the Revised Statutes, codified as 42 U.S.C. § 1981, guarantees persons of all races the same right to make and enforce contracts regardless of race.  The term "make and enforce" contracts includes enjoyment of all benefits privileges, terms, and conditions of an employment relationship.

158.    The Defendants maintained a set of uniform discriminatory practices and engaged in a pattern or practice of systemic racial discrimination against African American employees of the Water Department in violation of 42 U.S.C. § 1981.

159.    Plaintiffs and Class members were subjected to and harmed by the practices and custom of systemic racial discrimination in the Water Department orchestrated and conducted by the Defendants.

160.    Plaintiffs and Class Members were harmed economically by the race discrimination, by, among other things, losing wages, income, and retirement benefits.

WHEREFORE, Plaintiffs pray that the Court: certify the Class and Sub-Classes; designate Plaintiffs as Class and Sub-Class representatives and designate Plaintiffs' counsel as Class counsel; enter preliminary and permanent injunctive and other relief including, without limitation, enjoining the Defendants from discriminating against African Americans, and, if appropriate, appointing an independent and qualified Special Master or other qualified third-party to implement, supervise and train the Water Department personnel in such a manner as to eliminate employment discrimination in all its forms; award compensatory damages including without limitation lost wages, back pay, front pay, pre-and post-judgment interest, and compensation for lost benefits; award reinstatement to former employees; award the costs of this action, including the fees and costs of experts, together with reasonable attorneys' fees; and award all relief to which Plaintiffs and the Class are or may be entitled, even if they have not demanded that relief in their pleadings.

## COUNT V

### (against City of Chicago)

### Illinois Civil Rights Act of 2003, 740 ILCS 23/1 *et seq.*

161. Paragraphs 1 through 134 are incorporated by reference.

162. The Illinois Civil Rights Act of 2003, Section 23/1 of the Illinois Complied Statutes 740, prohibits, among other things, racial discrimination by units of local government in Illinois.

163. The City of Chicago is a unit of local government in Illinois.

164.    Defendants excluded the Plaintiffs and the Class members from participation in, denied the Plaintiffs and the Class members benefits of, and subjected the Plaintiffs and the Class members to discrimination in their employment on the basis of their race in violation of the Illinois Civil Rights Act, 740 ILCS 23/1 *et seq.*

165.    Defendants utilized criteria and methods of administration that had the effect of subjecting Plaintiffs and the Class member to discrimination because of their race.

166.    Plaintiffs and Class Members were harmed economically by the retaliation, by, among other things, losing wages, income, and retirement benefits.

WHEREFORE, Plaintiffs pray that the Court:  certify the class; designate Plaintiffs as class representatives and designate Plaintiffs' counsel as class counsel; enter preliminary and permanent relief enjoining the discriminatory conduct, including by appointing a third-party administrator to oversee promotions, transfers, shift, and overtime assignments; award compensatory damages including lost wages, back pay, front pay, and lost benefits; award reinstatement to former employees; award the costs of this action, including the fees and costs of experts, together with reasonable attorneys' fees; and award all relief to which Plaintiffs are entitled, even if they have not demanded that relief in their pleadings.

## COUNT VI

### (against City of Chicago)

### INDEMINFICATION - 745 ILCS 10/2-302

167.    Paragraphs 1 through 166 are incorporated by reference.

168.    This action was instituted and asserts claims against current and former employees of a local public entity based on injuries allegedly arising out of acts or omissions occurring within the scope of employment of the Individual Defendants.

169.    Pursuant to Illinois law, the City of Chicago shall indemnify the employee or former employee for any judgment based on the claims asserted in this action, or for a compromise or settlement of the claims asserted in this action.

**WHEREFORE**, Plaintiffs pray that, pursuant to 745 ILCS 10/2-302, the City of Chicago indemnify and pay any judgment or settlement rendered against any of the Individual Defendants.

## **JURY DEMAND**

Plaintiffs demand a trial by jury on all issues in this action.

**DATED: November 21, 2017.**

> **PLAINTIFFS DERRICK EDMOND, KATHERINE EALY, EDDIE COOPER, JR., VICKI HILL, ROBERT T. LAWS, JR. & ANTON GLENN,**
>
> By:  Victor P. Henderson
>     One of their Attorneys

Victor P. Henderson
Christopher W. Carmichael
**HENDERSON PARKS, LLC**
140 S. Dearborn St., Suite 1020
Chicago, Illinois 60603
Tel.: (312) 262-2900
vphenderson@henderson-parks.com
ccarmichael@henderson-parks.com

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on **November 21, 2017**, the foregoing **Amended Complaint** (filed as of right pursuant to Fed. R. Civ. P. 15(a)(1)(B)) was electronically filed with the Clerk of the United States District Court for the Northern District of Illinois by filing through the CM/ECF system, which served a copy of the foregoing upon all counsel of record.

By:/s/Christopher Carmichael