# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF
## ILLINOIS EASTERN DIVISION

DERRICK EDMOND, *et al*.,       )
          )
          Plaintiffs,     )     No. 17-cv-04858
      vs.           )
          )     Judge Joan B. Gottschall
CITY OF CHICAGO, *et al*.,     )
          )     Magistrate Judge Sheila Finnegan
          Defendants.   )

## MEMORANDUM OPINION AND ORDER

The nine plaintiffs in this proposed class action are current or former employees of the City of Chicago's Department of Water Management ("the Water Department"). 2d Am. Compl. ["SAC"] ¶ 16, ECF No. 87. Each plaintiff is an African American individual. SAC ¶¶ 17–25. According to the Second Amended Complaint, the City of Chicago ("the City") acknowledged in 2017 through its mayor that "there is a deeply ingrained *culture* of racial discrimination within the Water Department." SAC ¶ 8.[1] Named as defendants are the City and the following individual defendants, all Caucasian: the City's former Water Commissioner, Barrett Murphy ("Murphy"); the Water Department's Chief Operating Engineer, Joseph Lynch ("Lynch"); and three current or former deputy water commissioners, William Bresnahan ("Bresnahan"), John Pope ("Pope"), and Alan Stark ("Stark"). SAC ¶¶ 38–42. The seven-count SAC pleads claims under 42 U.S.C. §§ 1981 and 1983 for discrimination and for creating a hostile work environment (Counts I–V); similar violations of the Illinois Human Rights Act of 2003 ("IHRA"), 740 ILCS § 23/1 et seq., ("Count VI"); and an indemnification count against

---

[1] Plaintiffs cite to the following online news articles: https://chicago.suntimes.com/chicagopolitics/emanuel-responds-to-ugly-testimony-by-water-management-employees/; http://chicago.cbslocal.com/2018/01/15/emanuel-defends-new-water-commissioneramid-racist-culture-complaints/. The hyperlinks to the news articles appear to be broken as of November 13, 2018.

the City (Count VI).

Before the court are three motions to dismiss the SAC for failure to state a claim. Murphy and Bresnahan have filed separate motions, ECF Nos. 91 and 93 respectively. The City, Pope, Stark, and Lynch (collectively "City defendants") also move to dismiss for failure to state a claim, and to strike the SAC's class allegations. ECF No. 95 at 1.

## I. Legal Standards

The pending motions challenge the SAC under Federal Rules of Civil Procedure 12(b)(6) and in part under Rule 12(f). A Rule 12(b)(6) motion tests the sufficiency of the complaint, not the merits of the case.[2] *See Christensen v. Cty. of Boone*, 483 F.3d 454, 457 (7th Cir. 2007). A Rule 12(f) motion allows a court to strike from "a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). The Rule 12(f) standard will be elaborated *infra* in the context of the motion to strike plaintiffs' class action allegations.

Under federal notice pleading standards, "a plaintiff's complaint need only provide a short and plain statement of the claim showing that the pleader is entitled to relief, sufficient to provide the defendant with fair notice of the claim and its basis." *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008); *see also* Fed. R. Civ. P. 8(a)(2).

"To survive a motion to dismiss under Rule 12(b)(6), the complaint must provide enough factual information to state a claim to relief that is plausible on its face and raise a right to relief above the speculative level." *Haywood v. Massage Envy Franchising, LLC*, 887 F.3d 329, 333 (7th Cir. 2018) (quoting *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 736 (7th Cir. 2014)). When deciding a Rule 12(b)(6) motion, the court accepts all of the complaint's factual

---

[2] Plaintiffs attach a report to their response to the instant motion. The court does not decide whether it can be considered on a Rule 12(b)(6) motion because the report does not affect the outcome here.

allegations as true, "drawing all permissible inferences in the plaintiffs' favor." *Cmty. Bank of Trenton v. Schnuck Markets, Inc.*, 887 F.3d 803, 811 (7th Cir. 2018) (citing *W. Bend Mut. Ins. Co. v. Schumacher*, 844 F.3d 670, 675 (7th Cir. 2016)).

## II. Facts and Proceedings

### A. Procedural History

A different, but partially overlapping, group of current or former Water Department employees commenced this action by filing their original complaint in July 2017. ECF No. 1. Defendants moved to dismiss the original complaint for failure to state a claim and to strike its class action allegations, *see* Mem. Supp. 1, ECF No. 25, but the then-plaintiffs exercised their right to amend the complaint once as a matter of course. *See* Fed. R. Civ. P. 15(a)(1). The filing of plaintiffs' First Amended Complaint ("FAC"), ECF No. 32, mooted the motion to dismiss the original complaint. Minute Entry, Nov. 15, 2017, ECF No. 31; Minute Order, Nov. 28, 2017, ECF No. 33 (denying motion to dismiss as moot).

Bresnahan, Murphy, and the city defendants filed separate motions to dismiss the FAC and, as for the City defendants, to strike the FAC's class allegations. ECF Nos. 63, 65, 78. Plaintiffs moved for leave to amend the FAC less than two weeks later, but they did not attach a proposed amended complaint. ECF NO. 76. The court denied their motion but granted them leave to refile it with a proposed complaint. Minute Entry, Feb. 16, 2018, ECF No. 82.

Plaintiffs supplied the court and opposing counsel with the proposed SAC, and without opposition from defendants, the court granted leave to file it in March 2018. *See* Minute Entry, Mar. 8, 2018, ECF No. 86. Making no concessions, plaintiffs represented that the amendments to the SAC "address pleading deficiencies Defendants' [sic] claim exist," Pls.' Mot. Leave to File SAC ¶ 9, ECF No. 84. Among other things, plaintiffs dropped certain individual defendants

entirely, modified their class action allegations, and altered Count V to clarify that it is pleaded in the alternative. *See id.* ¶¶ 9–17 (summarizing amendments). The pending motions to dismiss and strike followed on the heels of the SAC's filing.

### B. Background on The Water Department And City-Wide Policies

With an annual budget of over $900 million and approximately 2,104 employees, the Water Department treats and delivers potable water to homes and businesses in Chicago and 126 surrounding communities. SAC ¶¶ 46–48. The Water Department's senior management includes the Commissioner, the First Deputy Commissioner, two Managing Deputy Commissioners, and five Deputy Commissioners. SAC ¶ 29–31. The mayor appoints the Commissioner with the approval of the City Counsel, SAC ¶ 29; the Deputy Commissioners are also appointed by the mayor, SAC ¶ 32. These positions, as well as superintendent positions, "have historically principally been filled by whites and not African Americans." SAC ¶ 67.

The individual defendants were required to follow city-wide written personnel rules and the City of Chicago Hiring Plan. SAC ¶ 49, 52. The hiring plan's goal is to provide an equal employment opportunity to qualified candidates and base hiring on factors unrelated to race such as the candidate's knowledge, skills, and ability to perform the job. SAC ¶ 52. The personnel rules cover topics such as "recruitment and applications for hiring or promotion, examinations for use in hiring or promotions, promotional lists, transfers, promotions and career progressions, performance evaluations, training and career development, disciplinary action, personnel administration, and personnel records." SAC ¶ 50. Under the rules, the City has established job classifications, duties, and rates of pay. SAC ¶ 51. Finally, for covered Water Department employees, collective bargaining agreements also dictated rules that the individual defendants had to follow. SAC ¶ 49. The city's written personnel rules cover the subjects about which

plaintiffs complain, including hiring, discipline, promotion, work assignments, and the like. SAC ¶ 51.

