## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

DERRICK EDMOND, KATHERINE
EALY, EDDIE COOPER, JR., VICKI
HILL, ROBERT T. LAWS, JR., ANTON
GLENN, VERONICA SMITH, DONALD
ANDERSON, and DAVID HENRY
individually and on behalf of all others
similarly-situated,

                    Plaintiffs,

    v.

THE CITY OF CHICAGO,

              Defendant.

No.  17 CV 4858

CLASS ACTION

Jury Trial Demanded

## THIRD AMENDED COMPLAINT

Plaintiffs, DERRICK EDMOND, KATHERINE EALY, EDDIE COOPER, JR.,

VICKI HILL, ROBERT T. LAWS, JR., ANTON GLENN, VERONICA SMITH,

DONALD ANDERSON, and DAVID HENRY, individually and on behalf of all

others similarly-situated, complain against Defendant THE CITY OF CHICAGO

and allege as follows:[1]

---

[1] Through this amendment, Plaintiffs intend that the former individual Defendants identified in the Second Amended Complaint (specifically, BARRETT MURPHY, former Commissioner of the Department of Water Management; WILLIAM BRESNAHAN, former Managing Deputy Commissioner of the Department of Water Management; JOHN POPE, Deputy Commissioner of the Department of Water Management; ALAN STARK, Deputy Commissioner of the Department of Water Management; and JOSEPH LYNCH, Chief Operating Engineer of the Department of Water Management) be dismissed without prejudice.

## NATURE OF THE ACTION

1.     This is an action brought under 42 U.S.C. §§ 1981(a) and 1983, and the Illinois Civil Rights Act of 2003, 740 ILCS 23/1, *et seq.* to remedy acts of race discrimination against African-Americans working for the City of Chicago Department of Water Management ("Water Department").

2.     Defendant has a long-standing and widespread pattern and practice of discriminating against African-Americans in their employment at the Water Department and in particular of denying African-Americans promotions, assigning African-Americans the least amount of overtime, and unfairly meting out unwarranted and excessive discipline to African-Americans.

3.     This pattern and practice of racial discrimination, as more particularly described below, is so prevalent, permanent and well-settled as to constitute an actionable "custom or usage."

4.     Defendant engaged in deliberate and unlawful policies, patterns, and employment practices to create and proliferate an objectively hostile and abusive work environment throughout the Water Department based on race.

5.     The environment at the Water Department is known to be, and is reasonably perceived as, hostile by workers.  It includes racially derogatory and unwelcome remarks and epithets, encouragement and toleration of same, violence, intimidation, retaliation, and constructive discharge against the Plaintiffs and the Class, and manifests itself in countless other ways, making the Water Department

an unpleasant, difficult place to work, one plagued with omnipresent obstacles to African-Americans performing, succeeding and advancing in their work.

6.     The racial discrimination within the Water Department may be described as systematic and emanating from the highest levels – from those persons with supervisory and final policymaking authority within the Water Department.

7.     The Water Department's Caucasian leadership, including but not limited to Barrett Murphy, former Commissioner of the Department of Water Management ("Murphy"), William Bresnahan, former Managing Deputy Commissioner of the Department of Water Management ("Bresnahan"), and Alan Stark, Deputy Commissioner of the Department of Water Management ("Stark"), communicated and knowingly condoned a policy to all of the supervisors within the Water Department that African-Americans were to be, or could with impunity be, treated with disdain, deprived of promotions, given less overtime, and harassed.

8.     In late 2017, the City of Chicago, through the Mayor, publicly acknowledged that there is a deeply ingrained *culture* of racial discrimination within the Water Department: https://chicago.suntimes.com/chicago-politics/emanuel-responds-to-ugly-testimony-by-water-management-employees/; http://chicago.cbslocal.com/2018/01/15/emanuel-defends-new-water-commissioner-amid-racist-culture-complaints/.

9.     While the City of Chicago purported to terminate some of the personnel involved in discriminatory behavior, including Murphy and Bresnahan, as well as Jennifer Izban, Paul Hansen, Irene Caminer, and Luci Pope Anderson,

(https://chicago.suntimes.com/politics/city-hall-shuffle-budget-director-leaves-ig-stays/), in reality the City allowed the personnel to retire with full benefits or resign.

10.     Actual terminations would have resulted in the former employees having decreased benefits and/or ineligibility for further City-related employment.

11.     Several of the retired or resigned employees involved in the discriminatory behavior, such as Luci Pope Anderson, were promptly hired by contractors doing work with the City.

12.     This refusal to take action against those who engaged in discrimination was known by employees at the Water Department and reaffirmed that the discrimination practiced against African-American employees by the Defendant was condoned and would continue.

## JURISDICTION AND VENUE

13.     Jurisdiction is proper pursuant to 28 U.S.C. § 1343(a)(3) & (4), which confers original jurisdiction in a civil action to redress the deprivation of any right, privilege, or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States under color of any State law, statute, ordinance, regulation, custom, or usage, and to recover damages or to secure equitable or other relief under any Act of Congress providing for the protection of civil rights.

14.     Jurisdiction is also proper pursuant to 28 U.S.C. § 1331, which confers original jurisdiction in a civil action arising under the Constitution or laws of the

United States, and under 28 U.S.C. § 1367, which confers supplemental jurisdiction over the state law claims.

15.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and 1391(c), because the Defendant resides within this District, and because the events or omissions giving rise to the claims alleged herein occurred and continue to occur within this District.

## PARTIES

16.     The plaintiffs are current or former employees of the City of Chicago.

17.     Derrick Edmond is African-American and was employed by the City of Chicago, Department of Water Management from 1985 until 2017.

18.     Katherine Ealey is African-American and was employed by the City of Chicago, Department of Water Management starting in 1999.

19.     Eddie Cooper Jr., is African-American has been employed by the City of Chicago, Department of Water Management since 1994.

20.     Vicki Hill is African-American and was employed by the City of Chicago, Department of Water Management from 1983 until 2015.

21.     Robert T. Laws, Jr. is African-American and has been employed by the City of Chicago, Department of Water Management since 1988.

22.     Anton Glenn is African-American and was employed by the City of Chicago, Department of Water Management starting in 1986.

23.     Veronica Smith is African-American and has been employed by the City of Chicago Department of Water Management since 1988.

24. Donald Anderson is African-American and has been employed by the City of Chicago Department of Water Management since 1994.

25. David Henry is African-American and has been employed by the City of Chicago Department of Water Management since 1999.

26. Plaintiffs and Class members are members of a protected class.

27. The City of Chicago is a municipal corporation organized under the laws of the State of Illinois.

28. The Chicago Department of Water Management is a component of the City government.

29. The Water Department operates under the direction of a Commissioner who is appointed by the Mayor and approved by the City Council.

30. The Commissioner serves at the pleasure and direction of the Mayor, and sets policy and directs the culture of the Water Department in consultation with the Mayor and other policymakers within the City government.

31. The Commissioner is assisted by the First Deputy Commissioner, two Managing Deputy Commissioners, and five Deputy Commissioners.

32. The Deputy Commissioners are selected by the Mayor and possess and exercise policymaking authority.

33. Each Deputy Commissioner is charged with overseeing a Bureau, and the Divisions that comprise that Bureau.

34.     The Commissioner along with the First Deputy and Deputy Commissioners have ultimate authority over promotions, transfers, discipline, and terminations within the Water Department.

35.     Under the direction and supervision of the Commissioner, the Deputy Commissioners exercise daily management and policymaking authority over the employees within the Water Department and over the terms and conditions of work at issue in this lawsuit, including the conduct and behavior of workers in the workplace and the standards for ensuring the harmonious, peaceful and orderly conduct of the Water Department's business, and workers' safety and productivity while at work, and issuing and approving discipline, determining work schedules and work locations, approving or denying transfers, determining the distribution of overtime, and deciding promotions.

36.     The policies and practices of the Water Department described herein were directed, approved, supervised, and implemented by the Commissioner, Deputy Commissioners, and other Water Department policymakers.

37.     Each act or omission alleged herein was done under color of authority and color of law vested in the City of Chicago as a municipal corporation within the State of Illinois.

38.     Barrett Murphy, who is Caucasian, was the Commissioner of the Department of Water Management.  Murphy is married to Lynn Lockwood, chairperson and treasurer of one of former Mayor Rahm Emanuel's political funds. Murphy attained or maintained the position of Commissioner through his

connections with Emanuel, and believed himself to therefore be immune from criticism or repercussions flowing from his treatment of African-Americans within the Water Department.

