**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **DERRICK EDMOND, KATHERINE EALY, VICKI HILL, ROBERT T. LAWS, JR., EDDIE COOPER, JR., ANTON GLENN, DAVID HENRY, VERONICA SMITH, and DONALD ANDERSON, on behalf of themselves and all others similarly situated,** | ) ) ) ) ) ) ) ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 17 C 4858** |
| | ) | |
| **THE CITY OF CHICAGO,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

MATTHEW F. KENNELLY, District Judge:

 Derrick Edmond, Katherine Ealy, Vicki Hill, Robert T. Laws, Jr., Eddie Cooper, Jr., Anton Glenn, David Henry, Veronica Smith, and Donald Anderson have sued the City of Chicago and several individual defendants on behalf of a putative class under 42 U.S.C. §§ 1981 and 1983 and the Illinois Civil Rights Act of 2003 for discrimination and creating a hostile work environment. On November 15, 2018, Judge Joan Gottschall granted the defendants' motion to dismiss in part. *See Edmond v. City of Chicago*, No. 17 C 4858, 2018 WL 5994929 (N.D. Ill. Nov. 15, 2018). The case was then reassigned to Judge Mary Rowland on August 22, 2019. Judge Rowland granted the plaintiffs' motion for leave to amend their complaint, through which the plaintiffs voluntarily dismissed without prejudice their claims against the individual defendants. On May 25,

2022, the case was reassigned to the undersigned Judge.  The plaintiffs have now moved to certify various classes under Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3).  For the reasons stated below, the Court denies the motion.

## Background

The party seeking class certification has the burden of establishing by a preponderance of the evidence that certification is proper.  *Priddy v. Health Care Serv. Corp.,* 870 F.3d 657, 660 (7th Cir. 2017).  In assessing whether the movant has met this burden, the district court need not accept the allegations in the complaint as true. *Szabo v. Bridgeport Machs., Inc.*, 249 F.3d 672, 675 (7th Cir. 2001).  The court should instead "make whatever factual and legal inquiries [that] are necessary under Rule 23." *Id.* at 676; *Beaton v. SpeedyPC Software*, 907 F.3d 1018, 1025 (7th Cir. 2018) ("[T]he court must go beyond the pleadings and, to the extent necessary, take evidence on disputed issues that are material to certification.").

The Court takes the following facts from the prior order on the defendants' motion to dismiss, the third amended complaint, and the parties' class certification briefing.  A more detailed recounting of the plaintiffs' allegations can be found in Judge Gottschall's November 15, 2018 decision on the defendants' motion to dismiss.  *See Edmond*, 2018 WL 5994929, at *2–5.

## A.    Organization of the Department of Water Management

The named plaintiffs are current and former African American employees of the City of Chicago's Department of Water Management.  The Department treats and delivers drinking water to Chicago and 126 surrounding communities.  It employs approximately 2,000 people spanning 150 different job titles, such as engineers,

chemists, plumbers, truck drivers, etc.  Many employees in the Department are represented by various labor unions that each operate pursuant to a collective bargaining agreement.  The Department is led by the Commissioner and First Deputy.  Until 2016, Tom Powers was the Commissioner and Barrett Murphy was the First Deputy.  In 2016, Murphy became the Commissioner.  Murphy then resigned in 2017, and Randy Conner was selected to replace him.

There are five bureaus within the Department:  (1) the Bureau of Operations and Distribution (BOD), (2) the Bureau of Water Supply (BWS), (3) the Bureau of Engineering (BOE), (4) the Bureau of Administrative Support (BAS), and (5) the Bureau of Meter Services (BMS).  Each bureau is led by a Deputy Commissioner who reports directly or indirectly to the Commissioner and First Deputy.

BWS is the second largest bureau, operating two water treatment plants and twelve pumping stations.  Alan Stark led BWS as Deputy Commissioner from 2011 until 2017 and then as Managing Deputy Commissioner until 2018.  BWS has four sections: Water Treatment, Water Quality, Water Pumping, and Administrative.  Plaintiff Hill worked in Water Pumping as a staff assistant until 2015.  Plaintiffs Edmond, Glenn, Cooper, and Ealy worked in Water Treatment.  Edmond was an operating engineer at one of the water treatment plants, the Sawyer Water Purification Plant, until 2017.  Glenn was a foreman at the same plant until 2019.  Cooper is currently employed as a water chemist at the Sawyer plant.  Ealy was an Assistant Chief Engineer at the other treatment plant, the Jardine Water Purification Plant, until 2017.  She was then promoted to Chief Operating Engineer at the Sawyer plant, where she remained until resigning in 2019.

BOD is the largest bureau and is divided into North, Central, and South Districts. Each district operates at a separate location. The districts also assign crews to make repairs and investigate leaks at various job sites along BOD's 4,400 miles of water mains and sewer lines. In addition to the districts, BOD operates a New Construction section. This section handles crews that work on longer-term projects, such as replacing water mains and sewer lines. Since 2011, William Bresnahan has led BOD as the Managing Deputy. Luci Pope-Anderson served as an Assistant Commissioner until 2016, when she was promoted to Deputy Commissioner. Several superintendents and foremen report to the commissioners. Most relevant to the plaintiffs' allegations are Paul Hansen, who worked as Superintendent in the North District from 2015 to 2017, and John Lee, who worked as Superintendent in the South District from 2010 to 2017.

