**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| DERRICK EDMOND, KATHERINE EALY, EDDIE COOPER, JR., VICKI HILL, ROBERT T. LAWS, JR., ANTON GLENN, VERONICA SMITH, DONALD ANDERSON, and DAVID HENRY, | ) ) ) ) ) ) ) | Case No. 1:17-cv-04858 |
| Plaintiffs, | ) ) | Honorable Matthew F. Kennelly |
| v. | ) ) | |
| THE CITY OF CHICAGO, | ) ) | |
| Defendant. | ) | |

## DEFENDANT CITY OF CHICAGO'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

**<u>TABLE OF CONTENTS</u>**

TABLE OF AUTHORITIES ...................................................................................... vii

I.      INTRODUCTION...........................................................................................1

II.     SUMMARY FACTS ABOUT DWM, THE DEPARTMENT OF HUMAN
        RESOURCES, AND PLAINTIFFS' WORK HISTORIES ...........................1

        A.    Bureau of Meter Services ("BMS")......................................................3

        B.    Bureau of Water Supply ("BWS")........................................................3

              1.    BWS – Water Treatment.............................................................3

              2.    BWS – Water Pumping ...............................................................5

        C.    Bureau of Operations and Distribution ("BOD")................................5

        D.    Plaintiffs worked in different locations................................................6

        E.    The Plaintiffs and Their Claims ..........................................................7

              1.    Derek Edmond .............................................................................8
              2.    Katherine Ealy .............................................................................8
              3.    Eddie Cooper................................................................................8
              4.    Vicki Hill......................................................................................9
              5.    Robert Laws .................................................................................9
              6.    Anton Glenn .................................................................................9
              7.    Veronica Smith...........................................................................10
              8.    Donald Anderson ........................................................................10
              9.    David Henry ................................................................................10

        F.    The Department of Human Resources.................................................11

III.    SUMMARY JUDGMENT STANDARD ......................................................11

IV.     SUMMARY JUDGMENT SHOULD BE GRANTED ON PLAINTIFFS'
        DISPARATE TREATMENT CLAIMS UNDER 42 U.S.C. § 1983, 42 U.S.C. § 1981,
        AND THE ILLINOIS CIVIL RIGHTS ACT................................................12

        A.    Plaintiffs have failed to establish the elements required to maintain disparate
              treatment claims under the Equal Protection Clause of the Fourteenth

Amendment via 42 U.S.C. § 1983, 42 U.S.C. § 1981 via 42 U.S.C. § 1983, and the Illinois Civil Rights Act of 2003, 740 ILCS 23/1, *et seq.* ............................12

1.    Plaintiffs do not meet the standard for maintaining disparate treatment claims under the Equal Protection Clause of the Fourteenth Amendment via 42 U.S.C. § 1983.........................................................12

2.    Plaintiffs do not meet the standard for maintaining disparate treatment claims under 42 U.S.C. § 1981 ...........................................13

3.    Plaintiffs do not meet the *Monell* standard for maintaining disparate treatment claims under 42 U.S.C. § 1983 ...............................15

4.    Plaintiffs cannot pursue claims against Defendant under the Illinois Civil Rights Act because the Act does not apply to Plaintiffs' employment discrimination claims.  However, if the Court holds that Plaintiffs can pursue claims under the Illinois Civil Rights Act, then the standard for disparate treatment claims under Title VII and the Equal Protection Clause applies to those claims. ................................16

5.    Summary judgment should also be granted on Plaintiffs' disparate treatment claims arising out of actions that occurred prior to the applicable statutes of limitations..........................................................20

B.    Plaintiffs do not meet the standard for disparate treatment ...........................21

1.    PLAINTIFFS CLAIMS FOR ALLEGEDLY DISCRIMINATORY OR RETALIATORY DISCIPLINE FAIL....................................................22

    a.    Defendant's disciplinary procedures and policies ....................22
    b.    Derrick Edmond cannot maintain a discipline claim ...............23
    c.    Katherine Ealy cannot maintain a discipline claim .................24
    d.    Eddie Cooper cannot maintain a discipline claim ....................27
    e.    Vicki Hill cannot maintain a discipline claim............................29
    f.    Robert Laws cannot maintain a discipline claim......................29
    g.    Anton Glenn cannot maintain a discipline claim......................30
    h.    Veronica Smith cannot maintain a discipline claim .................31
    i.    Donald Anderson cannot maintain a discipline claim..............32
    j.    David Henry cannot maintain a discipline claim......................34

2.    PLAINTIFFS' CLAIMS FOR ALLEGEDLY DISCRIMINATORY DENIAL OF PROMOTIONS FAIL .......................................................35

|     |                                                                          |     |
| --- | ------------------------------------------------------------------------ | --- |
| a.  | Defendant's hiring process ............................................... | 35  |
| b.  | Derrick Edmond cannot maintain a failure to promote claim ... | 37  |
| c.  | Katherine Ealy cannot maintain a failure to promote claim .. | 38  |
| d.  | Eddie Cooper cannot maintain a failure to promote claim .... | 40  |
| e.  | Vicki Hill cannot maintain a failure to promote claim .......... | 43  |
| f.  | Robert Laws cannot maintain a failure to promote claim ...... | 43  |
| g.  | Anton Glenn cannot maintain a failure to promote claim ...... | 44  |
| h.  | Veronica Smith cannot maintain a failure to promote claim . | 44  |
| i.  | Donald Anderson cannot maintain a failure to promote claim .. | 46  |
| j.  | David Henry cannot maintain a failure to promote claim ...... | 48  |

**3.     PLAINTIFFS' CLAIMS FOR ALLEGEDLY DISCRIMINATORY DENIAL OF OVERTIME FAIL** ............................................... **48**

|     |                                                                          |     |
| --- | ------------------------------------------------------------------------ | --- |
| a.  | Defendant's overtime processes ................................... | 48  |
| b.  | Derrick Edmond cannot maintain an overtime claim ............. | 50  |
| c.  | Katherine Ealy cannot maintain an overtime claim ............... | 50  |
| d.  | Eddie Cooper cannot maintain an overtime claim ................. | 50  |
| e.  | Vicki Hill cannot maintain an overtime claim ....................... | 51  |
| f.  | Robert Laws cannot maintain an overtime claim ................... | 51  |
| g.  | Anton Glenn cannot maintain an overtime claim ................... | 52  |
| h.  | Veronica Smith cannot maintain an overtime claim ............... | 53  |
| i.  | Donald Anderson cannot maintain an overtime claim ............ | 53  |
| j.  | David Henry cannot maintain an overtime claim ................... | 54  |

**4.     PLAINTIFFS' CLAIMS FOR ALLEGEDLY DISCRIMINATORY DENIAL OF ACTING UP FAIL** .............................................. **55**

|     |                                                                          |     |
| --- | ------------------------------------------------------------------------ | --- |
| a.  | Defendant's Acting Up Policy ...................................... | 55  |
| b.  | Katherine Ealy cannot maintain an acting up claim ............... | 55  |
| c.  | Eddie Cooper cannot maintain an acting up claim ................. | 55  |
| d.  | Veronica Smith cannot maintain an acting up claim .............. | 56  |
| e.  | Vicki Hill cannot maintain an acting up claim ...................... | 57  |
| f.  | Derrick Edmond, Robert Laws, Anton Glenn, David Henry, and Donald Anderson cannot maintain acting up claims ............... | 57  |

**5.     PLAINTIFFS' CLAIMS FOR ALLEGEDLY DISCRIMINATORY TRANSFERS/SHIFT SELECTIONS FAIL** ........................................ **57**

|     |                                                                          |     |
| --- | ------------------------------------------------------------------------ | --- |
| a.  | Defendant's transfer/shift selection processes .......................... | 57  |
| b.  | Derrick Edmond cannot maintain any transfer/shift selection claim ........................................................................ | 58  |

        c.      **Katherine Ealy cannot maintain any transfer/shift selection claim Defendant** ...........................................................................58

        d.      **Veronica Smith cannot maintain a transfer/shift selection claim** ...........................................................................................60

        e.      **Donald Anderson cannot maintain a transfer/shift selection claim** ..........................................................................60

        f.      **Eddie Cooper, Vicki Hill, Robert Laws, Anton Glenn, and David Henry cannot maintain transfer/shift selection claims**.............61

**V.**      **SUMMARY JUDGMENT SHOULD BE GRANTED ON PLAINTIFFS' HOSTILE WORK ENVIRONMENT CLAIMS**...............................................61

    **A.**      **Plaintiffs fail to establish the elements of a HWE claim**...................61

    **B.**      **Plaintiffs cannot pursue HWE claims based on time-barred conduct under a continuing violation theory** ...................................................64

    **C.**      **There is no basis for employer liability under Plaintiffs' 1981 and Equal Protection 1983 claims**................................................................67

    **D.**      **If the ICRA applies to employment claims, there is no basis for employer liability under Plaintiffs' ICRA claims** ................................................68

    **E.**      **INDIVIDUAL PLAINTIFFS DO NOT ESTABLISH THAT THEY EXPERIENCED A HOSTILE WORK ENVIRONMENT** ...........................69

        1.      **Defendant's Policies on Harassment, Discrimination, Violence, and Retaliation Preclude Plaintiffs' HWE Claims**......................................69

        2.      **Defendant's Investigation Protocols for EEO Complaints** .................71

        3.      **Defendant's EEO Training** ...................................................................73

        4.      **Plaintiffs cannot maintain a HWE claim based on the e-mails investigated by the OIG**..........................................................................73

        5.      **The Conduct Alleged by Plaintiffs Between January 1, 2011 and the Close of Discovery Does Not Establish a HWE Claim**.........................74

            a.      **Derek Edmond cannot establish that he experienced a HWE.**75

                 i.      **Derrick Edmond's interrogatory answers and deposition testimony are insufficient to establish a HWE** ..............75

        **ii.**    **Derrick Edmond cannot maintain a HWE claim in relation to his allegations about a photo of a noose ......75**

    **b.**    **Katherine Ealy cannot establish that she experienced a HWE....76**

        **i.**    **Katherine Ealy's interrogatory answers are insufficient to establish a HWE.......................................................76**

        **ii.**    **Katherine Ealy's deposition testimony is insufficient to establish a HWE ..............................................77**

    **c.**    **Eddie Cooper cannot establish that he experienced a HWE ...79**

        **i.**    **Eddie Cooper's deposition testimony is insufficient to establish a HWE ..............................................79**

        **ii.**    **Eddie Cooper's interactions with Joe Lynch do not establish a HWE ..............................................81**

    **d.**    **Vicki Hill cannot establish that she experienced a HWE.........83**

        **i.**    **Hill's Claim That She Overheard Stark Use The "N-Word" Is Not Harassment................................83**

        **ii.**    **Hill's Claims About A Black Face Doll Or Figurine At JWPP Are Not Timely ......................................84**

        **iii.**    **Conduct By Bresnahan, Murphy, And Pope-Anderson Was Not Directed At Or About Hill...............84**

        **iv.**    **Hill Was Not Racially Harassed in Relation to Her Mother's 2012 Hospitalization.........................86**

    **e.**    **Robert Laws cannot establish that he experienced a HWE.....86**

    **f.**    **Veronica Smith cannot establish that she experienced a HWE...88**

    **g.**    **Donald Anderson cannot establish that he experienced a HWE.88**

    **h.**    **David Henry cannot establish that he experienced a HWE.....90**

    **i.**    **Anton Glenn cannot establish that he experienced a HWE.....91**

**VI.**    **SUMMARY JUDGMENT SHOULD BE GRANTED ON PLAINTIFFS' DISPARATE IMPACT CLAIMS ..................................................................93**

    **A.**    **Plaintiffs cannot pursue disparate impact claims under 1981 or Equal Protection 1983.................................................................93**

    **B.**    **If the ICRA does apply to employment claims, it adopts federal disparate impact canon and Plaintiffs do not meet that standard ....................94**

       1.     **Plaintiffs have not identified any specific employment practices**........**95**

       2.     **Plaintiffs have not presented evidence that establishes that a particular employment policy or practice created a disparate impact** .................**95**

**VII.**   **SUMMARY JUDGMENT SHOULD BE GRANTED ON ANY CLAIMS UNDER THE DUE PROCESS CLAUSE** .....................................................................**96**

**VIII.**  **CONCLUSION** ...................................................................................**97**

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abrego v. Wilkie*,
   907 F.3d 1004 (7th Cir. 2018) ............................................................. 82

*Adam v. Obama*,
   210 F. Supp. 3d 979 (N.D. Ill. 2016) ................................................... 75

*Adams v. City of Indianapolis*,
   742 F.3d 720 (7th Cir. 2014) ............................................................... 94

*Ahern v. Board of Education of Chicago*,
   133 F.3d 975 (7th Cir. 1998) ............................................................... 18

*Alexander v. Casino Queen, Inc.*,
   739 F.3d 972 (7th Cir. 2014) ............................................................... 62

*Alexander v. Northeastern Illinois University*,
   586 F. Supp. 2d 905 (N.D. Ill. June 23, 2008) .................................... 19

*Alexander v. Wis. Dep't of Health & Family Servs.*,
   263 F.3d 673 (7th Cir. 2001) ............................................................... 29

*Allen v. Ford Motor Co.*,
   2023 U.S. Dist. LEXIS 159171 (N.D. Ill. Sept. 8, 2023) ............ 64, 67, 83

*Arora v. NAV Consulting Inc.*,
   2022 U.S. Dist. LEXIS 186909 (N.D. Ill. Oct. 13, 2022) .................... 15

*Arriaga v. Dart*,
   568 F. Supp. 3d 953 (N.D. Ill. 2021) ................................................... 69

*Barnes v. Bd. of Trs. of the Univ. of Ill.*,
   946 F.3d 384 (7th Cir. 2020) ............................................................... 13

*Beamon v. Marshall & Ilsley Trust Co.*,
   411 F.3d 854 (7th Cir. 2005) ............................................................... 62

*Buttitta v. City of Chi.*,
   9 F.3d 1198 (7th Cir. 1993) ................................................................. 97

*Calhoun v. Ramsey*,
   408 F.3d 375 (7th Cir. 2005) ............................................................... 67

*Campbell v. Forest Preserve District of Cook County,*
    752 F.3d 665 (7th Cir. 2014) ....................................................14, 68

*Cerros v. Steel Techs., Inc.,*
    398 F.3d 944, 951 (7th cir. 2005) ..................................................80

*Cervantes v. Ardagh Grp.,*
    914 F.3d 560 (7th Cir. 2019) .........................................................12

*Charleston v. Bd. Of Trustees of Univ. of Illinois at Chicago,*
    74 F.3d 769, 772 (7th Cir. 2013) ...................................................96

*Comcast Corp. v. National Association of African American-Owned Media,*
    140 S. Ct. 1009 (2020) .............................................................14, 27

*Denius v. Dunlap,*
    330 F.3d 919 (7th Cir. 2003) ..........................................................2

*Duminie v. Ne. Ill. Reg'l Commuter R.R. Corp.,*
    No. 17-cv-3030, 2020 U.S. Dist. LEXIS 46646 (N.D. Ill. Mar. 18, 2020) ...........75

*Edmond v. City of Chicago,*
    No. 17-cv-04858, 2018 U.S. Dist. LEXIS 195184 (N.D. Ill. Nov. 15, 2018) .........64

*Erickson v. Wisconsin Department of Corrections,*
    469 F.3d 600 (7th Cir. 2006) .........................................................69

*Ezell v. Potter,*
    400 F.3d 1041 (7th Cir. 2005) ........................................................78

*Farrell v. Butler Univ.,*
    421 F.3d 609 (7th Cir. 2005) .........................................................95

*Ford v. Marion County Sheriff's Office,*
    942 F.3d 839 (7th Cir. 2019) ...............................................65, 66, 67

*Ford v. Minteq Shapes & Servs.,*
    587 F.3d 845 (7th Cir. 2009) .........................................................76

*Geise v. Phoenix Co. of Chi., Inc.,*
    639 N.E.2d 1273 (Ill. 1994) ..........................................................19

*Gen. Bldg. Contractors Ass'n v. Pennsylvania,*
    458 U.S. 375, 102 S. Ct. 3141 (1982) .................................................94

*Ghosh v. Capital One Servs., LLC,*
    No. 21 C 4111, 2023 U.S. Dist. LEXIS 133964 (N.D. Ill. Aug. 2, 2023) ............76

*Grant v. Trs. of Ind. Univ.*,
  870 F.3d 562 (7th Cir. 2017) ........................................................11

*Graves v. Chief Legal Couns. Of Ill. Dep't of Hum. Rts.*,
  762 N.E.2d 722 (Ill. Ct. App. 2002) .............................................20

*Griffin v. Potter*,
  356 F.3d 824 (7th Cir. 2004) .................................................. *passim*

*Gunville v. Walker*,
  583 F.3d 979, 985 (7th Cir. 2009) ...............................................64

*Hambrick v. Kijakazi*,
  No. 22-3217, 2023 U.S. App. LEXIS 21747 (7th Cir. Aug. 18, 2023) .................62

*Harper v. Ceisel Masonry*,
  2008 U.S. Dist. LEXIS 7 (N.D. Ill. Jan. 2, 2008) ..............................78

*Harris v. Electro-Motive Diesel, Inc.*,
  2015 U.S. Dist. LEXIS 17107 (N.D. Ill. Feb. 12, 2015) ........................80

*Harris v. Forklift Sys.*,
  510 U.S. 17, 21 (1993) .............................................................62

*Hayden ex rel. A.H. v. Greensburg Cmty. Sch. Corp.*,
  743 F.3d 569 (7th Cir. 2014) ......................................................12

*Howard v. Cook Cnty. Sheriff's Off.*,
  2022 U.S. Dist. LEXIS 80848 (N.D. Ill. May 4, 2022) .....................12, 20

*Howard v. Cook Cty. Sheriff's Office*,
  989 F.3d 587 (7th Cir. 2021) ......................................................80

*Hudson v. City of Chi.*,
  No. 02 C 1129, 2003 U.S. Dist. LEXIS 9264 (N.D. Ill. May 28, 2003) ...............97

*Ill. Native Am. Bar Ass'n v. Univ. of Ill.*,
  856 N.E.2d 460 (Ill. Ct. App. 2006) ..........................................17, 94

*Illinois Native American Bar Ass'n v. University of Illinois*,
  368 Ill. App. 3d 321, 327, 856 N.E.2d 460, 467 (1st Dist. 2006) .................94

*Ineichen v. Ameritech*,
  410 F.3d 956 (7th Cir. 2005) ......................................................27

*Isaacs v. Hill's Pet Nutrition, Inc.*,
  485 F.3d 383 (7th Cir. 2007) ......................................................66

*Jackson v. Cerpa*,
    696 F. Supp. 2d 962 (7th Cir. 2010) .............................................................17, 94

*Jackson v. City of Chicago,*
    552 F.3d 619, 622 (7th Cir. 2009) ....................................................................35

*James v. City of Evanston,*
    2021 U.S. Dist. LEXIS 186804 (N.D. Ill. Sept. 29, 2021) ....................................15

*Jett v. Dallas Indep. Sch. Dist.*,
    491 U.S. 701 (1989)......................................................................................14

*Johnson v. Transportation Agency,*
    480 U.S. 616 (1987) .....................................................................................18

*Jones v. City of Chicago*,
    787 F.2d 200 (7th Cir. 1986) ........................................................................68

*Jones v. R.R. Donnelley & Sons Co.*,
    541 U.S. 369 (2004).....................................................................................21

*Jordan v. Evans,*
    No. 15 C 5907, 2020 U.S. Dist. LEXIS 210946 (N.D. Ill. Nov. 11, 2020) ...........95

*Jungiewicz v. Allstate Insurance Co.*,
    No. 13 C 3793, 2014 U.S. Dist. LEXIS 42772 (N.D. Ill. Mar. 31, 2014) ..............64

*Kelly v. City of Chi.*,
    No. 22 C 4535, 2023 U.S. Dist. LEXIS 18960 (N.D. Ill. Feb. 5, 2023).................96

*Kelly v. City of Chicago*,
    4 F.3d 509 (7th Cir. 1993) ............................................................................21

*Langston v. City of Chicago*,
    No. 22 C 5737, 2023 U.S. Dist. LEXIS 119284 (N.D. Ill. July 12, 2023) .............61

*LaRiviere v. Bd. Of Trs. Of S. Ill. Univ.*,
    2015 IL App (5th) 140443-U (5th Dist. 2015) ....................................................19

*Lauderdale v. Ill. Dep't of Human Servs.*,
    876 F.3d 904 (7th Cir. 2017) ........................................................................12

*Lee v. Styrolution America LLC*,
    2013 U.S. Dist. LEXIS 28611 (N.D. Ill. Mar. 1, 2013)........................................79

*Lucas v. Chi. Transit Auth.*,
    367 F.3d 714 (7th Cir. 2004) .....................................................................64, 65

*Luckie v. Ameritech Corp.*,
    389 F.3d 708 (7th Cir. 2004) ............................................................88

*Malhotra v. Univ. of Ill. At Urbana-Champaign*,
    No. 22-2469, 2023 U.S. App. LEXIS 20536 (7th Cir. Aug. 8, 2023) ....................................96

*Martin v. Cook County*,
    2019 U.S. Dist. LEXIS 133354 (N.D. Ill. August 8, 2019)....................................82

*Mason v. Southern Ill. Univ. at Carbondale*,
    233 F.3d 1036 (7th Cir. 2000) ......................................................61, 74, 76

*McDonnell Douglas Corp. v. Green*,
    411 U.S. 792 (1973)....................................................................13, 20

*McPhaul v. Board of Commissioner of Madison County, Indiana*,
    226 F.3d 558 (7th Cir. 2000) ......................................................63, 86, 88

*McPherson v. City of Waukegan*,
    379 F.3d 430, 438 (7th Cir. 2004) ....................................................78

*Mein v. Masonite Corp.*,
    485 N.E.2d 312, 315 (Ill. 1985)........................................................19

*Milligan-Grimstad v. Stanley*,
    877 F.3d 705 (7th Cir. 2017) ......................................................65, 66, 67

*Mir v. State Farm Mut. Auto. Ins. Co.*,
    847 F. App'x 347 (7th Cir. 2021) ......................................................15

*Mochu v. Advocate Aurora Health, Inc.*,
    No. 20 CV 7035, 2023 U.S. Dist. LEXIS 133966 (N.D. Ill. Aug. 2, 2023) ....................67

*Monell v. Dep't of Social Servs.*,
    436 U.S. 658 (1978)................................................................ *passim*

*Moore v. PNC Bank*,
    No. 19 CV 2707, 2023 U.S. Dist. LEXIS 107125 (N.D. Ill. June 21, 2023)....................63

*Morgan v. National R.R. Passenger Corp.*,
    536 U.S. 101 (2002)......................................................65, 66, 67

*Mozee v. Am. Commercial Marine Serv. Co.*,
    940 F.2d 1036 (7th Cir. 1991 ........................................................94

*Mulcahy v. Demopoulos*,
    No. 19 C 7155, 2020 U.S. Dist. LEXIS 180570 (N.D. Ill. Sep. 30, 2020)....................96

*Nichols v. Mich. City Plant Planning Dep't,*
 755 F.3d 594 (7th Cir. 2014) ............................................................79

*Ortiz v. Werner Enters., Inc.,*
 834 F.3d 760 (7th Cir. 2016) ........................................................13, 20

*Orton-Bell v. Indiana,*
 759 F.3d 768 (7th Cir. 2014) ............................................................49

*Paschall v. Tube Processing Corp.,*
 28 F.4th 805 (7th Cir. 2022) ........................................................80, 90

*Patton v. Indianapolis Pub. Sch. Bd.,*
 276 F.3d 334 (7th Cir. 2002) ............................................................83

*Pearson v. Advocate Health Care,*
 2017 U.S. Dist. LEXIS 128349 (N.D. Ill. Aug. 14, 2017)......................62

*Piccioli v. Plumbers Welfare Fund Local 130, U.A.,*
 2020 U.S. Dist. LEXIS 190576 (N.D. Ill. Oct. 14, 2020)......................14

*Porus v. Randall,*
 2014 U.S. Dist. LEXIS 47988 (N.D. Ill. Apr. 8, 2014) (Kennelly, J.) ...................................66

*Powell v. Fujimoto,*
 119 F. App'x 803 (7th Cir. 2004) ......................................................97

*Puffer v. Allstate Insurance Co.,*
 675 F.3d 709 (7th Cir. 2012) ............................................................95

*Quantock v. Shared Marketing Services, Inc.,*
 312 F.3d 899 (7th Cir. 2002) ............................................................19

*Rao v. Gondi,*
 2017 U.S. Dist. LEXIS 86152 (N.D. Ill. June 5, 2017) .........................20

*Robinson v. Perales,*
 894 F.3d 818 (7th Cir. 2018) ............................................................61

*Rogers v. City of Chicago,*
 320 F.3d 748 (7th Cir. 2003) ............................................................11

*Sanchez v. Tootsie Roll Indus., LLC,*
 2021 U.S. Dist. LEXIS 205604 (N.D. Ill. May 18, 2021) ......................15

*Selan v. Kiley,*
 969 F.2d 560 (7th Cir. 1992) ............................................................65

*Shakman v. Democratic Organization of Cook County*,
    69-C-2145 (N.D. Ill.) ...............................................................35

*Silverman v. Bd. of Educ.*,
    637 F.3d 729 (7th Cir. 2011) ...............................................27

*Smith v. City of Jackson*,
    544 U.S. 994 (1988).............................................................95

*Smith v. Northeastern Ill. Univ.*,
    388 F.3d 559 (7th Cir. 2004) ...............................................88

*Spiegel v. McClintic*,
    916 F.3d 611 (7th Cir. 2019) .......................................16, 68

*Springer v. Durflinger*,
    518 F.3d 479 (7th Cir. 2008) ...............................................11