**C. Summary of Claims**

Plaintiffs summarize their allegations this way: "Defendants have a long-standing and widespread pattern and practice of discriminating against African-Americans in their employment at the Water Department and in particular of denying African-Americans promotions, assigning African-Americans the least amount of overtime, and unfairly meting out unwarranted and excessive discipline to African-Americans." SAC ¶ 2. Plaintiffs allege that the Commissioner and Deputy Commissioners are policy makers, SAC ¶¶ 30, 32, and that all of the aspirations embodied in the city-wide policies just discussed went down the drain in the Water Department. According to the SAC, "[t]he Individual Defendants communicated and knowingly condoned a policy to all of the supervisors within the Water Department that African-Americans were to be, or could with impunity be, treated with disdain, deprived of promotions, given less overtime, and harassed." SAC ¶ 7.

Plaintiffs seek to represent a class defined in the SAC as "all African-Americans who were employed at the Water Department through the date of judgment in this action." SAC ¶ 198 (reserving right to define class differently). Plaintiffs further propose three subclasses: (1) a promotions subclass; (2) a transfer and shift subclass; and (3) an overtime subclass. SAC ¶ 198. Each subclass will consist of all African American Water Department employees who applied for the respective benefit but did not receive it. SAC ¶ 198.

Plaintiffs bring Counts I–IV against the City and the individual defendants in their official capacities. Count I is pled as a "hostile work environment" claim under the Equal Protection Clause, Due Process Clause, and § 1983. SAC at 50. Count II pleads the same theory

but under 42 U.S.C. § 1981 "via § 1983." SAC at 51. Counts III and IV follow the same pattern. Count III asserts a discrimination claim under the Fourteenth Amendment and § 1983; Count IV makes the same allegations under § 1981 "via § 1983." SAC at 53, 55. Count V is an alternative claim under § 1981 for employment discrimination brought against the individual defendants in their individual capacities. SAC at 56. Count V arises under the IHRA and names only the City as a defendant. SAC at 58. Finally, Count VI pleads an indemnity claim under Illinois law against the City. SAC at 59 (citing 745 ILCS 10/2-302).

### D. Examples of The Named Plaintiffs' Allegations

The named plaintiffs work or worked for the Water Department during the noted time periods: Derrick Edmond (1985–2017); Eddie Cooper, Jr., (1994–present); Vicki Hill (1983–2015); Robert T. Laws, Jr., (1988–present); Anton Glenn (1986–present); Veronica Smith (1988–present); Donald Anderson (1994–present); and David Henry (1999–present). SAC ¶¶ 18–25. The SAC's facts section concludes with allegations specific to each named plaintiff. *See* SAC ¶¶ 153–97. The allegations of three plaintiffs, Derrick Edmond, Eddie Cooper, Jr., and Anton Glenn, are recounted in the following paragraphs because they are fairly typical. Plaintiff Derrick Edmond alleges that he was denied promotions, denied transfers, and assigned undesirable shifts, days off, and work assignments due to his race. SAC ¶ 151. He was called "nigger" during his time at the Water Department. SAC ¶ 155. He spoke out against this treatment and was wrongfully disciplined for it, forcing him to retire early. SAC ¶ 156. Edmond applied 18 times for a position before getting it; meanwhile, the Water Department kept hiring less qualified Caucasian applicants. SAC ¶ 152. Edmond performed the duties of an assistant chief operating engineer for four years, yet when he applied for an open position with that title, less qualified white applicants were hired. SAC ¶ 153. Edmond was told he was not

qualified. SAC ¶ 154.

Plaintiff Eddie Cooper, Jr., alleges that he was denied promotions and transfers, denied overtime and "acting up" pay, and denied desirable shifts, days off, and work assignments on account of his race. SAC ¶ 163. For approximately 20 years, Cooper was eligible to be promoted to Water Chemist III, but because of his race he was never promoted, even though the position was needed and funded. SAC ¶ 164. Cooper completed the paperwork for receiving higher pay because he was performing the work of a Senior Chemist; the Water Department calls this "acting up." SAC ¶ 165. Despite his eligibility, he was denied "acting up" pay. SAC ¶ 165. When he spoke out in protest of this treatment, Cooper "was subjected to undue disciplinary hearings." SAC ¶ 166.

Plaintiff Anton Glenn alleges that he was discriminated against, that he was denied promotions and overtime, and that he was dissuaded from applying for promotions due to his raise. SAC ¶ 179. Glenn worked as a station laborer. SAC ¶ 179. Although he was qualified, his application for a position as a construction laborer was denied due to his race. SAC ¶ 180. Glenn alleges that awarding overtime to Caucasian employees while denying it to African American employees "was endorsed and encouraged by the Defendants." SAC ¶ 181.

### E. Alleged Discriminatory Practices At the Water Department

In addition to the named plaintiffs' experiences, The SAC lists several examples of discriminatory practices. For one, the Commissioners, Deputy Commissioners, and superintendents routinely referred to African American people using terms such as "shine," "nigger," "boy," "spook," "you people," and "darkie," and disciplined African American employees who took exception to the use of those terms. SAC ¶ 65.

At a meeting held at a water treatment plant, defendants Murphy and Bresnahan

discussed "niggers," but nothing was done when the incident was reported.  SAC ¶ 68.  The same two defendants also habitually excluded African American employees from meetings, refused to shake hands with, or look at, African American employees when speaking to them, and refused them offices in favor of white employees with less senior job titles.  SAC ¶¶ 69–70.

The SAC also identifies a number of other systematically discriminatory employment practices at the Water Department.  *See* SAC ¶ 78.  Senior African American employees received assignments to shut off water service (an assignment considered dangerous) in unsafe south and west side neighborhoods, causing the employees to be injured.  SAC ¶ 74.  "African-American employees injured on the job were told that they could not return to work on anything less than full-duty, while injured Caucasian employees were allowed to return to light-duty positions that were found for them."  SAC ¶ 75.  Experienced African American employees asked to train Caucasian employees routinely saw the former trainees promoted in a year or so while the trainer was passed up for promotion; the cycle repeated.  SAC ¶ 76.  Senior Water Department officials also systematically rated white interviewees higher than more experienced, African American interviewees and pretextually "lost" job applications submitted by African American applicants.  SAC ¶ 77.  "African-American employees are humiliated, harassed, and threatened daily by co-workers, supervisors, and Water Department leadership, and such conduct [is]condoned and encouraged by the Defendants . . . based on race."  SAC ¶ 137.

Also due to race, defendants discipline African American employees more harshly than white employees for comparable conduct.[3]  *See* SAC ¶¶ 127–31.  White employees are permitted to use paid leave to make up for coming to work late while African American employees are not,

---

[3] The SAC also briefly alleges that African American employees are "systematically subjected to unfair, arbitrary, and capricious discipline," fired, or constructively discharged in retaliation for speaking out about their treatment.  SAC ¶¶ 139–41.  The parties do not discuss a retaliation claim, and the SAC does not appear to plead one.

meaning they are effectively paid less than white employees. SAC ¶ 128. Plaintiffs allege that "[d]efendants use their practice of over-disciplining African-Americans as part of a practice and strategy to later deny, and justify denying, African-Americans promotions, transfers, and overtime to which they are entitled by virtue of their seniority and qualifications." SAC ¶ 131; *see also* SAC ¶ 135 (racially motivated discipline used to force the termination of African American employees).