39. William Bresnahan, who is Caucasian, was the Managing Deputy Commissioner of the Department of Water Management. Bresnahan was a Chicago Police Officer with no experience in the provision of water or sewer services at the time he was named to this position. Bresnahan harbored racist views of African-Americans from his time as a Chicago police officer and carried those views with him into his role at the Water Department.

40. John Pope, who is Caucasian, was and is a Deputy Commissioner of the Department of Water Management. Pope was the alderman of the 10th Ward and a political ally of Emanuel. After Pope lost a bid for reelection, he was hired into the Water Department. Pope also had no prior experience in the provision of municipal water or sewer services.

41. Alan Stark, who is Caucasian, was a Deputy Commissioner of the Department of Water Management.

42. Joseph Lynch, who is Caucasian, was the Chief Operating Engineer of the Department of Water Management.

43. [INTENTIONALLY OMITTED]

44. Murphy, Bresnahan, Pope, Stark and Lynch are or were at relevant times employees of the City of Chicago and acted or purported to act under color of law.

- 8 -

45.     The actions of Murphy, Bresnahan, Pope, Stark and Lynch were within the scope of their employment and within the scope of their authority as managers and policymakers overseeing the operations of the Water Department.

## FACTS

46.     The primary function of the Water Department is the purification and transmission of potable water to the homes and business within Chicago and 126 suburban communities.

47.     The Water Department employs approximately 2,100 full-time personnel and has an annual operating budget in excess of $900,000,000.

48.     The Water Department is one of the few departments of the City of Chicago that generates revenue.  The Water Departments charges the residents of the City for water and sewer service, and charges other municipalities for water provided to them.

49.     However, like most departments within the City of Chicago, the Water Department and its management should operate pursuant to certain City-wide policies, including the Personnel Rules and Hiring Plan.  Like most other departments in the City, the Water Department also employs individuals subject to collective bargaining agreements.

50.     The City has maintained Personnel Rules since at least 2003.  The City's Personnel Rules provide written guidance to Water Department policymakers on topics including recruitment and applications for hiring or promotion, examinations for use in hiring or promotions, promotional lists, transfers,

promotions and career progressions, performance evaluations, training and career development, disciplinary action, personnel administration, and personnel records.

51. Pursuant to the Personnel Rules, the City of Chicago also maintains a Classification and Pay Plan that establishes jobs and job titles, duties of specific jobs, and rates of pay for specific jobs.

52. Since at least 2007, the entire Water Department has been subject to the City of Chicago Hiring Plan ("Hiring Plan"), which was amended in 2011. The goals of the Hiring Plan are to base employee selection on neutral and non-discriminatory factors such as a candidate's knowledge, skills and ability to perform effectively on the job, to provide equal employment opportunity to all qualified applicants without regard for race, and to create a transparent hiring system that is intended to yield uniformity in employment decisions.

53. The Hiring Plan also establishes guidelines for assignments, transfers, promotions and career progressions, line of duty preference, duty disability, demotions and terminations. Pursuant to the Hiring Plan, the City must adhere to the goals in filling positions pursuant to these other employment actions identified in the Hiring Plan (*e.g.*, transfers, layoffs, *etc.*).

54. All bureaus and sub-divisions within the Water Department are required to comply with the City's Hiring Plan, the Personnel Rules, the Classification and Pay Plan for positions established by the Personnel Rules, applicable collective bargaining agreements and other City-wide policies.

55.     The Water Department has a centralized administration that, subject to the Personnel Rules, Hiring Plan, Classification and Pay Plan, determines departmental policy for promotions, transfers, discipline, and work assignments. All bureaus and sub-divisions within the Water Department work with the City's Department of Human Resources ("DHR") in connection with making and implementing these policies, all of which must comply with City-wide policies such as the Hiring Plan, the Personnel Rules, and the Classification and Pay Plan.

56.     Pursuant to the Personnel Rules, department heads have specific powers and responsibilities, including the ability to delegate certain responsibilities to supervisors. Pursuant to Personnel Rule XXI (21), department heads' principal responsibilities include: (a) designating key employees to be responsible in assisting in managing personnel matters of the department, including grievances, review of disciplinary actions, equal employment opportunity and employee training; (b) developing and administering departmental work rules; (c) initiation of personnel actions for employees related to employment, salary adjustments, promotions, discipline and related personnel transactions; (d) assigning and supervising work of employees; (e) evaluating performance of employees; (f) developing and implementing training programs and other programs to improve work effectiveness; (g) cooperating with the Department of Human Resources; and (h) maintaining departmental personnel records.

57.     Many employees in the Water Department are in positions covered by collective bargaining agreements, including collective bargaining agreements

negotiated by AFSCME Counsel 31, Operating Engineers Local 399, Machinists Local 126, Laborers Locals 1001, 1092 and 76, Teamsters Local 726 and SEIU Local 73 ("Water Department Unions").

58.     Collective bargaining agreements negotiated between the City and Water Department Unions contain provisions acknowledging certain rights, powers and responsibilities of the Water Department, including the right to schedule, assign and direct work, to hire or promote employees, and to make rules and discipline employees for violating those rules ("management rights").  Written policies, including the Personnel Rules, the Hiring Plan, and the Classification and Pay Plan, provide guidance on how Water Department policymakers should exercise those management rights.

59.     The collective bargaining agreements with the Water Department Unions contain provisions regarding assignment of overtime that require that overtime be assigned to collective bargaining unit members performing the job and, thereafter based on seniority to employees in the classification at the work location.

60.     The collective bargaining agreements contain provisions regarding discipline specifying the Water Department has discretion to determine whether disciplinary action should be an oral warning, written reprimand, suspension or discharge depending on factors including the severity of the offense and the employee's prior record.

61.     The collective bargaining agreements also have substantially and functionally similar provisions regarding filling permanent vacancies (*e.g.*, by promotion).

62.     Consistent with the Personnel Rules, Hiring Plan and collective bargaining agreements negotiated by Water Department Unions, work assignments, overtime, promotions, discipline, and transfers within the Water Department were and are ultimately the responsibility of and determined, reviewed and approved or ratified by the Commissioner and Deputy Commissioners or those delegated by them.

63.     Consistent with the "culture of racism" within the Water Department, the positions of Commissioner, Deputy Commissioners, and superintendents have historically been filled principally by Caucasians and not African-Americans.

64.     By approving, disapproving and otherwise influencing particular employment actions and decisions (hiring, promotion, transfers, *etc.*), the Water Department's predominantly Caucasian Commissioners, Deputy Commissioners, and the superintendents established and promoted a pattern and practice of racially discriminatory employment decisions.

65.     The Commissioner, Deputy Commissioners, and the superintendents in the Water Department established and promoted a pattern and practice of engaging in racially discriminatory remarks and actions against African-American employees, including but not limited to calling African-Americans "shine," "nigger,"

"boy," "spook," "you people," and "darkie," and disciplining African-Americans that took offense to these comments.

66.     Consistent with Mayor Emanuel's admitted "culture of racism", these actions were undertaken to communicate, and did communicate, to African-Americans that they were beneath the Caucasian employees in the Water Department and that they should "stay in their place."  Observing the discriminatory pattern of treatment of African-American employees and hearing the racially derogatory language, other Caucasian employees learned that racially discriminatory behavior would not only be tolerated, but that they themselves should engage in such behavior.  Many Caucasian employees did so, contributing to a hostile work environment for African-American employees at the Water Department.

67.     Racial discrimination toward African-American employees of the Water Department has been fostered, sanctioned, implemented, and endorsed by the its Commissioner, Deputy Commissioners, and the superintendents.

68.     For example, Murphy attended meetings at the South Water Treatment Plan (Sawyer Plant) with Bresnahan where the two talked about "niggers."  The incident was reported to other supervisors and nothing was ever done to withdraw or disavow the remarks or correct or discipline Bresnahan and Murphy.  The incident and its lack of consequences was observed by many employees and supervisors.

69.     Similarly, Bresnahan used a racial slur in a meeting directed against African-Americans and made crude remarks about African-Americans during meetings.  These slurs were heard by numerous employees and likewise were, as numerous employees knew, never disapproved, withdrawn or ameliorated.