Plaintiffs Henry, Laws, and Anderson worked in BDO. Henry and Laws both worked in the South District as a plumber and construction laborer, respectively. Anderson works in the Central District. He started as a foreman and then became an Assistant District Superintendent in 2018.

No named plaintiffs worked in BOE or BAS. Plaintiff Smith worked in BMS as a construction laborer.

**B.     The plaintiffs' allegations**

The plaintiffs allege that the Department's leaders fostered a culture of racism. An investigation by the Chicago Office of Inspector General (OIG) found "egregious, offensive racist and sexist emails distributed by and among" various leaders at the Department, including Murphy, Powers, Bresnahan, Pope-Anderson, Hansen, and Lee. Pls.' Opening Mem., Ex. 55 at 2. The OIG concluded that the emails "suggested the

4

existence of an unrestricted culture of overtly racist and sexist behavior and attitudes within the department." *Id.*

As a result of the OIG investigation, Murphy and Bresnahan resigned in 2017, and then-Mayor Emanuel appointed Conner as Commissioner.  Mayor Rahm Emanuel stated that "Barrett [Murphy] agreed that there should be a re-set button hit as it related to the culture."  Pls.' Opening Mem., Ex. 45-12 at 3.  In 2018, in response to media inquiries regarding the Department, Mayor Emanuel stated that "the culture of that department has been around for decades." *Id.* at 4.  The plaintiffs also point to Conner's deposition testimony that changing the culture was "challenging" because "trying to get people who think a certain way or try to change their thinking is a daunting task if that's how they think."  Pls.' Opening Mem., Ex. 3 at 196:3–8.

The plaintiffs also allege that "there were physical representations of racism in the workplace," including at least three instances of nooses present in Department trucks and uses of the n-word in workplace conversations.  Pls.' Opening Mem. at 13.  The plaintiffs and putative class members allege that they were subject to racial epithets, heard "race-based terrorizing comments" in the workplace, and were given worse equipment and more dangerous assignments. *Id.* at 18.  The plaintiffs contend that their allegations "confirm[] a racially hostile work environment existed at the Department." *Id.*  They also allege that there are racial disparities in overtime, discipline, and promotions at the Department demonstrated by anecdotal and statistical evidence.

The plaintiffs move to certify four classes.  The first proposed class, the hostile work environment class, includes "[a]ll Black employees who worked in the Department

between January 1, 2011 and the date of judgment."  Pls.' Opening Mem. at 43.  The plaintiffs also propose three subclasses within this class:  (1) hostile work environment class members who worked in a position eligible for overtime between June 29, 2015 and July 1, 2017 for all bureaus except BWS (the overtime subclass); (2) hostile work environment class members who were formally accused of a disciplinary infraction between June 29, 2015 and July 1, 2017 (the discipline subclass); and (3) hostile work environment class members who made an unsuccessful application for a position within the Department that was pending or determined between June 29, 2015 and July 1, 2017 (the promotion subclass).

## Discussion

In order for the case to proceed as a class action, the plaintiffs must show that their proposed classes satisfy all the requirements of Rule 23, which sets out the criteria for class certification.  *Mulvania v. Sheriff of Rock Island Cnty.*, 850 F.3d 849, 859 (7th Cir. 2017).  "In conducting this analysis, the court should not turn the class certification proceedings into a dress rehearsal for the trial on the merits."  *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 811 (7th Cir. 2012).

First, under Rule 23(a), a putative class must satisfy four requirements: numerosity, commonality, typicality, and adequacy of representation.  *See* Fed. R. Civ. P. 23(a)(1)–(4).  Rule 23(a) requires the class to be so numerous that joinder of all members is impracticable; there are common questions of law or fact; the representatives' claims are typical of those of the class; and the representatives fairly and adequately protect the interests of the class.

Second, the proposed class must fall within one of the three categories in Rule

6

23(b).  *Spano v. Boeing Co.*, 633 F.3d 574, 583 (7th Cir. 2011).  The plaintiffs argue for certification under Rule 23(b)(2) and Rule 23(b)(3).  Rule 23(b)(2) applies when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2).  Rule 23(b)(3) requires finding "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).

## A.     Hostile work environment class

The City primarily contends that the hostile work environment class cannot be certified because it fails the commonality requirement under Rule 23(a)(2).  To satisfy commonality, the plaintiffs must identify at least one question common to all the class members whose answer is "apt to drive the resolution of the litigation."  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (internal quotation marks omitted).  "One common question is enough, but not just any question will do."  *Howard v. Cook Cnty. Sheriff's Off.*, 989 F.3d 587, 598 (7th Cir. 2021).  "[T]he class claims 'must depend on a common contention' that is 'capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.'"  *Id.* (quoting *Wal-Mart*, 564 U.S. at 350).  "Dissimilarities within the proposed class . . . have the potential to impede the generation of common answers."  *Wal-Mart*, 564 U.S. at 350.