*Sraieb v. Ne. Reg'l Commuter R.R. Corp.*,
    2023 U.S. Dist. LEXIS 99081 (N.D. Ill. June 7, 2023) .........35

*Strickland v. Dart*,
    No. 19-cv-02621, 2023 U.S. Dist. LEXIS 56429 (N.D. Ill. Mar. 31, 2023) ...................78, 79

*Taylor v. Bd. of Educ. of Chi.*,
    2020 U.S. Dist. LEXIS 155741 (N.D. Ill. Aug. 27, 2020).................13, 27

*Thomas v. Neenah Joint Sch. Dist.*,
    2023 U.S. App. LEXIS 18493 (7th Cir. 2023) .....................16

*Thompson v. Mem'l Hosp. of Carbondale*,
    625 F.3d 394 (7th Cir. 2010) ...............................................78

*Vang v. State Farm Mut. Auto. Ins. Co.*,
    2021 U.S. Dist. LEXIS 231811 (C.D. Ill. Dec. 3, 2021) ......15

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
    429 U.S. 252, 97 S. Ct. 555 (1977).....................................93

*Waters v. City of Chicago*,
    580 F.3d 575 (7th Cir. 2009) ...............................................68

*Weiler v. Vill. of Oak Lawn*,
    86 F. Supp. 3d 874 (N.D. Ill. Mar. 31, 2014) (Kennelly, J.)...............17, 18, 20, 69

*Welch v. Eli Lilly & Co.*,
    585 F. App'x 911 (7th Cir. 2014) .......................................95

*Whittaker-Ardson v. Denneys Rest.*,
   2007 U.S. Dist. LEXIS 72036 (N.D. Ill. Sept. 26, 2007) ......................................79

*Williams v. City of Chi.*,
   Case No. 91 C 1821, 1991 U.S. Dist. LEXIS 18534 (N.D. Ill. Dec. 11, 1991)......................96

*Wince v. CBRE, Inc.*,
   No. 19-cv-1546, 2022 U.S. Dist. LEXIS 42516 (N.D. Ill. Mar. 10, 2022) ...........................49

*Woodard v. Tower Auto Prod Co.*,
   2004 U.S. Dist. LEXIS 19595 (N.D. Ill. Sept. 28, 2004) ......................................80

*Yancick v. Hanna Steel Corporation*,
   653 F.3d 532 (7th Cir. 2011) .......................................................63, 88, 91

*Yuknis v. First Student, Inc.*,
   481 F.3d 552 (7th Cir. 2007) ................................................................63

*Zayas v. Rockford Mem'l Hosp.*,
   740 F.3d 1154 (7th Cir. 2014) ..............................................................62

## Statutes

740 ILCS 23/5 ................................................................ 12, 17, 21, 64

775 ILCS 5/1-102(A) .........................................................................19

775 ILCS 5/8-111(D) .........................................................................19

28 U.S.C. § 1658's ..........................................................................21

42 U.S.C. § 1981 ........................................................................ *passim*

42 U.S.C. § 1981(a) .....................................................................13, 14

42 U.S.C. § 1981(c) .........................................................................14

42 U.S.C. § 1983 ........................................................................ *passim*

42 U.S.C. § 2000d ...................................................................17, 18, 68

Civil Rights Act of 1964 Title VII .............................................16, 18, 20, 79

## Other Authorities

Fourteenth Amendment ...................................................................12, 93

Federal Rule of Civil Procedure 12(b)(6) ......................................................14

Federal Rule of Civil Procedure 56 .........................................................................................1, 11

Local Rule 56.1(a)(2)..........................................................................................................................2

Defendant City of Chicago, by its undersigned attorneys, pursuant to Federal Rule of Civil Procedure 56, respectfully submits this memorandum in support of its Motion for Summary judgment:

## I.    <u>INTRODUCTION</u>

Plaintiffs are current or former employees of the City of Chicago's Department of Water Management ("DWM"). Plaintiffs' motion for class certification was denied and only their individual claims remain. In Counts I and II of the Third Amended Complaint ("TAC"), Plaintiffs allege hostile work environment ("HWE") claims under 42 U.S.C. § 1983 for violations of the Equal Protection Clause and 42 U.S.C. § 1981. In Counts III and IV, Plaintiffs allege disparate treatment claims under the Equal Protection Clause and Section 1981. In Count VI, Plaintiffs allege disparate treatment and disparate impact claims under the Illinois Civil Rights Act of 2003. Plaintiffs also purport to allege a Due Process Clause claim in Counts I and III.  Defendant seeks summary judgment on all claims.

Based on the undisputed facts, Plaintiffs cannot sustain their claims. The isolated incidents, common workplace disputes, and petty grievances Plaintiffs allege are insufficient to establish that they were subjected to a HWE or that DWM treated them differently because of their race.  Further, none of the conduct of which they complain constituted disparate treatment on the basis of race or retaliation for engaging in protected activity. For the reasons set forth below, summary judgment should be granted for Defendant on all of Plaintiffs' claims.

## II.    <u>SUMMARY FACTS ABOUT DWM, THE DEPARTMENT OF HUMAN RESOURCES, AND PLAINTIFFS' WORK HISTORIES</u>

DWM serves two principal and critical functions: (1) the production and delivery of drinking water from Lake Michigan to homes and businesses in the City of Chicago and approximately 126 communities outside Chicago, and (2) delivery of sewage and storm water

1

through miles of sewer pipe to the Metropolitan Water Reclamation District for treatment. Defendant's Local Rule 56.1(a)(2) Statement of Material Facts in Support of Its Motion for Summary Judgment ("DSOF"), ¶¶ 1–2.[1]  To perform those functions, DWM employs approximately 1,800 to 2,000 people in various roles, including water chemists and other scientists working at water treatment plants; operating engineers who operate and maintain equipment in the treatment plants and pumping stations; plumbers, bricklayers, and laborers repairing water mains, catch basins, and sewer lines; and various other jobs, including heavy equipment operator, motor truck drivers, and employees in other trades. DSOF ¶ 3.

DWM operates at locations and facilities across the City of Chicago, including two water treatment plants (the Jardine Water Purification Plant ("Jardine" or "JWPP") and the Sawyer (formerly South) Water Purification Plant, ("Sawyer" or "SWPP")), 12 pumping stations, three districts (the North, Central, and South Districts, each of which has its own facilities), a New Construction section, and various other offices, warehouses, supply yards, and construction sites. DSOF ¶ 5.

DWM operates five primary bureaus: the Bureau of Administrative Support ("BAS"), the Bureau of Meter Services ("BMS"), the Bureau of Operations and Distribution ("BOD"), the Bureau of Engineering Services ("BES"), and the Bureau of Water Supply ("BWS"). Each Bureau has separate leadership and employs a range of personnel in different job titles. DSOF ¶ 6.  The Plaintiffs worked in at least five separate locations during the period relevant to this action, including JWPP (Ealy and Hill), SWPP (Ealy, Edmond, Cooper, and Glenn), Meter Services

---

[1]  DSOF ¶ 1 cites DX 1, a page on the City of Chicago's website at https://www.chicago.gov/city/en/depts/water/auto_generated/water_our_structure.html. This Court may take notice of the contents of Defendant's website cited here on summary judgment. *See Denius v. Dunlap*, 330 F.3d 919, 926 (7th Cir. 2003) (contents of government websites are a proper item of which to take judicial notice).

(Smith), BOD Central District (Anderson), and BOD South District (Laws and Henry). DSOF ¶¶ 7–9.

### A. **Bureau of Meter Services ("BMS")**

BMS's principal work involves installation, maintenance, and inspection of water meters in homes and businesses. DSOF ¶¶ 10–11. BMS includes the Water Meter Installation and Repair function, which includes a plumbing shop, stock room, schedulers, meter testing, new accounts, and field services. BMS employees work in stock rooms but are also assigned to work throughout the City. DSOF ¶¶ 10–11. Plaintiff Veronica Smith worked in a stock room or warehouse at BMS. DSOF ¶ 11.

### B. **Bureau of Water Supply ("BWS")**

BWS is responsible for water intake cribs in Lake Michigan, tunnels that transport lake water to the City's two water purification plants, filtration facilities in the plants, laboratory operations, the City's 12 pumping stations, and the system of tunnels and mains that connect BWS facilities. DSOF ¶¶ 12–21. BWS has four sections: an Administrative section that includes a managing deputy or deputy commissioner and other administrative personnel, and three operating sections: (i) Water Quality, (ii) Water Treatment, and (iii) Water Pumping. DSOF ¶¶ 12–21. Water Quality is comprised of the Surveillance Section and the Water Purification Laboratories. DSOF ¶ 13. None of the Plaintiffs worked in Water Quality. DSOF ¶ 13.

#### 1. **BWS - Water Treatment**

BWS's Water Treatment section is responsible for the maintenance and operation of JWPP and SWPP. DSOF ¶ 14. The water treatment process begins when water is drawn from Lake Michigan through the intake cribs and a system of tunnels. After water enters the purification plants from the lake, it is treated with chemicals and then flows into large interior settling or

sedimentation basins, where it is treated so sediment can be removed. DSOF ¶ 14. The water then flows through a series of filters before being sent through a system of tunnels and mains to the pumping stations, where it is pressurized for delivery to customers. DSOF ¶ 14.

Water Treatment is comprised of: (i) Water Chemists who work in control labs located at JWPP and SWPP and monitor water quality at various stages of the filtration process, (ii) Filtration Engineers ("FEs") who manage the purification plants, receive and interpret data from the control centers in each plant, and make decisions about the purification process, (iii) Operating Engineers ("OEs") who operate and maintain pumps, filters, chemical storage tanks, and other equipment and fixtures at JWPP and SWPP; and (iv) trade workers such as mechanical engineers, steamfitters, and painters who are supervised by trade foremen (*e.g.*, the Foreman of Mechanical Engineers supervises mechanical engineers) and work with filtration and operating engineers to operate, maintain, and repair facilities at the plants and other BWS facilities. DSOF ¶ 15.

OEs work at JWPP, SWPP, and pumping stations. There are four levels of OEs. The entry level job is Operating Engineer Group C ("OE-C"). The next level up is Operating Engineer Group A ("OE-A"). OE-As supervise OE-Cs. The next level up is Assistant Chief Operating Engineer ("ACOE"). Chief Operating Engineers ("COE") are the highest level of OE. COEs are in charge of the OEs and trades personnel (*e.g.*, electricians, painters, carpenters, machinists, steam fitters) at those facilities. DSOF ¶ 16. In the treatment plants, ACOEs are assigned to supervise 24/7 watches or, if they are assigned to the Day Crew, particular areas or functions of the plant. DSOF ¶ 17. For example, ACOEs at JWPP have the following assignments: Training, Maintenance (Plants and Grounds), Pump Control, Chemical Transfer, and Chlorine. DSOF ¶ 17. Pursuant to the collective bargaining agreement ("CBA") with Operating Engineers Local 399, OEs can apply for transfers to other locations, shifts of day off groups two times per year. It is possible to apply

for a transfer from a shift (also referred to as a "watch") to the Day Crew but assignments among OEs on the Day Crew are determined by management, not the transfer rules in the CBA. DSOF ¶ 18.

Four of the Plaintiffs work or worked in Water Treatment. Glenn was a foreman of station laborers at SWPP until he retired in June 2019. DSOF ¶ 19. Edmond was an Operating Engineer-Group A at SWPP until he retired in June 2017. DSOF ¶ 19. Cooper has been a Water Chemist II in the control lab at SWPP for many years. DSOF ¶ 19. Ealy was the Training ACOE at JWPP from November 2014 until she was appointed as COE and transferred to SWPP in August 2017. She worked at SWPP until she resigned in August 2019. DSOF ¶ 19.

## 2. **BWS – Water Pumping**

Water Pumping is responsible for the operation and maintenance of the pumping stations that receive purified water from JWPP and SWPP and pressurize the water using large steam or electric pumps for delivery to customers and other municipalities. DSOF ¶ 20. None of the BWS Plaintiffs worked in pumping stations in the relevant period. Plaintiff Hill, the only Plaintiff who worked in Pumping, was the staff assistant to Engineer of Water Pumping Mark O'Malley from approximately 2006 until she retired in June 2015. She worked in an office at JWPP. DSOF ¶ 21.

## C. **Bureau of Operations and Distribution ("BOD")**

BOD is responsible for the maintenance, repair, and replacement of approximately 4,400 miles of water mains and sewer lines. DSOF ¶ 22. BOD primarily operates from three Districts that are staffed by a general superintendent or district superintendent, assistant district superintendents, foremen, plumbers, bricklayers, laborers, hoisting engineers, motor truck drivers, and various support personnel that perform administrative, data entry, and clerical functions. DSOF ¶¶ 22–24.

Each District also typically deploys an investigations crew on three shifts that consists of a plumber or caulker and a laborer who are assigned to respond to leak reports, resolve the leak if possible, or otherwise report the issue so that it can be addressed by a water crew. DSOF ¶ 25. BOD also operates city-wide crews that respond to calls during evening hours. DSOF ¶ 25. In addition to the three Districts, BOD also operates (i) the New Construction section, (ii) the Field Engineering Section, which is staffed by engineering technicians, (iii) the Garage Section, and (iv) the Machinery Section. DSOF ¶ 26.

Three of the Plaintiffs work or worked in BOD. Henry is a plumber assigned to an investigations truck in the South District on the 11 p.m. shift. DSOF ¶ 27. Laws is a construction laborer in the South District. DSOF ¶ 27. Anderson was a Foreman of Water Pipe Construction in the Central District until he was promoted to Assistant District Superintendent in 2018. DSOF ¶ 27. Anderson retired on January 31, 2023. DSOF ¶ 27.

**D. Plaintiffs worked in different locations.**

Plaintiffs worked in different locations with different supervisors. To the extent Plaintiffs allege that certain co-workers or supervisors created a HWE, those individuals' reach did not extend across the entirety of DWM. DSOF ¶¶ 28–31. In fact, some Plaintiffs testified to not knowing the alleged harassers that other Plaintiffs identified. For example, while Hill, Edmond, Glenn, and Ealy levied various accusations about John Pope (W), Alan Stark (W), and Joseph Lynch (W), other Plaintiffs admitted to having never met them and knowing nothing about them. For example, Laws and Henry testified that they do not know and have no information about Pope, Stark, or Lynch. DSOF ¶ 30. Likewise, BWS Plaintiffs had no knowledge of William Bresnahan (W) or Barrett Murphy (W). Glenn testified "I don't even know who Bresnahan is," and Ealy

conceded that Bresnahan "wasn't someone that I knew." DSOF ¶ 30. Cooper also admitted that he only met Bresnahan one time in 2009 and never interacted with Murphy. DSOF ¶ 30.

Even employees based out of the same physical location might not work in the same environment within that location or have the same supervisors. For instance, the two water filtration plants, JWPP and SWPP, are large facilities comprised of numerous levels containing office space, laboratories, auditoriums, locker rooms, control rooms, and enormous water filtration equipment. DSOF ¶ 31. As such, a station laborer cleaning settling basins at Sawyer works in a different environment with different co-workers and different supervisors than the chemists in a control lab. DSOF ¶ 31.

**E.** **The Plaintiffs and Their Claims**

In an attempt to narrow the issues to be addressed in this motion, Defendant's counsel contacted Plaintiffs' counsel on August 10, 2023 to clarify what claims Plaintiffs are and are not pursuing. DSOF ¶ 32 (citing DX 35: August-September 2023 E-mails Regarding Plaintiffs' Claims). Plaintiffs' counsel responded on August 16, 2023 that all Plaintiffs are pursuing individual hostile work environment/*Monell* claims, all Plaintiffs other than Laws are pursuing individual promotion claims, and only Glenn and Laws are pursuing individual overtime claims. DSOF ¶ 32. When Defendant's counsel sought clarification, however, Plaintiffs' counsel responded that "[a]ll of the types of discrimination described in the Third Amended Complaint alleges [sic] will be part of Plaintiff's case, i.e., discriminatory discipline, even if not an independent claim." DSOF ¶ 32. Because the August 16 and September 1 descriptions of Plaintiffs' claims do not clarify which claims remain at issue, Defendant moves for summary judgment on all identifiable claims, including those that are time-barred.

### 1. Derrick Edmond

Derrick Edmond was hired as a Water Meter Machinist effective August 31, 1998, appointed as OE-C effective August 16, 1991, and appointed OE-A effective September 1, 1998. Edmond retired with approximately 32 years of service on June 30, 2017. DSOF ¶ 33. Edmond was a member of Local 399, and from around 2011 until he retired in June 2017, worked at SWPP on the night shift (approximately 11 p.m. to 7 a.m.). DSOF ¶ 33. According to Plaintiffs' counsel's August 16, 2023 e-mail, Edmond is pursuing HWE and failure to promote claims. DSOF ¶ 33.

### 2. Katherine Ealy

Katherine Ealy was hired as an OE-C on July 17, 1999. She was appointed to three progressively higher-level positions in DWM: OE-A in DWM effective December 1, 2002, ACOE effective December 1, 2011, and COE effective August 1, 2017. Ealy resigned in 2019 with approximately 20 years of service. DSOF ¶ 34. As an ACOE at JWPP, Ealy worked on a day shift until 2014 when she was assigned to the Day Crew as the Training ACOE. After her promotion to COE in August 2017, she worked at SWPP until she resigned in 2019. DSOF ¶ 34. According to Plaintiffs' counsel's August 16, 2023 e-mail, Ealy is pursuing HWE and failure to promote claims. DSOF ¶ 34.

### 3. Eddie Cooper

Eddie Cooper was hired as Water Chemist I in 1994. He was appointed as a Water Chemist II (WC II) effective January 1, 1996. DSOF ¶ 35 . Cooper is a current DWM employee and part of the American Federation of State County and Municipal Employees ("AFSCME") bargaining unit. For his entire career, Cooper has worked in the Control Lab at SWPP. DSOF ¶ 35. According to Plaintiffs' counsel's August 16, 2023 e-mail, Cooper is pursuing HWE and failure to promote claims. DSOF ¶ 35.

### 4. **Vicki Hill**

Vicki Hill was hired as Senior Clerk on March 21, 1984. From January 1, 1987 to December 30, 1987, Hill was a Principal Clerk. From December 31, 1987 to December 31, 1999, she was a Clerk VI. On January 1, 1999, Hill was a Staff Assistant. She retired on June 30, 2015 with approximately 31 years of service. DSOF ¶ 36. Pursuant to an agreement between AFSCME and the City, Hill's Staff Assistant title was placed in the AFSCME bargaining unit effective December 1, 2011. DSOF ¶ 36. According to Plaintiffs' counsel's August 16, 2023 e-mail, Hill is pursuing HWE and failure to promote claims. DSOF ¶ 36.

### 5. **Robert Laws**

Robert T. Laws was hired as a Laborer-Water Distribution Laborer on August 22, 1988. In 1989 and 1990, Laws was a Laborer in the former Department of Public Works. From May 16, 1990 until April 30, 2006, Laws was a Laborer-Water Distribution. Since May 1, 2006, Laws has been a Construction Laborer in DWM. DSOF ¶ 37. He is a member of Laborer's Local 1092 ("Local 1092") and has worked in the Central District of BOD since 2019. For most of the period from 1988 to 2019 he worked at various locations in the BOD South District. DSOF ¶ 37. According to Plaintiffs' counsel's August 16, 2023 e-mail, Laws is pursuing HWE and denial of overtime claims. DSOF ¶ 37.

### 6. **Anton Glenn**

Anton Glenn was hired as a Station Laborer on August 2, 1986. He was appointed to Foreman of Station Laborers effective October 1, 1998. Glenn retired on June 30, 2019 with approximately 33 years of service. DSOF ¶ 38. Glenn was a member of SEIU Local 73, and for most of his career with the City until he retired in 2019, he worked at SWPP. DSOF ¶ 38.

According to Plaintiffs' counsel's August 16, 2023 e-mail, Glenn is pursuing HWE, denial of overtime, and failure to promote claims. DSOF ¶ 38.

### 7. **Veronica Smith**

Veronica Smith was hired as a Laborer-Water Distribution on August 16, 1988. In 1981 and 1990, she was a Laborer in the City's Public Works and Streets and Sanitation Departments and then returned as a Laborer-Water Distribution. She was appointed as a Construction Laborer in DWM effective May 21, 2008 where she worked until she retired on December 31, 2022. DSOF ¶ 39. Smith was a member of Local 1092, and from approximately 1997 until she retired worked in the Material Pick Up Room in BMS. DSOF ¶ 39. According to Plaintiffs' counsel's August 16, 2023 e-mail, Smith is pursuing HWE and failure to promote claims. DSOF ¶ 39.

### 8. **Donald Anderson**

Donald Anderson was hired as a Plumber on July 18, 1994. He was appointed Foreman of Water Pipe Construction effective September 16, 1998 and Assistant Superintendent effective October 1, 2018. Anderson retired on January 31, 2023 with approximately 28 years of service. DSOF ¶ 40. Anderson was a member of Plumbers Local 130 ("Local 130"), and from approximately 2009 until he retired, he worked in the Central District in BOD, first as a Foreman and then as an ADS. DSOF ¶ 40. According to Plaintiffs' counsel's August 16, 2023 e-mail, Anderson is pursuing HWE and failure to promote claims. DSOF ¶ 40.

### 9. **David Henry**

David Henry was hired as a plumber on November 19, 1999. DSOF ¶ 41. Henry is a member of Local 130, and from approximately 2000 to present, he has worked in the South District of BOD. DSOF ¶ 41. According to Plaintiffs' counsel's August 16, 2023 e-mail, Henry is pursuing HWE and failure to promote claims. DSOF ¶ 41.

## F. The Department of Human Resources

The City's Department of Human Resources ("DHR") includes an Equal Employment Opportunity Division ("EEO Division"), which enforces the City's Equal Employment Opportunity policy. DSOF ¶ 42. The EEO Division is headed by the Deputy Commissioner of the EEO Division, who reports directly to the Commissioner for Human Resources. DSOF ¶ 43. An EEO Officer, Disability Officer, and team of Training Policy Analysts report directly to the Deputy Commissioner of the EEO Division. DSOF ¶ 43. A team of Investigators work under the EEO Officer and Disability Officer. DSOF ¶ 43. DHR also includes an Employment Services Division that manages the City's hiring processes and ensures compliance the City's Personnel Rules and Hiring Plan. DSOF ¶ 44. DHR also includes a Training Division that provides training to City employees on City human resources policies, including its EEO Policies and training for those participating in selection procedures under the Hiring Plan. DSOF ¶ 45.

## III. SUMMARY JUDGMENT STANDARD

Summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. It "is warranted where 'a rational trier of fact' could not find for the non-moving party." *Rogers v. City of Chicago*, 320 F.3d 748, 752 (7th Cir. 2003). To withstand Defendant's motion, Plaintiffs cannot simply rely on speculation. *See Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008). They must identify "specific, admissible evidence showing that there is a genuine dispute of material fact for trial." *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017). "If the nonmoving party fails to establish the existence of an element essential to

his case, one on which he would bear the burden of proof at trial, summary judgment must be granted to the moving party." *Cervantes v. Ardagh Grp.*, 914 F.3d 560, 564 (7th Cir. 2019).

## IV.   SUMMARY JUDGMENT SHOULD BE GRANTED ON PLAINTIFFS' DISPARATE TREATMENT CLAIMS UNDER 42 U.S.C. § 1983, 42 U.S.C. § 1981, AND THE ILLINOIS CIVIL RIGHTS ACT.

Plaintiffs allege disparate treatment claims under the Equal Protection Clause of the Fourteenth Amendment via 42 U.S.C. § 1983, 42 U.S.C. § 1981 via 42 U.S.C. § 1983, and the Illinois Civil Rights Act of 2003, 740 ILCS 23/1, *et seq.*, arising out of alleged discriminatory discipline, denial of promotions, assignment of overtime, and denial of transfers, shifts, and days off. *See* Dkt. No. 194, TAC, at ¶¶ 1, 78, 225–243. Plaintiffs fail to establish a factual basis to maintain any of these claims.

### A.   Plaintiffs have failed to establish the elements required to maintain disparate treatment claims under the Equal Protection Clause of the Fourteenth Amendment via 42 U.S.C. § 1983, 42 U.S.C. § 1981 via 42 U.S.C. § 1983, and the Illinois Civil Rights Act of 2003, 740 ILCS 23/1, *et seq.*

#### 1.   Plaintiffs do not meet the standard for maintaining disparate treatment claims under the Equal Protection Clause of the Fourteenth Amendment via 42 U.S.C. § 1983.

Plaintiffs allege disparate treatment claims against Defendant under the Equal Protection Clause of the Fourteenth Amendment via 42 U.S.C. § 1983. *See* Dkt. No. 194, TAC, at ¶¶ 225–230. "The equal protection clause of the Fourteenth Amendment protects individuals against intentional, arbitrary discrimination by government officials." *Hayden ex rel. A.H. v. Greensburg Cmty. Sch. Corp.*, 743 F.3d 569, 577 (7th Cir. 2014). "An individual who is subjected to unconstitutional discrimination can seek relief from his or her employer under 42 U.S.C. § 1983." *Lauderdale v. Ill. Dep't of Human Servs.*, 876 F.3d 904, 910 (7th Cir. 2017) (internal citations omitted).

Courts use the same standards to analyze racial discrimination claims brought under Section 1983 and Title VII of the Civil Rights Act of 1964. *Barnes v. Bd. of Trs. of the Univ. of Ill.*, 946 F.3d 384, 389 (7th Cir. 2020). When ruling on discrimination claims at summary judgment, courts consider "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race . . . caused the discharge or other adverse employment action." *Ortiz v. Werner Enters., Inc.,* 834 F.3d 760, 765 (7th Cir. 2016). "In making this determination, the Court must consider the relevant evidence as a whole." *Taylor v. Bd. of Educ. of Chi.*, 2020 U.S. Dist. LEXIS 155741, *32–*33 (N.D. Ill. Aug. 27, 2020). However, the Seventh Circuit's holding in *Ortiz* did not disturb the Supreme Court's decision in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), which sets forth a burden-shifting framework for analysis of discrimination cases. *Taylor*, 2020 U.S. Dist. LEXIS 155741, at *33–*34 (internal citations and quotations omitted).