In sum, plaintiffs allege that African American Water Department employees face a "glass ceiling" and a "glass wall" at the Water Department. SAC ¶ 78. Due to their race, their opportunities for promotions, transfers, overtime, increased compensation for "acting up" (doing work assigned to a better-compensated job title), and more desirable assignments and shifts have all been systematically curtailed in favor of less, or equally, deserving, white employees. *See* SAC ¶¶ 99–126 (providing specific examples of behavior by the individual defendants).

### F. Additional Allegations Of Hostile Work Environment

In support of their hostile work environment claims, plaintiffs describe a number of email messages exchanged by senior Water Department officials, including the individual defendants here, using their official email accounts without apparent fear of negative repercussions. *See* SAC ¶¶ 80, 81, 143. Defendant Stark for instance never disciplined white Water Department employees who forwarded cartoons with crosses and swastikas. SAC ¶ 83. Bresnahan exchanged email messages about "niggers" with former colleagues in the Chicago Police Department. SAC ¶ 84. Paul Hansen, a Water Department superintendent, shared derogatory email messages with the individual defendants and other Water Department staff. SAC ¶¶ 85, 86. One was supposedly written in "[e]bonics." *Id.* Another included a picture captioned "watermelon protection." *Id.* The picture showed a KKK scarecrow guarding a field of

watermelons.  *Id.*  In still another email message to Murphy, Hansen referred to school children in a predominately African American area as "negro midgets."  SAC ¶ 87 (quotation omitted).

The alleged examples of a hostile work environment do not stop at email messages, however.  African American Water Department employees encounter racist images, such as a hangman's noose, in Water Department bathrooms, and they regularly endure racist slurs on the job.  *See* SAC ¶¶ 89–90.  Defendant Lynch "was involved [in] attempts to physically attack" plaintiffs Cooper and Glenn, but he has not physically attacked African American employees.  SAC ¶ 95.  In a less direct vein, defendant Stark is alleged to have intentionally assigned a white subordinate known to be violent toward African American people to work near such employees and then discipline the African American employees, but not the white employee.  SAC ¶ 94.

### G. Grievances Filed With The City

Finally, plaintiffs allege that over the years African American Water Department employees filed numerous grievances with the City.  SAC ¶ 149.  Those grievances made the City aware of the treatment of African American employees in the Water Department.  SAC ¶ 149.  "The discriminatory conduct was so pervasive within the Water Department and the internal grievances so numerous, that decisionmakers within the City of Chicago were aware of the ongoing racial discrimination and hostile work environment within the Water Department."  SAC ¶ 150.

### III. Failure to State A Claim

### A.  Counts II and IV Adequately Plead Claims Arising Under 42 U.S.C. §§ 1981 And 1983

Defendants first move to dismiss Counts II and IV as improper standalone claims under 42 U.S.C. § 1981.  They also argue that § 1983's two-year statute of limitations applies to

Counts II and IV and bars plaintiffs from relying on discrete acts that occurred more than two years prior to the date on which the plaintiffs filed their original complaint.

   1.   _Counts II and IV Arise Under 42 U.S.C. §§ 1981 and 1983_

   In 42 U.S.C. § 1981, Congress provided a damages remedy for constitutional violations and violations of federal law committed by persons acting "under color of State law." Section 1981 declares that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens." 42 U.S.C. § 1981(a). Considering the interplay between these two sections, the Supreme Court held in 1989 that § 1983 "provides the exclusive federal damages remedy for the violation of the rights guaranteed by § 1981 when the claim is pressed against a state actor." *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 735 (1989). Two years later, Congress added subsection (c) to § 1981. Civil Rights Act of 1991, Pub. L. No. 102-166, 105 Stat. 1071 (Nov. 21, 1991). A portion of the language Congress added provides that the rights § 1981 guarantees "are protected against impairment by nongovernmental discrimination and impairment under color of State law." § 1981(c).

   The Seventh Circuit addressed how § 1981(c) affected *Jett's* holding in *Campbell v. Forest Preserve District of Cook County.*, 752 F.3d 665 (7th Cir. 2014). The bottom line of *Campbell* is that § 1981(c) did not alter *Jett's* holding: "We . . . hold that *Jett* remains good law, and consequently, § 1983 remains the exclusive remedy for violations of § 1981 committed by state actors." *Id.* at 671. As this language suggests, § 1981 creates substantive rights but not a private right to sue to enforce them; rather, to bring a damages claim against a state actor for violating the rights § 1981 protects, the plaintiff must proceed through § 1983. *Goldberg v. 401*

*N. Wabash Venture LLC*, 755 F.3d 456, 467 (7th Cir. 2014) (citing *Jett*, 491 U.S. at 731–32) (other citations omitted). Dismissal of a § 1981 claim therefore results if the plaintiff intends to proceed as though that section, standing alone, creates a private right to sue. *See Campbell*, 752 F.3d at 671; *Ali v. Vill. of Tinley Park*, 79 F. Supp. 3d 772, 774 (N.D. Ill. 2015) (dismissing freestanding § 1981 claim in light of *Campbell* and analyzing claims under § 1983). And if the plaintiff does not satisfy § 1983's requirements for bringing suit, a § 1981 claim must be dismissed. *See Goldberg*, 755 F.3d at 467; *Foggey v. City of Chicago*, 2018 WL 704688, at *6 (N.D. Ill. Feb. 5, 2018).

Here, Counts II and IV of the SAC expressly disavow reliance on § 1981 as creating a private right of action. The SAC characterizes Counts I and II as "hostile work environment" claims. SAC at 50, 51. The Counts differ on whether they arise under the Fourteenth Amendment or 42 U.S.C. § 1981. Plaintiffs plead Count I under the "Equal Protection Clause and Due Process Clause via § 1983," SAC 50, and Count II via § 1981 "via § 1983," SAC 51. Counts III and V follow the same pattern. Respectively, they plead "discrimination" claims under the Constitution "via § 1983" and under § 1981 "via § 1983." SAC at 53, 54. Thus, Counts II and IV arise under §§ 1981 and 1983, so *Campbell*'s holding, which governs claims that arise exclusively under § 1981, does not apply.

Moreover, district court cases in this circuit hold that a complaint need not cite § 1983 to avoid dismissal of a § 1981 claim. Rather, a claim pleaded as a § 1981 claim will ordinarily be construed as arising under § 1983. *See, e.g.*, *Aku v. Chicago Bd. of Educ.*, 290 F. Supp. 3d 852, 862 (N.D. Ill. 2018). After all, plaintiffs do not need to plead legal theories, such as section numbers, and little usually can be gained by "requiring [a plaintiff] to replead [a § 1981 claim] to specifically mention Section 1983." *Barrett v. Ill. Cmty. Coll. Dist. No. 515*, 2015 WL 4381218,

at *3 (N.D. Ill. July 16, 2015) (citing *Shah v. Inter-Cont'l Hotel Chicago Operating Corp.*, 314 F.3d 278, 282 (7th Cir. 2002)) (denying motion to dismiss § 1981 count and construing it as arising under §§ 1981 and 1983).

As these cases show, Counts II and IV of the SAC exceed the minimum required by federal notice pleading standards by mentioning §§ 1981 and 1983 expressly.  Accordingly, the motion to dismiss Counts II and IV as independent § 1981 claims is denied.  Counts II and IV remain subject to dismissal to the extent plaintiffs fail to satisfy § 1983's requirements for bringing suit against a state actor.