70.     Bresnahan and Murphy also excluded African-American employees from meetings that they should, by virtue of their job responsibilities, have attended and refusing to interact with African-American employees by, among other things, refusing to shake hands with African-American employees or look at African-American employees when speaking to them.  These actions were well known among employees and communicated to other supervisors, and that encouraged them to engage in a pattern of similar behavior toward African-American employees.

71.     Bresnahan denied African-American employees offices even where roles and titles held by African-American employees warranted assigning an office. Instead, Bresnahan would fill open offices with Caucasian employees, even if the employee had a lower title than an African-American employee.  By taking these acts, Bresnahan sent a message to all Water Department employees that African-Americans did not have any power within the Water Department and were not welcome.

72.     The pattern and practice fostered by the Commissioners, Deputy Commissioners, and the superintendents was carried out by Caucasian supervisors, who, for example, moved the location where an African-American employee had

- 15 -

parked for nearly a decade, to a parking spot away from cameras, where his vehicle was subject to damage, such as being keyed. These actions were intended to demonstrate, and did demonstrate, to African-American employees that they had no authority and would be treated negatively if they attempted to question or speak up against Caucasian employees.

73. The daily use of racially derogatory language and disparate treatment based on the race of the employee confirms the culture of racism that Mayor Emmanuel decried but for so long did not address or remedy, and sent a clear message from the top to all employees of the Water Department that the pattern and practice of making racially derogatory remarks was endorsed and participated in by policymakers, *i.e.*, those in charge of hiring, promotion, work assignments, *etc.* Other supervisors and employees foreseeably and reasonably understood, from Murphy's, Bresnahan's, Stark's and other Caucasian leaders' actions (and inactions), that racially offensive conduct against African-Americans would be tolerated and condoned.

74. For example, senior African-American employees were assigned to the "shut off crew" (one of the most difficult jobs within the Water Department) in Englewood and the West Side (dangerous areas in the City) and often suffered injuries as a result.

75. African-American employees injured on the job were told that they could not return to work on anything less than full-duty, while injured Caucasian employees were allowed to return to light-duty positions that were found for them.

- 16 -

Injured African-American employees would then be forced to retire, at less than full benefits, once workers' compensation benefits were exhausted.

76.     African-American employees have been humiliated, harassed, denied opportunities for advancement and additional pay, and threatened daily as a result of the conduct of the Caucasian leaders, creating a hostile and abusive work environment that was and is reasonably perceived as such by Plaintiffs and other African-American workers and perpetuated, sustained, and created by deliberate acts allowed, sanctioned, and encouraged by the City and the Caucasian leaders within the shared belief in racism at the Water Department.

77.     For example, experienced African-American employees would be expected to train Caucasian employees, who would then be promoted not long after arriving, while the African-American employee would be passed over for promotion and the pattern would repeat.  The numerous ways African-Americans would be denied promotions all are reflective of the overall culture of racism at the Water Department.  Examinations for jobs would be given in pencil so that answers for the Caucasian employees could be altered later to increase their scores, or results could be fabricated.  For example, a plumbing inspector examination was administered with only one Caucasian observed taking the examination, yet three or four Caucasians were designated as the highest scoring employees on the exam. Interviews (purporting to be oral examinations of job duties) would be given for positions and senior African-Americans with far more experience than Caucasian employees would be told that they had failed the interview by interviewers (such as

Murphy and Bresnahan) who had no experience in the subject matter (such as plumbing), and Caucasian employees would be given higher interview marks and be promoted.  Sometimes, jobs were not openly posted, and African-Americans would not learn of the existence of the position until after the posting closed and only Caucasian employees applied.  On other occasions, African-Americans' applications would be "lost", so Caucasian employees could be selected without opposition.  Other times, African-Americans would be told that they do not meet the "qualifications" for a position and be barred from applying, despite possessing the qualifications necessary to apply.  Experienced African-Americans, who had even "acted up" (temporarily performed the duties of a higher position) have been and were unable to obtain promotions, despite being more qualified and having trained numerous Caucasian employees who were promoted over them with less seniority and less experience.

78.     The Commissioners, Deputy Commissioners, and the superintendents engaged in discriminatory acts against Plaintiffs and the Class, as defined below, of African-American Water Department employees, including:

      a.  Creating, encouraging and tolerating a hostile work environment;

      b.  assigning less desirable work assignments;

      c.  assigning less overtime;

      d.  denial of promotions or positions - "Glass Ceiling";

      e.  denial of transfers, shifts, and days off - "Glass Wall";

      f.  subjecting them to unwelcome racial intimidation and harassment;

- 18 -

g.  subjecting them to harsh and undue discipline; and

h.  subjecting them to retaliatory, adverse actions.

79.     As part of the culture of racism at the Water Department, the Commissioners, Deputy Commissioners, and the superintendents used subjective and/or discretionary criteria and methods of administration in making personnel decisions described herein that discriminated against African-Americans based on race or had the effect of discriminating against them based on their race, particularly as compared to Caucasians.

80.     The hostile work environment for African-Americans is demonstrated by, among other things, emails traded by the Caucasian leadership and other supervisors on their City of Chicago computers, on City of Chicago time, and using their City of Chicago email addresses.  The emails described below are examples of the numerous messages that were openly circulated by Caucasian Commissioners, managers, and supervisors.

81.     Murphy, Bresnahan and others sent or were recipients of email messages that contained racially derogatory content targeted at African-Americans. Murphy, Bresnahan and others were recipients of such messages because other employees of the Water Department were aware of their racial animus towards African-Americans.

82.     The wide distribution of racially derogatory messages within the Water Department was well known among the Water Department Commissioners, Deputy Commissioners and the superintendents.  The transmission of racially derogatory

messages about African-Americans demonstrated that the highest levels of the Water Department were hostile towards African-Americans and would endorse and countenance similar conduct and statements by other Water Department employees.

83.     For example, Stark would condone and encourage racist remarks and behavior by not disciplining Caucasian people who sent cartoons and other negative information (*e.g.*, crosses and swastikas) to African-American employees.  This was well known throughout the Water Department, yet Stark was never disciplined.

84.     Likewise, Bresnahan traded racially derogatory messages with former colleagues in the in the Chicago Police Department (where Bresnahan formerly worked), including an email message about a black lady's driver's license and her "ethnic" name and an email message about "niggers."  Setting a public example for others in the Water Department, Bresnahan laughed and joked about the messages openly in front of other Water Department employees, as was well known throughout the Water Department, but Bresnahan was never reprimanded or disciplined.

85.     Similarly, Paul Hansen,[2] a Water Department Superintendent and a policymaker, shared racially derogatory emails with Murphy, Bresnahan and other Caucasian leaders.  For example, Hansen sent a link to an online video supposedly

---

[2] Paul Hansen is the son of 44th Ward Alderman Bernie Hansen, and Paul Hansen believed that based on his lineage and connections to the Emanuel administration that he could treat African-American employees negatively without any repercussions.

showing several Kenyans unsuccessfully trying to fly an aircraft they had built, stating: "They are human beings. Just like us! Only 100 years later."

86. Other racist emails shared among Hansen, other supervisors, Murphy, Bresnahan and other Caucasian leaders include:

    a. an email touting a fake "Chicago Safari" package, referencing the number of shootings during a July Fourth weekend, and guaranteeing that tourists would observe "at least one kill and five crime scenes" and also see "lots of animals in their natural habitat;"

    b. messages purporting to be in "Ebonics,[3]" and a "humorous" picture supposedly describing a swimming pool for a small African-American, but which actually depicted a child sitting in a bucket filled with water while holding a slice of watermelon; and

    c. a "Watermelon Protection" email depicting a Ku Klux Klan scarecrow guarding a field of watermelons:





[3] "Ebonics," intended to be derogatory in this context, refers to the vernacular use of English by some African-Americans.