The Court begins its analysis "by identifying the elements" of the plaintiffs' hostile

work environment claim. *Simpson v. Dart*, 23 F.4th 706, 713 (7th Cir. 2022); *see also Santiago v. City of Chicago*, 19 F.4th 1010, 1018 (7th Cir. 2021) ("Only by properly circumscribing the claims and breaking them down into their constituent elements can a district court decide which issues are common, individual, and predominant."). "To establish a hostile work environment claim, a plaintiff must show: (1) the work environment was both subjectively and objectively offensive; (2) the harassment was based on membership in a protected class; (3) the conduct was severe or pervasive; and (4) there is a basis for employer liability." *Trahanas v. Nw. Univ.*, 64 F.4th 842, 853 (7th Cir. 2023).[1] "Hostile work environment claims are fact intensive" and "turn on the frequency, severity, character, and effect of the harassment." *Howard*, 989 F.3d at 604 (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)).

The City contends that the plaintiffs cannot satisfy commonality because they have not established a common work environment, relying primarily on the Seventh Circuit's decision in *Howard*. The Court agrees that *Howard* forecloses certification of the plaintiffs' proposed hostile work environment class.

In *Howard*, the Seventh Circuit reversed this Court's certification of a hostile work environment class, noting that such claims "are 'worker-specific' inquiries because they

---

[1] As in *Howard*, both parties cite the elements of a Title VII hostile work environment claim for the plaintiffs' hostile work environment claims brought under sections 1981 and 1983 and the Illinois Civil Rights Act. This poses no issue for the section 1981 and Illinois Civil Rights Act claims because the same legal standard applies for both claims. *See Howard*, 989 F.3d at 609; *Mahran v. Advoc. Christ Med. Ctr.*, 12 F.4th 708, 714 & n.5 (7th Cir. 2021). The plaintiffs' equal protection claim, however, "requires proof that the defendants were motivated by a discriminatory purpose." *Howard*, 989 F.3d at 609 (internal quotation marks omitted). But although "the claims' legal elements do not perfectly overlap," *id.*, neither party has suggested that the commonality analysis differs for the section 1983 claim.

depend on a class member's unique experience—which correlates to where she works."
*Id.* at 604 (quoting *Bolden v. Walsh Const. Co.*, 688 F.3d 893, 896 (7th Cir. 2012)).  The
alleged work environment in *Howard* was the Cook County jail, which "fill[ed] dozens of
buildings that sprawl[ed] across eight city blocks."  *Id.* at 604.  The plaintiffs provided
evidence that "employees often change jobs" and that "both employees and inmates,"
the alleged harassers, "traverse the jail."  *Id.* at 605.  The Seventh Circuit nevertheless
held that it was "a leap too far to conclude from this evidence that all class members
share essentially the same work environment."  *Id.*  "Without a stronger evidentiary
showing, the plaintiffs c[ould] not demonstrate that class members working in disparate
parts of the massive jail complex have experienced the same work environment."  *Id.*

As in *Howard*, the plaintiffs in this case have not demonstrated that all class
members working in the Department shared the same work environment.  The
Department is even larger than the jail complex at issue in *Howard*.  It encompasses
five separate bureaus and operates from numerous locations spread throughout
Chicago, including two large multi-level treatment plants and hundreds of construction
sites.  Moreover, unlike in *Howard*, the plaintiffs have not provided any evidence that
class members working in different bureaus occupied or experienced the same work
environment.  Instead, the evidence suggests the contrary.  Several plaintiffs employed
in BWS testified that they did not know the alleged harassers working in BOD and vice
versa.

The plaintiffs' reliance on *Brown v. Nucor Corp.*, 576 F.3d 149 (4th Cir. 2009), *as
amended* (Oct. 8, 2009), is unavailing.  The alleged hostile work environment in that
case involved a single manufacturing plant that was organized into six production

departments.  *See id.* at 151.  The Fourth Circuit held that the production departments were not separate environments because the evidence showed that the employees shared common areas, the departments were physically connected, and some of the alleged harassment was broadcast over a plant-wide radio.  *See id.* at 158.  In this case, by contrast, the bureaus operate at separate locations, and there is no similar evidence of common areas shared by all Department employees or instances of harassment broadcast across the entire Department.

The plaintiffs argue that the City has not shown that any part of the Department was discrimination-free.  But the same was true in *Howard*.  Although the Seventh Circuit observed in that case that sexual harassment was more prevalent in certain divisions of the jail than others, it also noted that "sexual harassment occurs throughout the jail."  *Howard*, 989 F.3d at 604–05.  As the Seventh Circuit explained, its holding "d[id] not mean that one class member (e.g., a Division 10 employee) ha[d] experienced a hostile work environment while another (e.g., a law librarian) ha[d] not."  *Id.* at 604–05.  This, however, did not carry the day on the question of commonality.  The court stated that "the questions of whether these two employees have endured objectively severe or pervasive harassment must be answered separately because they depend on individualized questions of fact and law, whose answers are unique to each class member's particular situation."  *Id.* at 605 (alterations accepted) (internal quotation marks omitted).