No matter whether the evidence in this case is considered as a whole pursuant to *Ortiz* or evaluated under the *McDonnell Douglas* framework, Plaintiffs fail to establish that Defendant discriminated against them based on their race with respect to any of the actions alleged, and summary judgment is therefore proper on all of their disparate treatment claims under the Equal Protection Clause via Section 1983. For each of the Plaintiffs, Defendant will address these shortcomings individually below. *See infra*, Section IV.B., Disparate Treatment Claims.

### 2. Plaintiffs do not meet the standard for maintaining disparate treatment claims under 42 U.S.C. § 1981.

Plaintiffs also allege disparate treatment claims against Defendant under 42 U.S.C. § 1981 via 42 U.S.C. § 1983. *See* Dkt. No. 194, TAC, at ¶¶ 231–237. Section 1981(a) provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white

citizens." 42 U.S.C. § 1981(a). In *Jett v. Dallas Indep. Sch. Dist.,* 491 U.S. 701 (1989), the Supreme Court held that Section 1983 "provides the exclusive federal damages remedy for the violation of the rights guaranteed by § 1981 when the claim is pressed against a state actor." *Jett*, 491 U.S. at 735. Section 1981 was subsequently amended to include subsection (c), which provides that the rights guaranteed by Section 1981 "are protected against impairment by nongovernmental discrimination and impairment under color of State law." 42 U.S.C. § 1981(c); *see also* Civil Rights Act of 1991, Pub. L. No. 102-166, 105 Stat. 1071 (Nov. 21, 1991). Thereafter, the Seventh Circuit held that "*Jett* remains good law, and consequently, § 1983 remains the exclusive remedy for violations of § 1981 committed by state actors." *Campbell v. Forest Preserve District of Cook County*, 752 F.3d 665, 671 (7th Cir. 2014).

In *Comcast Corp. v. National Association of African American-Owned Media*, 140 S. Ct. 1009 (2020), the Supreme Court held that to prevail on a claim under Section 1981, "a plaintiff must initially plead and ultimately prove that, *but for race*, it would not have suffered the loss of a legally protected right." *Comcast Corp.*, 140 S. Ct. at 1019 (emphasis added). In *Comcast Corp.*, the Court held that in order to survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a plaintiff must plead facts showing that racial animus was a "but for" cause of the defendant's conduct—merely alleging that race played "some role" in the defendant's decision-making process is insufficient. *Id.* at 1013–15.

Since the Court's decision in *Comcast Corp.*, courts in the Northern District of Illinois and the Seventh Circuit have repeatedly held that racial discrimination "must be the determining factor" in the challenged action to maintain a claim under Section 1981. *Piccioli v. Plumbers Welfare Fund Local 130, U.A.*, 2020 U.S. Dist. LEXIS 190576, at *6 (N.D. Ill. Oct. 14, 2020) ("Put differently, a plaintiff cannot survive a motion to dismiss upon a showing that racial

14

discrimination was one factor among many in a defendant's decision."); *see also Mir v. State Farm Mut. Auto. Ins. Co.*, 847 F. App'x 347, 350 (7th Cir. 2021) ("Nothing in Mir's complaint—which he declined to amend—could permit the inference of but-for causation here."); *Arora v. NAV Consulting Inc.*, 2022 U.S. Dist. LEXIS 186909, *5 (N.D. Ill. Oct. 13, 2022) (stating that "a plaintiff cannot allege multiple discrimination theories as the 'but for' cause for a Section 1981 violation"); *James v. City of Evanston*, 2021 U.S. Dist. LEXIS 186804, at *12 (N.D. Ill. Sept. 29, 2021) (granting motion to dismiss where complaint pleaded that avoidance of public scrutiny, not race, was the but-for cause of allegedly discriminatory conduct); *Sanchez v. Tootsie Roll Indus., LLC*, 2021 U.S. Dist. LEXIS 205604, at *6 (N.D. Ill. May 18, 2021) ("Because race plays no part in the factual allegations, Sanchez cannot maintain a cause of action premised on race discrimination under section 1981."); *Vang v. State Farm Mut. Auto. Ins. Co.*, 2021 U.S. Dist. LEXIS 231811, at *9 (C.D. Ill. Dec. 3, 2021) (allegations that "center on Plaintiffs' national origin, not their race" are insufficient to state Section 1981 claim).

Plaintiffs fail to meet Section 1981's "but-for" standard because they cannot establish that their race was the "determining factor" in any of the allegedly discriminatory actions that form the basis of their claims, and summary judgment is therefore proper on all of their disparate treatment claims under Section 1981. Defendant will address these failures individually below. *See infra*, Section IV.B., Disparate Treatment Claims.

### 3. <u>Plaintiffs do not meet the *Monell* standard for maintaining disparate treatment claims under 42 U.S.C. § 1983.</u>

In *Monell v. Dep't of Social Servs.,* 436 U.S. 658 (1978), the Supreme Court held that municipalities like Defendant are "person[s]" who may be sued under 42 U.S.C. § 1983. *Monell*, 436 U.S. at 690. Under *Monell*, a municipality cannot be liable for constitutional violations under Section 1983 unless official government policy inflicts the injury. *Id,* at 694. To establish *Monell*

liability under Section 1983, each Plaintiff must establish: "(1) she was deprived of a constitutional right; (2) the deprivation can be traced to some municipal action (i.e., a policy or custom), such that the challenged conduct is properly attributable to the municipality itself; (3) the policy or custom demonstrates municipal fault, i.e., deliberate indifference; and (4) the municipal action was the moving force behind the federal-rights violation." *Thomas v. Neenah Joint Sch. Dist.*, 2023 U.S. App. LEXIS 18493, *6 (7th Cir. 2023) (internal quotations and citations omitted).

"Municipalities may be sued only for their own violations of federal law, however, and cannot be held vicariously liable for the constitutional torts of their employees." *Id.* (internal citations omitted). Accordingly, all of the elements of a *Monell* claim "must be scrupulously applied to avoid a claim for municipal liability backsliding into an impermissible claim for vicarious liability." *Id.* (internal quotations omitted). There are three types of municipal action that can support *Monell* liability: "(1) an express policy that causes a constitutional deprivation when enforced; (2) a widespread practice that is so permanent and well-settled that it constitutes a custom or practice; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority." *Spiegel v. McClintic*, 916 F.3d 611, 617 (7th Cir. 2019) (internal quotation omitted).

Plaintiffs' *Monell* claims fail because they cannot establish that they suffered any constitutional violations caused by an express policy, widespread custom, or deliberate act of a policymaker, and summary judgment is therefore proper on all of their disparate treatment claims under Section 1983.

4. **Plaintiffs cannot pursue claims against Defendant under the Illinois Civil Rights Act because the Act does not apply to Plaintiffs' employment discrimination claims. However, if the Court holds that Plaintiffs can pursue claims under the Illinois Civil Rights Act, then the standard for disparate treatment claims under Title VII and the Equal Protection Clause applies to those claims.**

Plaintiffs' employment discrimination claims under the Illinois Civil Rights Act, 740 ILCS 23/1, *et seq.* ("ICRA"), should be dismissed because the ICRA does not apply to such claims. The ICRA "was patterned on" Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d. *Weiler v. Vill. of Oak Lawn*, 86 F. Supp. 3d 874, 889 (N.D. Ill. Mar. 31, 2014) (Kennelly, J.) (citing 93d Ill. Gen. Assemb., H. Deb., April 3, 2003, at 146 (statements of Rep. Fritchey) ("[T]his Bill will create a parallel state remedy to . . . the federal cases that were brought under Section 601 of the Civil Rights Act.")). Title VI provides that no person "shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S. Code § 2000d. Similarly, the ICRA provides that governmental entities in Illinois shall not "exclude a person from participation in, deny a person the benefits of, or subject a person to discrimination under any program or activity on the grounds of that person's race, color, national origin, or gender[.]" 740 ILCS 23/5(a).

The ICRA, which was enacted in 2003, was not intended to "create any new rights." *Ill. Native Am. Bar Ass'n v. Univ. of Ill.*, 856 N.E.2d 460, 467 (Ill. Ct. App. 2006) (quoting 93d Ill. Gen. Assemb., Senate Proceedings, May 21, 2003, at 9–10 (statements of Sen. Harmon)). Rather, the Act "was expressly intended to provide a state law remedy that was *identical* to the federal disparate impact canon" under Title VI. *Jackson v. Cerpa*, 696 F. Supp. 2d 962, 964 (7th Cir. 2010) (emphasis in original); *see also Ill. Native Am. Bar Ass'n*, 856 N.E.2d at 467 (quoting 93d Ill. Gen. Assemb., H. Deb., April 3, 2003, at 146–48 (statements of Rep. Fritchey) (the ICRA "provides a venue for individuals to bring a cause of action alleging disparate impact of a government policy via the [s]tate [c]ourts")). "Accordingly, Illinois courts look to cases

concerning alleged violations of federal civil rights statutes to guide our interpretation of the Act." *Weiler*, 86 F. Supp. 3d at 889.

In enacting Title VI, Congress did not intend to "impinge" on Title VII of the Civil Rights Act of 1964, which is the primary vehicle for addressing employment discrimination under federal law. *Johnson v. Transportation Agency*, 480 U.S. 616, 627, n. 6 (1987) (quoting 110 Cong. Rec. 11615 (1964) (statements of Sen. Cooper) ("it was not intended that [Title] VI would impinge on [Title] VII")). 42 U.S.C. § 2000d–3 expressly provides that nothing in Title VI "shall be construed to authorize action . . . with respect to any employment practice of any employer, employment agency, or labor organization *except where a primary objective of the Federal financial assistance is to provide employment.*" 42 U.S.C. § 2000d–3 (emphasis added). Accordingly, to maintain an employment discrimination claim under Title VI, a plaintiff must establish that the primary purpose of federal funds received by the defendant was to provide employment. *See Ahern v. Board of Education of Chicago*, 133 F.3d 975, 978 (7th Cir. 1998) (employment discrimination claims under Title VI are limited to circumstances in which "(1) providing employment is a primary objective of the federal aid, or (2) discrimination in employment necessarily causes discrimination against the primary beneficiaries of the federal aid") (internal quotation omitted). Where a defendant did not receive federal funding for the primary purpose of providing employment, a plaintiff must bring employment discrimination claims under Title VII, not Title VI.

Applying these principles, Plaintiffs cannot pursue employment discrimination claims against Defendant under the ICRA. The primary function of the Water Department is not to provide employment services or programs, but rather, as Plaintiffs concede in their Complaint, "[t]he primary function of the Water Department is the purification and transmission of potable

water to the homes and business within Chicago and 126 suburban communities." Dkt. No. 194, TAC, at ¶ 46. Rather, Plaintiffs' state law employment discrimination claims are governed by the Illinois Human Rights Act ("IHRA"), which was initially enacted in 1979 and prohibits discrimination and harassment in employment on the basis of race. *See* Ill. Pub. Act 81-1216 (eff. In part Dec. 6, 1979); 775 ILCS 5/1-102(A); 5/1-103(Q); 5/2-101(E-1); 5/2-102(A). In fact, the IHRA explicitly provides that "[n]o court of this state shall have jurisdiction over the subject of an *alleged civil rights violation* other than as set forth in this Act." 775 ILCS 5/8-111(D) (emphasis added). Moreover, "[t]he Illinois Supreme Court has found that 'the legislature intended the [IHRA], with its comprehensive scheme of remedies and administrative procedures, to be the exclusive source of redress for alleged human rights violations.'" *Alexander v. Northeastern Illinois University*, 586 F. Supp. 2d 905, 914 (N.D. Ill. June 23, 2008) (quoting *Mein v. Masonite Corp.*, 485 N.E.2d 312, 315 (Ill. 1985)).

State and federal courts in Illinois have repeatedly held that they do not have jurisdiction over claims brought under other statutes that are "inextricably linked" to alleged violations of an employee's civil rights, which are exclusively governed by the IHRA. *See, e.g., Geise v. Phoenix Co. of Chi., Inc.*, 639 N.E.2d 1273, 1277 (Ill. 1994) (court had no jurisdiction over negligent hiring tort claims that were "inextricably linked" to allegations of workplace sexual harassment governed by the IHRA); *Alexander*, 586 F. Supp. 2d at 914–15 (court had no jurisdiction over retaliation claims under the Illinois Whistleblower Act that were inextricably linked to complaints to employer about racial discrimination); *Quantock v. Shared Marketing Services, Inc.,* 312 F.3d 899, 905 (7th Cir. 2002) (affirming summary judgment where employee's intentional infliction of emotional distress tort claim depended on sexual harassment allegations against a supervisor); *LaRiviere v. Bd. Of Trs. Of S. Ill. Univ.*, 2015 IL App (5th) 140443-U, ¶ 21 (5th Dist. 2015) ("[A]

claim of individual employment discrimination . . . appears to be one that is properly brought under section 2-102 of the [IHRA] . . . . It is unclear to this court why the plaintiff did not proceed under the procedures set forth therein, which constitute a jurisdictional prerequisite for relief."). As the ICRA does not apply to the civil rights violations Plaintiffs allege, which arise solely out of their employment with the DWM, the Court should dismiss Plaintiffs' ICRA claims in their entirety on this basis.

In the alternative, if the Court finds that Plaintiffs can bring disparate treatment claims against Defendant under the ICRA, then the standard for disparate treatment claims under Title VII and the Equal Protection Clause applies to those claims. *See Howard v. Cook Cnty. Sheriff's Off.*, 2022 U.S. Dist. LEXIS 80848, *18 (N.D. Ill. May 4, 2022) (citing *Graves v. Chief Legal Couns. Of Ill. Dep't of Hum. Rts.*, 762 N.E.2d 722, 725 (Ill. Ct. App. 2002) (stating that state courts look to Title VII cases to interpret the ICRA));[2] *Weiler v. Vill. Of Oak Lawn*, 86 F. Supp. 3d at 889 (when interpreting the ICRA, courts "look to cases concerning alleged violations of federal civil rights statutes to guide our interpretation"); *Rao v. Gondi*, 2017 U.S. Dist. LEXIS 86152, *69–*70 (N.D. Ill. June 5, 2017) (using the same standards to analyze national origin discrimination claims under Title VII, the ICRA, and the Equal Protection Clause). As mentioned above and explained in further detail below, Plaintiffs have failed to establish that Defendant discriminated against them based on their race under the *Ortiz* or *McDonnell Douglas* standards, so summary judgment should be granted on their ICRA claims on this basis as well.

5. **Summary judgment should also be granted on Plaintiffs' disparate treatment claims arising out of actions that occurred prior to the applicable statutes of limitations.**

---

[2] Defendant notes that although this Court analyzed a hostile work environment claim under the ICRA pursuant to Title VII standards in *Howard*, neither the parties in *Howard* nor the parties in *Graves* raised the issue whether the ICRA applies to such employment claims in the first instance.

The applicable statute of limitations is two years for Plaintiffs' ICRA claims and Equal Protection claims brought under Section 1983, dating back to June 29, 2015.[3]  *See* 740 ILCS 23/5(b) (two-year statute of limitations for ICRA claims); *Kelly v. City of Chicago*, 4 F.3d 509, 511 (7th Cir. 1993) (Section 1983 claims arising in Illinois are governed by a two-year statute of limitations).  In Judge Gottschall's ruling on Defendant's motion to dismiss Plaintiffs' Second Amended Complaint, she held that pursuant to *Jones v. R.R. Donnelley & Sons Co.,* 541 U.S. 369, 373 (2004), 28 U.S.C. § 1658's four-year statute of limitations for federal claims "arising under an Act of Congress enacted after" December 1, 1990 applies to Plaintiffs' post-formation Section 1981 claims (brought via Section 1983).  Dkt. No. 108, at 13–15.  Accordingly, Plaintiffs' ICRA and Equal Protection claims are barred to the extent they arise out of alleged actions that occurred prior to June 29, 2015, and their Section 1981 claims are barred to the extent they arise out of alleged actions that occurred prior to June 29, 2013.

For the reasons set forth below, summary judgment should be granted for Defendant on the following bases: 1) Plaintiffs have not established that Defendant discriminated or retaliated against them on the basis of their race in violation of the Equal Protection Clause or the ICRA; 2) Plaintiffs have not established that their race was the "but for" cause of any alleged adverse action as required under Section 1981; 3) Plaintiffs have not established that any municipal policy of Defendant caused them to suffer a constitutional violation as required by *Monell*; and 4) the adverse actions Plaintiffs allege fall outside of the applicable statutes of limitations.

### B.  Plaintiffs do not meet the standard for disparate treatment.

Plaintiffs have failed to provide evidence sufficient to maintain claims for discriminatory discipline, denial of promotions, denial of overtime, denial of acting up, or transfers and shift

---

[3] Plaintiffs filed their initial Complaint on June 29, 2017.  *See* Dkt. No. 1.

selections. For the reasons explained below, the Court should dismiss Plaintiffs' disparate treatment claims.

1. **PLAINTIFFS CLAIMS FOR ALLEGEDLY DISCRIMINATORY OR RETALIATORY DISCIPLINE FAIL.**

Plaintiffs' counsel's August 16, 2023 e-mail indicated that none of the Plaintiffs are pursuing discrete claims related to discipline. DSOF ¶ 32. However, as discussed above, Plaintiffs subsequently stated that they are pursuing claims for "all types of discrimination described in the Third Amended Complaint . . . even if not an independent claim." DSOF ¶ 32. To the extent Plaintiffs are pursuing claims for discrimination with respect to discipline, Defendant moves for summary judgment on those claims for each Plaintiff.

a. **Defendant's disciplinary procedures and policies**

Discipline is regulated by Personnel Rules and CBAs. The first step in the disciplinary process is the issuance of a notice of pre-disciplinary hearing ("NPDH"). DSOF ¶ 46. A supervisor may issue a NPDH from the supervisor's personal observations of the employee, reports from other employees or supervisors, or from external sources such as external investigations or time-keeping reports that show late swipes or unauthorized absences. DSOF ¶ 46. In relation to time and attendance violations, the DWM maintains a timekeeping system that tracks employees' swipes into and out of work. On a monthly basis, a "batch report" is run that tracks time and attendance violations. If an employee swipes in late to work three times within one month, they are placed on the batch report and are automatically issued a NPDH. After employees are issued a NPDH for time and attendance violations, the nature of the discipline ultimately imposed depends on the employee's previous history of time and attendance infractions. DSOF ¶ 47.

The NPDH is not a "formal accusation" or actual discipline; rather, it is only a notice that a supervisor believed an employee committed an infraction and that a pre-disciplinary hearing

(sometimes referred to as a pre-disciplinary meeting) will be scheduled to discuss the issue. DSOF ¶ 48. Indeed, according to data used by Plaintiffs' statistical expert Bernard Siskin in support of their motion for class certification, approximately 60 percent of the NPDHs issued between July 1, 2015 and June 30, 2017 resulted in no actual discipline, and 71.3 percent of the NPDHs issued between 2011 and 2020 resulted in no actual discipline. DSOF ¶ 49. Even the next step in the process—the disciplinary hearing or meeting—may not result in discipline. DSOF ¶ 50. A hearing or meeting held pursuant to a NPDH can have several outcomes, including no action, non-disciplinary outcomes like a verbal counseling or warnings, or disciplinary outcomes like oral reprimands, written reprimands, unpaid suspensions, and discharge. DSOF ¶ 50.

Employees subject to discipline also have appeal rights. If an employee is a member of a union and is suspended for 10 days or less, the employee can appeal to the Bureau manager. DSOF ¶ 51. Most employees must appeal to the City's Human Resources Board ("HRB") or the department head. DSOF ¶ 51. However, AFSCME employees may appeal discipline, including discharge, to arbitration. DSOF ¶ 51.

### b. Derrick Edmond cannot maintain a discipline claim.

Edmond cannot maintain any claim for allegedly discriminatory discipline. In his answers to Defendant's interrogatories, Edmond stated that he "does not recall being subjected to discipline." DSOF ¶ 52. Edmond's only oral reprimand was outside the statute of limitations. DWM records indicate that the only disciplinary action Edmond received was an oral reprimand on or about May 21, 2012 relating to leaving his work site without authorization on July 26, 2011. DSOF ¶ 52. During his deposition, Edmond testified that on this occasion, he left the work site to get lunch after agreeing to work an overtime shift 15 minutes before the end of his normal shift. DSOF ¶ 52. Edmond testified that he only received an oral reprimand in relation to this incident

"just to say if you ever have to leave the Plant again to grab something to eat[,] go ahead and swipe out officially and then swipe back in when you come back." DSOF ¶ 53. Edmond testified that he did not believe any part of this oral reprimand was motivated by race, and that he did not receive any other discipline during his employment with DWM. DSOF ¶ 53.

To the extent Edmond attempts to pursue a disciplinary claim, his claim is time-barred, as it arose prior to the two-year statute of limitations for his ICRA and Section 1983 Equal Protection claims, and prior to the four-year statute of limitations for his Section 1981 claims. Moreover, even if Edmond's claim was not time-barred, the oral reprimand at issue was not an actionable adverse action. *See Griffin v. Potter*, 356 F.3d 824, 829 (7th Cir. 2004) (oral and written reprimands do not constitute adverse actions, which "must be materially adverse, not merely an inconvenience" and must "significantly alter[] the terms and conditions of the employee's job") (collecting cases). Indeed, Edmond himself testified that the reprimand had nothing to do with his race. DSOF ¶ 53. For these reasons, Edmond cannot maintain a discipline claim against Defendant.

### c. <u>Katherine Ealy cannot maintain a discipline claim.</u>

Ealy cannot maintain any claim against Defendant for allegedly discriminatory or retaliatory discipline. Ealy alleges only three potential disciplinary events. Two of these were NPDHs that did not result in any discipline, and the other was a suspension which had nothing to do with her race.

Ealy's April 2013 NPDH is outside the statute of limitations. On April 2, 2013, COE ███ ███ issued a NPDH to Ealy because she made █████ (B) work for 24 hours in a single day in violation of safety protocols. DSOF ¶ 54. While this request for a pre-disciplinary hearing was

supported by a time sheet for the date in question, Ealy was not ultimately disciplined for the alleged violation. DSOF ¶ 54. Accordingly, Ealy cannot maintain a claim relating to this NPDH.

On or about January 27, 2017, BWS Deputy Commissioner John Pope issued a NPDH to Ealy for insubordination in relation to Ealy's conduct during a staff meeting. DSOF ¶ 55. During this meeting, Pope informed staff that BWS was considering a process under which chiefs and supervisors would ensure that they and their subordinates received hardcopy information relating to the time and attendance policy by having a sign-off as proof that they had received the information. DSOF ¶ 55. In response, Ealy stated: "You can put that in your pipe and smoke it. . . . I am not going to force employees to sign sheets. They are grown adults. . . . And you runnin' up on people all puffy chested." DSOF ¶ 55. When Filtration Engineer V ███████ stated that there would be another meeting to discuss this issue, Ealy responded, "I am not going to that meeting." DSOF ¶ 55. Ealy was not disciplined for this alleged violation either. DSOF ¶ 55. As such, Ealy cannot maintain a claim relating to this NPDH.

The only instance of discipline Ealy received within the applicable statute of limitations was a five-day suspension she received on or about November 28, 2018, which started on December 3, 2018 and ended on December 9, 2018. DSOF ¶ 56. However, this suspension was entirely unrelated to Ealy's race. Managing Deputy Commissioner Marisol Santiago (H) issued this suspension to Ealy for insubordination in relation to her refusal to provide a key to a lactation room (also called a "mother's room") to Custodian ███████ (B), a nursing mother, and for Ealy's violation of the City's policy for acting up. DSOF ¶ 56.

In her answers to Defendant's interrogatories, Ealy claimed that Defendant "retaliated against Plaintiff by disciplining her in December 2018 for not providing a mother's room when Plaintiff did not receive the requisite notice of intent to nurse, the ultimate responsibility for a

mother's room belonged to Ed Salinas and he should have designated a mother's room in 2016 when the directive was originally issued, and, unbeknownst to Plaintiff, there was already a mother's room that Alan Stark and Joseph Lynch knew about but did share with Plaintiff." DSOF ¶ 57. However, this assertion is contradicted by e-mails Ealy sent in August 2018 and her own deposition testimony.

In e-mail correspondence on August 23 and August 24, 2018, Ealy argued with Santiago, Deputy Commissioner Jacqueline Toledo (H), and Engineer of Water Purification Eduardo Salinas (H) regarding the mother's room. In this e-mail correspondence, Ealy stated that she did not need to inform ███████ of the mother's room because ███████ was already aware it existed and admitted that she had not provided the key to the mother's room to ███████, but rather gave it to Filtration Engineer ███████. DSOF ¶ 58. In these e-mails, Ealy also claimed that ███████, a Black employee, was "defaming my name and character" and that Ealy planned on "consulting my attorney to see what legal action I can take against Ms. ███████ from her harassment and defamation." DSOF ¶ 58.

In regard to Ealy's violation of the City's Acting Up Policy, "[e]ligible employees in the relevant pool shall be offered Acting Up opportunities on the basis of seniority." DSOF ¶ 59. Of the Custodians at SWPP, ███████ (B), ███████ (B), ███████ (B), and ███████ (B) had seniority act up. DSOF ¶ 59. But Ealy admitted that she believed ███████, ███████, and ███████ should not be allowed to act up and was told that her justifications were not sufficient to deny them that opportunity. DSOF ¶ 59.