    *2. The Statute of Limitations*

Defendants make a statute of limitations argument under the same heading as their request to dismiss Counts II and IV.  City Defs.' Mem. 10, ECF No. 97.  They contend that the § 1983 limitations period governs plaintiffs' § 1981 claims, and they ask the court to rule that plaintiffs cannot base those claims on discriminatory acts that occurred more than two years before plaintiffs filed their original complaint.  Plaintiffs respond that a four-year limitations period applies and they have alleged a "continuing violation" of federal law.  SAC ¶ 87. What limitations period applies to plaintiffs' federal claims depends on the interplay between two statutes.  Under 42 U.S.C. § 1983, federal courts borrow the analogous state limitations period, here two years from the claim's accrual date.  *See Neita v. City of Chicago*, 830 F.3d 494, 498 (7th Cir. 2016) (citing *Savory v. Lyons*, 469 F.3d 667, 672 (7th Cir. 2006) and 735 ILCS 5/13–202) (using Illinois' two-year limitations period for general personal injury claims); *Liberty v. City of Chicago*, 860 F.3d 1017, 1019 (7th Cir. 2017) (citing *Rosado v. Gonzalez*, 832 F.3d 714, 716 (7th Cir. 2016)); *Campbell*, 752 F.3d at 667.  Congress has adopted a four-year statute of limitations for federal claims "arising under an Act of Congress enacted after" December 1,

1990. 28 U.S.C. § 1658. As already explained, the 1991 amendment to § 1981 extended the statute's reach to conduct that occurred after the formation of a contract. *See* 42 U.S.C. § 1981(b); *Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 373 (2004).

The City defendants cite a footnote to a district court opinion stating that § 1983's borrowed two-year statute of limitations governed a § 1981 claim. *See Cunliffe v. Wright,* 51 F. Supp. 3d 721, 735 n.6 (N.D. Ill. 2014*) (citing McGovern v. City of Phila.,* 554 F.3d 114, 120–21 (3d Cir. 2009); *accord Arce v. Chicago Transit Auth.*, 2015 WL 3504860, at *6 (N.D. Ill. June 2, 2015). That case turned on the question presented in *Campbell*: whether the plaintiff could bring a freestanding § 1981 claim. *See Cunliffe*, 51 F. Supp. 3d at 735. The district court answered the question in the negative, as does *Campbell*, *supra*, so the opinion's brief mention of the limitations period was not necessary to the decision.

Nor does this court find *Cunliffe* and other district court decisions applying the borrowed two-year limitations period to post-formation § 1981 claims persuasive in view of *Jones*, *supra*, the controlling Supreme Court case. The Court held in *Jones* that § 1658's four-year limitations period governs post-formation employment discrimination claims brought under § 1981 (via § 1983). *Id.* at 383; *see also Dandy v. United Parcel Serv., Inc.*, 388 F.3d 263, 269 (7th Cir. 2004). *Jones* controls here. Plaintiffs bring post-formation employment discrimination claims. Indeed, while the SAC contains some references to hiring, each named plaintiff began working at the Water Department more than four years before the original complaint was filed. *See* SAC ¶¶ 17–25. And the categories of alleged misconduct plaintiffs propose to use to define subclasses each arise after the employment relationship began. *See* SAC ¶ 197 (promotion, transfer, and ongoing compensation). A four-year limitations period therefore applies to plaintiffs' § 1981

claims pleaded in the SAC, and a two-year period governs any pre-formation § 1981 claims and all of plaintiffs' claims brought under § 1983 and the Fourteenth Amendment.

The parties also dispute the accrual dates of plaintiffs' claims. "[D]iscrete discriminatory employment actions such as termination, failure to promote, denial of a transfer, or refusal to hire are deemed to have been taken on the date they occurred, even if they form part of an ongoing practice or are connected with other acts." *Beamon v. Marshall & Ilsley Tr. Co.*, 411 F.3d 854, 860 (7th Cir. 2005). Plaintiffs claim that the continuing violations doctrine applies to their claims. The Supreme Court has held that harassment so serious and pervasive that it alters the terms and conditions of employment by creating a hostile work environment qualifies as a continuing violation. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002). As a result, "if the alleged conduct forms a single unlawful employment practice falling at least in part within the statutory period, the court may consider conduct outside the statute of limitations as part of the hostile work environment claim." *Milligan-Grimstad v. Stanley*, 877 F.3d 705, 712 (7th Cir. 2017) (citing *Morgan*, 536 U.S. at 117–19) (noting that "limitations does not bar the court from considering conduct that occurred '10, 15, or 20 years ago,' so long as it formed a single unlawful employment practice that reached into the statutory period."). The City defendants fault the SAC because plaintiffs "have failed to plead even one date of discriminatory conduct," Reply 3, ECF No. 105, making it unclear when the discrete acts of discrimination occurred and frustrating analysis of the timeliness of the hostile work environment claims.

It is true that the SAC gives no dates for the incidents of alleged discrimination, *see, e.g.*, SAC ¶ 151–57 (plaintiff Edmond), but under the governing pleading rules, plaintiffs need not plead the dates of alleged discriminatory conduct to avoid dismissal based on the statute of limitations. "A statute of limitations provides an affirmative defense, and a plaintiff is not

15

required to plead facts in the complaint to anticipate and defeat affirmative defenses." *Indep. Tr. Corp. v. Stewart Info. Serv. Corp.*, 665 F.3d 930, 935 (7th Cir. 2012). If the complaint "nonetheless sets out all of the elements of an affirmative defense," it may be dismissed. *Id.* Defendants do not argue that the SAC contains everything needed to determine that any claim is untimely. Courts have granted motions to dismiss where the complaint contained the dates needed to conclude that the claims were time barred. *See, e.g.*, *Monroe v. Columbia Coll. of Chicago*, 2018 WL 1726426, at *6 (N.D. Ill. Apr. 10, 2018); *Arce*, 2015 WL 3504860, at *7. In this case, the City defendants want plaintiffs to plead additional facts (dates) to negate the possibility that limitations bars the SAC's claims. *See* City Defs.' Reply 3. If some or all of the discrete acts about which plaintiffs complain occurred outside the limitations period, those facts should become readily apparent in discovery, but dismissal of the SAC is unwarranted here because it would saddle plaintiffs with the burden of negating an affirmative defense in their complaint. *See Sidney Hillman Health Ctr. of Rochester v. Abbott Lab., Inc.*, 782 F.3d 922, 928 (7th Cir. 2015) ("Dismissing a complaint as untimely at the pleading stage is an unusual step, since a complaint need not anticipate and overcome affirmative defenses, such as the statute of limitations.") (citation omitted). The City defendants' motion to dismiss the SAC for failing to negate their limitations defense is denied.

**B. Official Capacity Claims Are Redundant of Same Claims Against The City (Counts I–IV)**

Defendants argue that the individual defendants should be dismissed from Counts I–IV because claims against the City and city officials in their official capacities are duplicative. *See* Murphy Mot. to Dismiss 5, ECF No. 91; Bresnahan Mot. to Dismiss 13, ECF No. 93; City Defs.' Mem. Supp. Mot to Dismiss 21, ECF No. 97. Defendants are correct. Their argument applies to Counts I–IV under *Campbell* because plaintiffs' § 1981 claims against the individual defendants

in their official capacities must satisfy § 1983's requirements for bringing suit. *See Goldberg*, *supra*, 755 F.3d at 467; *Campbell*, *supra*, 752 F.3d at 671.