87.     Other racially derogatory email exchanges between Hansen and

Murphy, and other supervisors were summarized by the Chicago Tribune as follows:

> Another racially insensitive email dates back to February
> 2013, when Hansen was replying to an email that
> Murphy first forwarded to him. The original message
> concerned an 'urgent request' from ComEd to stop work
> near an alternate power line serving schools, a fire station
> and senior citizen homes until the main line was fixed so
> those facilities wouldn't lose their electricity feed if it were
> accidentally damaged.
>
> In response, Hansen wrote: 'I think the only thing that
> the line does not feed is the center for the severely
> challenged negro midgets, you know the place, its where
> we hired all those laborers from 7 years ago.' Murphy
> then forwarded that message to another department
> employee.
>
> Even an August 2015 note from Murphy describing an
> equation for calculating the circumference of a circle drew
> a convoluted, racially charged attempt at humor from
> Hansen.
>
> Hansen's message referred to the sex organs of white and
> black men, Caitlyn Jenner, Bill Cosby, a Confederate flag,
> and Dorothy and the Tin Man. Within minutes, Hansen
> then forwarded the same distasteful message to Durkin,
> whose response included: 'I'll have to get back to you with
> my answer after I discuss this with the All Powerful OZ.'

*See* Hal Dardick, Ray Long and Todd Lighty, *Newly released racist, sexist emails*

*show scope of scandal at Chicago's water department*, Chicago Tribune, July 14,

2017, available at:  http://www.chicagotribune.com/news/local/politics/ct-chicago-

water-department-emails-met-20170714-story.html.

88.     Water Department employees were encouraged, through the

distribution of racially derogatory messages, language, and disparate treatment of

- 22 -

African-Americans that they should reinforce the pattern and practice of treating African-American Water Department employees similarly.

89.     African-American Water Department employees are subjected to racist images, such as a hangman's noose in restrooms and Water Department vehicles:



90.     The racial slurs, insults, and intimidation were unwelcome by the Plaintiffs and the Class members.

91.     The hostile conduct fostered and encouraged by Muphy, Bresnahan, Stark and other Caucasian leaders was sufficiently severe or pervasive to alter the conditions of the Plaintiffs' and the Class members' employment and create a physically abusive and hostile work environment.

92.     The hostile work environment is pervasive throughout the entire Water Department, and was created, condoned, and encouraged by the Murphy, Bresnahan, Stark and other Caucasian leaders.

93. The hostile work environment included acts of physical violence and intimidation against Water Department African-American employees .

94. For example, Stark was aware that Water Department employee Anthony Nguyen was likely to commit acts of violence against black employees, but when the acts occurred and were reported to him, Stark would not discipline Nguyen. Not only did Stark not discipline Nguyen, but knowing Nguyen's proclivity for violence against African-Americans, Stark would place black employees near Nguyen and would then discipline the black employees, but not Nguyen, whenever Nguyen caused a disturbance. Stark engaged in this pattern and practice of discrimination to create a work environment so unpleasant that black people would quit to avoid the risk of being fired or disciplined.

95. Similarly, Joseph Lynch was, at various times, involved in attempts to physically attack African-American employees, including Plaintiffs Eddie Cooper (at Sawyer, the South Plant) and Anton Glenn (also at South Plant). Conversely, Lynch never attacked Caucasian Water Department employees, which demonstrates to employees the policymaker's endorsement and encouragement of a pattern and practice of intimidating African-American employees.

96. The Plaintiffs and the Class members perceived the working environment to be racially abusive or hostile.

97. A reasonable person in the Plaintiffs' and the Class members' circumstances would consider the working environment to be racially abusive or hostile.

98.     The City of Chicago, through the Commissioners, Deputy Commissioners, supervisors, and policymakers at the Water Department has a practice of discriminating against African-American employees of the Water Department.

99.     Defendant has a practice, pattern or policy of not promoting African-American employees, refusing to transfer African-Americans and unfairly meting out unwarranted and excessive discipline to African-American employees, assigning less overtime to African-American employees and unfairly meting out unwarranted and excessive discipline to African-Americans.

100.    For example, Stark intentionally gave African-Americans unfavorable work assignments (*e.g.*, by sending them to far away or inconvenient places), disciplined black employees while giving a pass to white employees for the same infractions, and promoted less experienced and or unqualified whites over more experienced and qualified black employees.

101.    The opportunity for promotion, transfer, and overtime for Water Department employees was and is negatively affected by employees' race. Additionally, African-Americans were subjected to unwarranted and excessive discipline.

102.    Plaintiffs and Class members are, in effect, and as direct, proximate and foreseeable result of Defendant's unlawful conduct, blocked by a "Glass Ceiling," a transparent barrier of racism obstructing opportunities for upward movement and advancement afforded to other employees of the Water Department.

103.    Defendant created a practice and scheme that requires African-American employees to work far longer than Caucasians and apply more times than Caucasians in order to receive a promotion.

104.    Defendant refused and refuses to promote, or delay promoting, qualified African-American employees because of their race, even though African-Americans have sufficient seniority, experiences, and performance history to qualify for promotions.

105.    African-Americans must apply for promotions to open positions many times before they are promoted.

106.    Caucasians, by contrast, are frequently promoted on the first attempt; and often, Caucasian applicants are selected for a promotion before applications are received or interviews are conducted.

107.    Instead of promoting and filling open positions fairly and without regard for race, Defendant deliberately and as part of a pattern, practice, and custom leaves positions unfilled until a handpicked Caucasian candidate is designated.

108.    Defendant systematically denies African-Americans the opportunity to advance as compared to Caucasian employees.

109.    African-American employees are deterred from, and refrain from, applying for promotions and transfers because of the Defendant's practice of refusing to promote or transfer African-Americans.

110.    Despite their desire to advance, many African-American employees remain in the same position for extended periods of time because they applied for a promotion numerous times, but were denied a promotion on the basis of race.

111.    For example, Bresnahan deliberately overlooked highly qualified African-American employees up for promotion and instead promoted Caucasians. Bresnahan would also design job descriptions for positions to ensure only specific Caucasian employees qualified for the position.  Other times, Defendant's Caucasian leaders would tell African-American employees that they had missed scheduled interviews (after not informing the employee of an interview) and that they would not be considered for a promotion.

112.    Plaintiffs and Class members are blocked by a "Glass Wall," a transparent barrier of racism that prevents African-American employees from obtaining preferred shifts, locations, or days off – something that is typically afforded to other employees with sufficient seniority.

113.    Defendant has a practice of assigning African-Americans to less-desirable work, locations, shifts, and denying desirable days off.

114.    African-American employees are assigned to positions, such as station laborers, clerks and custodians, that pay substantially less than other positions. For example, Defendant assigned African-American "station laborers" to perform harsher and more difficult work, while predominantly Caucasian "construction laborers" are not required to perform those tasks.  The predominately African-American "station laborers" are paid less than "construction laborers" despite

performing similar duties. Station laborers are also given less overtime, and "construction laborers" who should be performing work in the field are called into the stations to perform work that should be assigned to the station laborers, and the construction laborers often are paid overtime to perform the work.

115. Desirable shifts and locations, such as days with weekends off or at locations closer to one's home, are assigned to Caucasian employees, even though more senior African-American employees were entitled to those shifts and locations.

116. For example, Bresnahan assigned an African-American employee who resided on the South Side to the Jardine Water Plant near Navy Pier and told her that she must report to work at 8 AM, ensuring her commute would be lengthy and aggravate her back. When a complaint about the commute aggravating her back was brought to Murphy, with a request to start work at 7 AM, Murphy refused to help and told her that she could come in at 7 AM, but not start until 8 AM. The employee subsequently learned that her formal job start time had not changed and that Bresnahan and Murphy had orally (and improperly) altered her work schedule in order to punish her and force her to quit.

117. Because promotions, changes in shifts, days off, or work location must be sought from or approved by the Caucasian leaders and other supervising policymakers, Defendant is able to, and continues to, implement a practice of racial discrimination against African-Americans.

118. The Glass Ceiling and Glass Wall deprived Plaintiffs and Class members of the rights and liberties afforded non-African-Americans to advance

their careers and choose their own schedules and locations, in violation of their Constitutional rights under the color of law.

119.    As a result of the Glass Ceiling and Glass Wall, Plaintiffs and Class members were and are chilled and deterred from applying for promotions or transfers because of the Department-wide practice that they will not be promoted or transferred because of their race.

120.    Defendant has a practice of limiting the opportunity for African-American employees to work overtime.

121.    Defendant determines who receives overtime and preferentially selects Caucasian employees for overtime, instead of eligible African-American employees.