Similarly, in this case, the plaintiffs have provided evidence that racial discrimination occurred throughout the Department.  The evidence shows, however, that the discrimination took different forms based on each class member's situation.

Some plaintiffs and putative class members described hearing racial epithets, others reported seeing racially offensive imagery in certain workspaces, and still others testified that they received harder or more dangerous work assignments. In other words, the allegations of harassment are specific and vary from plaintiff to plaintiff. To evaluate these allegations, "a court would need site-specific, perhaps worker-specific, details, and then the individual questions would dominate the common questions (if, indeed, there turned out to be any common questions)." *Bolden*, 688 F.3d at 896.

The plaintiffs attempt to distinguish *Howard* by contending that they have provided "evidence of a wide-spread *de facto* policy of racism that emanated from the top leaders of the Department." Pls.' Reply Br. at 7. The plaintiffs point to the statements by the Mayor, the Commissioner, and OIG report that the Department had a long-standing culture of racism. But these general statements do not show that this culture "manifests in the same way across all parts of the [Department], such that it could be a common question for the class." *Howard*, 989 F.3d at 604. Similar to the so-called "ambient" harassment theory at issue in *Howard*, such contentions "overlook[] meaningful distinctions among the class members' individual experiences." *Id.* at 603. The plaintiffs also cite their sociological expert Dr. Charles Gallagher's conclusion that the Department had a hostile work environment stemming from a racist culture.[2] But

---

[2] The City contends that Dr. Gallagher's testimony should be excluded under Federal Rule of Evidence 702. "[W]hen an expert's report or testimony is critical to class certification, the district court must make a conclusive ruling on any challenge to that expert's qualifications or submissions before it may rule on a motion for class certification." *Howard*, 989 F.3d at 601 (internal quotation marks omitted). However, because the Court does not rely on Dr. Gallagher's testimony, it need not rule on the City's motion. *See Bolden*, 688 F.3d at 897 ("We need not determine whether Smith's study should have been excluded under Fed. R. Evid. 702. It is enough to say that it does not show any common issue that would allow a multi-site class.").

this still does not demonstrate commonality, for the same reason. *Cf. Wal-Mart*, 564 U.S. at 345, 353–55 (holding that the plaintiffs' contention that the defendant had "a strong and uniform 'corporate culture'" that "permit[ted] bias against women" could not satisfy commonality where the plaintiffs' sociological expert could not calculate what percentage of employment decisions were determined by this culture).

Lastly, the plaintiffs contend that "whether there was a widespread practice or custom of race discrimination" under *Monell* is a common question. Pls.' Opening Mem. at 59. As explained above, to satisfy the commonality requirement, the plaintiffs' class claims must "depend upon a common contention" that "will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart*, 564 U.S. at 350; *see also Howard*, 989 F.3d at 598 ("[T]he common question must 'not be peripheral but important to most of the individual class member's claims[.]'" (quoting 1 William B. Rubenstein, *Newberg on Class Actions* § 3:18 (5th ed. 2012))). Even if the existence of a policy under *Monell* is a common question for the class, it cannot satisfy the commonality requirement because it is a relatively subsidiary point on the class members' hostile work environment claims. The individualized issues related to proving liability described above would remain.[3] *See McFields v. Dart*, 982 F.3d 511, 517 (7th Cir. 2020) ("[T]he answer to that question—the mere existence of a policy—is relevant

---

[3] The plaintiffs also contend that under *Teamsters v. United States*, 431 U.S. 324 (1977), whether the City "engaged in a pattern-or-practice of hostility and discrimination presents a common issue" for the class. Pls.' Reply Br. at 9–10. This is not a common question for the same reason as discussed in connection with the plaintiffs' claim under *Monell*. Furthermore, "[t]he pattern and practice analysis is only relevant to statutory schemes which utilize the *McDonnell–Douglas* burden shifting framework, like Title VII, and thus it can not [sic] be used" for section 1983 equal protection claims. *Chavez v. Ill. State Police*, 251 F.3d 612, 638 n.8 (7th Cir. 2001).

to just one small part of the analysis required under *Monell* and *Miranda*, and it leaves us far from resolving the litigation on a classwide basis.").

The plaintiffs also briefly assert that common evidence could show that the City had a policy of tolerating racism at the Department and "failed to take adequate remedial measures" to address the harassment. Pls.' Opening Mem. at 58. But *Howard* also rejected employer liability as a common question.[4] "The reasonableness of an employer's response to harassment is a fact-bound inquiry." *Howard*, 989 F.3d at 608. Even if the City's policies were "uniform throughout" the Department, "the reasonableness of those policies (and any other preventative measures) still depends on the specific circumstances of the plaintiff(s) or class member(s) challenging the policies." *Id.* Thus, the City's liability is not a common question for the class.