Ealy cannot establish that her five-day suspension was discriminatory because her conduct did not meet Defendant's legitimate expectations and she cannot show that any other similarly situated employees outside of her protected class were treated more favorably under similar

circumstances. *See Taylor*, 2020 U.S. Dist. LEXIS 155741, at *33–*34 (requirements for establishing *prima facie* case of discrimination); *Ineichen v. Ameritech*, 410 F.3d 956, 960–61 (7th Cir. 2005) (summary judgment appropriate where plaintiff failed to present evidence that employees outside protected class engaged in the same conduct but were not fired). Nor can Ealy establish that the discipline had anything to do with her race as required under the ICRA and Section 1983, much less that his race was the "but for" cause of the suspension as required under Section 1981. *See Taylor*, 2020 U.S. Dist. LEXIS 155741, *32–*34; *Comcast Corp.*, 140 S. Ct. at 1019. To the contrary, Ealy was disciplined for failing to inform a Black employee of how to access a nursing room and for refusing to allow Black Custodians to act up in violation of City policy. To the extent Ealy felt she was being harassed, she claimed only that she was being harassed by Custodian Shaunta Sampson, who is also Black.

Ealy also cannot establish that her suspension was retaliatory. To establish a *prima facie* case of retaliation, Ealy must show that: (1) she engaged in a statutorily protected activity; (2) she suffered a materially adverse action by her employer; and (3) there was a causal link between the two. *Silverman v. Bd. of Educ.*, 637 F.3d 729, 740 (7th Cir. 2011) (affirming summary judgment). Here, Ealy has failed to articulate any causal link between the suspension and her engagement in any statutorily protected activity, so she cannot maintain a claim for retaliation based on the suspension.

### d. **Eddie Cooper cannot maintain a discipline claim.**

Cooper cannot argue that his NPDHs for absenteeism or tardiness were discriminatory because he was never actually disciplined for them. Cooper received a verbal counseling in 2011, one NPDH in 2012, one NPDH in 2013, two NPDHs in 2014, and one NPDH in 2019 relating to instances of tardiness or absenteeism, but he was not ultimately disciplined for these instances.

DSOF ¶ 60. Cooper also received a NPDH on or about May 23, 2017 for retaliation against another employee, discourteous treatment, solicitation of other employees, and distributing literature in the work area in relation to his distribution of a petition calling for management to take action against Chief Operating Engineer Joe Lynch. As Cooper acknowledged during his deposition, he was not ultimately disciplined in relation to this incident either. DSOF ¶ 61. As none of these instances constitute actionable discipline and some are time-barred, they cannot form the basis of any claim Cooper may attempt to pursue relating to discipline. *See Griffin*, 356 F.3d at 829 (oral and written reprimands do not constitute adverse actions).

Cooper cannot show his single suspension for insubordination was discriminatory because he admitted to the underlying conduct that led to his suspension. On or about October 17, 2018, Cooper was issued a NPDH for eight instances of tardiness in September 2018. DSOF ¶ 62. Cooper attended the pre-disciplinary hearing regarding these instances of tardiness on November 7, 2018. DSOF ¶ 62. During his deposition, Cooper admitted that during this meeting he called Deputy Commissioner John Pope "a dumb ass" and "a dummkopf," which is a German word for "dumb head." DSOF ¶ 62. As a result of this incident, Cooper received a 29-day suspension for discourteous treatment, insubordination, restricting production output, and conduct unbecoming an officer or public employee. DSOF ¶ 62.

In his answers to Defendant's interrogatories, Cooper claims that he was subjected to unspecified "discipline or retaliation for reporting issues and filing grievances, including . . . Alan Stark and John Pope initiating discipline against Plaintiff directly or indirectly through others." DSOF ¶ 60. As explained above, the only discipline Cooper received within the applicable limitations periods was his 29-day suspension, which he received for admittedly calling Deputy Commissioner John Pope "a dumb ass" and "a dummkopf" during a pre-disciplinary hearing for

repeated instances of tardiness.  There is no evidence that this suspension was related to Cooper's race or his engagement in protected activity.  Accordingly, he cannot maintain any claim for disparate treatment or retaliation in relation to discipline.  *See, e.g., Alexander v. Wis. Dep't of Health & Family Servs.*, 263 F.3d 673, 683 (7th Cir. 2001) (upholding summary judgment where plaintiff "offered no evidence that the [suspensions] he is challenging were motivated by his race or by his complaints of discrimination rather than by defendant[s'] legitimate belief that such discipline was justified by [plaintiff's] conduct").

### e.  **Vicki Hill cannot maintain a discipline claim.**

Hill cannot maintain any claim against Defendant for allegedly discriminatory discipline. Though Hill had repeated issues with tardiness, she was never disciplined for these issues and only received a single verbal counseling in relation to 13 instances of tardiness in 2012. DSOF ¶¶ 63, 267–269.  As none of these instances occurred within the statutes of limitations and the verbal counseling Hill received is not actionable in any event, Hill cannot establish a claim of discriminatory discipline. *See Griffin*, 356 F.3d at 829 (oral and written reprimands do not constitute adverse actions).

### f.  **Robert Laws cannot maintain a discipline claim.**

Laws cannot maintain any claim against Defendant for allegedly discriminatory discipline. In his answers to Defendant's interrogatories, Laws stated that he "does not recall a specific instance of discipline within the position he held . . . ."  DSOF ¶ 64.  During his deposition, Laws testified that he did not recall any specific instance of discipline he received other than "verbal warnings or disciplinary hearings about maybe coming in late one time, punching in late one time . . . ."  DSOF ¶ 64. DWM records indicate that Laws received a single NPDH for absenteeism and/or tardiness on February 28, 2014 (which resulted in no discipline), but no other NPDHs or

any discipline after January 1, 2011.  DSOF ¶ 64.  Thus, Laws cannot pursue a discriminatory discipline claim.

### g.   Anton Glenn cannot maintain a discipline claim.

Glenn cannot maintain any claim against Defendant for allegedly discriminatory or retaliatory discipline because Glenn only received NPDHs outside the limitations periods, a one-day suspension arising out of a DHR finding that he engaged in inappropriate conduct toward a Black co-worker, and a NPDH in 2017 that was withdrawn.

On or about November 1, 2011, Glenn received a verbal counseling for conduct unbecoming of an employee in relation to an incident during which he disrupted a training session for members of another union.  DSOF ¶ 65.  On or about May 18, 2012, Glenn received a written reprimand for leaving his worksite without authorization on July 18 and July 29, 2012, which was supported by time records for the dates in question. DSOF ¶ 65.  Neither the 2011 verbal counseling nor the 2012 written reprimand are actionable adverse actions because they both occurred prior to June 29, 2013, and are time-barred.  *See Griffin*, 356 F.3d at 829 (oral and written reprimands do not constitute adverse actions).

Glenn also cannot establish that his one-day suspension was discriminatory or retaliatory. On or about September 29, 2017, Glenn received a one-day suspension for engaging in conduct toward Station Laborer ██████████████ (B) that violated the City's EEO policy.  DSOF ¶ 66.  The suspension arose from an EEO complaint filed by ███████████, in which she alleged that Glenn sexually harassed her or harassed her on the basis of her gender, and that Glenn retaliated against her in violation of the City's EEO Policy.  DSOF ¶¶ 66–67.  The DHR found that Glenn violated the City's EEO policy by telling ████████████ that her work suffered when she was wearing makeup, calling her "GI Jane," and calling her "McThirsty" over an intercom

system that many employees could hear. DSOF ¶ 67. Based on the DHR's findings, both the DHR and Glenn's supervisor, Plaintiff Ealy, recommended that Glenn receive a one-day suspension. DSOF ¶ 67. Glenn's one-day suspension for making statements to a Black female employee that violated the City's EEO policy, which was recommended by both the DHR and Glenn's supervisor Ealy (who is also a Black woman and a Plaintiff in this lawsuit), had nothing to do with his race or his engagement in protected activity.

Additionally, Glenn cannot show that his NPDH from 2017, which was withdrawn, was related to his race or engagement in protected activity. On July 14, 2017, acting COE Ivy Anderson (B) issued a NPDH to Glenn for conduct unbecoming a public employee after ████████ accused Glenn of telling her, "you will not be staying here much longer." DSOF ¶ 68. After investigating this incident, Ealy and Chief Filtration Engineer Eduardo Salinas (H) determined ████████████ complaint was unfounded, and Glenn did not receive any discipline. DSOF ¶ 68. Though Glenn alleges that he received discriminatory discipline from White supervisors, in an e-mail to John Pope on July 14, 2017, he claimed Ivy Anderson (B) was biased against him and took Shorter-Thomas's side in disputes. DSOF ¶ 68. This NPDH initiated by Ivy Anderson, who is also Black, cannot support any claim of discrimination or retaliation.

### h. Veronica Smith cannot maintain a discipline claim.

Smith cannot maintain any claim against Defendant for allegedly discriminatory discipline. In her answers to Defendant's interrogatories, Smith stated that she "does not recall having been disciplined." DSOF ¶ 69. DWM records show that Smith did not receive any NPDHs or discipline after January 1, 2011. DSOF ¶ 69. Smith has no evidence of any disciplinary action within the applicable statutes of limitations.

31

### i. __Donald Anderson cannot maintain a discipline claim.__

Anderson cannot maintain any claim against Defendant for allegedly discriminatory discipline. His 2008 oral reprimand and 2012 verbal counseling are time-barred. Anderson received NPDHs on January 17, January 18, and January 24, 2008 for insubordination in relation to repeatedly parking in a parking spot against the instructions of General Superintendent █████ ████ for which he only received an oral reprimand. DSOF ¶ 70. Anderson also received a verbal counseling for tardiness on or about January 20, 2012. DSOF ¶ 70. DWM records indicate that Anderson received an NPDH for poor work performance on or about August 23, 2012 because he "refused to answer his city cell phone after being told to answer to get his current location, turned in paperwork late and dug a parkway leak with[out] notifying anyone the job was ready for a plumber to complete." DSOF ¶ 71. However, he was not disciplined in relation to this incident. DSOF ¶ 71.

Within the statutes of limitations, DWM records indicate that Anderson received two NPDHs for absenteeism and/or tardiness in January 2014, but was not disciplined for either violation. DSOF ¶ 72. Anderson also received a verbal counseling on or about June 19, 2017 for conduct involving job performance or substandard work performance in relation to hitting a utility. DSOF ¶ 72. Again, neither of these instances constitute actionable discipline sufficient to maintain a disparate treatment claim. *See Griffin*, 356 F.3d at 829 (oral and written reprimands do not constitute adverse actions).

In his answers to interrogatories, Anderson claims that he was "disciplined when a false violence in the workplace complaint was brought in March 2017 by Michael Szorc (W), after Szorc called Plaintiff a 'nigger', pushed Plaintiff and attempted to goad Plaintiff into an altercation. Szorc acted at the behest of Andy Anderson to retaliate against Plaintiff for raising issues, and was using

the violence in the workplace as a means to remove Plaintiff from his job, and Anderson used overtime to buy off witnesses." DSOF ¶ 78. However, Anderson cannot show the five-day suspension he received in relation to this incident was related to his race.

On July 27, 2017, Anderson received a five-day suspension relating to a "Violence in the Workplace" ("VIW") incident that occurred on March 2, 2017 involving Anderson, who was a Foreman of Water Pipe Construction, and Szorc, who was a Foreman of Laborers. Szorc and Anderson were foremen in different unions. DSOF ¶¶ 73–77, 79. Szorc filed a VIW complaint against Anderson alleging that Anderson pushed him and caused him to fall backwards and land on the floor. Szorc alleged that he got up, pushed Anderson, and asked him "what was his problem." Szorc also alleged that Anderson raised his fist near Szorc's face and told Szorc that Szorc would "get [his] head kicked in," "[his] ass kicked in" and that Anderson would "kill [him.]" DSOF ¶ 74. Anderson filed his own VIW complaint alleging Szorc pushed him and started yelling "what he [was] going to do to me." *Id.* at DSOF ¶ 75.

DWM personnel investigated both VIW complaints and found Anderson responsible. DSOF ¶ 75. DWM found that multiple witnesses confirmed they saw Anderson push Szorc, "get in Szorc's face with his fist cocked back ready to hit him[,]" and tell Szorc that Szorc would "get his head kicked in and his ass kicked in" and that Anderson would "kill him." DSOF ¶ 75. Anderson never asserted that Szorc called him the "n-word" at any point during DWM's investigation of the VIW complaints (which included a PowerPoint Anderson prepared and submitted to DWM detailing the incident), nor did any witness. DSOF ¶ 79. During his deposition, Anderson also failed to identify any "issues" he raised that led Szorc or District Superintendent █████████ to retaliate against him, and admitted that he had no personal knowledge of Anderson using overtime to "buy off witnesses." DSOF ¶ 79. Anderson's VIW complaint against

Szorc was found to be unsustained. DSOF ¶ 76. Anderson filed a grievance appealing the five-day suspension, which was denied by Managing Deputy Commissioner Marisol Santiago (H) because the evidence showed Anderson was the aggressor. DSOF ¶ 77.

Given the foregoing, Anderson cannot maintain a claim for disparate treatment or retaliation for his five-day suspension in 2017. First, he cannot establish a *prima facie* case of discriminatory discipline because he cannot establish that he was meeting his employer's legitimate expectations when he engaged in the confrontation with Szorc. Nor can he point to others who were not disciplined when witnesses corroborated misconduct, such as they did for Anderson's conduct. Even if Anderson could establish a *prima facie* case of discrimination (which he cannot), Defendant has a legitimate, nondiscriminatory reason for his suspension—namely, that its investigation found that Anderson pushed Szorc, cocked his fist back, and told Szorc that Szorc would "get his head kicked in and his ass kicked in" and that Anderson would "kill him." Anderson has not come forth with any evidence that this reason was pretextual, as he never informed anyone during the DHR investigation that Szorc called him the "n-word" during the confrontation. Likewise, Anderson cannot establish that his race was the "but for" cause of his suspension. He also cannot establish a claim for retaliation related to the five-day suspension because there is no evidence that the suspension was related to Anderson's engagement in any protected activity.

### j. David Henry cannot maintain a discipline claim.

Henry cannot maintain any claim against Defendant for allegedly discriminatory discipline. In his answers to interrogatories, Henry stated that he "does not currently recall any specific instances of improper discipline." DSOF ¶ 80. Henry also testified during his deposition that that he did not recall any improper discipline. DSOF ¶ 80. DWM records show that Henry

did not receive any NPDHs or discipline after January 1, 2011. DSOF ¶ 80. Accordingly, Henry has not come forth with any evidence to support a discriminatory discipline claim.

## 2. PLAINTIFFS' CLAIMS FOR ALLEGEDLY DISCRIMINATORY DENIAL OF PROMOTIONS FAIL.

### a. Defendant's hiring processes

To maintain failure-to-promote claims against Defendant, Plaintiffs must establish that: (1) they are members of a protected class, (2) they were qualified for the sought after position, (3) they were rejected for the position, and (4) the position was given to an individual outside of the protected class who was less qualified. *Sraieb v. Ne. Reg'l Commuter R.R. Corp.*, 2023 U.S. Dist. LEXIS 99081, *26 (N.D. Ill. June 7, 2023) (citing *Jackson v. City of Chicago*, 552 F.3d 619, 622 (7th Cir. 2009)).

The City's hiring process is controlled by the Personnel Rules and the City's Hiring (or Employment) Plan. DSOF ¶ 81. When a department is ready to fill a position, it must submit a request to the Office of Budget and Management ("OBM") for an A-form (*i.e.,* OBM approval to fill one or more vacant positions designated on the A-form). DSOF ¶ 81. The Hiring Plan initially was adopted as part of a settlement in *Shakman v. Democratic Organization of Cook County*, 69-C-2145 (N.D. Ill.). The original Hiring Plan was adopted on May 31, 2007. DSOF ¶ 82. The parties in *Shakman* agreed to a substitute Hiring Plan that was proposed to the court on June 24, 2011 and subsequently approved by the Court. DSOF ¶ 82. The 2011 Hiring Plan is relevant to the promotions at issue in this action.

The Hiring Plan regulates various aspects of the hiring process, including how the process is initiated, intake meetings, notices of job opportunities, bid announcements, applications, intake meetings, and procedures for interviewed and non-interviewed positions. DSOF ¶ 83. The Hiring Plan delineates the roles of DHR and the hiring department (*e.g.*, DWM) and the oversight role of

the City's Office of the Inspector General ("OIG"). DSOF ¶ 83. The Hiring Plan also regulates acting up (*i.e.*, an employee working in a higher-graded position), assignments, transfers, and other employment actions. DSOF ¶ 84.

The hiring process also is regulated by the City's Personnel Rules. The 2010 Personnel Rules and 2014 Personnel Rules are relevant to the actions at issue in this lawsuit. DSOF ¶ 85. Rule V, Section 1 of both versions of the Personnel Rules, in addition to the City's Human Rights Ordinance, MCC 6-10-010 *et seq.*, prohibit discrimination on the basis of race, color, sex, and other protected classifications. DSOF ¶ 85.

The hiring process begins when DWM has budget authority from OBM to fill one or more positions. DSOF ¶ 86. DHR then issues a bid or job announcement so individuals can apply. DSOF ¶ 86. A bid is open only to members of a certain bargaining unit who are currently employed by the City in any City department. DSOF ¶ 86. A job announcement is open to anyone, regardless of whether he or she is a member of a bargaining unit or employed by the City. DSOF ¶ 86. In addition, there can be a hybrid procedure with a bid/job announcement, in which anyone can apply but priority will be given to union bidders. DSOF ¶ 86.

Applicants apply online through Taleo, the City's applicant tracking system. DSOF ¶ 87. The Taleo system uses requisition numbers to track applicant and hiring data. DSOF ¶ 87. Applicants move through the process in steps. In the first two steps, screening and scoring, DHR screens out unqualified applicants. DSOF ¶ 87. Applicants who pass the scoring step are said to have been referred. Depending on the job, the referral step can include a lottery, written tests, or interviews. DSOF ¶ 87.

Some positions involve interviews which occur after applicants are referred to the hiring department. Interviewers must complete DHR interview and consensus training before

they are allowed to participate in interviews. DSOF ¶ 88. Interviewers are required to take notes during interviews and rate the applicants as recommended, recommended with some reservations, or do not recommend. DSOF ¶ 88. Interviewers are not allowed to discuss the applicants with each other until a consensus meeting is convened after interviews are completed. DSOF ¶ 88. The consensus meeting is led by the DHR recruiter who leads a conversation among the interviewers. The first step at the consensus meeting is to sort the candidates into three categories based on the interviewers' ratings: "all recommend for hire," a mix of ratings, and "all do not recommend for hire." Then the participants in the consensus meeting discuss the group with a mix of ratings and place them in either the "all recommend" or "all do not recommend" groups. The recommended candidates are prequalified ("PQC"). For bid positions, the PQC order is by seniority; for non-bid positions the interviewers determine the order in which offers will be made. DSOF ¶ 89.

Interview and consensus training programs offered by DHR address the hiring process, how to develop interview questions, how to conduct interviews, how to take notes, the consensus meeting, and various forms required as part of the hiring process. DSOF ¶ 90. DHR retains records showing which employees have received the training required before the employee participates in interviews and consensus meetings. DSOF ¶ 90.

### b. **Derrick Edmond cannot maintain a failure to promote claim.**

Edmond was hired as an OE-C in August 1991 and appointed as an OE-A in September 1998. DSOF ¶ 91. Edmond cannot maintain a promotions claim because he did not apply for any positions from 2011 until he retired in 2017. DSOF ¶ 91.

### c. **Katherine Ealy cannot maintain a failure to promote claim.**

Ealy was promoted to ACOE effective December 1, 2011 and to COE effective August 1, 2017. DSOF ¶ 92. Ealy applied for ACOE on June 22, 2011 on Requisition 207878 and was promoted to ACOE from that requisition effective December 1, 2011. DSOF ¶ 92.

Any claim has for a promotion to COE that she sought in 2012 is time barred. Ealy applied for COE on June 13, 2012 on Requisition 227569. Ealy was not selected for this position. DSOF ¶ 93. ▮▮▮▮▮▮ (W) and ▮▮▮▮▮▮ (W) were promoted from this requisition in compliance with a Local 399 arbitration award related to a COE bid in October 2010, in which ▮▮▮ and ▮▮▮ had been ranked highly qualified but were not selected and were required to retest because the City cancelled their selections due to an alleged Hiring Plan violation. The arbitrator sustained Local 399's grievance on September 10, 2012 and ordered the City to promote ▮▮▮ and ▮▮▮. DSOF ¶ 93. None of the other individuals who applied for COE on Requisition 227569 was promoted from that requisition. DSOF ¶ 93.

Ealy applied for COE on April 27, 2014 on Requisition 254613. Six applicants were rated Highly Qualified based on the results of a test: Ealy, ▮▮▮▮▮▮ (W), Joseph Lynch (W), ▮▮▮▮▮▮ (W), ▮▮▮▮▮, and ▮▮▮▮▮ (W). Seven applicants were rated Qualified: ▮▮▮▮▮ (B), ▮▮▮▮▮ (W), ▮▮▮▮▮, ▮▮▮▮▮ (B), ▮▮▮▮▮ (H), ▮▮▮▮▮ (W), and ▮▮▮▮▮ (W). DSOF ¶ 94. The Highly Qualified candidates were ranked in seniority order: (1) ▮▮▮▮▮, (2) ▮▮▮, (3) ▮▮▮, (4) ▮▮▮, (5) ▮▮▮ and (6) ▮▮▮. DSOF ¶ 94. Ealy was ranked fifth on the Highly Qualified list and was not selected because only the two most senior applicants (▮▮▮▮▮ and ▮▮▮) were appointed on this requisition. DSOF ¶ 90.

Ealy applied for COE on July 2, 2015 on Requisition 264323. DSOF ¶ 95.  Twenty applicants, including Ealy, passed the scoring step and were referred by DHR. Ealy, however, failed a written test administered on September 11, 2015. DSOF ¶ 95.  Nine candidates were interviewed by ██████████ (W), ██████████ (W), and ██████████ (B).  Based on the interviews and consensus meeting, ██████████ (W), ██████████ (W), and ██████████ (B) were pre-qualified. DSOF ¶ 95.  ██████ and ██████ were appointed based on seniority from the pre-qualified group. DSOF ¶ 95.

Ealy applied for COE on August 18, 2016 on Requisition 279350. DSOF ¶ 96. Nineteen applicants passed the scoring step, including Ealy. DSOF ¶ 96.  Nine applicants, including Ealy and ██████████ (W), passed the test step. DSOF ¶ 96.  ██████████ (W), ██████████ (B), and ██████████ (H) conducted the interviews.  ██████ received a rating of "Recommend with Some Reservations" from ██████ a rating of "Recommend" from ██████ and a rating of "Recommend with Some Reservations" from Salinas.  DSOF ¶ 96.  Ealy received a rating of "Recommend" from Lynch, a rating of "Recommend" from ██████ and a rating of "Do Not Recommend" from Salinas.  DSOF ¶ 96.  Eduardo Salinas (H) was the hiring manager on this requisition.  He recommended that Ealy not be included on the prequalified list. DSOF ¶ 97.  Only one promotion was made from this requisition:  ██████ had the highest seniority on the prequalified list and was appointed as COE on December 16, 2016.  DSOF ¶ 97.

Ealy applied for COE on March 31, 2017 on Requisition 288170 and was appointed as COE on August 1, 2017.  DSOF ¶ 98.  Ealy and ██████████ (W) were interviewed and rated as prequalified. The interviewers were ██████████ (B) and ██████████ (W).  ██████ rated Ealy as "Recommended" and ██████████ rated her as "Recommended with Some Reservations."

███ and ███ both rated ███ as "Recommended with Some Reservations." DSOF ¶ 98.

Ealy cannot maintain a denial of promotion claim. Although Ealy applied several times before being promoted to COE, there is no evidence that race was a factor, or the sole factor, in any of the selection processes described above. In 2012, the selections were the result of an arbitration award. In 2014 and 2016, Ealy was not selected because other applicants had more seniority. In 2015, Ealy did not pass a required test, and a Black applicant, ███, was promoted to COE. In 2016, her white supervisor recommended her for promotion but the hiring manger thought she was not qualified. Defendant adhered to the requirements set forth in the Hiring Plan, CBA, and/or arbitration decisions and there is no evidence that race played a role in any of these processes.

### d. Eddie Cooper cannot maintain a failure to promote claim.

Cooper's claims fail because many of his attempts for promotion took place before the applicable statute of limitations period or because it was undisputed that he was unqualified for the promotions he sought.

Cooper's 2011 application is untimely, and it is undisputed he was unqualified. Cooper applied for Filtration Engineer II ("FEII") in 2011 on Req. 207894. The FEII job is part of the AFSCME CBA. DSOF ¶ 99. Cooper was the only internal bidder; the other 17 applicants were not part of the bargaining unit. DSOF ¶ 98. All eight of the successful applicants were external applicants. DSOF ¶ 98. In his application, Cooper incorrectly answered "yes" to the question of whether he had a Bachelor's, Master's, or Doctorate degree in chemical engineering, civil engineering, or a directly related field in Engineering. DSOF ¶ 100. In reliance on Cooper's misrepresentation, DHR referred him to DWM for interviews. DSOF ¶ 100.

Cooper and AFSCME filed a grievance challenging the City's appointment of five of the eight successful candidates on the theory that the City could not demonstrate the outside candidates were more qualified than Cooper. DSOF ¶ 101. All five of the appointees disputed by Cooper held a degree in engineering; Cooper did not. DSOF ¶ 101. A material issue in the arbitration was whether Cooper met minimum qualifications and whether the City waived that requirement by referring him to DWM for interviews. The arbitrator held Cooper was not qualified for the FEII job and there was no waiver. DSOF ¶¶ 101–102.