As previously discussed, 42 U.S.C. § 1983 allows a plaintiff to sue "[e]very person, who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. Bringing a § 1983 suit against a "government employee in his official capacity is akin to suing the entity that employs him and the standard for liability is the same." *Second Amendment Arms v. City of Chicago*, 2012 WL 4464900, at *4 (N.D. Ill. Sep. 25, 2012). Thus, "naming the official capacity defendants in addition to the [government entity], the true party in interest, is redundant and fails to state a separate claim for relief." *Id*. (citation omitted). "Naming either is sufficient. Naming both is redundant." *Id*. (citing *Harris v. Denver Health Med. Ctr.*, 2012 WL 1676590, at *7 (D. Colo. May 10, 2012)); *accord Walker v. Sheahan*, 526 F.3d 973, 977 (7th Cir. 2008).

Accordingly, the court dismisses the individual defendants from Counts I–IV, leaving the City as a defendant to those claims. The court does not reach defendant Murphy's alternative argument for dismissal of Count III and V. *See* Murphy Mot. to Dismiss 5–6.

### C. Count V: 42 U.S.C. § 1981 Claim Against Individual State Actors In Their Individual Capacities

The discussion of § 1981 to this point has concerned claims against individual state actors in their official capacities. *Campbell* makes clear those claims must proceed under § 1983 or not at all. But one way in which § 1981 differs from § 1983 is that it permits suits against private actors, for the Supreme Court "has construed the section to forbid all 'racial' discrimination in the making of private as well as public contracts." *St. Francis Coll. v. Al–Khazraji*, 481 U.S. 604, 613 (1987) (citing *Runyon v. McCrary*, 427 U.S. 160, 168 (1976)). Examples of § 1981

suits against private employers can therefore be readily found.  *See, e.g.*, *L.P. v. Marian Catholic High Sch.*, 852 F.3d 690, 695–96 (7th Cir. 2017) (analyzing § 1981 claims against private actors and applying § 1983 rules to claims against state actors in their official capacities); *Humphries v. CBOCS W., Inc.*, 474 F.3d 387, 398 (7th Cir. 2007) (holding, in suit brought against private employer, that "section 1981, as amended by the Civil Rights Act of 1991, applies to claims of retaliation"); *Daniels v. Pipefitters' Ass'n Local Union No. 597*, 945 F.2d 906, 913 (7th Cir. 1991) (discussing § 1981 claims against private actors prior to Civil Rights Act of 1991).  As an employment discrimination claim under § 1981 against City employees in their individual capacities, Count V straddles the line between §§ 1981 and 1983.

The City defendants say that they are unclear whether Count V is brought against the individual defendants in their official or individual capacities.  City Defs.' Mem. Supp. Mot. to Dismiss 22.  However, the SAC says in so many words that plaintiffs bring the 42 U.S.C. § 1981 claims in Count V "in the alternative" to Counts I–IV.  SAC at 56.  While Counts I–IV seek to impose liability on the individual defendants in their official capacities, Count V covers the possibility that they were exceeding the scope of their authority as public officials, in which case plaintiffs seek to hold them individually liable.[4]  *See* SAC ¶ 241 ("The Individual Defendants, to the extent they acted outside the scope of their authority, engaged in discrimination against African-Americans in violation of 42 U.S.C. § 1981.").  The Federal Rules of Civil Procedure condone pleading claims in the alternative.  Fed. R. Civ. P. 8(d)(2) ("A party may set out 2 or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones.").  The court therefore analyzes Count V as it has been pleaded, an

---

[4] Plaintiffs further explain in their response brief that they pleaded Count V because the City "has taken the position that Defendants were not policymakers, and publicly the City asserted that acts of discrimination were impermissible."  ECF No. 102 at 14.

alternative claim under § 1981 against the individual defendants in their individual capacities.

The City defendants and Bresnahan argue that allegations found elsewhere in the SAC sink Count V because plaintiffs unequivocally accuse them of acting in their official capacities on City time and using City resources. *See, e.g.*, SAC ¶ 37, 44–45, 81. Each claim pleaded in the alternative must separately satisfy federal pleading requirements, so the fact that Count V is pleaded in the alternative does not by itself save it from dismissal if it fails to state a plausible claim. *See* Fed. R. Civ. P. 8(a)(2); *Weddle v. Smith & Nephew, Inc.*, 2016 WL 1407634, at *4 (N.D. Ill. Apr. 11, 2016) (dismissing alternatively pleaded claim and stating "that a party may assert inconsistent claims or defenses does not license disregard of the requisite pleading standards. Inconsistency does not doom a claim, but implausibility does.") (collecting authority).

The parties cite no Seventh Circuit authority providing guidance on the circumstances in which an individual capacity § 1981 claim can be maintained against a state employee who allegedly acted outside of the scope of his or her authority. Like the Seventh Circuit in *Campbell*, the Sixth Circuit held in *McCormick v. Miami University*, 693 F.3d 654, 661 (6th Cir. 2012), that "§ 1983 is the exclusive mechanism to vindicate violations of § 1981 by an individual state actor acting in his individual capacity" (citing *Jett*, *supra*). The *McCormick* court added a caveat in a footnote. Its holding does not prevent a § 1981 suit "[i]f the defendant's alleged infringement of § 1981 is not fairly attributable to the state." *Id.* at 665 n.3. The Fifth Circuit has reached the same conclusion. *Felton v. Polles*, 315 F.3d 470, 482 (5th Cir. 2002), abrogated on other grounds by *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006).

But how should a court decide when a state employee's actions are fairly attributable to the state? The *McCormick* court did not ask whether the state actor violated some policy. Instead, it employed the § 1983 test for the presence of state action. 693 F.3d at 661 n.3. Under

this test, a state actor falls under § 1983's exclusive purview if the defendant "exercised power possessed by virtue of state law and made possible only because [he was] clothed with the authority of state law." *Id.* (citing *West v. Atkins*, 487 U.S. 42, 49 (1988)); *accord Wilson v. Price*, 624 F.3d 389, 393 (7th Cir. 2010) (quotation omitted). District courts in the Seventh Circuit have employed this test. *See, e.g., McKinney v. Office of Sheriff of Whitley Cty.*, 2018 WL 2296750, at *2 (N.D. Ind. May 21, 2018), reconsideration denied 2018 WL 3434710, *1 (July 17, 2018) ("[G]overnment employees sued in their individual capacities are state actors for purposes of Section 1981, and such claims must be brought under Section 1983."); *Omachonu v. Shields*, 2015 WL 4509146, at *5 (W.D. Wis. July 24, 2015) (dismissing all § 1983 claims against state actors); *Sams v. City of Chicago*, 2014 WL 6685809, at *6 (N.D. Ill. Nov. 25, 2014) (citing *Felton* and *Harrison v. Ill. Dep't of Transp.*, 2011 U.S. Dist. LEXIS 66145, *15 n.2 (N.D. Ill. 2011)). This court adopts the reasoning and holdings of these cases.

Applying the *West* test used in *McCormick*, the court dismisses Count V to the extent it arises solely under § 1981. No party here suggests that the individual defendants' alleged conduct was unrelated to their status as City employees. Nor do defendants argue that that § 1983's test for the presence of state action is unsatisfied. Indeed, by citing *McCormick*, the court understands the City to be conceding as much. That is, despite its firing of some of the individual defendants and the City's public statements about them, the City concedes that the SAC states a claim that the individuals who were fired were state actors for § 1983 purposes. With that understanding, the court dismisses Count V to the extent it arises solely under § 1981 because the individual defendants concededly acted "under color of state law." § 1983.