122.    For example, although overtime is often supposed to be assigned by list, African-American employees would be excluded from participating, would be "skipped" when it was their turn, or specific Caucasian employee would be called for overtime.  Overtime is and was used by Caucasian supervisors to reward (and the refusal to grant overtime would be used to punish) employees based on race. Overtime on Sundays, which is double time, was often reserved to Caucasian employees.  Predominantly African-American crews would be pulled off emergency repair jobs at the end of a shift, while predominately Caucasian crews would be told to work overtime to finish the job.

123.    Defendant also has a practice of assigning Plaintiffs and Class members the duties of a higher position, while declining, because of their race, to pay them the corresponding higher compensation.

124. Water Department employees who perform the duties of a higher position are eligible for increased pay ("acting up pay") for the period they perform the duties of the higher position. For example, if an employee performs the duties of the next grade above theirs while someone is on vacation, the employee is eligible for acting up pay.

125. Defendant's Caucasian leadership determined and determines who receives acting up pay and systemically denies Plaintiffs and Class members acting up pay, while approving acting up pay for similarly situated Caucasian employees.

126. Defendant applies workplace rules and regulations in a racially-biased manner.

127. Defendant maintains practices of disciplining African-American employees in a manner different from and more harshly than Caucasian employees.

128. African-American employees receive disciplinary write-ups for the same conduct or actions that Caucasian employees engage in without consequence.

129. For example, John Pope made a decision to remove information that employees needed to perform certain job functions, and when an African-American dared to question a Caucasian supervisor's decision, Pope saw to it that the employee was disciplined in retribution. African-American employees are treated more harshly than whites for late arrivals. Caucasian employees are also allowed to use paid time off to make up for late arrivals while African-American employees are not, resulting in reduced pay for African-American employees.

130.    Defendant uses discipline against African-Americans to adversely affect the employment prospects of African-Americans and prevent and dissuade African-Americans from raising legitimate work-related questions and from complaining about or seeking to redress disparate treatment and racial discrimination.

131.    Defendant uses the practice of over-disciplining African-Americans as part of a practice and strategy to later deny, and justify denying, African-Americans promotions, transfers, and overtime to which they are entitled by virtue of their seniority and qualifications.

132.    For example, when position postings are forthcoming, eligible and experienced African-American employees will find themselves cited for any possible infraction, while Caucasian employees are not, and will be disciplined as a basis to deny the African-American employee the promotion.

133.    Caucasian leaders, including Murphy, Bresnahan and/or Stark, control the discipline and appeal process and denied appeals of African-American employees who complained about disparate or unfair treatment, and disciplinary actions that were racially motivated, inconsistent with practice or procedures, or racially disparate.

134.    Bresnahan, for example, in addressing complaints, grievances, or appeals routinely denied legitimate complaints, grievances, or appeals of African-American employees who complained about disparate and unfair treatment (not receiving overtime, shift and location scheduling, and promotions).  Bresnahan also

simply ignored complaints of disparate and unfair treatment by African-Americans intending that African-Americans employees would "get the message" and eventually stop challenging the racially discriminatory treatment.

135. Defendant also uses discriminatory discipline against African-Americans as a means of "encouraging" or even forcing African-Americans to retire prematurely, and as a basis to improperly terminate African-Americans' employment.

136. While trying to circumvent the Glass Ceiling and Glass Wall, African-American employees of the Water Department are subject to racist conduct, speech, and images during their day-to-day activities.

137. African-American employees are humiliated, harassed, and threatened daily by co-workers, supervisors, and Water Department leadership, and such conduct is condoned and encouraged by the Defendant's Caucasian leadership, creating and proliferating a hostile and abusive work environment based on race.

138. Instead of taking steps to remedy the systemic racial discrimination within the Water Department, which was not only known to but created by the Defendant's Caucasian leadership, the Water Department and its Caucasian leadership instituted a practice of retaliation against African-American employees that complained about discrimination or racism.

139. African-American employees were and are systematically subjected to unfair, arbitrary, and capricious discipline in retaliation for speaking out against racism and discrimination.

140.    In retaliation for speaking out against racism and discrimination, African-American employees were and are subjected to: transfers to less desirable locations and/or work shifts; constructive discharge; or involuntary termination.

141.    The racially discriminatory practices maintained by Defendant are so pervasive, involve so many policymaking personnel, and/or are so well known and have persisted for such a long time, as to create and constitute a policy of the City of Chicago.

142.    Defendant has maintained a systemic practice that willfully discriminates against and imposes disparate treatment upon a protected group based on race.

143.    Defendant's willful discrimination against African-American Water Department employees represents a department-wide pattern and practice. Indeed, given the emails quoted above, how could it be otherwise; when the top management of the Water Department freely write, circulate and exchange – without apparent concern or fear of retribution or discipline – the most hateful of racist images. It strains credulity to suppose that such a rampant discriminatory work environment could exist without the City of Chicago's knowledge and consent.

144.    Defendant's systemic and willful racial discrimination has caused stress, anxiety and fear to the Plaintiffs and Class members, and denied the Plaintiffs and Class members tangible job benefits which Caucasian employees were permitted to enjoy.

145.    The Defendant's systemic and repeated discriminatory acts resulted in Plaintiffs and Class members being compensated less than Caucasian employees.

146.    The discriminatory acts also adversely affect Plaintiffs' and Class members' retirement benefits, which are substantially less than they would have been but for the discriminatory acts.

147.    The discriminatory practices described herein are ongoing and constitute a continuing violation of the Plaintiffs' civil rights.

148.    The racially discriminatory practices uniformly harm and similarly affect African-Americans employed at the Water Department.

149.    The City of Chicago was aware of all the foregoing conduct by virtue of, among other things, reports and internal grievances that were filed by numerous African-American employees of the Water Department repeatedly over the course of years.

150.    The discriminatory conduct was so pervasive within the Water Department and the internal grievances so numerous, that decisionmakers within the City of Chicago were aware of the ongoing racial discrimination and hostile work environment within the Water Department.

### *Derrick Edmond*

151.    During his employment with the Water Department, Derrick Edmond was discriminated against on the basis of his race.  Edmond applied for promotions for which he was qualified, successfully passed the prerequisite examinations, but was denied promotions because of his race.  Edmond applied for transfers, but was

- 34 -

denied those opportunities because of his race. Because of his race and despite his seniority, Edmond was given undesirable work assignments, shifts, and days off.

152. For example, Edmond applied and interviewed for an operating engineer position, for which he was qualified, approximately eighteen times, but Defendant promoted less qualified Caucasian applicants despite Edmond's superior qualifications. Edmond was finally promoted after continuing to apply and interview for the position, in contrast to Caucasian applicants, who were promoted on the first attempt or were designated as promoted before the interviews were even conducted.

153. Edmond performed the duties of an assistant chief operating engineer for approximately four years. Despite this, when the position of assistant chief operating engineer was opened for applications, Defendant told Edmond he was not qualified and hired Caucasians with less experience.

154. Edmond was treated differently because of his race. Edmond was unable to secure more desirable shifts, while Caucasians with less seniority were able to obtain those shifts.

155. Edmond was called a "nigger" and referred to as "you people" during his time at the Water Department.

156. Edmond was subjected to undue discipline in retaliation for speaking out against this racially disparate treatment, and was forced to retire early.

157.  Edmond's wages were suppressed, he lost income, and his retirement benefits were reduced because of racial discrimination orchestrated, endorsed, and encouraged by Defendant's Caucasian leadership.

### *Katherine Ealy*

158.  During her employment with the Water Department, Ealy was discriminated against on the basis of her race.  Ealy applied for promotions for which she was qualified, successfully passed the prerequisite examinations, but was denied the promotions because of her race.  Ealy applied for transfers, but was denied those opportunities because of her race.

159.  Ealy performed the duties of a chief operating engineer for a substantial period of time.  Ealy applied for the open position of chief operating engineer two to three times over a period of several years, and successfully passed all tests necessary for the position.  Ealy was not selected for the position and a Caucasian with lesser qualifications, who never worked in a water purification plant before and was not hazmat qualified, was selected.

160.  Ealy was treated differently because of her race.  Ealy was denied the day shift and desired work locations, while Caucasian employees with less seniority were given preference for shifts and locations.

161.  Because of her race, Ealy was regularly called something other than her name, such as being called a fucking whore and a bitch.

162.     Ealy's wages were suppressed and she lost income because of racial discrimination orchestrated, endorsed, and encouraged by the Defendant's Caucasian leadership.