In sum, the plaintiffs have failed to establish commonality for the hostile work environment class. The Court denies the plaintiffs' motion for class certification on this basis and thus need not address whether the hostile work environment class satisfies the other requirements of Rule 23(a) or Rule 23(b).

## B. Subclasses

The plaintiffs also seek certification of three subclasses relating to discipline, promotion, and overtime. As the plaintiffs recognize, each subclass must independently

---

[4] The plaintiffs do not clarify whether they are pursuing a strict liability or negligence theory of employer liability. *See Howard*, 989 F.3d at 607 ("An employer is liable in a hostile work environment case if (1) a supervisor participated in the harassment (giving rise to strict liability) or (2) the employer was negligent in discovering or remedying the harassment by a coworker or a third party."). The City contends in its response brief that the plaintiffs' employer liability argument is foreclosed by *Howard*, which addressed a negligence theory. The plaintiffs do not address this contention in their reply brief. *See Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument . . . results in waiver.").

satisfy Rule 23. *See* Fed. R. Civ. P. 23(c)(5). In addition to claims of intentional discrimination, the putative discipline, promotion, and overtime class members bring claims for unintentional discrimination under the Illinois Civil Rights Act. For each subclass, the plaintiffs rely on statistical and anecdotal evidence to allege a general policy of discrimination; they do not contend that a common policy produced disparate outcomes. The City contends that each subclass fails Rule 23(a)'s commonality requirement.

As a preliminary matter, the plaintiffs contend that under the Illinois Civil Rights Act, the plaintiffs need only identify the "criteria or methods of administrati[ng]" discipline, promotion, or overtime that had a discriminatory effect, 740 ILCS 23/5(a)(2), rather than a "specific employment practice as required by Title VII." Pls.' Opening Mem. at 62.[5] But the plaintiffs do not explain the difference between these standards, other than to assert that Title VII's requirement is "more specific and demanding." Pls.' Reply Br. at 17. They also do not cite any caselaw drawing a distinction between "criteria or methods of administration" and a "specific employment practice."

---

[5] The plaintiffs contend that "[w]hether Plaintiffs must identify a 'specific employment practice' to pursue a claim for overtime, promotion or discipline discrimination under the Illinois Civil Rights Act" is a question common to the subclasses. Pls.' Opening Mem. at 62. But the answer to this question will not "resolve an issue that is central to the validity of each one of the claims in one stroke," which, as explained above, is required to satisfy commonality. *Wal-Mart*, 564 U.S. at 350. Rather, the plaintiffs' proposed question is whether they are required to identify a common practice to prove their Illinois Civil Rights Act disparate impact claim. Put another way, their proposed common question is whether the claim "is a common or an individualized question in the first place." *Dancel v. Groupon, Inc.*, 949 F.3d 999, 1007 (7th Cir. 2019). Whether this claim must be proven through individualized evidence or whether it can be proven with the plaintiffs' common statistical evidence of discrimination "is precisely the question the court must answer at certification." *Id.*

Courts have consistently held that the Illinois Civil Rights Act "merely created a new venue in which plaintiffs could pursue in the State courts discrimination actions that had been available to them in the federal courts." *Ill. Native Am. Bar Ass'n v. Univ. of Ill.*, 368 Ill. App. 3d 321, 327, 856 N.E.2d 460, 467 (2006); *see also Williams v. Dart*, 967 F.3d 625, 638 n.1 (7th Cir. 2020) ("The Illinois Civil Rights Act of 2003 creates two separate causes of action which have been held only to provide a state forum for federal rights under Title VI and Title VII, respectively, of the Civil Rights Act of 1964.") (citations omitted); *Dunnet Bay Const. Co. v. Borggren*, 799 F.3d 676, 697 (7th Cir. 2015) ("Section 5 of the Illinois Civil Rights Act of 2003 was not intended to create new rights but merely created a new venue—state court—for discrimination claims under federal law.").  In any event, the plaintiffs have not identified any common criteria, methods, or practices that caused the alleged discrimination in discipline, promotions, and overtime decisions.

### 1.    Discipline class

The plaintiffs first seek certification of a discipline subclass, encompassing hostile work environment class members "who were formally accused of a disciplinary infraction between June 29, 2015 and July 1, 2017."  Pls.' Opening Mem. at 43.  At the Department, a formal accusation of a disciplinary infraction is called a Notice of Pre-Disciplinary Hearing (NPDH).  Under the City's personnel rules and collective bargaining agreements, the disciplinary process begins when a NPDH is issued by the employee's supervisor.

The City contends that this class cannot satisfy the commonality requirement because NPDHs involve "the discretionary decisions of more than one hundred

supervisors." Def.'s Resp. Br. at 44. The plaintiffs do not dispute that NPDH decisions are made by "individual decision-makers." Pls.' Reply Br. at 11.[6] Instead, the plaintiffs contend that "discretion was exercised in a common way" by the supervisors, "consistent with Plaintiffs' common contention for the Sub-Class that the racist culture affected how the Department's supervisors applied department-wide Personnel Rules." Pls.' Reply Br. at 11–12.