Cooper's 2012 application for a promotion is also untimely. Cooper applied for Sanitary Engineer II ("SEII") in 2012 on Requisition 227552. DSOF ¶ 103. The SEII title, like the FEII title, required an engineering degree. Cooper correctly answered "no" to the question about having an engineering degree and was disqualified by DHR at the scoring step because he did not meet minimum qualifications. DSOF ¶ 103.

Cooper cannot claim he was not promoted in 2013 because of race because it was undisputed that he was less qualified than other applicants, and another Black worker was offered the position. Cooper applied for Water Chemist III ("WCIII") in 2013 on Requisition 241671. DSOF ¶ 104. Eleven candidates were interviewed, including Cooper. The interviewers were ███████████ (B) and ████████████ (A). ████ and ████ both recommended ████ ████████ (B) and ████████ (A) for appointment. They rated ██████████ (B) and Cooper (B) as "Recommended with Reservations," and did not recommend ██████████ (A). ████ recommended ████████████ (H), and rated ██████████ (A), ██████████ (B), ████████ (B), ████████ (W), and ████████████ (B) as "Recommended with Reservations." ████ recommended ███ and did not recommend ████ ████ ████ ████ or ████ At the consensus meeting on December 10, 2013, ████ and ████ agreed that ████████ and

41

█████ had the highest overall ratings and recommended them for promotion. They did not recommend Cooper or the other candidates they interviewed. DSOF ¶ 104.

Cooper's 2014 application for a promotion fails because he was undisputedly unqualified. In 2014, Cooper applied for FEII on Requisition Req. 254625. DSOF ¶ 105. Cooper correctly answered "no" to the question about having an engineering degree and was disqualified by DHR at the scoring step because he did not meet minimum qualifications given that he did not have the required degree. DSOF ¶ 105.

Cooper was also unqualified for the promotion he sought in 2016. In 2016, Cooper applied for FEII on Requisition 275158. DSOF ¶ 106. Cooper correctly answered "no" to the question about having an engineering degree and was disqualified by DHR at the scoring step because he did not meet minimum qualifications given that he did not have the required degree. DSOF ¶ 106.

Cooper also cannot show he was discriminated against in relation to the promotion he sought in 2019. Cooper applied for WCIII in 2019 on Requisition 319487. DSOF ¶ 107. The interviewers were ██████ (B), ████████ (B), and ████████ (B). DSOF ¶ 107. At the consensus meeting, █████ and ████████ agreed that ████████ (B), ████████ (B), ████████ (H), and ██████ (A) should be rated prequalified for selection. They did not prequalify Cooper or the other applicants they interviewed. ██████ (B), ██████ (B), ███ (H), and █ (A) were selected for the position. DSOF ¶ 108. Cooper cannot show this decision was discriminatory because the three Black hiring evaluators found other applicants more qualified, none of the successful candidates were White, and half of the successful candidates were Black.

### e.  **Vicki Hill cannot maintain a failure to promote claim.**

Hill cannot bring a promotion claim.  Hill did not identify any positions for which she applied in her answers to interrogatories.  DSOF ¶ 109.  She also did not apply for any positions between January 2011 to December 2020.  DSOF ¶ 109.

Hill claims that sometime between 1999 and 2004, ███████ (W) and ██████████ (W) were promoted to Assistant to Commissioner "over" Hill.  Hill admits this was not actually a "promotion;" rather, she claims a job was "created" for ███ DSOF ¶ 110.  ███ was hired as an Assistant to the Commissioner in June 2002 and was appointed as Assistant Commissioner on June 1, 2008. DSOF ¶ 111.  City data show the person that Hill is referring to, also known as ████ ████ was appointed as an Assistant to the Commissioner effective November 1, 2001.  DSOF ¶ 111.  Hill admits that she did not apply to either of these positions, and any claims relating to these appointments or any other appointment she may be disputing are time-barred in any event. DSOF ¶ 110.

### f.  **Robert Laws cannot maintain a failure to promote claim.**

Plaintiffs' counsel's August 16, 2023 e-mail indicated that Laws is not pursuing a denial of promotion claim. DSOF ¶ 32. To the extent Laws attempts to pursue a denial of promotion claim, he cannot show discrimination in any promotion he sought. It is undisputed that Laws was not qualified for either of the positions he sought in 2018.

Laws applied for Caulker in 2018 on Requisition 305134. The original job was posted for bid-only, limited to members of Local 130.  DSOF ¶ 112.  Laws was not eligible because he was not a member of Plumbers Local 130.  DSOF ¶ 112.  All of the original applicants were disqualified for various reasons, so the job was reposted as a job announcement without the bid requirement.  DSOF ¶ 112.  Laws did not apply when the job was reposted.  DSOF ¶ 112.

Laws applied for Emergency Crew Dispatcher ("ECD") in 2018 on Requisition 305164. DSOF ¶ 113. The ECD position involves receiving calls for service from the public and entering data into City information systems. A minimum qualification is the ability to type a minimum of 20 words per minute. DSOF ¶ 113. Laws was one of 12 applicants who failed the typing test. DSOF ¶ 113. Three applicants passed the test: ███████ (W), ███████████ (H), and ████████████████████ (B). ████████ and █████████████, who is Black, were appointed as ECDs on August 16, 2018. DSOF ¶ 113.

DHR records do not show any other applications submitted by Laws from 2011 to 2020. DSOF ¶ 114.

### g. Anton Glenn cannot maintain a failure to promote claim.

Glenn was a Foreman of Station Laborers from October 1998 until he retired in June 2019. DSOF ¶ 115. There are two Station Laborer titles in DWM: Station Laborer and Foreman of Station Laborers. DSOF ¶ 115. In his answers to interrogatories, Glenn admitted that he did not apply for any promotions after Stark became Deputy Commissioner. DSOF ¶ 116. Stark was appointed as acting Deputy Commissioner in October 2009 and as Deputy Commissioner effective September 1, 2011. DSOF ¶ 116. In any event, Glenn has not identified which other positions he was interested in, if any. DSOF ¶ 116. DHR data show that Glenn did not apply for any jobs from 2011 through the date he retired. DSOF ¶ 117.

### h. Veronica Smith cannot maintain a failure to promote claim.

Smith cannot show any discriminatory denial of promotions, and many of the promotions she sought took place outside the statutes of limitations. Smith applied for Foreman of Construction Laborers on April 4, 2012 on Requisition 227677. DSOF ¶ 118. DHR declared the

requisition to be obsolete, took down the posting, and reposted the job announcement on September 24, 2012. Smith did not apply when the job was reposted. DSOF ¶ 118.

Smith applied for General Foremen of Construction Laborers on April 3, 2012 on Requisition 227613. DSOF ¶ 119. DHR declared the requisition to be obsolete, took down the posting, and reposted the job announcement on September 24, 2012. Smith did not apply when the job was reposted. DSOF ¶ 119. In any event, DHR rejected Smith at the scoring step on the obsolete requisition because she did not meet minimum qualifications—specifically, insufficient evidence that she had supervisory experience. DSOF ¶ 119.

Smith was not promoted in 2013 because she failed a prerequisite test for the position and cannot show that other applicants who failed the test were selected. Smith applied for Foreman of Pipe Salvage Yards on October 9, 2013 on Requisition 243688. DSOF ¶ 120. ████████ (B) and ████████ (W) failed Part I of the test. Fifteen other applicants, including Smith, passed Part I. Seven applicants, including Smith, failed Part II of the test. Five candidates failed Part III of the test. Three applicants, ████████ (W), ████████ (H), and ████████ (W) passed all three parts of the test. ████ was rated Most Qualified and was appointed as Foreman of Pipe Salvage Yards on December 1, 2013. DSOF ¶ 120.

DHR posted the job announcement for Laborer Apprentice, Requisition 9410-DWM-2017, on February 2, 2017. DSOF ¶ 121. Taleo data show that a person named Veronica Smith, Taleo Candidate ID No. 2331496, started an application for that job but did not complete the application. DSOF ¶ 121. If Smith had completed an application for Laborer Apprentice and been selected for that job, that would have resulted in a demotion because she had been a Career Service Laborer since 1989. DSOF ¶ 121.

Smith applied for Foreman of Construction Laborers in 2018 on Requisition 305133. DSOF ¶ 122. Twenty applicants, including Smith, passed a written test and were referred to DWM for interviews. 19 of those applicants were interviewed. DSOF ¶ 122. The interviewers for this requisition were ███████████ (W) and ███████████ (B). Both interviewers did not recommend Smith. DSOF ¶ 123. Eight applicants were rated "Pre-Qualified" and ███████ (H) and ███████████ (B) from that group were appointed to the position on October 1, 2018. DSOF ¶ 123. There is no evidence race was a factor in this selection process. Smith also cannot establish discrimination because one of the interviewers was Black, one of the two promotions went to a Black candidate, and none of the White candidates were offered the position.

Smith applied for Assistant Superintendent of Water Meters in 2019 on Requisition 319924. DSOF ¶ 124. Smith was rejected by DHR at the screening step because she did not meet minimum qualifications. DSOF ¶ 124. Smith was undisputedly not qualified for this position.

### i. Donald Anderson cannot maintain a failure to promote claim.

Anderson's claim related to his application for a promotion in 2011, if any, is untimely. Anderson applied for ADS in 2011 on Requisition 207921. DSOF ¶ 125. Four applicants were included on the bid list: Anderson, ███████████ (B), ███████████ (B), and Anthoney Mitchell (W). All applicants passed Part I of the examination; Anderson failed Part II. DSOF ¶ 125. ███████ (B) was rated Highly Qualified and was selected. DSOF ¶ 125. As a Black individual was selected for this position, Anderson also cannot establish that this decision was related to race.

On May 20, 2013, Anderson started an application for ADS on Requisition 241704 but did not submit the application. DSOF ¶ 126. On the same date, Anderson also started an application for General Superintendent of Water Management on Requisition 241688. Initially the application

was not complete. DHR, however, changed the status from incomplete to complete on September 28, 2013. On October 7, 2013, DHR rejected Anderson's application for this position at the scoring step because he did not meet minimum qualifications. DSOF ¶ 127.

Anderson did not meet the requirements for the ADS position he sought in 2014. Anderson applied for ADS in 2014 on Requisition 254651. There were nine applicants on the bid list: Anderson, ███████████ (W), ███████ (W), ███████████ (W), ███████ (W), ███████ (B), ███████ (W), ███████ (W), and ███████ (B). Anderson failed Part I of the test. ███ ███ ███ ███ and ███████ were rated Highly Qualified and ███ was rated Qualified. DSOF ¶ 128. After ███████ initially was selected based on seniority, Local 130 agreed to five additional appointments from the results of the original selection process, and the other five Highly Qualified or Qualified applicants, including a Black applicant, were appointed to ADS. DSOF ¶ 129.

In August 2017, Anderson started applications for General Superintendent on Requisition 288203 and Superintendent of Construction/Maintenance on Requisition 288243, but did not complete the applications. DSOF ¶ 130. This cannot be the basis for any claim.

Anderson was promoted to ADS on October 18, 2018, on Requisition 305172. He was promoted along with six other candidates, ███████ (W), ███████████ (H), ███████████ (W), ███████ (W), ███████████ (B), and ███████ (W). DSOF ¶¶ 131–133.

Anderson applied for District Superintendent of Water Distribution in 2019 on Requisition 319542 but failed the written test. DSOF ¶ 134. ███████ (B) and ███████████ (W) were appointed on two matched requisitions, Requisition 326412 and Requisition 319886. DSOF ¶ 134. Since it is undisputed that Anderson failed the required test and a Black individual was

selected for this position, Anderson cannot claim he was denied this promotion for discriminatory reasons.

Anderson started an application for General Superintendent of Water Management in 2019 on Req. 320327 but did not complete it. DSOF ¶ 135. This, too, cannot be the basis for any claim.

### j. David Henry cannot maintain a failure to promote claim.

Several of Henry's attempts at promotion were outside the applicable limitations period. Henry applied for ADS in 2011. DHR rejected Henry at the Scoring step because he did not meet minimum qualifications given that his job title did not include supervisory duties. DSOF ¶ 136. Henry applied for Foreman of Pipe Construction in 2012. Though he was not referred, another Black applicant, ████████ (B) was. DSOF ¶ 137. Henry applied for Assistant District Superintendent in 2012227621 but did not complete application. DSOF ¶ 138.

When Henry applied for a promotion in 2014, 2017, and 2018, it was undisputed the reason he did not get the promotion was because of his lack of qualifications, not his race. Henry applied for District Superintendent of Water Distribution in 2014. DHR determined he did not demonstrate sufficient supervisory experience to satisfy the minimum qualifications for the job and rejected him at the scoring step. DSOF ¶ 139. On August 16, 2017, Henry applied for Superintendent of Construction and Maintenance. DHR rejected him at the scoring step because he did not meet minimum qualifications. DSOF ¶ 140. Henry applied for Assistant District Superintendent in 2018 and was rejected by DHR due to lack of supervisory experience. DSOF ¶ 141.

### 3. PLAINTIFFS' CLAIMS FOR ALLEGEDLY DISCRIMINATORY DENIAL OF OVERTIME FAIL.

#### a. Defendant's overtime processes

None of the individual Plaintiffs can present evidence that they were denied overtime because of their race. To establish a prima facie case of discrimination in overtime, each Plaintiff

"would need to provide evidence that he (1) is a member of a protected class, (2) was meeting the defendant's legitimate expectations, (3) suffered an adverse employment action, and (4) was not treated as favorably as similarly situated employees outside of his protected class." *Wince v. CBRE, Inc.*, No. 19-cv-1546, 2022 U.S. Dist. LEXIS 42516, at *39 (N.D. Ill. Mar. 10, 2022) (denying overtime discrimination claim). The individual Plaintiffs cannot meet this burden.

The individual Plaintiffs lack evidence that they were treated differently than similarly situated individuals with respect to eligibility and availability of overtime. "In general, a plaintiff who believes another individual is 'similarly situated' must at least show that this 'comparator' (1) 'dealt with the same supervisor,' (2) 'w[as] subject to the same standards,' and (3) 'engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish [his] conduct or the employer's treatment of [him].'" *Orton-Bell v. Indiana*, 759 F.3d 768, 777 (7th Cir. 2014). Distribution of overtime is highly situation-specific and is carried out by individual supervisors based on employees' job titles, seniority, locations, the applicable CBAs, and differences in the circumstances requiring overtime. DSOF ¶¶ 142–147. How overtime is distributed depends on the CBA and whether the employee accepts the offer of overtime. DSOF ¶ 143. Employees can turn down or ignore the opportunity when they are called. DSOF ¶ 143.

According to Plaintiffs' counsel's August 16, 2023 e-mail, only two Plaintiffs are pursuing claims for overtime: Anton Glenn and Robert Laws. DSOF ¶ 32. Plaintiffs' expert in support of their motion for class certification, Bernard Siskin, analyzed payroll data by creating an average expected overtime accounting for title, bureau, seniority, and other factors, and then determining whether an individual had more or fewer hours than expected. DSOF ¶ 148. Exhibit 5 to the report of Defendant's expert Paul White shows Siskin's analysis at the employee level between 2011 and 2020. DSOF ¶ 148. Siskin's analysis revealed that between 2011 and 2020, Laws worked 197.5

hours of overtime more than expected, while Glenn had no overtime surplus or deficit. DSOF ¶¶

163; 173. Although Plaintiffs' counsel's August 16, 2023 e-mail indicated only Glenn and Laws

are pursuing overtime claims, Defendant is addressing possible overtime claims for each Plaintiff

given the ambiguity in Plaintiffs' September 1, 2023 e-mail. DSOF ¶ 32.

### b. **Derrick Edmond cannot maintain an overtime claim.**

Edmond did not disclose a claim for overtime in his answers to interrogatories: "Plaintiff

does not recall being denied overtime." DSOF ¶149. In his deposition, he also agreed he is not

pursuing a claim for overtime. DSOF ¶ 150. To the extent Edmond may attempt to pursue an

overtime claim, Siskin's analysis showed that Edmond worked 1,939.27 hours of overtime more

than expected between 2011 and 2020. DSOF ¶ 151.

### c. **Katherine Ealy cannot maintain an overtime claim.**

Ealy has not disclosed a claim for denial of overtime. DSOF ¶ 152.

### d. **Eddie Cooper cannot maintain an overtime claim.**

Cooper did not claim denial of overtime in his answers to interrogatories. DSOF ¶ 153. At

his deposition, Cooper testified that he complained about changing his schedule from three 12-hour

shifts to five 8-hour shifts. DSOF ¶ 153. The 12-hour shift schedule was a pilot program

implemented at SWPP that affected Water Chemists on watch in the Control Lab and Filtration

Engineers on watch in the Control Center, regardless of their race. The pilot program ended in 2013.

DSOF ¶ 154. The 12-hour shift was not workable; for example, even if employees agreed to work

past their regular shifts to cover called out absences, employees could not work more than 16 hours

in a day. DSOF ¶ 155. Regardless, this schedule change did not negatively impact Cooper's

overtime. Rather, Cooper conceded that the 8-hour shift schedule would result in more overtime

than the 12-hour shift schedule. DSOF ¶ 156. Thus, Cooper cannot establish that he was denied

overtime because of his race. Indeed, Siskin's analysis showed that Cooper worked 1,703.84 hours of overtime more than expected between 2011 and 2020. DSOF ¶ 157.

### e. **Vicki Hill cannot maintain an overtime claim.**

Hill also cannot establish that she was denied overtime because of her race. During her deposition, Hill claimed she was not paid for overtime work she performed. However, she was not paid only because she did not submit signed authorization forms. Hill claims she worked overtime in 2012, was not paid for it, and filed a grievance on this issue in 2013. Stark responded at Step II: "Please provide proper documentation with reason for O.T. and Mark's signature and the City will pay O.T." DSOF ¶¶ 158–159. Hill finally submitted the paperwork and was paid for the unpaid overtime. DSOF ¶¶ 158–159. Hill presents no evidence that O'Malley or Stark were responsible for the delayed payment or that they approved payment of overtime for White employees who did not submit the appropriate documents. Furthermore, Siskin's analysis showed that Hill did not have a surplus or deficit of overtime between 2011 and 2020. DSOF ¶ 160.

### f. **Robert Laws cannot maintain an overtime claim.**

Laws stated in his answers to Defendant's interrogatories that unspecified individuals "manipulated" the overtime call out list by placing other unspecified individuals higher on the list than Laws and by giving Laws less time to respond to a request for overtime, so that "members of a particular race" were given more overtime. DSOF ¶ 161. In his deposition, Laws claimed that John Daly manipulated the overtime lists. Laws claimed Daly was the lead in charge of the overtime lists and gave overtime preferences to ████████ (H), who Laws identified as White (but DHR data reports as Hispanic). However, Laws did not identify any White employee who allegedly received overtime preferences. DSOF ¶ 162. Laws testified that ████ was favored because of his friendship

with Daly, not because of his race. DSOF ¶ 162. As noted above, Siskin's analysis also showed that Laws worked 197.5 hours of overtime more than expected between 2011 and 2020. DSOF ¶ 163.

### g.  Anton Glenn cannot maintain an overtime claim.

In his interrogatory answers, Glenn claims he was stripped of overtime after 2011 by Alan Stark. DSOF ¶ 164. However, Glenn cannot show that he was denied overtime due to his race. Glenn was one of two Foremen of Station Laborers, one assigned to SWPP and one assigned to JWPP. Glenn was the Foreman of Station Laborers at SWPP from 1986 until he retired in 2019. DSOF ¶ 165. Glenn claims that changes in how crews were assigned to clean basins reduced overtime for him and his crew of Station Laborers, which then went to Construction Laborers. DSOF ¶ 166.

However, operational changes, not racial bias, resulted in less overtime for Station Laborers. First, DWM reassigned Station Laborers who had been assigned to Pumping Stations to the treatment plants, JWPP and SWPP. This change meant that there were more Station Laborers available to work on cleaning the basins. Second, Stark implemented a rotating crew schedule intended to reduce the amount of time Station Laborers were required to work in the basins. The revised crew schedule also allowed the crews to rotate between JWPP and SWPP, which allowed for more efficiency in how the basis were cleaned. DSOF ¶ 167. The rotating schedule did not affect the Foreman of Station Laborers. DSOF ¶ 167. Moreover, Glenn's crew of Station Laborers was not made up solely of Black employees; for example, in July 2015, members of his crew included (███████ (H), ███████ (H), ███████ (H), ███████ (B), and ███████ (B)). DSOF ¶ 168.

Glenn also claims he wanted to be a member of Local 1092 and that Stark prevented that from occurring. But SEIU Local 73 and Laborers' Local 1092 were not able to agree on how to

move Station Laborers into Local 1092. Without the consent of the two unions, the City could not unilaterally force the move Glenn requested. DSOF ¶¶ 169–170.

Glenn also complained that Local 1092 laborers were erecting scaffolding, which Glenn believed was Local 73 work. DSOF ¶ 171. Again, this was a dispute between two unions that had no relation to race discrimination. Glenn admitted that some of the Local 1092 Construction Laborers were Black, but he did not care what race they were because he believed they were doing the work of his union, Local 73. DSOF ¶¶ 171–172. There is no evidence that race was a consideration in how this work was done or who was assigned to it.

As noted above, Siskin's analysis also showed that Glenn did not have a surplus or deficit of overtime between 2011 and 2020. DSOF ¶ 173.

### h. Veronica Smith cannot maintain an overtime claim.

Smith has not disclosed a claim for denial overtime within the statutes of limitation. In her answers to interrogatories, Smith stated only that she "recalls overtime being direct [sic] to certain individuals until about 2010." DSOF ¶ 174. During her deposition, Smith could not testify to any specific instance in which she was denied overtime after an overtime list was implemented "sometime in 2000." DSOF ¶ 174.

### i. Donald Anderson cannot maintain an overtime claim.

In his interrogatory answers, Anderson claims that "mostly white" crews would be assigned to "jobs likely to generate overtime" until May 2017, and that "he and his mostly African-American crew would be pulled from jobs that would generate overtime . . . and that they would be replaced by mostly white crews." DSOF ¶ 175. Anderson was a Foreman of Water Pipe Construction from 1998 to 2018, when he was promoted to Assistant District Superintendent ("ADS"). DSOF ¶ 40. Anderson worked in the Central District. DSOF ¶ 40. During his deposition, Anderson claimed that

ADS ████████████ (W) gave overtime to a White plumbing crew and would not allow Anderson's plumbing crew to get work that included overtime for complex jobs, extension of the workday, and jobs on evenings and weekends. DSOF ¶ 176. However, to the extent Anderson complains that any "mostly white" crew received overtime work, he has failed to come forth with any evidence that these crews were assigned work on the basis of race. Furthermore, Anderson cannot show he personally received less overtime. In fact, Siskin's analysis showed that Anderson worked 392.07 hours of overtime more than expected between 2011 and 2020. DSOF ¶ 177.

### j. David Henry cannot maintain an overtime claim.

Henry alleges that one of his supervisors, Jack Lee (W), wrongly denied him overtime. During his deposition, Laws claimed that after his supervisor John Sanders (B) retired, Lee did not provide Henry with overtime opportunities. DSOF ¶ 178. Henry claims Lee allowed White plumbers from leak crews to work overtime on the investigation truck on the day shift, rather than allowing Henry to work a second shift after he worked the midnight shift. DSOF ¶ 178.

Henry testified that after Lee left, he had no other issues with overtime. DSOF ¶ 178. Henry furthermore does not claim that any other superintendents with whom he worked, including Victor Villasenor (H), Jimmy Stroden (W), and Michael Gallagher (W), denied him overtime. DSOF ¶ 178. His complaint about overtime is limited to Lee. Henry was also unable to identify any particular plumbers who were getting overtime he thinks should have gone to him. DSOF ¶ 178. Contrary to his unsupported assertion that Lee deprived him of overtime, Siskin's analysis showed that Henry worked 792.03 hours of overtime more than expected between 2011 and 2020. DSOF ¶ 179. These facts are insufficient to sustain a claim for discriminatory denial of overtime.

4. **PLAINTIFFS' CLAIMS FOR ALLEGEDLY DISCRIMINATORY DENIAL OF ACTING UP FAIL.**

    a. **Defendant's Acting Up Policy**

A pool of employees eligible to act up is prepared by DWM each year and submitted to DHR. Employees in bargaining units generally are selected to act up from the pool in seniority order. DSOF ¶ 181. The general rule for acting up is that appointments related to long-term acting up shall not exceed 90 days and that if an extension is needed, DWM must request the extension and DHR must approve it before the employee reaches the time limit. DSOF ¶ 180.

    b. **Katherine Ealy cannot maintain an acting up claim .**

In her answers to interrogatories, Ealy claimed denial of opportunity to act up in 2015-2016. DSOF ¶ 182. Ealy cannot show she was denied the opportunity to act up. Rather, DWM records show that Ealy consistently acted up from June 2015 through September 2015 and July 2016 through September 2016. DSOF ¶ 183.

Ealy was treated consistently with Department rules on acting up and cannot show she was treated differently because of her race. In fact, after Ealy had reached the 90-day acting up limit in 2015, Stark requested that Ealy be allowed to act up for an additional 90 days due to operational needs caused by the unavailability of other ACOEs and Ealy's willingness to act up. DSOF ¶ 184.

    c. **Eddie Cooper cannot maintain an acting up claim.**

In his answers to interrogatories and deposition testimony, Cooper claimed that he was not allowed to act up from WC II to WC IV for a single week in May 2017. DSOF ¶ 185. The Acting Up Policy defines the "Relevant Pool" for acting up as "a list of Eligible Employees in a bargaining unit and their seniority dates. Generally, *this includes all employees in the title directly below the Acting Up title,* unless otherwise required by the CBA." DSOF ¶ 186 (emphasis added). Cooper claims that he should have been permitted to act up two grades, from WC II to WC IV, but offers no

evidence that a CBA required that his request be granted, or that the general rule did not apply to him. Cooper also was unable to provide any evidence that the alleged denial of acting up was related to his race in any way, and there is no evidence that non-Black employees were permitted to act up from WC II to WC IV. *See* DSOF ¶¶ 185–186.