**D. The Defendants' Personal Involvement (Count V)**

As defendants recognize, Count V must also be analyzed under § 1983's framework for

imposing liability on a state actor sued in his or her individual capacity. *See Aku*, 290 F. Supp. 3d at 862. Defendants' primary argument in this regard is that the SAC fails adequately to tie any individual defendant to the alleged acts of discrimination. The parties agree that, as with a § 1983 claim, individual capacity liability under § 1981 depends on the defendant's personal involvement in the alleged wrongdoing. *See Musikiwamba v. ESSI, Inc.*, 760 F.2d 740, 753 (7th Cir. 1985); *see also Odogba v. Wis. Dept. of Justice*, 22 F. Supp. 3d 895, 909 (E.D. Wis. 2014) (citing *Hildebrandt v. Ill. Dep't of Nat. Res.*, 347 F.3d 1014, 1039 (7th Cir. 2003), for the proposition that the "personal involvement requirement applies to §§ 1981 and 1983 claims") (other citations omitted). In short, "[a]n individual cannot be held liable in a § 1983 action unless he caused or participated in an alleged constitutional deprivation . . . . A causal connection, or an affirmative link, between the misconduct complained of and the official sued is necessary." *Colbert v. City of Chicago*, 851 F.3d 649, 657 (7th Cir. 2017) (quoting *Wolf-Lillie v. Sonquist*, 699 F.2d 864, 869 (7th Cir. 1983) (alteration and emphasis omitted). To be liable under this standard, a supervisor "must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what [he] might see." *Gill v. City of Milwaukee*, 850 F.3d 335, 344 (7th Cir. 2017) (quoting *Matthews v. City of E. St. Louis*, 675 F.3d 703, 708 (7th Cir. 2012)) (alteration in original).

When applying these principles to Count V, the court finds it necessary to differentiate between the discrete acts of discrimination allegedly experienced by plaintiffs and the claim for a hostile work environment. Except for two instances, plaintiffs do not adequately allege the individual defendants' personal involvement in the discrete acts. The defendants take different positions on the hostile work environment allegations. The City defendants do not contend that their involvement in creating the hostile work environment is inadequately alleged. *See* City

Defs.' Mem. Supp. Mot. to Dismiss 22–28.  But defendants Murphy and Bresnahan challenge the sufficiency of the hostile work environment claim and their involvement in creating it.  *See* Murphy Mot. to Dismiss 9; Bresnahan Mot. to Dismiss 6–8.

### 1. *Discrete Acts of Discrimination*

With two exceptions, the SAC does not adequately allege the individual defendants' personal involvement in any of the specific allegedly discriminatory actions taken towards the named plaintiffs.  Plaintiffs cite *Smith v. Rowe*, 761 F.2d 360, 369 (7th Cir. 1985), where the defendant sheriff could be held liable based on a letter he wrote showing that he had an "intimate knowledge" of his subordinates' unlawful activities (serving stale warrants) and that he ratified them.  They also rely on a case in which the complaint specifically alleged that the defendant supervisor "participated in the decisions to discipline" the plaintiff.  *McQueen v. City of Chicago*, 803 F. Supp. 2d 892, 901 (N.D. Ill. 2011).

The SAC includes no allegations giving rise to a plausible inference of similarly detailed knowledge of, or specific involvement in, the particular instances of discrimination visited upon the plaintiffs.  Indeed, the SAC does not mention the individual defendants when it recites the denials of promotions, transfers, overtime, "acting up" pay, and other discrete acts of alleged discrimination experienced by the named plaintiffs.  *See* SAC ¶ 151–97.

Plaintiffs point to an allegation that "promotions, changes in shifts, days off, or work location must be sought from or approved by the Commissioners, Individual Defendants, and other supervising policymakers, Defendants are able to, and continue to, implement a practice of racial discrimination against African-Americans"  and at allegations that the individual defendants exercised their authorized to disadvantage African American Water Department employees.  SAC ¶ 117.  Not only does this allegation fail to differentiate between the named

individual defendants and the "other" individuals with supervisory powers, it also seeks to impose liability for specific acts of discrimination solely because the individual defendants had supervisory authority. Plaintiffs need not plead all the evidence they will use to prove their case, but they must plausibly allege the supervisors' "knowledge of the *specific conduct* challenged and acquiescence." *Lessley v. City of Madison*, 654 F. Supp. 2d 877, 895 (S.D. Ind. 2009) (citing *Lanigan v. Vill. of E. Hazel Crest*, 110 F.3d 467, 478 (7th Cir. 1997)) (emphasis added); *accord Gill*, 850 F.3d at 344 (supervisor must "know about" the subordinate's conduct); *Burks v. Raemisch*, 555 F.3d 592, 593–94 (7th Cir. 2009). Consistent with the parties' briefing, the SAC pleads that the "culture of racism" defendants fostered allowed the discrete acts of discrimination to occur. SAC ¶ 79. But, with a pair of exceptions, the SAC stops short of plausibly alleging that the individual defendants knew of that specific conduct and acquiesced in it.[5]

The court has found two exceptions in the SAC personally implicating some individual defendants in denying an individual plaintiff a promotion. *See McQueen*, 803 F. Supp. 2d at 901. Defendants Bresnahan and Hansen allegedly interviewed plaintiff Anderson for a position he was denied on account of his race. *See* SAC ¶ 189. Plaintiff Edmond also alleges that he applied for a position as an Operating Engineer, for which he was qualified, but "[d]efendants told Edmond he was not qualified and hired Caucasians with less experience for the position." SAC ¶ 153.

With the exception of those two incidents discussed in the previous paragraph, the claims pleaded in Count V based on discrete acts of discrimination, such as failure to promote, denial of

---

[5] In similar fashion, the SAC repeatedly alleges the conclusion that the individual defendants "endorsed and encouraged" general discriminatory practices such as denying overtime to African American employees and awarding it to Caucasian employees. SAC ¶¶ 157, 162, 167, 173, 178, 181, 183, 187, 192, 195. This conclusion must be disregarded as too conclusory. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 ("bare assertions" in a complaint amounting to "formulaic recitations of the elements of a constitutional discrimination claim" must be disregarded (quotation omitted)).

overtime, denial of transfers, denial of favorable work assignments, and denial of "acting up" pay, are dismissed.

## 2. *Hostile Work Environment Adequately Pleaded*

To state a discrimination claim based on a hostile work environment, the plaintiff must allege:

> (1) [S]he was subject to unwelcome harassment; (2) the harassment was based on her [race,] national origin[,] or . . . another [forbidden] reason; (3) the harassment was severe or pervasive so as to alter the conditions of employment and create a hostile or abusive working environment; and (4) there is basis for employer liability.

*Huri v. Office of the Chief Judge of the Circuit Court of Cook Cty.*, 804 F.3d 826, 834 (7th Cir. 2015) (citing *Cooper–Schut v. Visteon Auto. Sys.*, 361 F.3d 421, 426 (7th Cir. 2004)) (Title VII and § 1983 claims); *see also Smith v. Chicago Transit Auth.*, 806 F.3d 900, 904 (7th Cir. 2015) ("The legal analysis for discrimination claims under Title VII and § 1981 is identical[.]").  The Seventh Circuit recently affirmed that current federal pleading standards requires a plaintiff alleging a hostile work environment claim, as well as other discrimination claims, to include "the type of discrimination" the plaintiff thought occurred, "by whom, and when." *Huri*, 804 F.3d at 833 (quoting *Swanson v. Citibank, N.A.*, 614 F.3d 400, 405 (7th Cir. 2010)) (alteration omitted).