**Eddie Cooper, Jr.**

163.     During his employment with the Water Department, Cooper was discriminated against on the basis of his race.  Cooper applied for promotions for which he was qualified, successfully passed the prerequisite examinations, but was denied promotions because of his race.  Cooper applied for transfers, but was denied those opportunities because of his race.  Because of his race and despite his seniority, Cooper was given undesirable work assignments, shifts, and days off, and was denied overtime and acting up pay.

164.     Cooper was eligible to be promoted to the Water Chemist III position for approximately 20 years.  Cooper was not promoted to Water Chemist III because of his race, despite the position being funded and needed.

165.     Cooper was eligible for acting up pay for performing the duties of a senior chemist in the chemist's absence.  Despite completing the necessary paperwork, he was denied acting up pay.

166.     Cooper was subjected to undue disciplinary hearings in retaliation for speaking out against his treatment in the Department.  Cooper was treated differently because of his race, and Defendant's Caucasian leadership, tolerated, encouraged, and sustained the disparate treatment.

167. Cooper's wages were suppressed and he lost income because of racial discrimination orchestrated, endorsed, and encouraged by the Defendant's Caucasian leadership.

### Vicki Hill

168. During her employment with the Water Department, Hill was discriminated on the basis of her race. Hill applied for promotions for which she was qualified, successfully passed the prerequisite examinations, but was denied the promotions because of her race. Hill applied for transfers, but was denied those opportunities because of her race.

169. Hill sought a promotion, and a less qualified Caucasian was selected for the position.

170. Hill was treated differently because of her race. For example, Hill was required to travel to different locations throughout the City and was not given a City vehicle, while a Caucasian employee performing the same duties was not required to travel as extensively and was given a City vehicle.

171. Hill was denied overtime, while Caucasian employees with less experience were assigned overtime.

172. Hill was subjected to discipline in retaliation for speaking out against racial discrimination. Defendant used disciplinary proceedings to force Hill to retire six months short of receiving the maximum amount on her pension.

173.    Hill's wages were suppressed, she lost income, and her retirement benefits were reduced because of racial discrimination orchestrated, endorsed, and encouraged by the Defendant's Caucasian leadership.

**_Robert T. Laws, Jr._**

174.    During his employment with the Water Department, Laws was discriminated against on the basis of his race.  Laws applied for promotions for which he was qualified, and successfully passed the prerequisite examinations, but was denied promotions because of his race.  Laws applied for transfers, but was denied those opportunities because of his race.  Because of his race and despite his seniority, Laws was given undesirable work assignments, shifts, or days off, and was denied overtime.

175.    Laws applied for the open position of Caulker, and was denied the position even though he met the job requirements, while Caucasians were hired with little or no experience.  Laws replied for the position on numerous other occasions, but was likewise denied the position because of his race.

176.    Laws was denied overtime, while similarly situated Caucasian employees were assigned overtime.  The assignment of overtime to Caucasian employees, and not to African-American employees, was endorsed and encouraged by the Defendant's Caucasian leadership.

177.    Laws was subjected to racist messages and slurs, including "nigger" and "KKK" written in Water Department facilities.

178.   Laws' wages were suppressed and he lost income because of racial discrimination that was orchestrated, endorsed, and encouraged by Defendant's Caucasian leadership.  For example, positions that Laws applied for and was denied paid $10,000 more per year than Laws was paid.

### Anton Glenn

179.   During his employment as a station laborer with the Water Department, Glenn was discriminated against on the basis of his race.  Glenn was dissuaded from applying for promotions and denied promotions for which he was qualified by the racist and discriminatory actions of the Defendant's Caucasian leadership.  Because of his race and despite his seniority, Glenn was given undesirable work assignments and was denied overtime.

180.   Glenn applied for the open position of Construction Laborer, and was denied the position, even though he met the job requirements, because of his race.

181.   Glenn was denied overtime, while similarly situated Caucasian employees were assigned overtime.  The assignment of overtime to Caucasian employees, and not to African-American employees, was endorsed and encouraged by the Defendant's Caucasian leadership.

182.   Glenn was humiliated, harassed, denied opportunities for advancement and additional pay.

183.   Glenn's wages were suppressed and he lost income because of racial discrimination orchestrated, endorsed, and encouraged by Defendant's Caucasian leadership.

*Veronica Smith*

184.    During her employment as a construction laborer with the Water Department, Veronica Smith was discriminated against on the basis of her race. Smith was dissuaded from applying for promotions and denied promotions for which she was qualified by the racist and discriminatory actions of the Defendant.

185.    Smith had extensive experience as a construction laborer and in the meter shop and trained numerous Caucasian employees. The Caucasian employees that Smith trained were promoted within a year or two. Smith repeatedly applied for the open position of foreman, and was denied the position because of her race, even though she met the job requirements. Smith passed the written examinations each time she was interviewed and told that she failed the oral examination or was "not selected" from promotion. Smith was denied a promotion to foreman despite "acting up" in that position repeatedly over a period of years. Recently, a foreman position was open and should have been posted, but to avoid Smith applying for the position, the position was never posted and a pre-selected person from a different City department was handed the position.

186.    Smith was humiliated, harassed, denied opportunities for advancement and additional pay as a result of the discrimination. Because of her race and despite her seniority, Smith was excluded from conversations with supervisors about her area of expertise and questions were instead directed to

Caucasians, who would often need to consult with Smith in order to answer the questions.

187.    Smith's wages were suppressed and she lost income because of racial discrimination that was orchestrated, endorsed, and encouraged by Defendant's Caucasian leadership.

### Donald Anderson

188.    During his employment as a plumber and leak crew foreman with the Water Department, Anderson was discriminated against on the basis of his race. Anderson was denied promotions for which he was qualified by the racist and discriminatory actions of the Defendant.  Because of his race, Anderson and the African-Americans that worked with and under him were given undesirable work assignments and denied overtime.

189.    Anderson applied for the open positions of Assistant District Superintendent and General Superintendent, and was denied the positions because of his race, even though he met the job requirements.  Anderson was interviewed by Bresnahan and Hansen, who knew nothing about plumbing or leak crews, and Caucasians were selected over him.  Caucasians that Anderson trained were quickly promoted to foreman and then Assistant District Superintendent.

190.    Anderson and his crews were denied overtime, while similarly situated Caucasian employees were assigned overtime.  Crews within the Central District have been working overtime since December 2017, but Anderson's crew has been

denied overtime since January 2018. Anderson's supervisor, Andy Anderson[4], with the endorsement of the Defendant's Caucasian leaders, assigns Caucasian crews consistent overtime, while predominately African-American crews are not assigned overtime. The assignment of overtime to Caucasian employees, and not to African-American employees, was endorsed and encouraged by the Defendant's Caucasian leaders.

191.   Anderson was humiliated, harassed, denied opportunities for advancement and additional pay. Andy Anderson and Chris Williams (a Caucasian Assistant District Superintendent who was trained by Plaintiff Anderson and then promoted over Plaintiff Anderson) have harassed Anderson because he is African-American by: reassigning his parking space from one that can be observed by cameras to another spot (which led to his vehicle being damaged); pulling experienced workers from Anderson's crew and assigning him rookies (while Caucasian crews experienced little turnover); attempting to fire African-American members of his crew, who were adequately performing their jobs, in order to inhibit Anderson's ability to perform his work; dictating the details of how Anderson performs his job duties while not interfering with Caucasians in that manner; and, using another Caucasian employee to start an altercation with Anderson and then seeking to discipline Anderson when he was pushed by the Caucasian employee. Anderson's treatment was endorsed and encouraged by the Defendant's pattern and

---

[4] Andy Anderson is married to Luci Pope Anderson.

practice of racial discrimination and is emblematic of the culture of racism the Mayor admitted exists at the Department of Water.

192.    Anderson's wages were suppressed and he lost income because of racial discrimination that was orchestrated, encouraged, and endorsed by Defendant's Caucasian leadership.  Recently, Anderson was "acting up" in the position of Assistant District Superintendent, and should have acted up in that position for three months, as Caucasians have done.  Anderson's acting up, and the pay associated with that, was terminated early and he was told to go "back on the street" unlike similarly situated Caucasian employees.