"Cases in which low-level managers use their given discretion to make individual decisions without guidance from an overarching company policy do not satisfy commonality because the evidence varies from plaintiff to plaintiff." *Bell v. PNC Bank, Nat. Ass'n*, 800 F.3d 360, 375 (7th Cir. 2015); *see also Bolden*, 688 F.3d at 898 ("[T]he policy of on-site operational discretion [] is the precise policy that *Wal-Mart* says cannot be addressed in a company-wide class action."). As in *Bolden* and *Wal-Mart*, the only policy the plaintiffs have identified is a policy of "*allowing discretion* by local supervisors." *Bolden*, 688 F.3d at 897 (quoting *Wal-Mart*, 564 U.S. at 355). Although the plaintiffs point to the personnel rules as a department-wide policy, the personnel rules reiterate that supervisors have discretion over discipline. The plaintiffs do not identify any practice contained within the personnel rules that they contend is discriminatory. *See Brand v. Comcast Corp., Inc.*, 302 F.R.D. 201, 231 (N.D. Ill. 2014)

---

[6] The plaintiffs note that Jennifer Izban "coordinated disciplinary hearings for the Department." Pls.' Opening Mem. at 28. But they do not contend that Izban's coordination caused the disparate disciplinary outcomes. Rather, the plaintiffs' expert found statistically significant disparities at the NPDHs stage, which occurred before the disciplinary hearings. In their reply brief, the plaintiffs do not dispute the City's contention that Izban is not involved in the issuances of NPDHs. Moreover, the plaintiffs' allegations involve false accusations of disciplinary infractions, not discrimination at the hearings stage.

("Plaintiffs do not, for example, point to a single entity intervening in the disciplinary decisions of individual managers or an overall policy pursuant to which 112th Street managers tended to discipline or terminate their employees more than those at other facilities.").

The plaintiffs instead point to statistical evidence of racial disparities in discipline compiled by their expert, Dr. Bernard Siskin, to show that the Department's "racist culture affected how the Department's supervisors applied department-wide Personnel Rules." Pls.' Reply Br. at 12. But showing that "local discretion had a disparate impact" is insufficient to "justif[y] class treatment." *Bolden*, 688 F.3d at 897. The plaintiffs' statistical evidence is akin to the evidence rejected in *Bolden* and *Wal-Mart* as a basis for class certification. As in those cases, Dr. Siskin's "aggregate data would show that black workers did worse than white workers—but that result would not imply that all" the supervisors "behaved similarly, so it would not demonstrate commonality." *Id.* at 896; *Wal-Mart*, 564 U.S. at 357 ("Even if it established . . . a pay or promotion pattern that differs from the nationwide figures or the regional figures in *all* of Wal–Mart's 3,400 stores, that would still not demonstrate that commonality of issue exists.").

The plaintiffs contend that *Bolden* is inapplicable because the plaintiffs' statistical evidence in that case "did not control for factors other than race that would help show individual supervisors exercised discretion in a common way." Pls.' Reply Br. at 8. But although the Seventh Circuit in *Bolden* noted that the expert "did not attempt to control for variables other than race," that was merely one of several problems with the expert's analysis that the court found significant. *Bolden*, 688 F.3d at 896. The central problem with the statistical evidence in *Bolden* and *Wal-Mart*, which applies equally to the

17

statistical evidence in this case, is that "[m]erely showing that [the Department]'s policy of discretion has produced an overall . . . disparity does not suffice" to show commonality. *Wal-Mart*, 564 U.S. at 357. Such evidence "falls well short" of showing "a common mode of exercising discretion." *Id.* at 356.

The Court therefore declines to certify the plaintiffs' proposed discipline subclass for failure to meet the commonality requirement of Rule 23(a)(2).

### 2. Overtime class

The overtime subclass has the same problems as the discipline subclass. The plaintiffs' proposed overtime class encompasses the hostile work environment class members "who worked in the Department in a position eligible for Overtime between June 29, 2015 and July 1, 2017, for the Bureaus of Operations and Distribution, Engineering Services, Administrative Support, and Meter Services." Pls.' Opening Mem. at 43. In addressing commonality, the plaintiffs again rely on Dr. Siskin's statistical evidence of disparate outcomes. For the same reasons explained for the plaintiffs' discipline class, Dr. Siskin's statistical analysis is unavailing to show commonality.

In their reply brief, the plaintiffs shift focus, contending that "[o]vertime approval decisions are made at the Deputy Commissioner and District Superintendent level." Pls.' Reply Br. at 22 (citing Ex. 89). Per the City's organizational charts, each bureau is headed by a Deputy Commissioner to which District Superintendents report.

As a preliminary matter, the plaintiffs' assertion is only thinly supported by the record. The exhibit the plaintiffs cite is ostensibly the Department's "Overtime Policy" effective in 2017. Pls.' Reply Br., Ex. 89 at 1. According to the policy, for BOD, BOE,

BWS, and BMS, overtime must be approved by the Deputy Commissioner or Managing Deputy of the bureau. *See, e.g., id.* at 3 ("The Superintendent or his designee (ADS) to [sic] contact the Managing Deputy/Deputy for notification and approval of overtime each weekday afternoon."), *id.* at 5 ("Time sheets and an explanation of the reason for the overtime will be submitted to the deputy commissioner for approval."). The policy does not address overtime for BAS, so at least for that bureau, the plaintiffs have not provided any evidence that the Deputy Commissioner had final approval of overtime. The policy also does not suggest that District Superintendents make approval decisions.