### d. <u>Veronica Smith cannot maintain an acting up claim .</u>

During her deposition, Smith claimed that after ▮▮▮▮▮▮ retired in 2017, Smith had the most seniority in the unit and should have been allowed to act up when the Foreman was not present. She further claimed that after ▮▮▮▮ retired, the DWM changed its rules such that everyone acts up on a rotating basis. DSOF ¶ 187. ▮▮▮▮▮ is Construction Laborer ▮▮▮▮▮▮ (W), who was hired in 1963 and retired on July 14, 2018. DSOF ¶ 188. ▮▮▮▮▮▮ (W) is a Foreman of Construction Laborers in BMS. DSOF ¶ 188. Until ▮▮▮▮▮ (H) was appointed as Foreman of Pipe/Salvage Yards in April 2017, Brown was the only foreman in BMS. As part of a bureau reorganization, ▮▮▮▮ was assigned to supervise the Construction Laborers who worked inside in the contractors and stock rooms. This group included Smith. ▮▮▮▮ was assigned to supervise Construction Laborers who worked in the field. Since 1997, Smith only worked in the field around six times, working overtime changing meters. DSOF ¶ 188.

The rules for acting up did not change as Smith claims. Construction Laborers act up to foreman in seniority order. DSOF ¶ 189. As Smith admits, ▮▮▮▮ had more seniority than she did, so when ▮▮▮ was absent, ▮▮▮▮ would act up to foreman. The same rules applied after BMS divided the inside and outside functions between ▮▮▮ and ▮▮▮ in or around 2017. DSOF ¶ 189. Construction Laborers like Smith who worked in the meter shop and reported to ▮▮▮ would act up when he was absent, and Construction Laborers who worked in the field and reported to ▮▮▮ would act up when he was absent. The same seniority rules applied to both. DSOF ¶ 189.

### e.  **Vicki Hill cannot maintain an acting up claim.**

In her answers to Defendant's interrogatories, Hill stated that she "would perform the work of other (higher) jobs and duties but would not be designated as acting up and would not be compensated for performing that work."  DSOF ¶ 190.  First, this statement does not describe a denial of the opportunity to act up.  Moreover, Hill has not identified any positions she believed she should have been permitted to act up into, any other Staff Assistants who were permitted to act up into a higher graded position, or even what those positions might have been.   Hill also testified that she never filed a grievance complaining that she was not being paid at a higher rate or that she was working outside of the scope of her title.  DSOF ¶ 191.  Accordingly, Hill has failed to establish that she was denied the opportunity to act up on the basis of her race or for any other reason.

### f.  **Derrick Edmond, Robert Laws, Anton Glenn, David Henry, and Donald Anderson cannot maintain acting up claims.**

Edmond, Laws, Glenn, Henry, and Anderson have not disclosed any acting up claims. DSOF ¶ 192.

## 5.  **PLAINTIFFS' CLAIMS FOR ALLEGEDLY DISCRIMINATORY TRANSFERS/SHIFT SELECTIONS FAIL.**

### a.  **Defendant's transfer/shift selection processes.**

Transfers and shift (or "watch") selection are regulated by CBAs and operational need. The general rule is the most senior applicant can transfer to vacant positions but management has the right to select individuals over seniority based on skills and experience. Work assignments within locations or shifts/watches are not subject to CBA transfer rules—they are management rights. DSOF ¶ 193.

### b. **Derrick Edmond cannot maintain any transfer/shift selection claim.**

From approximately 2013 until he retired in June 2017, Edmond worked on the 10 PM to 6 AM watch (the "midnight shift") at SWPP. DSOF ¶ 194. During his deposition, Edmond claimed that he requested a transfer to JWPP in approximately 2015 that was denied, but he subsequently clarified that he requested the transfer to JWPP a couple of years before he transferred to the midnight shift at SWPP. Edmond admitted that he did not file a grievance over not getting the transfer to JWPP, and he did not have any knowledge the denial was discriminatory. DSOF ¶ 191. In any event, there is no evidence that this alleged denial of transfer was discriminatory, and any claim relating to the alleged denial of transfer is time-barred.

### c. **Katherine Ealy cannot maintain any transfer/shift selection claim.**

Ealy cannot show she was denied a transfer or shift selection because of race. ACOEs are assigned to watches or to the "Day Crew." DSOF ¶ 195. In January 2014, Ealy worked as an ACOE on a watch at JWPP, working days. DSOF ¶ 195. ACOE Miguel Salinas (H), who was assigned to the Chlorine Department, was planning to retire in June 2014. Ealy expressed interest in being assigned to Chlorine but claimed Salinas and Engineer ████████████ (W) were encouraging her not to take that assignment. DSOF ¶ 195. She also stated that Stark wanted to assign ████████ (H) to Chlorine and to assign her to Training. DSOF ¶ 195. Ealy filed a DHR/EEO complaint about the Chlorine assignment but withdrew it after speaking with Stark, who told her that comments from Salinas and ██████ had nothing to do with his decision, and that he thought she was a good fit for the Training position regardless of what Salinas said. Ealy was satisfied with Starks's explanation and withdrew her complaint about the assignment to Chlorine. DSOF ¶ 196.

On June 11, 2014, Ealy submitted a Local 399 request for change of assignment form. On that form, Ealy requested several ACOE assignments: Chemical Transfer at SWPP, Training at SWPP, Training at JWPP, Chlorine at JWPP, and ACOE Watch Slot 14 at JWPP. Ealy did not include Pump Control at JWPP on that form. DSOF ¶ 197. On July 2, 2014, Ealy wrote an e-mail to Stark specifically requesting the Training ACOE assignment at JWPP, stating she would be an excellent fit and asking that the assignment be made as soon as possible. DSOF ¶ 197.

Joseph Lynch was promoted to COE on September 16, 2014 and assigned to SWPP as the COE. Prior to his appointment as COE, Lynch was the Maintenance ACOE at JWPP. DSOF ¶ 198. Effective October 1, 2014, ████████████ was appointed as ACOE. DSOF ¶ 199. ████ initially was assigned to JWPP on a rotation watch. DSOF ¶ 199. ████ appointment as ACOE allowed Stark to grant Ealy's request for the Training ACOE assignment on the Day Crew, which he approved on November 10, 2014. DSOF ¶ 199.

On December 18, 2014, Ealy submitted a transfer request for days at JWPP and SWPP. At that time, she already was assigned as the Training ACOE on the Day Crew at JWPP. DSOF ¶ 200. On December 29, 2014, ████ submitted a transfer request for several slots, including days at JWPP. DSOF ¶ 201. In January 2015, ████ transferred to the Day Crew at JWPP based on seniority. DSOF ¶ 201. This transfer was not adverse to Ealy because she was already assigned to the JWPP Day Crew.

On April 1, 2015, Ealy wrote to Stark requesting assignment from Training to Pump Control as a result of the pending retirement of ACOE ████████ (W). In that e-mail, she referred to seniority as a basis for making assignments among ACOEs assigned to the Day Crew. DSOF ¶ 202. The CBA, however, does not control assignments on a watch or Day Crew; it only regulates transfers between locations and watches. DSOF ¶ 203. Stark determined that based on the relative

knowledge and experience of ███ and Ealy and the need to maintain continuity in the Training program, the best option was to retain Ealy as the Training ACOE and to assign ███ to Pump Control.  DSOF ¶ 203.  Stark also determined that because ███ did not have experience with chlorine, he could not act up as the COE until he had sufficient experience to manage the entire facility.  DSOF ¶ 203.  In December 2015, ███ reported his work experience with chlorine to Stark and then was allowed to act up as COE.  DSOF ¶ 203.

### d.  Veronica Smith cannot maintain a transfer/shift selection claim.

In her answers to Defendant's interrogatories, Smith stated that she "recalls being sent out into the field, while white workers did not have to go out into the field." DSOF ¶ 204.  However, during her deposition, Smith testified that since 1997, she has only worked in the field around six times, working overtime changing meters.  She was also unable to identify any white employees who did not have to go out into the field.  DSOF ¶ 205.  Because Smith has not presented any evidence that she was discriminated against by "being sent out into the field" or that working in the field is an adverse action, she has failed to establish a transfer/shift selection claim.

### e.  Donald Anderson cannot maintain a transfer/shift selection claim.

In his answers to Defendant's interrogatories, Anderson claimed that he was "forced from the South District to the Central District" by William Bresnahan and Barrett Murphy in or about 2009.  DSOF ¶ 206.  However, during his deposition, Anderson testified that no one gave him a reason why he was being transferred from the South District to the Central District.  DSOF ¶ 207.  He also testified that he never saw any documents showing that Bresnahan and Murphy approved the transfer, and that no one ever told him that Bresnahan and Murphy approved the transfer.  DSOF ¶ 207.  As an initial matter, this claim is time-barred because it arises out of an alleged

transfer that occurred in 2009. But even if this claim was not time-barred, there is no evidence that Anderson's transfer from the South District to the Central District had anything to do with his race. Accordingly, Anderson has cannot maintain a transfer/shift selection claim against Defendant.

### f. Eddie Cooper, Vicki Hill, Robert Laws, Anton Glenn, and David Henry cannot maintain transfer/shift selection claims.

Cooper, Hill, Laws, Glenn, and Henry have not disclosed any shift selection/transfer claims. DSOF ¶ 208.

## V. SUMMARY JUDGMENT SHOULD BE GRANTED ON PLAINTIFFS' HOSTILE WORK ENVIRONMENT CLAIMS.

### A. Plaintiffs fail to establish the elements of a HWE claim.

To avoid summary judgment on a HWE claim, Plaintiffs must provide sufficient evidence to create a genuine issue of material fact establishing that: 1) they were subject to unwelcome harassment; 2) the harassment was based on their race; 3) the harassment was severe or pervasive so as to alter the conditions of their environment and create a hostile or abusive working environment; and 4) there is a basis for employer liability. *Mason v. Southern Ill. Univ. at Carbondale*, 233 F.3d 1036, 1043 (7th Cir. 2000); *Langston v. City of Chicago*, No. 22 C 5737, 2023 U.S. Dist. LEXIS 119284, at *3 (N.D. Ill. July 12, 2023) (Kennelly, J.) (analyzing HWE claims pursuant brought pursuant to Title VII, Section 1981, Section 1983 and the ICRA).

In determining whether conduct is severe or pervasive enough to create a HWE, courts "must consider the severity of the alleged conduct, its frequency, whether it is physically threatening or humiliating (or merely offensive), and whether it unreasonably interferes with the employee's work performance." *Robinson v. Perales*, 894 F.3d 818, 828 (7th Cir. 2018). An employer creates a HWE when "the workplace is permeated with discriminatory intimidation,

ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 982 (7th Cir. 2014). "What matters is whether the conduct became so severe or pervasive that 'a reasonable person would find [it] hostile or abusive.'" *Hambrick v. Kijakazi*, No. 22-3217, 2023 U.S. App. LEXIS 21747, at *11 (7th Cir. Aug. 18, 2023) (citing *Harris v. Forklift Sys.*, 510 U.S. 17, 21 (1993)).

As further explained below, Plaintiffs' HWE claims amount to nothing more than a collection of isolated incidents, conduct that was not directed to Plaintiffs, or disputes and petty grievances entirely unrelated to race. "While it is true that harassment need not be *explicitly* racial in order to be probative of a hostile environment, it is equally true that not every perceived unfairness in the workplace may be ascribed to discriminatory motivation merely because the complaining employee belongs to a racial minority." *Beamon v. Marshall & Ilsley Trust Co.*, 411 F.3d 854, 863 (7th Cir. 2005) (emphasis in original). Accordingly, Plaintiffs must establish that the conduct of which they complain "was tied 'in character or purpose' to" their race. *Pearson v. Advocate Health Care*, 2017 U.S. Dist. LEXIS 128349, *13 (N.D. Ill. Aug. 14, 2017) (quoting *Luckie v. Ameritech Corp.*, 389 F.3d 708, 713 (7th Cir. 2004). Plaintiffs have taken the approach of throwing everything at the wall to see what sticks, with the vast majority of the conduct they allege having no connection to their race beyond Plaintiffs' conclusory belief that a "racist culture" existed in the DWM. Such allegations are insufficient to establish that Plaintiffs were subjected to a HWE. *See Zayas v. Rockford Mem'l Hosp.*, 740 F.3d 1154, 1159 (7th Cir. 2014) ("Alleged harassment must be sufficiently connected to race before it may reasonably be construed as being motivated by the defendant's hostility to the plaintiff's race.") (brackets omitted).

Even where Plaintiffs do allege conduct that is racial in nature, the conduct consists of isolated incidents that are insufficiently severe or pervasive, many of which were not directed at Plaintiffs specifically or did not even occur in their presence. The Seventh Circuit has held that it will *not* find a HWE for offensive conduct that is isolated, does not interfere with the plaintiff's work performance, and is not physically threatening or humiliating. *Yancick v. Hanna Steel Corporation*, 653 F.3d 532, 544 (7th Cir. 2011). "The more remote or indirect the act claimed to create a hostile working environment, the more attenuated the inference is that it had an effect on the terms and conditions of the plaintiff's workplace." *Id.* at 545. When allegedly harassing comments are not directed towards the plaintiff, "the impact of [such] second hand harassment is obviously not as great as the impact of harassment directed at the plaintiff." *McPhaul v. Board of Commissioner of Madison County, Indiana*, 226 F.3d 558, 567 (7th Cir. 2000) (internal quotation omitted). As stated by the Seventh Circuit in *Yuknis v. First Student, Inc.*, 481 F.3d 552, 555–56 (7th Cir. 2007): "The American workplace would be a seething cauldron if workers could with impunity pepper their employer and eventually . . . the courts with complaints of being offended by remarks and behaviors unrelated to the complainant except for his having overheard, or heard of, them." Plaintiffs' allegations regarding such isolated and indirect incidents are insufficient to maintain a HWE claim against Defendant.

Plaintiffs also admit that they have no personal knowledge and fail to provide specific details regarding much of the harassing conduct they allege. "Vague recollection alone, unsubstantiated with any specific dates or details" does not create a triable issue of fact. *Moore v. PNC Bank*, No. 19 CV 2707, 2023 U.S. Dist. LEXIS 107125, at *34 (N.D. Ill. June 21, 2023) (granting summary judgment for defendant where plaintiff recalled instances of a failure to accommodate "but could not remember any specific instances, let alone how many times it

happened or when it occurred").  Accordingly, such vague allegations are insufficient to establish a HWE.  *See Lucas v. Chi. Transit Auth.*, 367 F.3d 714, 726 (7th Cir. 2004) (stating that general allegations that did not include times, dates, or places were insufficient to establish HWE, and that "conclusory statements, not grounded in specific facts, are not sufficient to avoid summary judgment"); *Jungiewicz v. Allstate Insurance Co.*, No. 13 C 3793, 2014 U.S. Dist. LEXIS 42772, at *14 (N.D. Ill. Mar. 31, 2014) (finding plaintiff's recollection of statements made by supervisors "several times" insufficient to defeat summary judgment where plaintiff "was unable to identify any specific instance or even give the name of one supervisor who made such a statement").

Moreover, Plaintiffs cannot rely upon secondhand statements that constitute inadmissible hearsay to defeat summary judgment.  *See Allen v. Ford Motor Co.*, 2023 U.S. Dist. LEXIS 159171, *15–*16 (N.D. Ill. Sept. 8, 2023) (holding that plaintiff could not rely on hearsay statements that she was frequently referred to as "black bitch" to establish a HWE) (quoting *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009) ("A party may not rely upon inadmissible hearsay to oppose a motion for summary judgment.")).  For these reasons, the Court should dismiss Plaintiff's HWE claims.

**B.**      **Plaintiffs cannot pursue HWE claims based on time-barred conduct under a continuing violation theory.**

HWE claims are subject to a two-year statute of limitation when brought under the Section 1983 Equal Protection and a four-year statute of limitations when brought pursuant to Section 1981. *Edmond v. City of Chicago*, No. 17-cv-04858, 2018 U.S. Dist. LEXIS 195184, at *20-22 (N.D. Ill. Nov. 15, 2018). If the ICRA applies to Plaintiffs' claims, which the City denies, HWE claims brought under the ICRA are governed by a two-year statute of limitations.  740 ILCS 23/5. Plaintiffs filed their Complaint on June 29, 2017.  Dkt. No. 1.  As such, Plaintiffs cannot pursue Section 1981 claims arising out of conduct occurring before June 29, 2013 and cannot pursue

Section 1983 Equal Protection or ICRA claims arising out of conduct occurring before June 29, 2015.

The Court may consider conduct from before the start of the statutory time period only if the untimely conduct is part of a "a *single unlawful employment practice* falling at least in part within the statutory period." *Milligan-Grimstad v. Stanley*, 877 F.3d 705, 712 (7th Cir. 2017) (emphasis added); *Morgan v. National R.R. Passenger Corp.*, 536 U.S. 101 (2002) (finding that because "incidents constituting a HWE are part of one unlawful employment practice" the court may consider untimely acts that are "part of [a] single [hostile work environment] claim."). "Acts bearing 'no relation' to one another" constitute "separate employment practices." *Ford v. Marion County Sheriff's Office*, 942 F.3d 839, 852 (7th Cir. 2019) (*citing Morgan*, 536 U.S. at 117-18).

Courts consider a number of factors in assessing whether conduct from before the start of the statutory period constitutes part of a single unlawful employment practice. *Ford*, 942 F.3d at 852. "The simplest factor is time: A significant gap between alleged incidents of discriminatory harassment can sever the hostile work environment claim." *Id.*; *see Milligan-Grimstad*, 877 F.3d at 713 (noting that "the length of time between incidents has been a consistent limiting factor" on what conduct the court may consider). Several courts have found that discriminatory incidents that occurred years apart are not properly considered part of a single, continuous HWE. *See, e.g.*, *id.* (incidents "two or three years" apart did not constituted a single HWE); *Lucas v. Chicago Transit Authority*, 367 F.3d 714, 727 (7th Cir. 2004) (discriminatory acts separated by a three year gap were "not part of the same hostile work environment"); *see also Selan v. Kiley*, 969 F.2d 560, 567 (7th Cir. 1992) (two similar acts, separated by a two-year gap were not part a continuing violation).

In addition, "a change in managers can affect whether incidents are related." *Ford*, 942 F.3d at 853. An "employee moved from one plant to another, where a different set of managers made decisions about working conditions, might well experience different hostile environments for the purpose of *Morgan*." *Isaacs v. Hill's Pet Nutrition, Inc.*, 485 F.3d 383, 386 (7th Cir. 2007). Finally, other intervening action by the employer can interrupt a HWE claim, including "prompt and appropriate corrective action reasonably likely to prevent the harassment from recurring." *Ford*, 942 F.3d at 853 (citing *Morgan*, 536 U.S. at 118).

Courts have repeatedly refused to consider events from outside the statutory period as part of a single HWE claim based on these factors. In *Porus v. Randall*, 2014 U.S. Dist. LEXIS 47988 (N.D. Ill. Apr. 8, 2014) (Kennelly, J.), this Court held that time-barred offensive conduct involving different perpetrators, levels of frequency, and severity was insufficiently related to an isolated incident involving a slur that occurred within the statute of limitations to form part of the same HWE. *Porus*, 2014 U.S. Dist. LEXIS 47988, at *12–*16 (granting summary judgment) ("[T]he Court concludes that no reasonable jury could find that the Belmonte incident contributed to or formed part of the same HWE that arose from the earlier conduct that Porus cites. For this reason, the single incident that occurred within the [statute of limitations] does not permit her to rope in all of the more severe but far earlier harassment.").

In *Milligan-Grimstad*, the plaintiff alleged "two broad periods of conduct: one lasting from 2003 to some point in 2009 and another lasting from some point in 2011 until [2012]" and asked that the court treat all of the alleged conduct, including conduct that occurred outside the statutory period, as part of a single HWE claim. The court found plaintiff's nonspecific allegations about when the earlier conduct occurred and how much time elapsed between incidents could not "connect otherwise distant allegations into a single employment practice" and did not permit

consideration of time-barred conduct from the first period of time in evaluating plaintiff's HWE claim. *Milligan-Grimstad*, 877 F.3d at 713.

The court in *Mochu v. Advocate Aurora Health, Inc.*, No. 20 CV 7035, 2023 U.S. Dist. LEXIS 133966, at *46-47 (N.D. Ill. Aug. 2, 2023) recently reached the same conclusion, finding that a gap of about three years without incident known to the defendant, two changes to the plaintiff's supervisors and intervening remedial action by defendant did not suggest a single continuous violation and required limiting plaintiff's HWE claim to the later-alleged conduct. Likewise, in *Ford*, the Seventh Circuit affirmed that an eighteen-month gap, the departure of plaintiff's supervisor and the transfer of Ladd and Watts calculated to end their alleged harassment, severed plaintiff's HWE claim into two distinct claims, each subject to the statute of limitations. *Ford*, 942 F.3d at 854.

Here, Plaintiffs seek to extend their HWE claim to include conduct dating back to 2011— either approximately two or four years, respectively, before the start of the applicable statutes of limitations. DSOF at ¶ 32 (citing Dkt. No. 245, Plaintiffs' Corrected Memorandum in Support of Motion for Class Certification, at 54 ("Plaintiffs assert their HWE claim going back to 2011.")). As discussed below, that conduct does not constitute part of a single HWE and is barred by the statutes of limitations and *Morgan*.

### C.    <u>There is no basis for employer liability under Plaintiffs' 1981 and Equal Protection 1983 claims.</u>

Plaintiffs' HWE claims fail because Plaintiffs cannot establish a basis for employer liability. As noted above, under *Monell*, the City cannot be held liable for the acts of its employees under Section 1983 unless those acts were undertaken pursuant to an official City policy or widespread practice, or undertaken by an individual with final policymaking authority. *Monell v. Dept of Soc. Servs.*, 436 U.S. 658, 690 (1978); *Calhoun v. Ramsey,* 408 F.3d 375, 379 (7th Cir.

2005).  Because Section 1983 provides the exclusive federal remedy for the violation of Section 1981 by a state actor, Plaintiffs' section 1981 claims likewise require evidence of "a custom or policy within the meaning of *Monell*." *Campbell*, 752 F.3d at 669 (citing *Jett v. Dallas Indep. Sch. Dist.,* 491 U.S. 701 (1989)).

Whether a person has "final policymaking authority" for purposes of § 1983 is determined by state and local law. *Waters v. City of Chicago*, 580 F.3d 575, 581 (7th Cir. 2009). Both the Chicago City Council and the City's Commissioner of Human Resources may be considered the final policymakers for the City of Chicago in the area of employment. *Id.*  There are no facts to establish that the allegedly discriminatory conduct was taken by either the City Council or the Commissioner of Human Resources. Nor is there any evidence to suggest that Plaintiffs were discriminated against due to an official policy.  As such, to establish employer liability and survive summary judgment, Plaintiffs must establish a widespread practice "that is so permanent and well-settled that it constitutes a custom or practice." *Spiegel*, 916 F.3d at 617. "[T]here must be some knowledge or an awareness--actual or imputed--of the custom and its consequences showing the municipality's approval, acquiescence, or encouragement of the alleged unconstitutional violation." *See Jones v. City of Chicago,* 787 F.2d 200, 204 (7th Cir. 1986).

### D.      If the ICRA applies to employment claims, there is no basis for employer liability under Plaintiffs' ICRA claims.

As discussed above, Plaintiffs cannot pursue HWE claims under the ICRA because the Act does not apply to Plaintiffs' employment discrimination claims, and Defendant is entitled to summary judgement on this basis. *See supra*, Sec. IV.A.4., at 16–20.

Should the Court permit Plaintiffs to pursue HWE claims against Defendant under the ICRA however, Plaintiffs will need to establish that the City acted with deliberate indifference, consistent with the requirements of Title VI, in order to establish a basis for employer liability.

*See Arriaga v. Dart*, 568 F. Supp. 3d 953, 962 (N.D. Ill. 2021) ("the [ICRA] is modeled on the federal Title VI, which accommodates claims for discrimination by third parties when defendants with an obligation to respond to such conduct exhibit deliberate indifference"); *Weiler v. Vill. of Oak Lawn*, 86 F. Supp. 3d 874 (N.D. Ill. 2015) (explaining that Illinois courts look to cases involving violations of federal civil rights statutes to guide its interpretation of the ICRA).

Alternatively, should the court look to Title VII—despite the clear history patterning the ICRA after Title VI—Plaintiffs would need to establish that the City acted negligently in failing to discover and prevent the harassment that gave rise to the alleged HWE. *See Erickson v. Wisconsin Department of Corrections*, 469 F.3d 600, 606 (7th Cir. 2006) (noting Title VII's goals by holding an employer liable under Title VII's negligence standard if it failed to discover and prevent the harassment of an employee giving rise to a HWE). As explained below, Plaintiffs HWE claims must fail under either standard.

## E. INDIVIDUAL PLAINTIFFS DO NOT ESTABLISH THAT THEY EXPERIENCED A HOSTILE WORK ENVIRONMENT.

None of the Plaintiffs can maintain a HWE claim. Defendant had clear policies and procedures to address harassment and discrimination, and the conduct Plaintiffs allege did not rise to the level of a HWE. Much of the alleged conduct was unrelated to race or consisted of isolated incidents occurring infrequently over a long period of time. Without evidence to show Defendant was on notice of the alleged conduct or that the alleged conduct rises to the level of actionable harassment, Plaintiffs' HWE claims cannot go forward.