Like the complaint held to be sufficient in *Huri*, the SAC here "describe[s] events that *could* have happened and which discovery can be reasonably expected to reveal." 804 F.3d at 834 (citing *Swanson*, 614 F.3d at 404) (emphasis in original).  The SAC lists numerous examples of racist statements made by defendants, email messages they forwarded, and racist policies and practices they allegedly furthered in the Water Department. *See, e.g.*, SAC ¶¶ 67–78, 82–101, 110–32.  They answer the what (race discrimination), whom, and when questions. *See Huri*, 804 F.3d at 834.  The SAC therefore gives fair notice of plaintiffs' hostile environment claim.

The individual defendants nevertheless argue that plaintiffs have not adequately alleged that they were personally involved in each incident of alleged discrimination or that a sufficiently severe and pervasive environment existed. When evaluating a hostile work environment claim, the court reviews "the totality of the circumstances, including: the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Alamo v. Bliss*, 864 F.3d 541, 549–50 (7th Cir. 2017) (citation and internal quotation marks omitted); *see also Boss v. Castro*, 816 F.3d 910, 917–18 (7th Cir. 2016). A complaint is not well-suited to this inquiry. *See Huri*, 804 F.3d at 834 ("[I]t is premature at the pleadings stage to conclude just how abusive Huri's work environment was.").

The cases cited by the individual defendants demonstrate the advisability of this approach. As plaintiffs point out, the Seventh Circuit has treated a supervisor's use of racial epithets, such as "nigger," directed at an employee as nearly per se hostile. *See, e.g.*, *Hrobowski v. Worthington Steel Co.*, 358 F.3d 473, 477 (7th Cir. 2004). Murphy and Bresnahan cite *Smith v. Northeastern Illinois University*, 388 F.3d 559, 566 (7th Cir. 2004), which affirmed the dismissal of a hostile work environment claim at summary judgment. The record in *Smith* showed that the plaintiff overheard the use of just one racial epithet and heard second-hand reports of additional uses. *Id.* The court of appeals reasoned that "[w]hile certainly relevant to the determination of a hostile work environment claim, when harassment is 'directed at someone other than the plaintiff, the 'impact of [such] 'second-hand harassment' is obviously not as great as the impact of harassment directed at the plaintiff." (citations omitted). *Id.* Nonetheless, the opinion's very next sentence reads (and neither individual defendant mentions this), "We do not mean to hold that a plaintiff can never demonstrate a hostile work environment through second-

hand comments or in situations where a plaintiff is not the intended target of the statements." *Id.*

So defendants' arguments that the SAC fails to allege that the plaintiffs were targeted by the

emails and statements described in the SAC or that they knew about the emails and other alleged

bad behavior of the individual defendants "is certainly relevant" but not dispositive, even at

summary judgment. *Id. Pierce v. Ill. Department of Human Services*, 55 F. App'x 28, 31–32

(7th Cir. 2009) (unpublished), also a summary judgment case, turned on the facts that two

isolated incidents of coworker harassment four years before the plaintiff filed suit were not

sufficiently pervasive to support a hostile environment claim. Even so, the *Pierce* court

distinguished another case's denial of summary judgment in part because the people who used

racial epithets supervised the employee. *See id.* at 31 (distinguishing *Cerros v. Steel Tech., Inc.*,

398 F.3d 944 (7th Cir. 2005)).

 As should be clear from this tangle of fact-intensive distinctions, defendants' invocation

of summary judgment cases turning on details such as whether a coworker or supervisor harassed

the plaintiff, how many times, and under what circumstances, *Williams v. Waste Management of

Illinois*, 361 F.3d 1021, 1029 (7th Cir. 2004), is misplaced and entirely unhelpful. Once the

simple requirements of *Swanson* have been pleaded, discovery is the place to build the fact-

specific record on how alleged statements and actions affected the working environment

plaintiffs experienced. *See Huri*, 804 F.3d at 834; *March v. Crisham & Kubes, Ltd.*, 2006 WL

1005110, at *2–3 (N.D. Ill. Apr. 17, 2006). The motions to dismiss Count V's hostile

environment claims are denied.

### E. The City's Liability Under *Monell* (Counts I–IV)

 Having dealt with the individual defendants' personal involvement, the court next turns

to the City's challenge to the SAC's §§ 1981 and 1983 counts. In *Monell v. Department of*

*Social Services of City of New York*, 436 U.S. 658, 691–95 (1978), the Supreme Court held that municipalities can be liable for damages under 42 U.S.C. § 1983 caused by constitutional violations but not under the doctrine of respondeat superior theory: *i.e.,* that the person who committed the violation was acting in the course and scope of employment. "Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id.* at 694. Official municipal policy "includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Connick v. Thompson*, 563 U.S. 51 (2011) (citing *Monell*, 436 U.S. at 691) (other citation omitted). The custom or policy must also be "the moving force behind" the constitutional violation. *Colbert,* 851 F.3d at 660 (quoting *Estate of Sims ex rel. Sims v. Cty. of Bureau,* 506 F.3d 509, 514 (7th Cir. 2007)).

   *1. Widespread Custom or Practice*

   Relying principally on *McCauley v. City of Chicago,* 671 F.3d 611, 615 (7th Cir. 2011)*,* the City urges the court to disregard most of the allegations of widespread practices in the SAC as boilerplate legal conclusions masquerading as facts. They cite paragraphs under Counts I and III of the SAC. Paragraph 214, for instance, reads: "This hostile and abusive work environment is widespread throughout the Water Department, is permanent and well-settled [so as] to constitute a custom or usage with the force of law." This allegation and others like it must be disregarded when searching for a plausible claim, just as the allegations that a municipality "has an unwritten custom, practice and policy to afford lesser protection or none at all to victims of domestic violence" and that "[t]here is no rational basis" for this purported policy was

disregarded in *McCauley*, 671 F.3d at 617. The SAC contains several more isolated paragraphs that identify the custom or practice in conclusory terms. *See* SAC ¶¶ 7, 65, 98, 99, 103.

Shorn of its boilerplate allegations, the SAC still contains enough well-pleaded facts to survive a rule 12(b)(6) motion. *Cf. McCauley*, 617 F.3d at 617–18 (finding only one paragraph of the complaint was left after boilerplate was disregarded). Where the inference that a practice is widespread is plausible, the plaintiff need not identify anyone else affected by it in the complaint. *See White v. City of Chicago,* 829 F.3d 837, 844 (7th Cir. 2016) (citing *Jackson v. Marion Cty.*, 66 F.3d 151, 152–53 (7th Cir. 1995)) (plausible inference of widespread custom or practice from one incident and contents of preprinted form).

Plaintiffs here allege that the City's mayor has acknowledged that "a deeply engrained culture of racism" existed in the Water Department. SAC ¶ 8 (citing newspaper article). That is no threadbare allegation; it permits a favorable inference for plaintiffs that if the mayor knows this, final policymakers may as well. *See Chicago Joe's Tea Room, LLC v. Vill. of Broadview*, 2008 WL 4287002, at *11 (N.D. Ill. Sept. 11, 2008). "If the same problem has arisen many times and the municipality has acquiesced in the outcome, it is possible (though not necessary) to infer there is a policy at work." *Lewis v. City of Chicago*, 496 F.3d 645, 656 (7th Cir. 2007). Each named plaintiff has alleged specific experiences consistent with the mayor's description of the Water Department, *see* SAC ¶¶ 151–97, and the SAC includes well-pleaded allegations that the named plaintiffs were subjected to racial epithets and regularly encountered hangman's nooses and other badges of racism in Water Department facilities, *e.g.*, SAC ¶¶ 89, 177. Additionally, though the City would have the court disregard them, it is reasonable to infer that the general descriptions of systematic denials of overtime, promotions, and desirable schedules result from the plaintiffs' observations in their many years at the Water Department. *See* SAC ¶¶

17–25.  Seen cumulatively and with inferences favorable to plaintiffs (as must be the case at the current procedural stage), these allegations "weave together into a cognizable [government] policy." *Valentino v. Vill. of S. Chicago Heights*, 575 F.3d 664, 675 (7th Cir. 2009) (quoting *Phelan v. Cook Cty.*, 463 F.3d 773, 789 (7th Cir. 2006)).  Add to all of this the allegations that, with favorable inferences, the City received numerous grievances of these matters, SAC ¶¶ 149–50, and a plausible inference can be drawn that City policymakers knew of the widespread practices in the Water Department and acquiesced in them until 2017.