### David Henry

193.    During his employment as a plumber and plumbing investigator with the Water Department, Henry was discriminated against on the basis of his race. Henry was dissuaded from applying for promotions and denied promotions for which he was qualified by the racist and discriminatory actions of the Defendant. Because of his race and despite his seniority, Henry was denied overtime.

194.    Henry applied for the open position of foreman, and was denied the position because of his race, even though he met the job requirements, while Caucasian employees with less experience were promoted.  Henry was dissuaded from applying for the position of foreman again because he was informed that Caucasians had been preselected for the position(s) and that his application would be a waste of his time and effort.

195.    Henry was denied overtime, while similarly situated Caucasian employees were assigned overtime.  Henry was denied overtime for years based on the racist practices and policies of Defendant.  Henry received approximately two overtime shifts over a period of three to five years, and those instances were on holidays when Henry did not want the overtime because he would already have been paid for that day.  Henry was given some overtime after June 2017, when one of the racist supervisors was terminated and the allegations of this lawsuit were brought forward.  In contrast to the prior years, Henry received overtime more than thirty-seven times between June 2017 and December 2017.  The assignment of overtime to Caucasian employees, and not to African-American employees, was endorsed and encouraged by the Defendant's Caucasian leadership.

196.    Henry was humiliated, harassed, denied opportunities for advancement and additional pay.

197.    Henry's wages were suppressed and he lost income because of racial discrimination that was orchestrated, endorsed and encouraged by Defendant's Caucasian leadership.

## CLASS ALLEGATIONS

198.    Plaintiffs bring this action on their own behalf, and on behalf of a Class of all African-Americans who were employed at the Water Department through the date of judgment in this action. The Class contains or may be divided into three Sub-Classes of African-American Water Department employees under FED. R. CIV. P.  23(c)(5):  an **Overtime Sub-Class** consisting of all African-

American Water Department employees who were eligible to work overtime; a **Promotions Sub-Class** consisting of all African-American Water Department employees who applied for a position and did not receive it; and a **Discipline Sub-Class**, consisting of all African-American Water department employees who were subjected to Defendant's disciplinary process by being accused of disciplinary infractions.

199.    The discriminatory acts engaged in by Defendants were part of a pattern and practice that was centrally devised and commonly applied to Plaintiffs and members of the Class and Sub-Classes, including:

a.   Creating a hostile work environment as alleged above for and affecting the Class of African-American employees of the Water Department which adversely affected their employment and opportunities;

b.   For the Overtime Sub-Class, denying overtime to African-American employees of the Water Department eligible to work overtime and awarding overtime to Caucasian employees instead;

c.   For the Promotions Sub-Class, denying positions to African-American employees of the Water Department or requiring African-Americans to apply repeatedly before getting the promotion, despite equal or superior qualifications to Caucasian employees; and

d.   For the Discipline Sub-Class, unfairly meting out unwarranted and excessive discipline to African-American employees.

200.    The Class includes all African-Americans who worked at the City of Chicago Department of Water Management and is in excess of five hundred (500) members.  The Class and Sub-Classes are each so numerous that joinder of all members is impracticable.   FED. R. CIV. P. 23(a)(1).  Each of the Sub-Classes includes in excess of 40 employees.  The identity of class members is ascertainable based on records maintained by the Defendants, the Water Department Unions or Plaintiffs and Class Members.

201.    There are questions of law and fact common to the Class and to each Sub-Class.  FED. R. CIV. P. 23(a)(2).

202.    The claims of the representative Plaintiffs are typical of the claims of the Class and each Sub-Class.  FED. R. CIV. P. 23(a)(3).

203.    The representative Plaintiffs will fairly and adequately represent the interests of the Class and each Sub-Class.  FED. R. CIV. P. 23(a)(4).  Each Class and Sub-class representative is interested in and able to represent the interests of the other Class and Sub-class members and is free of any conflict of interest that might interfere with such representation.

204.    The questions of law or fact common to Class and Sub-Class members predominate over any questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.  FED. R. CIV. P. 23(b)(3).

205.    Absent Class and Sub-Class members do not have an interest in individually controlling the prosecution or defense of separate actions and the

expense of such would be prohibitive. There is no other putative class litigation the Plaintiffs are aware of concerning the controversy already begun by Class and Sub-Class members; it is desirable to concentrate the litigation of the claims in this, and Plaintiffs do not envision any significant difficulties in managing a Class action.

206. The Defendant has acted or refused to act on grounds that apply generally to the Class and each Sub-Class, so that final injunctive relief is appropriate respecting the Class and Sub-Classes as a whole. FED. R. CIV. P. 23(b)(2).

207. A class action should be maintained because the prosecution of separate actions by individual Class or Sub-Class members would create the risk of inconsistent or varying adjudications with respect to individual Class or Sub-Class members that would establish incompatible standards of conduct for the party opposing the Class or Sub-Class; or adjudications with respect to individual Class or Sub-Class members, as a practical matter, would substantially impair or impede their ability to protect their interests. FED. R. CIV. P. 23(b)(1).

208. Plaintiffs have retained skilled and experienced counsel to represent them in this litigation. Fed. R. Civ. P. 23(g). Counsel have done substantial work in identifying or investigating potential claims in the action. Counsel have substantial experience in litigating class actions, and other complex litigation, and employment claims. Counsel have knowledge of the applicable law, and possess sufficient resources to represent the class.

209.    Alternatively, the issues determining liability and equitable relief are appropriate for issue certification under Rule 23(c)(4), as are other common issues.

## COUNT I

## HOSTILE WORK ENVIRONMENT – EQUAL PROTECTION CLAUSE AND DUE PROCESS CLAUSE VIA SECTION 1983

210.    Plaintiff incorporates all paragraphs by reference.

211.    The Fourteenth Amendment to the United States Constitution protects persons from being subjected to hostile work environments based on race by persons acting under color of state law.

212.    Defendant, under color of state law, set forth policies and/or practices that creates, sustains, and proliferates a hostile and abusive work environment based on race.

213.    This hostile and abusive work environment is created, perpetuated, and sustained by the Defendant acting under color of state law.

214.    This hostile and abusive work environment is widespread throughout the Water Department, is permanent and well-settled to constitute a custom or usage with the force of law.

215.    Plaintiffs and Class Members were subjected to and harmed by the systemic hostile work environment for African-Americans within the Water Department.

216.    Plaintiffs and Class Members were harmed economically by the hostile work environment, by, among other things, losing wages, income, and retirement benefits.

- 49 -

**WHEREFORE**, Plaintiffs pray that the Court: certify the Class and/or Sub-Classes; designate Plaintiffs as Class and Sub-Class representatives and designate Plaintiffs' counsel as Class counsel; enter preliminary and permanent injunctive and other relief including, without limitation, enjoining the Defendant from creating and perpetuating a hostile and discriminatory work environment, enjoining Defendant to maintain a lawful work environment, and, if appropriate, appointing an independent and qualified Special Master or other qualified third-party to implement, supervise and train the Water Department personnel in such a manner as to eliminate employment discrimination in all its forms; award compensatory damages including without limitation lost wages, back pay, front pay, pre-and post-judgment interest, and compensation for lost benefits; award reinstatement to former employees; award the costs of this action, including the fees and costs of experts, together with reasonable attorneys' fees; and award all relief to which Plaintiffs and the Class are or may be entitled, even if they have not demanded that relief in their pleadings.

## COUNT II

### HOSTILE WORK ENVIRONMENT - SECTION 1981 VIA SECTION 1983

217. Plaintiff incorporates all paragraphs by reference.

218. Section 1977 of the Revised Statutes, codified as 42 U.S.C. § 1981, prohibits harassment of workers based upon race.

219. The Defendant created a hostile work environment for African-American employees of the Water Department, in violation of 42 U.S.C. §§ 1983 and 1981.

220.    The Defendant, under color of state law, set forth policies and/or practices that create, sustain, and proliferate a hostile and abusive work environment based on race.

221.    This hostile and abusive work environment is created, perpetuated, and sustained by the Defendants acting under color of state law.

222.    This hostile and abusive work environment is widespread throughout the Water Department, is permanent and well-settled to constitute a custom or usage with the force of law.

223.    Plaintiffs and Class Members were subjected to and harmed by the systemic hostile work environment for African-Americans within the Water Department.

224.    Plaintiffs and Class Members were harmed economically by the hostile work environment, by, among other things, losing wages, income, and retirement benefits.