The plaintiffs also cite the OIG Overtime Audit report from 2020. That report stated, however, that although the Department had developed an overtime policy, it had not distributed the policy as of April 2018 because the Department "was unaware it had been approved" by the Office of Budget and Management. Pls.' Opening Mem., Ex. 58 at 12. This casts doubt on whether the Department's overtime policy had been put into practice during the class period. The OIG report also recommended that the Department "update its policy" to identify "which supervisory positions are responsible for approving and reviewing overtime"; management response was that the Department's "Division Heads are responsible for reviewing and approving overtime. This change was implemented *last year* and will be addressed in the policy." *Id.* at 12–13 (emphasis added). This suggests that it was not until 2019—two years after the end of the class period—when the plaintiffs' identified practice was implemented.

Even assuming the plaintiffs had made a sufficient showing that overtime was approved by the Deputy Commissioners, they still would not satisfy the commonality requirement. "[S]ubjective, discretionary decisions can be the source of a common

claim if they are, for example, the outcome of employment practices or policies controlled by higher-level directors, if all decision-makers exercise discretion in a common way because of a company policy or practice, or if all decision-makers act together as one unit." *Chi. Tchrs. Union, Loc. No. 1 v. Bd. of Educ. of City of Chi.*, 797 F.3d 426, 438 (7th Cir. 2015); *see also Bolden*, 688 F.3d at 899 ("*Wal–Mart* observes that it may be possible to contest, in a class action, the effect a single supervisor's conduct has on many employees."). In *Chicago Teachers Union*, the plaintiffs alleged that the City of Chicago's Board of Education's selection of ten schools for reconstitution was racially discriminatory. *See Chi. Tchrs. Union*, 797 F.3d at 432. The Seventh Circuit held that the plaintiffs "demonstrated commonality by asserting that a uniform employment practice (the set of criteria used to evaluate the school) used by the same decision-making body to evaluate schools was discriminatory." *Id.* at 440.

This case is distinguishable from *Chicago Teachers Union* in two ways. First, the plaintiffs here contend that certain District Superintendents intentionally denied overtime. They do not identify a uniform policy or set of criteria applied by the Deputy Commissioners in deciding whether to approve overtime. The evidence shows that overtime processes were inconsistent and, according to the OIG report, "varie[d] widely depending on the supervisor, trade, and work location." Pls.' Opening Mem., Ex. 58 at 18.

Second, there is no evidence that the Deputy Commissioners made approval decisions together, such that "the same decision-making body" was making all the overtime decisions for the class. *Chi. Tchrs. Union*, 797 F.3d at 440. Thus, even if Bresnahan, the Managing Deputy of BOD, approved overtime in a discriminatory

20

manner as the plaintiffs allege, that does not indicate that the Deputy Commissioner of BOE or BAS made discriminatory overtime decisions.  *See Wal-Mart*, 564 U.S. at 355–56 ("[D]emonstrating the invalidity of one manager's use of discretion will do nothing to demonstrate the invalidity of another's."); *Bolden*, 688 F.3d at 897 ("Although the Court recognized that discretion might facilitate discrimination, it also observed that some managers will take advantage of the opportunity to discriminate while others won't.") (citation omitted).  Indeed, the plaintiffs do not make any allegations specific to Julie Hernandez-Tomlin, Michael Sturtevant, or Burt Rezko, the Managing Deputy and Deputy Commissioners of those bureaus during the class period.

In sum, none of the conditions that the Seventh Circuit outlined as allowing "discretionary decisions [to] be the source of a common claim" are met in this case. *Chi. Tchrs. Union*, 797 F.3d at 438.  The plaintiffs have therefore not satisfied the commonality requirement for this subclass.  The Court declines to certify the overtime subclass on this basis.

### 3.    Promotion class

Lastly, the plaintiffs seek certification of a promotion subclass, encompassing all members of the hostile work environment class "who made an unsuccessful application for a position within the Department which was pending or determined between June 29, 2015 and July 1, 2017."  Pls.' Opening Mem. at 43.  Under the City's personnel rules and Hiring Plan, the Department's hiring process proceeds in steps.  In the first two steps, screening and scoring, Human Resources screens out unqualified applicants. Qualified applicants proceed to the third step, which is called referral.  Depending on the position, the referral step may constitute a lottery, written tests, interviews, or some

21

combination of tests and interviews. As with the discipline class, the plaintiffs contend that "a policy of racism . . . influenced and governed decisions as part of the pattern of racially discriminatory conduct." Pls.' Reply Br. at 15. The City contends that the promotion class fails the commonality requirement because it includes too many different jobs, evaluators, and selection procedures.