### 1. Defendant's Policies on Harassment, Discrimination, Violence, and Retaliation Preclude Plaintiffs' HWE Claims.

The City has put into place extensive policies to address potential harassment and discrimination in the workplace. Since 2013, there have been two operative City EEO policies:

one issued in 2013 and one updated in 2019. DSOF ¶ 209. The City's EEO policy prohibits harassment and discrimination based on a series of protected categories, including race and national origin, and retaliation against a person who asserts his or her rights by: (1) opposing discriminatory practices in the workplace, (2) complaining about conduct prohibited by this policy, or (3) complaining to, cooperating with, or assisting the Diversity and EEO Division or a City department in resolving a complaint of discrimination. DSOF ¶ 209. Employees found to be in violation of the policy are subject to discipline, up to and including discharge. DSOF ¶ 209. The City also implemented written equal employment opportunity policies through its Personnel Rules in 2010 and 2014, which expressly prohibit discrimination and harassment based on race and national origin, and also prohibit retaliation against anyone who engages in protected activity. DSOF ¶ 210.

Each departmental HR Liaison distributes copies of the EEO Policy to all employees, who are required to sign a form acknowledging that they received the EEO Policy. DSOF ¶ 211. Plaintiffs Hill, Anderson, Glenn, Ealy, Smith, Henry, Laws, and Edmond signed the acknowledgement forms, verifying that they received the 2013 EEO Policy. DSOF ¶ 212. DHR also posts the EEO Policy to the City's internet and intranet sites for employees to easily reference. DSOF ¶ 213.

There are many people working to ensure that the City's EEO policies are effectively implemented and enforced. The Deputy Commissioner for Diversity and Equal Employment Opportunity ("EEO Deputy") directs the implementation of the City's EEO policy. DSOF ¶ 214. The Equal Employment Opportunity Officer ("EEO Officer"), under the supervision of the EEO Deputy, manages the City's process for investigating and resolving complaints, assists departments with implementing the policy, and conducts trainings. DSOF ¶ 214. Each department, including

DWM, is then responsible for implementing the City's EEO policies and appointing an EEO liaison from within the department. DSOF ¶ 215. The EEO liaison is responsible for receiving complaints and referring them to the EEO division of the Department of Human Rights, as well as reporting any conduct he or she becomes aware of that could constitute discrimination or harassment. DSOF ¶ 215. In addition, the EEO liaison assists with collecting information, scheduling interviews, and otherwise assisting the EEO division in its investigation of any alleged EEO violations. DSOF ¶ 215. ████████ served as the DWM's EEO Liaison until she retired in or around 2017. DSOF ¶ 216. Jacqueline Toledo took over as EEO Liaison after Egan's retirement and is assisted by ████████. DSOF ¶ 216.

Supervisors also have an obligation under the City's policies to report possible EEO violations that they become aware of to the Liaison, the EEO Officer, or the EEO Deputy. DSOF ¶ 217. A supervisor who fails to report a potential EEO can be investigated for his/her failure to report. DSOF ¶ 217.

### 2. **Defendant's Investigation Protocols for EEO Complaints**

Complaints of EEO violations are investigated by DHR's EEO Division. DSOF ¶ 218. There are six ways in which the EEO Division can receive a complaint: (1) by referral from the EEO Liaison or department personnel; (2) from the hotline number; (3) by email to the Investigator, Deputy, Officer, or the EEO Division-dedicated e-mail; (4) by a referral from the OIG; (5) by referral from the Mayor's Office; or (6) in person. DSOF ¶ 218. All complaints received that allege a violation of the EEO policy are investigated pursuant to specific, written investigation protocols which were implemented on May 1, 2012 and revised on June 14, 2012, May 29, 2013, August 11, 2014, and November 8, 2018. DSOF ¶ 219.

The investigation process involves interviewing the complainant, preparing an investigation plan, requesting additional information, reviewing logs for prior cases involving the complainant or respondent, interviewing witnesses, interviewing the respondent, reviewing personnel records and any additional relevant documentary evidence including, for example, time sheets, photographs, surveillance footage, etc., and ultimately preparing a report summarizing the investigation and DHR's findings. DSOF ¶ 220.

The protocols include numerous safeguards to maintain confidentiality and avoid retaliation in order to encourage employees to come forward, including: (i) conducting interviews at DHR's offices and, to the extent circumstances require field interviews, confirming the appropriate facilities, resources, and confidentiality safeguards at those location; (ii) refusing to confirm or deny the existence of any complaint filed in response to any inquiries from third-parties; and (iii) emphasizing neutrality and confidentiality and expressly informing witnesses of the City's anti-retaliation policy. DSOF ¶ 221.

At the conclusion of the EEO Division's investigation, the investigator prepares a summary report outlining the allegations, summarizing the interviews, analyzing the allegations against the policy, assessing the credibility of the parties and the witnesses, and presenting its findings and recommendation. DSOF ¶ 222. If the allegation is sustained, the EEO Division makes a recommendation as to the appropriate discipline. DSOF ¶ 222. The investigator submits the report to the EEO Office for review, which is then sent to the head of the department with copies to the DHR commission, the EEO Division Deputy Commission, the EEO liaison, and, if the finding is sustained, the Department of Law. DSOF ¶ 222.

This process meaningfully changes the workplace to address discrimination concerns. From 2011 through 2020, there were 22 instances in which DHR imposed race-related discipline

or where an employee retired or resigned during an investigation into alleged racial discrimination or harassment. DSOF ¶ 223.

### 3. Defendant's EEO Training

The EEO Officer conducts trainings to ensure that all employees are aware of the EEO Policy and that all department heads, EEO Liaisons, and supervisors understand their role in implementing the EEO Policy and promoting a fair and inclusive workplace. DSOF ¶ 224. DHR conducts city-wide EEO trainings specific to supervisors, as well as separate training for rank-and-file employees. DSOF ¶ 225. DHR has been offering supervisor-training to all supervisors City-wide since 2014. DSOF ¶ 225.

DHR also offers department-wide training. DSOF ¶ 225. Beginning around mid-2017, DWM required mandatory, annual EEO training conducted by DHR for all DWM employees. DSOF ¶ 225. The trainings describe the City's EEO policy and include true/false statements and hypotheticals to test employees' understanding. DSOF ¶ 226. The trainings explain that supervisors are required to notify DHR or the EEO liaisons if they become aware of conduct that may violate the City's policy and provide an explanation of DHR's confidential investigation process, resources for employees, and contact information for DHR and for the EEO liaisons. DSOF ¶ 226. Employees have the opportunity to ask questions throughout and at the conclusion of the training. DSOF ¶ 226.

### 4. Plaintiffs cannot maintain a HWE claim based on the e-mails investigated by the OIG.

Plaintiffs rely heavily in the TAC on offensive e-mails that were uncovered in the OIG investigation into former District Superintendent Paul Hansen. The e-mails the OIG investigated constituted a clear violation of City policy. Following the OIG's initial report of its investigation in 2017, the City took swift action to remove the employees involved. DSOF ¶ 227.

Offensive as they are, the e-mails do not establish a HWE for any of the individual Plaintiffs, none of whom were sent these e-mails. These e-mails were exchanged among a small group of individuals and there is no evidence that they were distributed beyond that group. In fact, Plaintiffs and other witnesses acknowledged that they did not receive offensive e-mails, but only learned of the e-mails after some of them were published in the media. DSOF ¶ 228. This is not a case in which offensive comments and imagery populated Plaintiffs' e-mail inboxes or were otherwise on display; they were nowhere to be found other than in the e-mails of the narrow group of individuals who sent or received them. The Seventh Circuit has held that evidence of racial harassment of which a plaintiff was unaware during his or her employment cannot be used to establish a HWE claim. In order for such comments to be relevant in a HWE claim, the plaintiff must at least know of the comments during his employment. *See Mason v. Southern Ill. Univ. at Carbondale,* 233 F.3d 1036, 1046 (7th Cir. 2000).

**5. The Conduct Alleged by Plaintiffs Between January 1, 2011 and the Close of Discovery Does Not Establish a HWE Claim.**

Plaintiffs allege HWE claims arising out of conduct reaching back to January 1, 2011. DSOF at ¶ 32 (Dkt. No. 245, Plaintiffs' Corrected Memorandum in Support of Motion for Class Certification, at 54 ("Plaintiffs assert their HWE claim going back to 2011.")). However, Plaintiffs' claims include conduct occurring two years before the Section 1981 statute of limitations and four years before the Equal Protection and ICRA statutes of limitation. As noted above, Plaintiffs cannot pursue HWE claims arising out of time-barred conduct on a continuing violation theory. For the following reasons, none of the Plaintiffs can establish that they were subjected to a HWE during the relevant time period.

### a.  Derek Edmond cannot establish that he experienced a HWE.

#### i.  Derrick Edmond's interrogatory answers and deposition testimony are insufficient to establish a HWE.

Edmond was not subjected to a HWE.  In responding to an interrogatory asking to him identify "each event or occurrence in which you contend you experienced harassment, retaliation or a HWE," the only specific events Edmond identified were that he was not allowed park next to the chorine building but saw white employees park there, and that African Americans in general were denied desirable shifts and work times, though he did not specifically state that he was denied any shift.  DSOF ¶ 229.  These vague workplace slights do not rise to the level of unlawful harassment.  At his deposition, Edmond for the first time alleged he heard the term "you people" used by Lynch, but never heard Lynch use any other language he found offensive.  DSOF ¶ 230. Edmond also believed that Lynch would refuse to shake hands with Black employees based on one occasion when Lynch did not shake his hand. DSOF ¶ 230. This alleged slight does not rise to the level of an actionable HWE.  *Duminie v. Ne. Ill. Reg'l Commuter R.R. Corp*., No. 17-cv-3030, 2020 U.S. Dist. LEXIS 46646, at *17 (N.D. Ill. Mar. 18, 2020) ("it is well established that petty workplace slights that do not represent significant negative alterations in the workplace are not actionable") (internal quotation omitted); *Adam v. Obama*, 210 F. Supp. 3d 979, 991 (N.D. Ill. 2016) ("Generally, rude or impolite interactions with co-workers are insufficient to support a claim for hostile work environment.").

#### ii.  Derrick Edmond cannot maintain a HWE claim in relation to his allegations about a photo of a noose.

Edmond also testified he saw a photo of a noose in the newspaper and shown to him by other co-workers, but never personally saw a noose while working for the Water Department. DSOF ¶ 231. Edmond claimed that while he never saw a noose in person, he saw people passing

pictures of it around but could not recall who.  DSOF ¶ 231.  However, this conduct could only have occurred after Edmond retired in June 2017, as the noose was not published in the media until October 2017.  DSOF ¶ 232.  As noted above, evidence of racial harassment of which the plaintiff was unaware during his employment cannot be used to establish a HWE claim. *See Mason v. Southern Ill. Univ. at Carbondale,* 233 F.3d 1036, 1046 (7th Cir. 2000).  Furthermore, there is no evidence that Edmond used the City's complaint procedures or EEO policy to try to address these concerns or to put the City on notice that this alleged conduct was occurring.  For these reasons, the Court should dismiss Edmond's HWE claim.

### b.  Katherine Ealy cannot establish that she experienced a HWE.

#### i.  Katherine Ealy's interrogatory answers are insufficient to establish a HWE.

Ealy's work environment also did not rise to level of a racially HWE. In discovery, Ealy was asked to identify "each event or occurrence in which you contend you experience harassment, retaliation or a hostile work environment."  DSOF ¶ 233.  Interrogatory Number 5 also asked Ealy to identify the date on which the incident or incidents occurred.  DSOF ¶ 233.  Ealy lists only two specific events: 1) when Alan Stark refused a shift change request by Ealy, and 2) when she was excluded from becoming an interviewer.  Ealy provides no dates, neither approximate nor specific, for these two events. DSOF ¶ 233.  This type of behavior does not rise to the level of severe or pervasive conduct sufficient to sustain a HWE claim. *See, e.g., Ford v. Minteq Shapes & Servs.*, 587 F.3d 845, 847 (7th Cir. 2009) ("Wampler's referring to Ford as 'black man' and 'black African-American,' even for fourteen months as we must assume favorably to Ford, was not severe enough to alter Ford's working conditions"); *Ghosh v. Capital One Servs., LLC*, No. 21 C 4111, 2023 U.S. Dist. LEXIS 133964, at *13 (N.D. Ill. Aug. 2, 2023) (finding that, though conduct was inappropriate and offensive, it did not rise to level of a hostile working environment).

During her deposition, Ealy alleged she heard only a few comments while working for the Water Department that she believes were racial. She claimed that Alan Stark would use the word "you all" in morning meetings rather than refer to people by name. DSOF ¶ 234. That is the only allegedly "racially based" comment she attributed to Alan Stark. DSOF ¶ 234. The only "racially based" comments she attributed to John Pope or Joe Lynch were alleged comments in which they referred to black people as "you all." DSOF ¶ 234. Ealy also claimed that when she first started working at JWPP, Nick Dever would call Black employees "hey boy" or "hey" or "you people." DSOF ¶ 235. She does not allege she heard any race-based comments by Barrett Murphy, and she does not recall Miguel Salinas making any comments toward her because of her race. DSOF ¶¶ 235–236. She claims she once heard a co-worker, Barry Racz,[4] say that when he sees a black person on TV, he turns the channel. DSOF ¶ 239.

Ealy also claimed she saw symbols she found to be racially offensive, but that was prior to 2011. Ealy alleges she saw what she believed was a noose, but admits this occurred before she became an ACOE, which was in 2011. DSOF ¶ 241. Ealy also alleges she saw a black-faced doll in the maintenance ACOE office but did not say when she saw this and did not report it to anyone. DSOF ¶ 241. It is undisputed from the testimony of other witnesses that if the black-faced doll existed at all, this occurred before 2005. DSOF ¶ 241. Plaintiff Vicki Hill testified that she saw a black face figurine on a shelf in the ACOE's office between 1998 and 2005 but did not see it after then. DSOF ¶ 241. Alan Stark's and John Pope's assistant Renee Perisee (B) has worked at JWPP since 1994 and has never seen any black dolls or black figurines. DSOF ¶ 241.

---

[4] Barry Racz's name is misspelled as "Barry Race" in Ealy's deposition transcript. DSOF ¶ 239.

Ealy also claimed that a co-worker named John Scollard called her "black bitch." DSOF ¶ 237. However, John Scollard retired on December 31, 2010, so this alleged conduct is time-barred. DSOF ¶ 237. Ealy also testified that Nick Dever called her a "fucking whore" and "black bitch" on multiple occasions but did not specify when or how many times this occurred. DSOF ¶ 238. Dever went on an FMLA leave of absence on April 16, 2015, and did not return to work at the DWM until he retired on February 1, 2020. DSOF ¶ 238. Finally, Ealy testified that Barry Racz also called her a "bitch," but did not specify when or how many times this occurred. DSOF ¶ 239. Racz retired on January 31, 2015. DSOF ¶ 239. Ealy further testified that she was not aware that anyone ever witnessed Scollard, Dever, or Racz calling her a "bitch." DSOF ¶ 240.

Though neither the City nor the courts condone these types of comments, they do not rise to the level of a HWE. The terms "whore" and "bitch" have no relation to race, and Ealy has failed to specify when or how many times she was called "black bitch." *Strickland v. Dart*, No. 19-cv-02621, 2023 U.S. Dist. LEXIS 56429, at *54 (N.D. Ill. Mar. 31, 2023) (finding use of "you people" and other derogatory comments not to rise to the level of hostile work environment"); *Harper v. Ceisel Masonry*, 2008 U.S. Dist. LEXIS 7, *3 (N.D. Ill. Jan. 2, 2008) ("Conduct such as . . . calling plaintiff a 'black bitch' is unprofessional and indicative of ugly racist impulses. Yet it falls on the 'merely objectionable' side of the line established by caselaw in this Circuit . . . not on the actionable side.") (quoting *McPherson v. City of Waukegan*, 379 F.3d 430, 438 (7th Cir. 2004)); *Ezell v. Potter*, 400 F.3d 1041, 1048 (7th Cir. 2005) (affirming summary judgment on HWE claim and noting that the plaintiff " provides no detail on the regularity and so we cannot consider the few comments detailed in the briefs to be pervasive") ); *Thompson v. Mem'l Hosp. of Carbondale*, 625 F.3d 394, 401 (7th Cir. 2010) (finding statements that plaintiff "could not do what others could do because he was black and another where she said she was not sure what her neighbors would

think if she invited a black person to her home" to "not reflect severe or pervasive enough conduct to be actionable under Title VII").

### c. Eddie Cooper cannot establish that he experienced a HWE.

#### i. Eddie Cooper's deposition testimony is insufficient to establish a HWE.

Cooper did not experience a HWE claim. During his deposition, Cooper initially testified that he did not hear any racially derogatory language during his employment with the DWM. DSOF ¶ 242. He then testified that on one occasion, there "was a news event where this woman left – this African-American left her child in a Dumpster, and when [Filtration Engineer V Frank Skiadopoulos] was working as [a Filtration Engineer] in the control room, he came to me and said, you people always doing this and that kind of thing." DSOF ¶ 242. Cooper testified that on another occasion, Skiadopoulos "said, hey, Cooper, why is it that when I say 'boy,' that a boy is a good thing but if I call you a boy, it's a bad thing." DSOF ¶ 243. According to Cooper, Skiadopoulos would commonly use the terms "boy" and "you people." DSOF ¶ 243.

Use of these vague and ambiguous terms are insufficient to establish that Cooper was subjected to the severe or pervasive harassment required to maintain a HWE claim. *See Nichols v. Mich. City Plant Planning Dep't*, 755 F.3d 594, 601–02 (7th Cir. 2014) (affirming summary judgment on HWE claim where plaintiff alleged that co-worker referred to him as "black nigger" and "boy"); *Lee v. Styrolution America LLC*, 2013 U.S. Dist. LEXIS 28611, *16–*18 (N.D. Ill. Mar. 1, 2013) (holding that plaintiff's allegation that co-worker repeatedly called him "boy" was not severe or pervasive enough to establish a HWE); *Strickland v. Dart*, 2023 U.S. Dist. LEXIS 56429, *53–*54 (N.D. Ill. Mar. 31, 2023) (statements including "you people" "are not particularly severe[,]" "not directly linked to . . . race[,]" and "cannot be reasonably inferred as derived from racial animus"); *Whittaker-Ardson v. Denneys Rest.*, 2007 U.S. Dist. LEXIS 72036, *22–*24 (N.D.

Ill. Sept. 26, 2007) (finding that use of the phrase "you people" was insufficient to establish a HWE).

Cooper also testified that he saw "KKK" graffiti in a restroom in the chemical building, "KKK" graffiti scribbled on a driveway, and swastika graffiti. He testified that in the restroom in the chemical building, a Black employee wrote "Queens, quacks and queers" over the "KKK" graffiti, but he never reported the graffiti to anyone. DSOF ¶ 244. These isolated instances of offensive graffiti, which were not directed at Cooper himself, are also insufficient to establish that he was subjected to a HWE. *See Woodard v. Tower Auto Prod Co.*, 2004 U.S. Dist. LEXIS 19595, *7 (N.D. Ill. Sept. 28, 2004) (holding that graffiti including the terms "nigger" and "Ku Klux Klan" "which was directed at a general audience rather than at plaintiff" and did not interfere with plaintiff's work performance was insufficient to establish HWE); *Howard v. Cook Cty. Sheriff's Office*, 989 F.3d 587, 603 (7th Cir. 2021) ("Indeed, we have repeatedly rejected HWE claims that rest primarily on secondhand harassment.").

While the Seventh Circuit has held that graffiti specifically directed at a plaintiff which contains racial epithets can form the basis of a HWE claim, the graffiti alleged by Cooper here does not rise to that level. *See Cerros v. Steel Techs.*, Inc., 398 F.3d 944, 951 (7th Cir. 2005) (reversing summary judgment on HWE claim where plaintiff was subjected to graffiti calling him a "spic" and "wetback," directing him to "go back to Mexico," and proclaiming "KKK" and "white power"); *cf. Harris v. Electro-Motive Diesel, Inc.*, 2015 U.S. Dist. LEXIS 17107, *22–*24 (N.D. Ill. Feb. 12, 2015) (distinguishing *Cerros* and granting summary judgment on HWE claim where graffiti defacing plaintiff's locker did not "include the use of highly-charged epithets"). Moreover, Cooper cannot establish any basis for employer liability because he admitted that he did not report the graffiti to anyone. *See Paschall v. Tube Processing Corp.*, 28 F.4th 805, 816 (7th Cir. 2022)

(holding that plaintiffs "fail[ed] to demonstrate a basis for employer liability because they did not report" alleged harassment to defendant's management or human resources).

### ii. Eddie Cooper's interactions with Joseph Lynch do not establish a HWE.

Cooper also cannot establish that any of his interactions with COE Joseph Lynch were related to his race or his engagement in protected activity. In his answers to Defendant's interrogatories, Cooper claims that in April 2017, Joseph Lynch "lunged at Plaintiff and was restrained by others[,]" and that Lynch "attacked" him "in retaliation for exercising his rights." DSOF ¶ 245.[5] During his deposition, Cooper testified that on April 24, 2017,[6] he was discussing a grievance relating to a toilet leaking on employee Paul Eppinger's desk with Skiadopoulos. According to Cooper, Lynch was also present and "kept interrupting." Cooper testified that after he and Lynch went "back and forth for a few minutes . . . I just lost -- I said listen, man, just shut the fuck up." Cooper claimed that Lynch then "got angry," "jumped out of his chair, rolled his sleeves up and came . . . less than a foot from me and I just froze and I was put in a fearful situation." Cooper testified that Lynch had a "menacing look on his face" but did not claim that Lynch touched him. Cooper also testified that Lynch did not use any racially offensive language during this incident, and that he had never heard Lynch use any racially offensive language. DSOF ¶ 246. Both Lynch and Cooper filed "Violence in the Workplace" ("VIW") complaints against each other relating to the incident, but neither was sustained and neither Lynch nor Cooper were disciplined. DSOF ¶ 247.

---

[5] Cooper's answer to Interrogatory No. 9 alleges that Lynch "attacked" him in April 2013, while his answer to Interrogatory No. 10 alleges that Lynch "lunged at" him on April 24, 2017. DSOF ¶ 245. During his deposition, Cooper clarified that there was a typo in his answer to Interrogatory No. 9, and that his answers to both of these interrogatories refer to the same incident that occurred in April 2017. DSOF ¶ 245.

[6] DWM records indicate that this incident occurred on April 21, 2017. DSOF ¶ 246 (citing X 163: DWM-Edmond-062633 – DWM-Edmond-062644)

As noted above, on or about May 9, 2017, Cooper distributed a petition calling for management to take action against Lynch. DSOF ¶ 248; *see supra*, Sec. IV.B.1.d., Cooper Discipline, at 27–29. During his deposition, Cooper claimed that he distributed the petition because "somebody needs to deal with this guy because he's dangerous, going around threatening people mainly and attacking African-Americans." DSOF ¶ 248. However, the petition alleged only that Lynch "exhibited violent and dangerous behavior/actions to numerous BWS employees"—it did not accuse him of racial misconduct, and it was signed by three Hispanic employees (Robert Lozano, Art Senteno, and Juan Romero) and one White employee (Joe McMahon). DSOF ¶¶ 248–249. Cooper also admitted during his deposition that he had no personal knowledge regarding any violence between these employees and Lynch, although he identified McMahon as "a white person that got into it with Joe Lynch." DSOF ¶ 249.

As noted above, Cooper was issued a NPDH for distributing the petition but was not ultimately disciplined. Notes from a meeting regarding the petition on May 11, 2017, indicate that Cooper never asserted the petition was related to racial harassment and that he agreed to cease circulating the petition. DSOF ¶ 250.

To the extent Cooper relies on his interactions with Lynch, his HWE claim fails because he has not established any nexus between Lynch's actions and race. To maintain a HWE claim, Cooper must allege harassment based on race, not general workplace incivility like a superior giving him a "menacing look" after Cooper told him to "shut the fuck up," with no indication that such actions are related to race. *See Abrego v. Wilkie*, 907 F.3d 1004, 1015 (7th Cir. 2018) (affirming summary judgment on HWE claim despite evidence that plaintiff's "supervisors were short-tempered, hostile, unfairly critical, and disrespectful") (internal quotations omitted); *Martin v. Cook County*, 2019 U.S. Dist. LEXIS 133354, *34 (N.D. Ill. August 8, 2019) (granting summary

judgment on HWE claim where plaintiff failed to demonstrate challenged conduct was related to race and holding that superior "yelling at her one time" was insufficiently severe or pervasive).

Likewise, Cooper's claims that Lynch subjected others to racial harassment are based on inadmissible hearsay, and there is no evidence that Lynch took any action against others on the basis of their race or that Cooper's petition was related to racial harassment in any event. *See Patton v. Indianapolis Pub. Sch. Bd.*, 276 F.3d 334, 339 (7th Cir. 2002) (holding conduct by plaintiff's immediate supervisor fell "far short of creating an actionable hostile work environment" even though he "treated her in a rude, abrupt, and arrogant manner"); *Allen*, 2023 U.S. Dist. LEXIS 159171, at *15–*16 (plaintiff cannot rely on hearsay statements to establish a HWE).

### d. <u>Vicki Hill cannot establish that she experienced a HWE.</u>

#### i. <u>Hill's Claim That She Overheard Stark Use The "N-Word" Is Not Harassment.</u>

Hill's allegations regarding comments she allegedly heard at do not meet the threshold of a HWE. She claims she heard Stark make a racial comment one time, but it was not directed toward her and she never complained about it. She claims she overheard Stark say the "n-word" one time while he was speaking to someone on a phone in his office with the door open as she was near a cubicle outside his office. DSOF ¶ 251. Hill conceded that she did not know the subject of the conversation and that Stark did not direct the term to her and was not speaking about her. DSOF ¶ 251. Hill is uncertain about the date of this occurrence, estimating it occurred "between 2010 to 2014, 15." DSOF ¶ 251. Hill did not complain about the incident to anyone. DSOF ¶ 251.