The City's motion to dismiss plaintiffs' *Monell* claims against the City is therefore denied.  The court need not reach the parties' alternative dispute over whether the individual defendants are final policymakers under state law.

### F.  Illinois Human Rights Act Claim Against the City (Count VI)

The City argues that the IHRA claim pleaded in Count VI rises and falls with the §§ 1981 and 1983 claims against the City.  To quote the City's preferred case, the IHRA "was not intended to create new rights but merely created a new venue—state court—for discrimination claims under federal law." *Dunnet Bay Constr. Co. v. Borggren*, 799 F.3d 676, 697 (7th Cir. 2015).  Plaintiffs disagree.  They contend that the IHRA does not require a *Monell* finding to impose liability on the City.  *See* Pls.' Resp. 22–23, ECF No. 102.  The court need not resolve this dispute because even if the City is right, the motion to dismiss Count VI would be denied because plaintiffs state plausible *Monell* claims.  The court therefore denies defendants' motion to dismiss Count VI.

### V. Motion to Strike Class Action Allegations

Rule 12(f) motions to strike material from a complaint are ordinarily disfavored, but they can be helpful in "remov[ing] unnecessary clutter from the case." *Heller Fin., Inc. v. Midwhey*

*Powder Co.*, 883 F.2d 1286, 1294 (7th Cir. 1989). Where, as here, a party moves to strike class allegations, "[c]ourts in this [d]istrict . . . evaluate motions to strike class allegations under Rule 23, not Rule 12(f)." *Buonomo v. Optimum Outcomes, Inc.*, 301 F.R.D. 292, 294 (N.D. Ill. 2014) (collecting authority). If class discovery is needed, a motion to strike should ordinarily be denied, but "when the defendant advances a legal argument based on the pleadings, discovery is not necessary for the court to evaluate whether a class action may be maintained." *Wright v. Family Dollar, Inc.*, 2010 WL 4962838, at *1 (N.D. Ill. Nov. 30, 2010). Rule 23 itself directs the court to decide certification questions "[a]t an early practicable time." Fed. R. Civ. P. 23(c)(1)(A) (collecting authority).

Defendants (all except Bresnahan) challenge plaintiffs' ability to satisfy nearly every aspect of Rule 23—numerosity, typicality, commonality, and adequacy of representation under Rule 23(a) and any of the three means of certifying a class under Rule 23(b). All of these arguments depend ultimately on defendants' assertions that insufficient common questions exist and employee-specific questions will swamp any common questions satisfying Rule 23.[6] Defendants point to the differences among the nine plaintiffs' job titles and the varieties of alleged discrimination they experienced. *See* City Defs.' Mem. 32. They submit that the approximately 2,000 Water Department employees have 159 job titles. *Id.* at 29. Defendants claim that these differences and differences among employees relating to the identity of supervisors, working conditions, collective bargaining agreements, and more will make it impossible for plaintiffs to certify a class.

That is quite a conclusion to reach about a department of over 2,000 employees based on

---

[6] Regarding numerosity, defendants acknowledge that the SAC alleges that the class has more than 500 members, but they nevertheless maintain that plaintiffs will be unable to show that "the other 500 African-American employees were subjected to a common (and still unidentified) policy of race discrimination that satisfies Rule 23(a)'s numerosity requirement." City Defs.' Mem. 36.

a count of job titles and generalizations about differences among them, especially over plaintiffs' vociferous requests for an opportunity to conduct discovery. Plaintiffs cite cases certifying classes of employees despite potential differences in shifts, supervisors, and the like. *See Smith v. Nike Retail Serv.*, 234 F.R.D. 648, 660 (N.D. Ill. 2006) (concluding that class had a "common essential claim that a hostile work environment, manifested in a variety of ways, existed at Nike"); *Wilfong v. Rent-A-Center, Inc.*, 2001 WL 1795093, at \*2 (S.D. Ill. Dec. 27, 2001); *Adams v. R.R. Donnelley & Sons*, 2001 WL 336830, at \*13 (N.D. Ill. Apr. 6, 2001). The Seventh Circuit recently reversed an order denying class certification, explaining that "the Supreme Court's *Wal–Mart* decision and ours in *McReynolds* and *Bolden* together demonstrate that a company-wide practice is appropriate for class challenge even where some decisions in the chain of acts challenged as discriminatory can be exercised by local managers with discretion— at least where the class at issue is affected in a common manner, such as where there is a uniform policy or process applied to all." *Chicago Teachers Union v. Bd. of Educ. of Chicago*, 797 F.3d 426, 438 (7th Cir. 2015). Determining whether the common policy affects discretion in a sufficiently uniform way often involves a fact-intensive inquiry. *See id.* at 437–38 (*comparing McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 672 F.3d 482 (7th Cir. 2012), in which a uniform practice influenced discretion in individual employees' cases, *with Bolden v. Walsh Constr. Co.*, 688 F.3d 893 (7th Cir. 2012), reaching the opposite conclusion).

The court intimates nothing about how these cases would affect the certification analysis here because it lacks the factual record needed to make that determination. Plaintiffs have identified the alleged common policy, but the uniformity and scope of its influence is unknown and, given the size of the Water Department, likely cannot be known without some discovery. As defendants repeatedly argue, the answer will inform not just commonality and predominance,

if plaintiffs seek to certify a Rule 23(b)(3) class, but also typicality and even numerosity. Indeed, identifying a common policy, if any, may well inform the class definitions, for plaintiffs say they need discovery to determine whether the subclasses proposed in the SAC are supportable.

The court is mindful that it "may abuse its discretion by not allowing for appropriate discovery before deciding whether to certify a class." *Damasco v. Clearwire Corp.*, 662 F.3d 891, 897 (7th Cir. 2011) (citations omitted), *overruled in part on other grounds by Chapman v. First Index, Inc.*, 796 F.3d 783 (7th Cir. 2015). Here, plaintiffs must have the opportunity they request to conduct class discovery before the court can rule on the Rule 23 questions defendants raise. *See Salam v. Lifewatch, Inc.*, 2014 WL 4960947, at *2 (N.D. Ill. Sept. 22, 2014). Accordingly, the motions to strike the SAC's class action allegations are denied.

## V. Conclusion

For the reasons stated, the court grants in part and denies in part defendants' motions to dismiss and to strike, ECF Nos. 91, 93, and 95. The individual defendants are dismissed from Counts I–IV, and Count V is dismissed insofar as it pleads a claim arising exclusively under 42 U.S.C. § 1981. The alternative claim pleaded in Count V against the individual defendants in their individual capacities is dismissed in part. The claim is dismissed to the extent it is predicated on the discrete acts of discrimination claimed by plaintiffs, except the two acts identified herein. The motions to strike class allegations are denied, and all other relief requested is denied.


Date: November 15, 2018                    _____/s/_____
                                           Joan B. Gottschall
                                           United States District Judge