**WHEREFORE**, Plaintiffs pray that the Court: certify the Class and/or Sub-Classes; designate Plaintiffs as Class and Sub-Class representatives and designate Plaintiffs' counsel as Class counsel; enter preliminary and permanent injunctive and other relief including, without limitation, enjoining the Defendant from creating and perpetuating a hostile and discriminatory work environment, enjoining Defendant to maintain a lawful work environment, and, if appropriate, appointing an independent and qualified Special Master or other qualified third-party to implement, supervise and train the Water Department personnel in such a

manner as to eliminate employment discrimination in all its forms; award compensatory damages including without limitation lost wages, back pay, front pay, pre-and post-judgment interest, and compensation for lost benefits; award reinstatement to former employees; award the costs of this action, including the fees and costs of experts, together with reasonable attorneys' fees; and award all relief to which Plaintiffs and the Class are or may be entitled, even if they have not demanded that relief in their pleadings.

## COUNT III

### DISCRIMINATION – EQUAL PROTECTION CLAUS AND DUE PROCESS CLAUSE VIA SECTION 1983

225. Plaintiff incorporates all paragraphs by reference.

226. The Fourteenth Amendment to the United States Constitution protects persons from being subjected to racial discrimination by persons acting under color of state law.

227. The Defendant, under color of state law, engaged in a pattern and in practices that treated African-American employees differently because of their race.

228. The disparate treatment of African-Americans is so widespread throughout the Water Department, is sufficiently permanent and well-settled to constitute a practice, custom, or usage with the force of law.

229. Plaintiffs and Class members were subjected to and harmed by the practices and custom of systemic racial discrimination in the Water Department.

230.    Plaintiffs and Class Members were harmed economically by the race discrimination, by, among other things, losing wages, income, and retirement benefits.

**WHEREFORE**, Plaintiffs pray that the Court:  certify the Class and/or Sub-Classes; designate Plaintiffs as Class and Sub-Class representatives and designate Plaintiffs' counsel as Class counsel; enter preliminary and permanent injunctive and other relief including, without limitation, enjoining the Defendant from discriminating against African-Americans, and, if appropriate, appointing an independent and qualified Special Master or other qualified third-party to implement, supervise and train the Water Department personnel in such a manner as to eliminate employment discrimination in all its forms; award compensatory damages including without limitation lost wages, back pay, front pay, pre-and post-judgment interest, and compensation for lost benefits; award reinstatement to former employees; award the costs of this action, including the fees and costs of experts, together with reasonable attorneys' fees; and award all relief to which Plaintiffs and the Class are or may be entitled, even if they have not demanded that relief in their pleadings.

## COUNT IV

### DISCRIMINATION - SECTION 1981 VIA 1983

231.    Plaintiff incorporates all paragraphs by reference.

232.    The Fourteenth Amendment to the United States Constitution protects persons from being subjected to discrimination based on race by persons acting under color of state law.

- 53 -

233.    The Defendant, under color of state law, discriminated against African-Americans based on race.

234.    Section 1977 of the Revised Statutes, codified as 42 U.S.C. § 1981, guarantees persons of all races the same right to make and enforce contracts regardless of race.  The term "make and enforce" contracts includes enjoyment of all benefits privileges, terms, and conditions of an employment relationship.

235.    The Defendant maintained a set of uniform discriminatory practices and engaged in a pattern or practice of systemic racial discrimination against African-American employees of the Water Department in violation of 42 U.S.C. §§ 1983 and 1981.

236.    Plaintiffs and Class members were subjected to and harmed by the practices and custom of systemic racial discrimination in the Water Department orchestrated and conducted by the Defendant.

237.    Plaintiffs and Class Members were harmed economically by the race discrimination, by, among other things, losing wages, income, and retirement benefits.

**WHEREFORE**, Plaintiffs pray that the Court:  certify the Class and/or Sub-Classes; designate Plaintiffs as Class and Sub-Class representatives and designate Plaintiffs' counsel as Class counsel; enter preliminary and permanent injunctive and other relief including, without limitation, enjoining the Defendant from discriminating against African-Americans, and, if appropriate, appointing an independent and qualified Special Master or other qualified third-party to

implement, supervise and train the Water Department personnel in such a manner as to eliminate employment discrimination in all its forms; award compensatory damages including without limitation lost wages, back pay, front pay, pre-and post-judgment interest, and compensation for lost benefits; award reinstatement to former employees; award the costs of this action, including the fees and costs of experts, together with reasonable attorneys' fees; and award all relief to which Plaintiffs and the Class are or may be entitled, even if they have not demanded that relief in their pleadings.

## COUNT V

### DISCRIMINATION - SECTION 1981

### Intentionally Omitted From Plaintiff's Third Amended Complaint

## COUNT VI

### Illinois Civil Rights Act of 2003, 740 ILCS 23/1 *et seq.*

238.    Paragraphs 1 through 209 are incorporated by reference.

239.    The Illinois Civil Rights Act of 2003, Section 23/1 of the Illinois Complied Statutes 740, prohibits, among other things, racial discrimination by units of local government in Illinois.

240.    The City of Chicago is a unit of local government in Illinois.

241.    Defendants excluded the Plaintiffs and the Class members from participation in, denied the Plaintiffs and the Class members benefits of, and subjected the Plaintiffs and the Class members to discrimination in their

- 55 -

employment on the basis of their race in violation of the Illinois Civil Rights Act, 740 ILCS 23/1 *et seq.*

242.   Defendants utilized criteria and methods of administration that had the effect of subjecting Plaintiffs and the Class member to discrimination because of their race as compared to their Caucasian coworkers in violation of the Illinois Civil Rights Act, 740 ILCS 23/1 *et seq.*, including with respect to opportunities to obtain positions, opportunities to work overtime, and being subjected to unwarranted and excessive discipline.

243.   Plaintiffs and Class Members were harmed economically by the discrimination, by, among other things, losing wages, income, and retirement benefits.

**WHEREFORE**, Plaintiffs pray that the Court:  certify the Class and/or Sub-Classes; as Class and Sub-Class representatives and designate Plaintiffs' counsel as Class counsel; enter preliminary and permanent injunctive and other relief including, without limitation, enjoining the Defendant from discriminating against African-Americans, and, if appropriate, appointing an independent and qualified Special Master or other qualified third-party to implement, supervise and train the Water Department personnel in such a manner as to eliminate employment discrimination in all its forms; award compensatory damages including without limitation lost wages, back pay, front pay, pre-and post-judgment interest, and compensation for lost benefits; award reinstatement to former employees; award the costs of this action, including the fees and costs of experts, together with reasonable

attorneys' fees; and award all relief to which Plaintiffs and the Class are or may be entitled, even if they have not demanded that relief in their pleadings.

## COUNT VII

## INDEMNIFICATION - 745 ILCS 10/2-302

## Intentionally Omitted From Plaintiff's Third Amended Complaint

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues in this action.

**DATED: December 20, 2021.**

**PLAINTIFFS DERRICK EDMOND, KATHERINE EALY, EDDIE COOPER, JR., VICKI HILL, ROBERT T. LAWS, JR. ANTON GLENN, VERONICA SMITH, DONALD ANDERSON and DAVID HENRY,**

By: Victor P. Henderson
        One of their Attorneys

Victor P. Henderson
Christopher W. Carmichael
Devlin Schoop **HENDERSON PARKS, LLC**
140 S. Dearborn St., Suite 1020
Chicago, Illinois 60603
Tel.: (312) 262-2900
vphenderson@henderson-parks.com
ccarmichael@henderson-parks.com
dschoop@henderson-parks.com

J. Bryan Wood
**THE WOOD LAW OFFICE, LLC**
303 W. Madison St., Suite 2650
Chicago, Illinois 60606
Tel.: (312) 554-8600
bryan@jbryanwoodlaw.com

Charles R. Watkins
**GUIN, STOKES & EVANS, LLC**
321 S. Plymouth Ct., Ste. 1250
Chicago, Illinois 60604
Tel.: (312) 878-8391
cwatkins@gseattorneys.com

## **CERTIFICATE OF SERVICE**

    The undersigned certifies that on **December 20, 2021**, the foregoing Third Amended Complaint was electronically filed with the Clerk of the United States District Court for the Northern District of Illinois through the CM/ECF system, which served a copy of the foregoing upon all counsel of record.

                    By: s/J. Bryan Wood