There are two problems with the promotion subclass that prevent a finding of commonality. First, the subclass includes all class members who unsuccessfully applied for a position, regardless of which step they reached in the process. The reasons an applicant may falter at each step vary significantly. Unlike the plaintiffs in *Chicago Teachers Union*, the plaintiffs here do not contend "that the objective criteria in the first two steps narrowed the pool in such a way as to have a disparate impact . . . without regard to the later, subjective step." *Chi. Tchrs. Union*, 797 F.3d at 436. Indeed, the plaintiffs' expert specifically found that "the problem occurs at the referral stage," which is the subjective step. Pls.' Opening Mem., Ex. 42-1 at 47. And, "[w]ithout conceding Defendant's arguments," the plaintiffs withdrew the representatives whose applications did not pass the scoring stage, Henry and Smith. Pls.' Reply Br. at 21 n.10.

Second, even if the promotion subclass were focused on the referral step, the plaintiffs still have not satisfied the commonality requirement. The referral step takes various forms depending on the job position. The plaintiffs contend that the promotion process "often involved the same top management personnel (like Deputy Commissioner William Bresnahan)." Pls.' Reply Br. at 14. As support, the plaintiffs cite Bresnahan's deposition testimony to the effect that he sometimes participated in

interview panels typically composed of three people chosen by Luci Pope-Anderson. This falls short of showing that Bresnahan was involved in all promotion decisions for the class. Indeed, Edmond alleges that Stark, not Bresnahan, "impeded his ability to receive any" promotions. Pls.' Opening Mem. at 33. The plaintiffs also cite Murphy's deposition testimony that in BWM, Marissa Keating, John Pope, and Keith Holmes assisted with reassignments within departments, akin to how Pope Anderson handled this process for BOD. Thus, as with the overtime class, the plaintiffs have not shown that the same group of decision-makers made all the hiring decisions for the class.

Moreover, the plaintiffs have not identified a uniform set of criteria used by evaluators in the referral step. Not all candidates are even interviewed. For some positions included in the class, applicants are chosen based on a lottery system. *See* Def.'s Resp. Br., Ex. 31-1 at 65–66 ("[A] general laborer for streets and sanitation, they don't have a test. They don't have an interview. They essentially apply for the position, and the list gets what's called lotterized.").

In sum, the plaintiffs have not shown that hiring decisions were "the outcome of employment practices or policies controlled by higher-level directors" or made by "decision-makers act[ing] together as one unit." *Chi. Tchrs. Union*, 797 F.3d at 438. The only proposed common evidence that remains is Dr. Siskin's statistical evidence of disparities in hiring, which is insufficient for the reasons explained above. The plaintiffs therefore have not provided any common contention that ties the various hiring decisions together. As with the proposed discipline and overtime subclasses, the Court declines to certify the plaintiffs' proposed promotion class because it does not satisfy the commonality requirement of Rule 23(a)(2).

C.    **Issue classes**

In the alternative, the plaintiffs seek certification under Rule 23(c)(4) for several liability issues.[7]  Rule 23(c)(4) provides that "[w]hen appropriate, an action may be brought or maintained as a class action with respect to particular issues."  Fed. R. Civ. P. 23(c)(4).  However, the issues the plaintiffs identify overlap with the questions the Court concluded were not common for the plaintiffs' proposed classes.  An issue class, like any class action, "must satisfy Rule 23 and all its requirements."  *Russell v. Educ. Comm'n for Foreign Med. Graduates*, 15 F.4th 259, 266 (3d Cir. 2021), *cert. denied*, 142 S. Ct. 2706 (2022); *see also Van v. Ford Motor Co.*, 332 F.R.D. 249, 293 (N.D. Ill. 2019) ("Rule 23(c)(4) does not exempt class representatives from the threshold requirements of Rule 23(a).") (internal quotation marks omitted).  The plaintiffs do not explain how any of the issues they identify are common to the class, instead relying on their same commonality arguments for the other classes that the Court has already rejected.  Thus, the Court declines to certify any Rule 23(c)(4) classes.

### Conclusion

For the reasons stated above, the Court denies the plaintiffs' motion for class certification [dkt. no. 226].  The parties are directed to confer regarding a schedule for further proceedings and are to file a joint status report in this regard on June 13, 2023.

---

[7] "Plaintiffs seek certification pursuant to Fed. R. Civ. P. 23(c)(4) for the issues of:  (a) whether Defendant maintained a hostile work environment for Blacks; (b) whether Defendant's methods or criteria for administering discipline, assigning overtime and/or selecting internal applicants for positions discriminated against Blacks or had the effect of discriminating against them; (c) whether discrimination was so widespread and well-established that it constituted a de facto policy of the Department for purposes of liability under Section 1983 (*e.g., Monell*); and (d) whether Defendant engaged in a pattern-or-practice of discrimination against Blacks."  Pls.' Opening Mem. at 3.

The case is set for a telephonic status hearing on June 15, 2023 at 9:30 a.m., using call-in number 888-684-8852, access code 746-1053.

MATTHEW F. KENNELLY
United States District Judge

Date:  June 6, 2023