In any event, this was an isolated incident. Hill testified that "Stark did not deal with me on any type of personally like that except for discipline or via other managers or to – you know, outside of work-related requests or job assignments that he wanted to give me. He tried not to – he didn't fraternize with me." DSOF ¶ 252. Stark's assistant, Renee Perisee, never heard Stark

say anything racial nor did Plaintiffs Cooper or Edmond. DSOF ¶ 253. This incident does not establish a HWE claim because Hill cannot prove when it occurred, the alleged comment was not directed to her, she did not report it to Defendant, and it was a single, isolated incident.

### ii. Hill's Claims About A Black Face Doll Or Figurine At JWPP Are Not Timely.

Hill claims she saw a "black face figurine" on the shelf in the ACOE's office between 1998 and 2005. The figurine was "black face style and had white clothing on it." DSOF ¶ 254. Hill testified she verbally notified COE Nick Dever the same day she saw it and Hill never saw the figurine again. DSOF ¶ 254. Perisee, who has worked at JWPP from 1994 to present never saw a black face doll or figurine at JWPP. DSOF ¶ 241. This claim is not timely or sufficient to support a claim.

### iii. Conduct By Bresnahan, Murphy, And Pope-Anderson Was Not Directed At Or About Hill.

Hill alleges a series of isolated incidents with Bresnahan, Murphy, and Pope-Anderson. However, these allegations lack specifics, including details as to what was said, by whom, and at what time. Many of the alleged comments are not related to race, and they are all isolated in nature. These vague allegations cannot support a HWE claim.

Hill claims she overheard someone in the Commissioner's office refer to the "n-word in the South District" but could not recall when this occurred. She claims Barrett Murphy (W), William Bresnahan (W), and an unknown third person were in the office. She does not know who said the word and was not able to provide the date that this occurred. DSOF ¶ 255. When Hill was further questioned about that claim, Hill admitted that Murphy did not make any racist statements that she heard, but claimed that she "heard voices" making racist statements when Murphy was in the room. DSOF ¶ 256. Hill testified that she heard the "n-word" and "people

spoken about in a bad manner as far as calling them idiots or stupid." Hill testified that she could not remember any specific instance when she heard this, and that she "would be right out of the office" when this allegedly occurred. DSOF ¶ 256.

Hill described one incident in the area outside the office involving a person named "Carmy" who allegedly said on one occasion when Murphy was present that Hill "would be at his house and I would be the maid[,]" but she could not recall the person's last name or the date of the occurrence. She did not file a complaint about this incident. She claims she let her supervisor know but she could not remember who that was. DSOF ¶ 257. Hill did not recall any other time when she felt a racist statement was made in her presence when Murphy was present. DSOF ¶ 257. Hill did not report any incidents of racial discrimination to Murphy. DSOF ¶ 257.

Hill initially claimed she heard Bresnahan brag about beating Black men when he was on the police force. DSOF ¶ 258. However, when questioned about the details of that claim, she was not able to identify any particular instances other than one instance during which Bresnahan discussed "a black guy, and that he kicked a chair from up under them" and a second instance during which Bresnahan stated that "he was fighting with a lot of people, and this one guy and him were tussling." DSOF ¶ 258.

Hill claims Bresnahan sent an e-mail to Tracie Burns and Kathleen Hanley and told them to open it, and that Hill saw the e-mail when it was opened. Hill claimed that the employees then began laughing at the woman's ethnic name. The e-mail was not sent to Hill and she does not recall when this occurred. She did not report this to anyone. DSOF ¶ 259. Hill also claims she heard Bresnahan say "black bitch" one time but did not recall when it occurred or who was present. DSOF ¶ 260. Hill also was not able to say that Bresnahan or Murphy discriminated against her.

DSOF ¶ 261.  Hill's vague testimony about these isolated comments, which were not directed toward her personally, is insufficient to sustain a HWE claim.  *See McPhaul*, 226 F.3d at 567.

### iv. <u>Hill Was Not Racially Harassed in Relation to Her Mother's 2012 Hospitalization.</u>

Hill claims she was with her mother in the hospital before her mother passed away on March 15, 2012, and that she only left her mother's side to come into the office and fill out a leave sheet.  DSOF ¶ 262. There is no basis to conclude that this incident involved any racial discrimination or harassment.  Furthermore, this incident took place in March 2012 before the applicable status of limitations. DSOF ¶ 262.

Hill also claims that when she came in for that half day, Stark said her mother was deceased and that Defendant tried to hold a hearing about her time.  DSOF ¶ 263.  Hill also claims that before she left to return to the hospital, she stopped downstairs and complained to DWM Commissioner Thomas Powers (W) that Stark made her come in and was harassing her.  DSOF ¶ 263.  No part of Hill's account of her alleged discussion with Stark about her mother's hospitalization pertains to race.  Moreover, Hill's account of this incident is not supported by any objective evidence, as Kronos time data show Hill worked every day of the week before her mother passed away, other than the Casmir Pulaski Holiday on March 5, 2012.  DSOF ¶ 264.  Emails between Hill and a friend from March 6 to 8, 2012 also show she was at work that week. DSOF ¶ 265.  Hill cannot establish a hostile work environment in relation to this alleged incident because it is time-barred and not supported by the evidence.

### e. <u>Robert Laws cannot establish that he experienced a HWE.</u>

Laws also did not experience a HWE. Law's hostile work environment centers largely around one individual, MTD Foreman Norman Clark (W), who Laws alleges used racial epithets in reference to other people but never to Laws himself.  DSOF ¶ 270.   Laws claims that around

2016 or 2017, he heard Clark tell Roger Stribling "you could take your black ass to the Central District," call Keith Evans a half-breed and the "n-word," and tell Joe Johnson and other black drivers to "do what I say or if you don't do what I say, you can get your black ass somewhere else." DSOF ¶ 271. Laws also claims that Clark told an African American worker to stand next to a door to see if it was painted black. DSOF ¶ 272.

Laws never filed a complaint or reported Clark's alleged conduct to Defendant and did not know if anybody else did. DSOF ¶ 273. He assumed that others complained because Clark had several disciplinary hearings, but no one ever told him they complained about Clark and Laws has never seen any documents showing complaints made about Clark. DSOF ¶ 273.

Laws also testified that in or around 2017 or 2018 he saw a rope that appeared to be a noose hanging from a White truck driver's truck. DSOF ¶ 274. When Laws saw the alleged noose, he just shook his head and kept moving. DSOF ¶ 274. Laws claims he saw the alleged noose for two or three days or maybe a week before somebody got rid of it. DSOF ¶ 274. Laws testified that it was possible that Clark "didn't see it as a noose" and could only speculate that Clark saw the alleged noose "[b]ecause he had to walk past the same truck to go to the same time clock that I go to." DSOF ¶ 274. Laws also testified there was a rumor that the driver of the truck denied it was a noose and said that he was using the rope to blow the truck's horn, which is accomplished by pulling a string at the top of the cab. DSOF ¶ 275.

Laws concedes that the only instances in which Laws himself was called derogatory names occurred in the early 1990s. DSOF ¶ 276. Laws also concedes that he has not seen any racially offensive graffiti in any City facilities since the early-to-mid-1990s. DSOF ¶ 276. Such time-barred conduct cannot form the basis of a hostile work environment claim. Additionally, the comments and symbols Laws alleges within the statutes of limitations, which were directed at

others, did not rise to the level of severe or pervasive conduct sufficient to be actionable harassment.  *See Yancick*, 653 F.3d at 544; *McPhaul*, 226 F.3d at 567.

### f.  <u>Veronica Smith cannot establish that she experienced a HWE</u>

Smith also did not experience a HWE. During her deposition, Smith testified that on the single occasion she met Managing Deputy William Bresnahan in 2013, "he just sat there looking at me in a very intimidating way" but did not say anything to her.  DSOF ¶ 277.  Smith also testified that she was never called a racial epithet and that she never heard anyone call someone else a racial epithet.  DSOF ¶ 278.

Smith's allegations well short of what a plaintiff must prove to establish severe or pervasive racial harassment sufficient to maintain a hostile work environment claim. The Seventh Circuit routinely finds alleged racial harassment that is significantly more blatant and egregious that what Smith alleges here to be insufficient as a matter of law.  *See Luckie v. Ameritech Corp.,* 389 F.3d 708, 713 (7th Cir. 2004) (affirming summary judgment where comment that could have been construed as racial was not severe); *Smith v. Northeastern Ill. Univ.,* 388 F.3d 559, 566 (7th Cir. 2004) (being referred to as "black motherf***er" once, outside of plaintiff's presence, was deplorable but not sufficient to establish hostile work environment).  Accordingly, the Court should dismiss Smith's hostile work environment claims.

### g.  <u>Donald Anderson cannot establish that he experienced a HWE.</u>

Anderson's hostile work environment claim is based on allegations of the use of the "n-word" at times during his more than 20-year career at DWM.  The vast majority of the instances he described occurred in the early 2000s and well before the relevant time period.  During the relevant period, Anderson described: (i) Bresnahan and ADS Chris Williams (W) telling "n-word

jokes," and (ii) a few discrete instances of being called the "n-word," one of which he did not disclosure until filing this lawsuit.

Anderson testified that William Bresnahan and ADS Chris Williams "sat around and told 'N word' jokes" in the office in 3901 South Ashland on about five occasions in 2016 or 2017. DSOF ¶ 279. Anderson claims he was present when this occurred but cannot recall if anyone else was. DSOF ¶ 279. Anderson never said anything to Bresnahan or Williams because they were his supervisors and he believed doing so would just "put him in harm's way." DSOF ¶ 279.

During his deposition, Anderson testified that he filed a complaint with the EEOC or the City about harassment and discrimination in what could have been 2015 or 2016, but the complaint came back unfounded. DSOF ¶ 280. Anderson initially claimed that he specifically alleged in the complaint that Williams and Bresnahan were using the "n-word." DSOF ¶ 280. Anderson subsequently testified that the complaint he refenced was actually a complaint filed with DHR. There is no evidence that Anderson ever filed such a complaint. DSOF ¶ 280.

Anderson's testimony about the use of the "n-word" is inconsistent. Anderson testified that Szorc and Williams called him the "n-word," but "that's about it" and that most people were respectful. DSOF ¶ 281. Anderson then identified Bryan Gill and somebody named Jimmy whose last name he could not recall as others who called him the "n-word" at an unspecified time. DSOF ¶ 281. During his deposition, Anderson identified only two instances of being called the "n-word" during the relevant time period. One instance allegedly occurred in 2017 when Williams was Anderson's supervisor. DSOF ¶ 282. Anderson testified that Williams said "that nigger" and then started talking to Bresnahan about Anderson. Anderson testified that he was outside the office when this occurred and that he could see Bresnahan and Williams speaking through the open door. DSOF ¶ 282.

Anderson also claims that Szorc called him the "n-word" during a physical altercation in 2017. DSOF ¶ 283; *see also supra*, Sec. IV.B.1.i., Anderson Discipline, at 32–34. Anderson claims the altercation occurred when Szorc bumped Anderson and then shoved him toward a plate-glass window. Anderson then grabbed Szorc, who fell down and called Anderson the "n-word." Anderson was winding up to hit Szorc but stopped. Anderson testified that a room full of people witnessed the incident, but that Szorc bribed them with overtime to say that Anderson was the aggressor. Anderson admitting to having no evidence that Szorc bribed any of the witnesses to say that Anderson was the aggressor. Anderson also testified that he filed a police report and a violence in the workplace complaint relating to the incident. DSOF ¶ 283.

These isolated incidents are insufficient to sustain a HWE claim. Defendant also cannot be liable for any racial harassment related to the altercation with Szorc. None of the complaints Anderson submitted in 2017 about this alleged incident referred to Szorc's alleged use of the "n-word" or other racial terms. The first time Anderson claimed that Szorc allegedly used a racial epithet during this incident was in Anderson's answers to interrogatories in 2019. DSOF ¶¶ 78–79. *See Paschall*, 28 F.4th at 816 (holding that plaintiffs "fail[ed] to demonstrate a basis for employer liability because they did not report" alleged harassment to defendant's management or human resources).

### h. David Henry cannot establish that he experienced HWE.

Henry cannot establish that he experienced a hostile work environment. He never filed any complaints or grievances about race discrimination. DSOF ¶ 284. Henry testified that on one occasion he saw what he identified as a noose in Motor Truck Driver David McKinney's (W) truck. DSOF ¶ 285. He does not know what happened to the noose and did not know if it was taken down. DSOF ¶ 285. This incident allegedly occurred in April 2017 and was investigated by

Deputy Commissioner Dwayne Hightower (B), and then by DWM Commissioner Randy Conner (B). DSOF ¶ 286. Hightower concluded that the rope was not racial and was used for hanging pens. DSOF ¶ 286. A story about the rope was first published in the media in October 2017. DSOF ¶ 232.

During his deposition, Henry also recalled seeing a picture that somebody had printed of people in suits with a gorilla face over the face of the Hightower. DSOF ¶ 287. Henry testified that he thought it was "childish bullshit" and that he did not have time for it when another black employee who liked to gossip showed it to him. DSOF ¶ 287. These isolated instances are insufficiently severe or pervasive, as Henry admits they did not interfere with his work performance. *See Yancick*, 653 F.3d at 544.

### i. <u>Anton Glenn cannot establish that he experienced a HWE.</u>

Glenn's allegation of alleged racial comments does not rise to the level of a HWE. Further, some of his allegations undisputedly occurred before the statute of limitations periods. There is also no evidence Defendant was on notice of any this alleged conduct, because Glenn never reported any racial harassment to anyone. DSOF ¶ 289.

Anton Glenn worked at SWPP beginning in 1986. DSOF ¶ 288. Glenn was the foreman of station laborers at SWPP from October 1, 1998 when he was promoted to foreman until he retired on June 30, 2019. DSOF ¶ 288. Glenn's nickname at the plant was "Homey" or "Homie." Glenn testified he started being called by that name in 1986. DSOF ¶ 290. When Lynch arrived at SWPP in 2014, he understood that everyone at the plant, including Glenn himself, called Glenn "Homey." Lynch testified that "[b]asically everybody at Sawyer referred to him as Homey . . . I have never got any inclination from him that he had any problem with me calling him that. If he

did, I would not have persisted." DSOF ¶ 290. Glenn admits he never told Lynch he did not like that name. DSOF ¶ 290.

In fact, in text messages Glenn sent to Lynch in 2015 and 2016, Glenn referred to himself as "Homie" and "Homey," see, e.g. "Chief, this is Homie will you please call at my shop when you're through with your meeting 7-0153 thanks Chief" and "Chief this is homey I'm requesting a half a day vacation charlie's going to take care of the bottom of the timesheet just to let you know." DSOF ¶ 291. Plaintiff Eddie Cooper also referred to Glenn as "Homie." DSOF ¶ 291. Glenn's own SEIU union representative, Leroy Jones, Jr., also referred to him as "Homey." DSOF ¶ 291. There also is no evidence that this nickname, which Glenn himself also used, was related to his race in any way.

Glenn claims Pope called him the "n-word" one time on some unspecified date. He testified that Pope pulled him aside and asked him to sign a petition regarding someone saying something during a meeting that Glenn did not attend. Pope allegedly said, "I'm so sick and tired of you niggers. Either you sign the paperwork, or you're getting written up." Glenn claims he signed the paper because he was sick of getting written up. DSOF ¶ 293. Glenn offers no information about the incident or individual that was the subject of the document, or why Pope would have been upset that Glenn did not sign it. DSOF ¶ 293. In any event, no evidence supports Glenn's claim that he signed a document for Pope because he was "sick of being written up." Glenn offers no evidence that Pope ever "wrote him up," and the paucity of evidence of disciplinary action against Glenn described above further undermines this claim. *See supra*, Sec. IV.B.1.g., Glenn Discipline, at 30–31. Glenn cannot establish that the incident occurred during the statute of limitations, since he cannot specify a date and there is no objective corroboration of when this could have taken place.

Further, even if this did happen, it was an isolated event. Glenn admits he did not hear Pope say any other racially offensive words. DSOF ¶ 294. Renee Perisee (B) worked with Pope and never heard him use the "n-word" or any other racially offensive words. DSOF ¶ 295. Cooper also did not hear Pope use racially offensive language. DSOF ¶ 295.

Glenn claims that he saw a swastika in the workplace around 2009 or 2010, which was spray painted on the ground in the garage area toward the front of the plant. He does not know who did this, and he believes the painters painted over it. DSOF ¶ 292. Glenn also claims he saw "KKK" written on the walls at SWPP, but he thinks the "KKK" writings were removed. The last time he saw any racial material on the walls in the galleries would have been 2014 or 2015. Glenn did not report any of this graffiti to anyone, including Lynch or Ealy. DSOF ¶ 292. A claim based on an alleged swastika in 2009 or 2010 is time-barred, and these vaguely described occurrences do not rise to the level of a hostile work environment in any event.

## VI. SUMMARY JUDGMENT SHOULD BE GRANTED ON PLAINTIFFS' DISPARATE IMPACT CLAIMS.

### A. Plaintiffs cannot pursue disparate impact claims under 1981 or Equal Protection 1983.

To the extent the individual Plaintiffs are asserting a disparate impact theory under Section 1981 or Section 1983, summary judgment must be granted on those claims. Fourteenth Amendment challenges brought under Section 1983 cannot be brought under a disparate impact theory, but rather must establish intentional discrimination. The Supreme Court has held that "official action will not be held unconstitutional solely because it results in a racially disproportionate impact." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264-65, 97 S. Ct. 555, 563 (1977). The same is true for actions brought under Section 1981. The Supreme Court definitively held that "§ 1981, like the Equal Protection Clause, can be violated

only by purposeful discrimination." *Gen. Bldg. Contractors Ass'n v. Pennsylvania*, 458 U.S. 375, 391, 102 S. Ct. 3141, 3150 (1982); *see also Mozee v. Am. Commercial Marine Serv. Co.*, 940 F.2d 1036, 1051 (7th Cir. 1991) ("[P]roof of disparate impact does not support section 1981 liability since intentional discrimination is required").

### B. If the ICRA does apply to employment claims, it adopts federal disparate impact canon and Plaintiffs do not meet that standard.

As stated above, ICRA should not be applied to employment matters other than in limited circumstances not relevant to this action. *See supra*, Sec. IV.A.4., at 16–20. If ICRA does apply to the employment at issue in this action, it is clear it must be applied consistent federal disparate impact law. Courts agree that the ICRA incorporates the identical standards required under Federal disparate impact law. *Jackson v. Cerpa*, 696 F. Supp. 2d 962, 964 (N.D. Ill. 2010) ("the Act was expressly intended to provide a state law remedy that was identical to the federal disparate impact canon"); *Illinois Native American Bar Ass'n v. University of Illinois*, 368 Ill. App. 3d 321, 327, 856 N.E.2d 460, 467 (1st Dist. 2006) ("It is clear from the legislators' comments and from the language in subsection (b) of the statute that the Act was not intended to create new rights. It merely created a new venue in which plaintiffs could pursue in the State courts discrimination actions that had been available to them in the federal courts").

Plaintiffs cannot establish the elements of a disparate impact claim. A disparate impact claim "does not require proof of intentional discrimination, but the employer may defeat the claim by showing that the challenged employment practice is job-related and consistent with business necessity." *Adams v. City of Indianapolis*, 742 F.3d 720, 731 (7th Cir. 2014). But a Plaintiff must "first establish a *prima facie* case by proving by a preponderance of the evidence that the employment policy or practice had an adverse disparate impact on [] on the basis of their [protected

category].” *Farrell v. Butler Univ.*, 421 F.3d 609, 616 (7th Cir. 2005).  Plaintiffs cannot establish a prima facie case.

### 1.    Plaintiffs have not identified any specific employment practices.

Plaintiffs have not identified a particular employment practice for purposes of a disparate impact claim. “For disparate impact claims, a plaintiff must establish that a particular employment practice causes a disparate impact on a member of a protected class.” *Puffer v. Allstate Insurance Co.*, 675 F.3d 709, 717 (7th Cir. 2012). The Seventh Circuit has emphasized that “it is not enough to simply allege that there is a disparate impact on workers, or point to a generalized policy that leads to such an impact.” *Id.* (citing *Smith v. City of Jackson*, 544 U.S. 994 (1988)); *Welch v. Eli Lilly & Co.*, 585 F. App’x 911, 912-13 (7th Cir. 2014) (finding no employment practice where there were only allegations of “Eli Lilly’s culture of giving supervisors great say in making hiring and discharge decisions, disciplining employees, determining pay raises and assignments to pay levels, approving lateral and reallocation transfers, giving promotions, and resolving ‘other career development’ questions”). Plaintiffs must identify the specific employment practice that resulted in the disparate outcome. Their failure to do so is fatal to their claim. *See Jordan v. Evans*, No. 15 C 5907, 2020 U.S. Dist. LEXIS 210946, at *25-26 (N.D. Ill. Nov. 11, 2020).

Plaintiffs have not identified any particular practice that created any alleged disparate impact. In discovery, Plaintiffs never identified any employment practice that created an alleged disparate impact.  Without articulating an employment practice, Plaintiffs cannot meet the prima facie case of a disparate impact claim.

### 2.    Plaintiffs have not presented evidence that establishes that a particular employment policy or practice created a disparate impact.

During discovery in this case, Plaintiffs produced a report from statistician Dr. Bernard Siskin.  Dr. Siskin’s report opined only in support of their motion for class certification and did

not offer opinions as to the merits of any of the individual Plaintiffs' discrimination claims. The Court has set a schedule for expert disclosures as the individual Plaintiffs' claims, but their disclosures are not due until September 29, 2023. *See* Dkt. No. 277. As of the filing of this motion, Plaintiffs have not adduced any disparate impact evidence in support of their individual claims.

## VII.    SUMMARY JUDGMENT SHOULD BE GRANTED ON ANY CLAIMS UNDER THE DUE PROCESS CLAUSE.

Plaintiffs refer to the Due Process Clause in Count III of the TAC but do not identify any basis for that claim. To the extent, Plaintiffs allege a denial of substantive due process rights, that claim must fail. A procedural due process analysis consists of two steps: (1) the plaintiff must identify a protected property or liberty interest, and (2) plaintiff also show what process was due and how the public body did not provide due process. *See Malhotra v. Univ. of Ill. At Urbana-Champaign*, No. 22-2469, 2023 U.S. App. LEXIS 20536, at *7 (7th Cir. Aug. 8, 2023) citing *Charleston v. Bd. of Trustees of Univ. of Illinois at Chicago*, 741 F.3d 769, 772 (7th Cir. 2013).

Plaintiffs do not identify any property or liberty interests, nor do they show what due process was due or that they were deprived of those interest without due process. For example, they do not have property interests in promotions, overtime, transfers or other similar aspects of City employment. *See, e.g., Mulcahy v. Demopoulos*, No. 19 C 7155, 2020 U.S. Dist. LEXIS 180570, at *6 (N.D. Ill. Sep. 30, 2020) ("absent fixed rules, a public employee does not have a protected property interest in a promotion"); *Kelly v. City of Chi.*, No. 22 C 4535, 2023 U.S. Dist. LEXIS 18960, at *6 (N.D. Ill. Feb. 5, 2023) ("no constitutionally-protected property interest in opportunities for overtime pay"); *Williams v. City of Chi.*, Case No. 91 C 1821, 1991 U.S. Dist. LEXIS 18534, at *35 (N.D. Ill. Dec. 11, 1991) ("Nothing in the City of Chicago Personnel Rules affords a basis upon which to assert that property rights exist with respect to a particular position"). A suspension without pay or a termination of employment would implicate a property interest.

*See, e.g. Powell v. Fujimoto*, 119 F. App'x 803, 805 (7th Cir. 2004) ("internal discipline without further adverse employment consequences does not implicate a protected property interest"). However, no Plaintiffs were terminated for cause and only Anderson, Cooper, Ealy, and Glenn were suspended. None of them claim they were denied due process. Moreover, if they had made such claims, they could not prevail because the Personnel Rules and collective bargaining agreements provided them with more than sufficient due process. *See, e.g.*, *Buttitta v. City of Chi.*, 9 F.3d 1198, 1206 (7th Cir. 1993) ("we hold that the post-deprivation grievance procedure outlined in Article 9 of the Collective Bargaining Agreement satisfied the requirements of due process"); *Hudson v. City of Chi.*, No. 02 C 1129, 2003 U.S. Dist. LEXIS 9264, at *29 (N.D. Ill. May 28, 2003) ("The Seventh Circuit has held that grievance procedures created by collective bargaining agreements can satisfy the requirements of due process for terminated employees").

## VIII.   <u>CONCLUSION</u>

For the reasons stated above, Defendant moves for summary judgment on all claims by all Plaintiffs.

Dated: September 27, 2023

Respectfully submitted,

**CITY OF CHICAGO**

By: */s/ Richard J. Mrizek*
    One of Its Attorneys

Patrick J. Rocks, Jr.
James F. Botana
Richard J. Mrizek
Julia S. Wolf
Anderson Franklin
Jackson Lewis P.C.
Special Assistants Corporation Counsel
150 N. Michigan Ave, Suite 2500
Chicago, IL 60601
312-787-4949

## CERTIFICATE OF SERVICE

The undersigned certifies that on September 27, 2023, a copy of the foregoing DEFENDANT CITY OF CHICAGO'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT was filed with the Clerk of the United States District Court for the Northern District of Illinois using the CM/ECF system, which also electronically serves a copy upon all attorneys of record in this matter.

By: */s/ Richard J. Mrizek*