**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

DERRICK EDMOND, *et al*., individually and
on behalf of all others similarly-situated,

                             Plaintiffs,

        v.

THE CITY OF CHICAGO,

                   Defendant.

No.  17 CV 4858

Judge Matthew F. Kennelly

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Victor P. Henderson
Devlin Joseph Schoop
Christopher W. Carmichael
HENDERSON PARKS, LLC
140 S. Dearborn St., Suite 1020
Chicago, Illinois 60603
Tel: (312) 262-2900
vphenderson@henderson-parks.com
dschoop@henderson-parks.com
ccarmichael@henderson-parks.com

J. Bryan Wood
THE WOOD LAW OFFICE, LLC
303 W. Madison St, Ste. 2650
Chicago, Illinois 60606
Tel: (312) 554-8600
bryan@jbryanwoodlaw.com

Charles R. Watkins
GUIN, STOKES & EVANS, LLC
805 Lake Street, #226
Oak Park, IL 60301
Tel: (312) 878-8391
cwatkins@gseattorneys.com

# TABLE OF CONTENTS

**Section / Heading**                                                                                    **Page**

**TABLE OF CONTENTS** ...................................................................................... i-v

**TABLE OF AUTHORITIES** .................................................................................. vi-xi

**INTRODUCTION** ........................................................................................... 1-5

**LEGAL STANDARD** ...................................................................................... 5-7

    A. Defendant Must Establish Plaintiffs cannot prevail as a matter of law ...................... 6-7

    B. Plaintiffs Need Only Address Arguments Defendants Raise ........................................... 7

    C. Plaintiffs Need Not Address Arguments Directed At Claims They Do Not Assert ........ 7

**SUMMARY OF MATERIAL FACTS** .................................................................... 7

**ARGUMENT** ................................................................................................. 7-87

    I. Defendant's Statement of Facts Fails To Comply With Rule 56 and Local Rule 56.1 By Identifying Admissible Evidence To Support Facts It Claims Are Undisputed ......................................................................................... 7-14

        A. Defendant mischaracterizes evidence, including Plaintiffs' testimony ................. 8-9

        B. Accepting facts described in Defendant's exhibits as true requires drawing inferences against Plaintiff and making credibility determinations .................... 9-10

        C. Defendant offers inadmissible hearsay, including so-called "business records," which the Court a\may properly disregard as inadmissible evidence…………… ..................................................................... 10-14

    II. Disputed Facts Preclude Summary Judgment On Plaintiffs' *Monell* Claims ........... 14-27

        A. The City is liable under *Monell* for DWM's Culture of Racism and Widespread Custom and Practice of Permitting Racially-Offensive Language and Conduct in the DWM Workplace, Which Emboldened Other Employees to Engage in Department-Wide Racist Behavior Towards African-American Employees .................................................................................... 17-18

        B. The City is liable under *Monell* for failing to act in the face of a known and obvious risk that DVM employees would be subjected to racial discrimination and harassment ...................................................................... 18-20

    C.  The City is also liable under a final policymaker theory……………….. ......... 20-22

    D.  The City Trained Only 15 of DWM's Approximately 2,000 employees,
        consciously disregarding the importance of EEO training for preventing racial
        discrimination and harassment……………….................................................... 22-24

    E.  The City failed to implement an effective EEO complaint system, evincing
        deliberate indifference to preventing workplace discrimination and harassment
        at DWM…… ................................................................................................... 24-26

    F.  The City's post-May 2017 actions to "reset" DWM help prove deliberate
        indifference toward preventing discrimination and harassment at DWM…….. 26-27

III.    Defendant's Failure To Address Plaintiffs' "Pattern-or-Practice" Theory
      Dooms Its Motion On All Plaintiffs' Intentional Discrimination Claims.......... 27-30

IV.    Defendants' Cannot Establish As A Matter Of Law That No Racially Hostile
      Work Environment Existed At DWM…… ....................................................... 30-53

    A.  A four-year, not two-year, statute of limitations applies to Plaintiffs' §1983
        hostile work environment and discrimination and Plaintiffs can rely on
        incidents that pre-date that period….................................................................. 31-34

        1.  Defendant applies the wrong statute of limitations to Plaintiffs'
            harassment claims ......................................................................................32

        2.  Plaintiffs can rely on the continuing violation theory for their
            harassment claims ......................................................................................33

    B.  Hostile work environments are proven with severe or pervasive conduct. …… 34-35

    C.  Plaintiffs can rely on each others' and other African-American's experiences
        to establish the racially hostile work environment… .................................... ….35-37

    D.  All the conduct Defendant claims does not constitute an "adverse act" is evidence that
        supports Plaintiffs' hostile work environment claim…………………………………37

    E.  Each Plaintiff suffered harassment as part of DWM's hostile work environment..38-42

        1.  Defendant's key leaders created a racially hostile work environment…...42-44

        2.  Other managers and supervisors harassed African Americans, including
            Plaintiffs……………………………………………………………..……..44-45

3. Plaintiffs experienced intimidating and physically threatening racial harassment………………………………………………..……44-45

4. Racially derogatory language towards others was commonplace………..44-46

5. DWM's "Jim-Crow" culture treated African Americans as second-class citizens…………………………………………………………………46-50

F. Plaintiffs' expert evidence supports their hostile work environment claim…...……50-51

G. A jury could find Defendant did not take steps to prevent racial harassment…….51-52

H. Defendant's arguments go to weight or damages, not liability, because whether conduct the harassment they experienced was severe or pervasive is a question for the jury……………………………………………………………...……………52-53

V. Each Plaintiff Can Prevail On Disparate Treatment Claims……………….……...53-79

A. Race Discrimination under §§1981 and 1983 can be proven in multiple ways……………………………………………………………….…………………54-56

B. The Court must not consider each Plaintiff's evidence in isolation…………………56

C. Arguments regarding Defendant's "legitimate" expectations are red herrings..…56-58

D. Plaintiffs' evidence of patterns of discriminatory treatment bolster their individual claims…………………………………………………………………………58-59

E. Discriminatory discipline claims should proceed to trial for Ealy, Cooper, Glenn and Anderson…………………………………………………………………………59-63

1. A jury could find Ealy's 2018 suspension was discriminatory………………59-61

2. A jury could find Cooper's 2018 29-day suspension was discriminatory……61-62

3. A jury could find Glenn's 2017 1-day suspension was discriminatory……...…62

4. A jury could find Donald Anderson's 2017 5-day suspension was discriminatory……………………………………………………………….…62-63

F. Discriminatory promotion claims should proceed to trial for Ealy, Cooper, Smith, Anderson and Henry…………………………………………...……………63-70

1. A jury could find Ealy's 2014, 2015 and 2016 denials of promotion to COE were discriminatory………………………………………………..……………63-65

2. A jury could find Cooper's 2013 and 2019 denials of promotion to Water Chemist III were discriminatory…………………………………….…….65-66

3. A jury could find Laws' 2018 denial of promotion to Caulker was discriminatory………………………………………………………….....66-67

4. A jury could find Smith's 2013 denial of promotion to Pipe Salvage Yard Foreman, promotion to foreman in 2017, and promotion to Foreman of Construction Laborers in 2018 was discriminatory…………………………..67-68

5. A jury could find Anderson's 2014, 2017 and 2019 denials of promotion were discriminatory………………………………………………………...………68-69

6. A jury could find Henry's 2014, 2017 and 2018 denials of promotion were discriminatory………………………………………………….……...69-70

G. Discriminatory denial of overtime claims should proceed to trial for Hill, Laws, Anderson, Glenn and Henry……………………………………...………70-75

1. Defendant mischaracterizes output from Dr. Siskin's analyses in asking the Court to draw inferences against Plaintiff…………………………………………70-71

2. Defendant's failure to preserve records dooms its motion…………...………71-72

3. Disputed facts regarding Hill's denial of overtime claim warrant a trial………..73

4. Disputed facts regarding Laws' denial of overtime claim warrant a trial………………………………………………………………………72-73

5. Disputed facts regarding Glenn's denial of overtime claim warrant a trial….73-74

6. Disputed facts regarding Anderson's denial of overtime claim warrant a trial……………………………………………………………….………...74

7. Disputed facts regarding Henry's denial of overtime claim warrant a trial…74-75

H. Discriminatory denial of acting-up opportunities should proceed to trial for Ealy, Cooper, Smith, Hill and Anderson……………………………………………74-77

iv

I.   Ealy's shift assignment claim should proceed to trial……………………………77-78

J.   Dr. Gallagher's unrebutted conclusions help show Defendant's intent…….……78-79

VI.   Plaintiffs Can Prevail On Their Illinois Civil Rights Act Claims Challenging Employment Discrimination Under Section 5(a)(1) And Section 5(a)(2)………………………………………………………………………….…79-87

A.   ICRA applies to Plaintiffs' employment discrimination claims……………..…80-83

B.   Plaintiffs ICRA claims for intentional discrimination should proceed to trial….83

C.   Plaintiffs' unintentional discrimination claims also should proceed to trial…………………………………………………………………………....83-87

1.   The Illinois Civil Rights Act's plain language prohibits unintentional discrimination without incorporating Title VII's burdens of proof……...83-87

2.   Plaintiffs' evidence proves Defendant used criteria or methods of administration that had the effect of discriminating against African Americans…………………………………………………………………87

**CONCLUSION** ......................................................................................................88

**Cases**                                                            **Page(s)**

*Abreu v. City of Chicago*,
   2022 U.S. Dist. LEXIS 85501 (May 10, 2022) ................................................................ passim

*Alexander v. Casino Queen, Inc.*,
   739 F.3d 972 (7th Cir. 2014) .......................................................................................... 31

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) .................................................................................................. 5, 13

*Baker v. Birmingham Bd. of Educ.*,
   531 F.3d 1336 (11th Cir. 2008) ..................................................................................... 33

*Barrett v. Illinois Community College Dist. No. 515*, 15-CV- 2334,
   2019 U.S. Dist. LEXIS 130241 (N.D. Ill. Aug. 5, 2019) ............................................. 33

*Bellaver v. Quanex Corp.*,
   200 F.3d 485 (7th Cir. 2000) ........................................................................................... 5

*Berberena v. Pasquino*, 03-557-CJP,
   2006 U.S. Dist. LEXIS 82214 (S.D. Ill. Nov. 9, 2006) ............................................... 13

*Bostock v. Clayton Cty.*,
   ___ U.S. ____, 140 S. Ct. 1731 (2020) .............................................................. 68, 86, 90

*Brand v. Comcast*,
   302 F.R.D. 201 (N.D. Ill. 2014) .................................................................................... 35

*Bright v. Hill's Pet Nutrition, Inc.*,
   510 F.3d 766 (7th Cir. 2007) ........................................................................................ 39

*Calhoun v. Ramsey*,
   408 F.3d 375 (7th Cir. 2005) ........................................................................................ 14

*Cary v. Ne. Ill. Reg&#8217;l Commuter R.R. Corp.*, 19-CV-3014,
   2020 U.S. Dist. LEXIS 49102 (N.D. Ill. Mar. 22, 2020) ............................................. 84

*Celotex Corp v. Catrett*,
   477 U.S. 317 (1986) ........................................................................................................ 5

*Chavez v. Ill. State Police*,
   251 F.3d 612 (7th Cir. 2001) ........................................................................................ 28

*Cole v. Bd. of Trustees of N. Ill. Univ*,
   838 F.3d 888 (7th Cir. 2016) ........................................................................................ 35

*Coleman v. Donahoe*,
   667 F.3d 835 (7th Cir. 2012) (reversing ......................................................................... 6

*Curry v. Menard, Inc.*,
   270 F.3d 473 (7th Cir. 2001) ........................................................................................ 59

*Dandy v. United Parcel Serv., Inc.*,
   388 F.3d 263 (7th Cir. 2004) ........................................................................................ 32

*Davis v. Carter*,
   452 F.3d 686 (7th Cir. 2006) ........................................................................................ 18

*Deloughery v. City of Chicago*,
   No. 02 C 2722, 2002 U.S. Dist. LEXIS 29049 (N.D. Ill. Nov. 25, 2002) .................... 21, 22

*Diaz v. Kraft Foods Global, Inc.*,
  653 F.3d 582 (7th Cir. 2011) ............................................................... 68

*Distt.*,
  856 F.3d 216 (7th Cir. 2017) ............................................................... 57

*Doe v. R.R. Donnelley & Sons Co.*,
  42 F.3d 439 (7th Cir. 1994) ................................................................... 5

*Doe I v. City of Chicago*, 18-CV- 3054,
  2020 U.S. Dist. LEXIS 41988 (N.D. Ill. Mar. 11, 2020) ...................... 25

*EEOC v. WRS Infrastructure and Env't, Inc.*,
  2011 WL 4460570 (N.D. Ill. Sept. 27, 2011) ....................................... 44

*Fane v. Locke Reynolds, LLP*,
  480 F.3d 534 (7th Cir. 2009) ............................................................... 32

*Gable v. City of Chicago*,
  296 F.3d 531 (7th Cir. 2002) ............................................................... 14

*Gates v. Bd. of Educ. of Chi.*,
  916 F.3d 631 (7th Cir. 2019) ........................................................ Passim

*Glisson v. Ind. Dep't of Corr.*,
  849 F.3d 372 (7th Cir. 2017) ............................................................... 18

*Hackett v. City of S. Bend*,
  956 F.3d 504 (7th Cir. 2020) ................................................................. 6

*Harris v. FedEx Freight, Inc.*,
  110 F.Supp.3d 805 (N.D. Ill. 2015) .................................................... 36

*Hasan v. Foley & Lardner LLP*,
  552 F.3d 520 (7th Cir. 2008) ......................................................... 57, 59

*Hildebrandt v. Ill. Dep't of Natural*,
  347 F.3d 1014 (7th Cir. 2003) ............................................................. 28

*Hobby Lobby Stores, Inc. v. Sommerville*,
  2021 IL App (2d) 190362, ¶ 20 ........................................................... 86

*Igasaki v. Ill. Dep't of Prof'l Regulation*,
  988 F.3d 948 (7th Cir. 2021) ............................................................... 56

*Illinois v. CSL Plasma, Inc.*,
  635 F. Supp. 3d 645 (N.D. Ill. 2022) ................................................... 86

*Isaacs v. Hill's Pet Nutrition, Inc.*,
  485 F.3d 383 (7th Cir. 2007) ............................................................... 34

*J.K.J. v. Polk Cnty.*,
  960 F.3d 367 (7th Cir. 2020) ........................................................ Passim

*J.S.A. v. MH*,
  224 Ill. 2d 182, 863 N.E.2d 236, 309 Ill. Dec. 6 (2007) ..................... 90

*Jett v. Dallas Indep. Sch. Dist.*,
  491 U.S. 701 (1989) ............................................................................... 1

*Johnson v. Advocate Health & Hosps. Corp.*,
  892 F.3d 887 (7th Cir. 2018) ........................................................ Passim

*Johnson v. Indiana*,
 2011 WL 4348148 (N.D. Ind. Sept. 16, 2011) ........................................... 44

*Joll v. Valparaiso Cmty. Sch.*,
 953 F.3d 923 (7th Cir. 2020) ....................................................................... 5

*Jones v. R.R. Donnelly & Sons Co.*,
 541 U.S. 369 (2004) .................................................................................. 32

*King v. Acosta Sales & Mktg., Inc.*,
 678 F.3d 470 (7th Cir. 2012) ..................................................................... 34

*Lores v. Sailpoint Technologies, Inc.*,
 No. 18-cv-3910, 2019 U.S. Dist. LEXIS 51416 (N.D. Ill. Mar. 27, 2019) ............... 27

*Lust v. Sealy*,
 383 F.3d 580 (7th Cir. 2004) ..................................................................... 11

*Malhotra v. Cotter & Co.*,
 885 F.2d 1305 (7th Cir. 1989) ..................................................................... 6

*Mataya v. Kingston*,
 371 F.3d 353 (7th Cir. 2004) ..................................................................... 58

*Mattenson v. Baxter Healthcare Corp.*,
 438 F.3d 763 (7th Cir. 2006) ..................................................................... 57

*McDonnell Douglas Corp. v. Green*,
 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed. 2d 668 (1973) ......................... 57, 60

*McPherson v. City of Waukegan*,
 379 F.3d 430 (7th Cir. 2004) ....................................................................... 9

*Miksis v. Howard*,
 106 F.3d 754 (7th Cir. 1997) ............................................................... 63, 74

*Monell v. Dep't of Social Servs.*,
 436 U.S. 658 (1978) .................................................................................... 1

*Moore v. City of Chicago*,
 126 F. App'x 745 (7th Cir. 2005) ................................................................ 33

*Morris v. BNSF Ry. Co.*,
 969 F.3d 753 (7th Cir. 2020) ................................................................. 28, 63

*Mozee v. American Commercial Marine Service Co.*,
 940 F.2d 1036 (7th Cir. 1991) ............................................................... 27, 28

*Mozee v. Jeffboat, Inc.*,
 746 F.2d .................................................................................................. 58

*Musa–Muaremi v. Florists' Transworld Delivery, Inc.*,
 2011 WL 4738520 (N.D. Ill. Oct. 5, 2011) ................................................. 44

*National R.R. Passenger Corp. v. Morgan*,
 536 U.S. 101 (2002) ....................................................................... 33, 34, 35

*Nelson v. Pace Suburban Bus*, 17-CV-7697,
 2023 U.S. Dist. LEXIS 51443 (N.D. Ill. Mar. 27, 2023) ............................. 84

*Oest v. Ill. Dep't of Corr.*,
 240 F.3d 605 .............................................................................................. 60

*Ortiz v. Werner Enters., Inc.*,
  834 F.3d 760 (7th Cir. 2016) ................................................................ 56, 57, 58

*Palmer v. Indiana Univ.*,
  31 F.4th 583 (7th Cir. 2022) ....................................................................... 80

*Payne v. Pauley*,
  337 F.3d 767 (7th Cir. 2003) ......................................................................... 6

*Paz v. Wauconda Healthcare & Rehab. Ctr., LLC*,
  464 F.3d 659 (7th Cir. 2006) ...................................................................... 57

*People v. Johnson*,
  2019 IL 123318, 160 N.E.3d 31 ................................................................ 88

*Perez v. Thorntons, Inc.*,
  731 F.3d 699 (7th Cir. 2013) ...................................................................... 80

*Price v. N. Illinois Univ.*, 16-CV-9827,
  2017 U.S. Dist. LEXIS 205544 (N.D. Ill. Dec. 14, 2017) ........................... 33

*Rao v. Gondi*, 14-CV-66,
  2014 U.S. Dist. LEXIS 151105 (N.D. Ill. Oct. 23, 2014) ............................. 84

*Reeder-Baker v. Lincoln Nat. Corp.*,
  649 F. Supp. 647 (N.D. Ind. 1986) ............................................................. 10

*Reeves v. Sanderson Plumbing Products, Inc.*,
  530 U.S. 133 (2000) ....................................................... 6, 10, 13, 67

*Riordan v. Kempiners*,
  831 F.2d 690 (7th Cir. 1987) ................................................................ 34, 80

*Robinson v. Perales*,
  894 F.3d 818 (7th Cir. 2018) ................................................................ 31, 55

*Rodgers v. W.-S. Life Ins. Co.*,
  12 F.3d 668 (7th Cir. 1993) .................................................................. 35, 41

*Rodgers v. White*,
  657 F.3d 511 (7th Cir. 2011) (reversing ................................................... 60

*Roland v. Dart*, 14-CV-10161,
  2016 U.S. Dist. LEXIS 106073 (N.D. Ill. Aug. 11, 2016) ........................... 24

*Rudin v. Lincoln Land Community College*,
  420 F.3d 712 (7th Cir. 2005) ...................................................................... 60

*Smith v. Bray*,
  681 F.3d 888 (7th Cir. 2012) ...................................................................... 56

*Sommerfield v. City of Chicago*,
  254 F.R.D. 317 (N.D. Ill. 2008) ................................................................. 12

*Sommerfield v. Knasiak*,
  967 F.3d 617 (7th Cir. 2020) ...................................................................... 56

*Staub v. Proctor Hosp.*,
  562 U.S. 411 (2011) ................................................................................... 63

*Sublett v. John Wiley & Sons, Inc.*,
  463 F.3d 731 (7th Cir. 2006) ......................................................................... 6

ix

*Sylvester v. SOS Children's Vills Illinois, Inc.*,
    453 F.3d 900 (7th Cir. 2006) ........................................................ 58
*Teamsters v. United States*,
    431 U.S. 324 (1977) ............................................................... 4, 27
*Thomas v. Cook Cnty Sherriff's Dep't.*,
    604 F.3d 293 (7th Cir. 2010) ............................... 14, 15, 17, 18
*Thomas v. Sheahan*,
    499 F.Supp.2d 1062 (N.D. Ill. 2007) ........................................ 18
*Thompson v. District of Columbia*,
    832 F.3d 339- (D.C. Cir. 2016) ................................................. 22
*Troupe v. May Dep't Stores Co.*,
    20 F.3d 734 (7th Cir. 1994) ............................................... 57, 60
*United States v. Melvin*,
    948 F.3d 848 (7th Cir. 2020) .................................................... 86
*Vega v. Chicago Park District*,
    954 F.3d 996 (7th Cir. 2020) ............................................. 58, 63
*Vodak v. City of Chicago*,
    639 F.3d 738 (7th Cir. 2011) ............................................. 21, 22
*Walker v. Bd. of Regents of Univ. of Wisconsin Sys.*,
    410 F.3d 387 (7th Cir. 2005) ...................................................... 6
*Waters v. City of Chicago*,
    580 F.3d 575 (7th Cir. 2009) .................................................... 20
*White v. United States*,
    8 F.4th 547 (7th Cir. 2021) ...................................................... 30
*Williams v. Seniff*,
    342 F.3d 774 (7th Cir. 2003) .................................................... 28
*Woodward v. Corr. Med. Servs. of Ill., Inc.*,
    368 F.3d 917 (7th Cir. 2004) ............................................. 17, 18
*Yancick v. Hanna Steel Corp.*,
    653 F.3d (7th Cir. 2011) .......................................................... 59
*Yatvin v. Madison Metro. Sch. Dist.*,
    840 F.2d 412 (7th Cir. 1988) .................................................... 57
*Yuknis v. First Student, Inc.*,
    481 F.3d 552 (7th Cir. 2007) .................................................... 44

**Statutes**

28 U.S.C. §1658 ....................................................................................... 32
42 U.S.C. §2000e-5(e)(1) ...................................................................... 34
42 U.S.C. § 2000e-2(k)(1) ..................................................................... 87
42 U.S.C. § 2000e-2(k)(1)(A)(i) ........................................................... 88
740 ILCS 23/5 ......................................................................................... 84
740 ILCS 23/5(a)(1) and (2) ................................................................. 84

740 ILCS 23/5(a)(2)...........................................................................................................90

**Rules**

Fed. R. Evid. 803(6)...............................................................................................11, 13
Fed. R. Evid. 803(6)(A)...................................................................................................11
Fed. R. Evid. 803(6)(B) & (C).........................................................................................11
Fed. R. Evid. 901(a).........................................................................................................9
Rule 803(6)(D).................................................................................................................11
Rule 803(6)(E).................................................................................................................11

**Other Authorities**

Seventh Circuit Pattern Instruction 1.13.........................................................................10

# INTRODUCTION

The threshold issue for decision is whether a *Monell* custom and practice of race-based discrimination and harassment existed at DWM. Without it, as a matter of law, the City cannot be liable for the discrimination and harassment at DWM. *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 735 (1989) (holding §1981 claims against municipalities must be brought via §1983).

*Monell* liability is <u>disjunctive</u>. A plaintiff establishes municipal liability by showing that the unlawful conduct "is caused by (1) an official policy adopted and promulgated by its officers; (2) a governmental practice or custom that, although not officially authorized, is widespread and well settled; <u>or</u> (3) an official with final policy-making authority." *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 694 (1978).

The City frames this case to be solely about how a mid-level manager (Paul Hansen) sent racist emails, arguing there can be no *Monell* liability because: (1) none of the participants in Hansen's email exchanges were "final policymakers"; (2) the City's express policy -- the EEO Policy -- prohibited workplace discrimination and harassment; (3) the City's DHR <u>offers</u> training on the EEO Policy; (4) several of the Plaintiffs received a copy of the EEO Policy and knew about it generally; (5) Hansen's emails were exchanged by a select few people within DWM, none of whom were the Plaintiffs; (6) <u>almost</u> everyone involved in the e-mails was disciplined; (7) alleged incidents of harassment and discrimination happened outside the statutes of limitation; and (8) Plaintiffs did not complain about or report the harassment or discrimination.

But the City's narrative is only true if you cherry-pick or ignore evidence of the widespread custom and practice of race-based discrimination and harassment at DWM evidenced by racial slurs (including "nigger") being directed at Plaintiffs and others, the appearance of nooses, and the denial of equal terms and conditions of employment (described in Plaintiffs' Statement of

Additional Facts). Overwhelming direct, statistical and anecdotal evidence reveals a DWM workplace wrought with shocking and offensive racial discrimination, including liberal and unabated use of racially-tinged communication that frequently employed the use of "Ebonics," slurs such as "nigger," public displays of racist graffiti, nooses and Swastikas in the workplace promoted and perpetuated by an unacceptable attitude of indifference by top DWM officials tasked with day-to-day management, including former DWM Commissioner Murphy and his top lieutenants, Deputy Commissioners Alan Stark, William Bresnahan, Joseph Lynch, Luci Pope-Anderson, Superintendent Paul Hansen and Jennifer Izban, among others.

Individually and collectively, DWM's managers engaged in unabashed racist behavior, constituting ratification and perpetuation of a DWM custom and practice that treated Black employees less favorably than whites in almost every aspect of their employment from hiring, assignment of work, promotion, assignment of overtime and discipline. A jury could reasonably conclude that happened at DWM for more than a decade, as recounted by multiple witnesses, and confirmed by binding admissions from the former mayor, OIG and multiple Rule 30(b)(6) designee testimony. *Abreu v. City of Chicago*, 19-CV-2161, 2022 U.S. Dist. LEXIS 85501, at *56-62 (May 10, 2022) (Pallmeyer, J.) (denying summary judgment on *Monell* claim -- "And while [the City] notes that only 'select employees' received the emails, those employees included DWM's top officials – those with the responsibility and power to set DWM culture and enforce DWM rules . . . it is [the City's] position that strains credulity; a jury could certainly find that Hansen's use of vile and offensive language, over the course of many years, would be expected to extend beyond emails he was sending to his superiors.").

The City's EEO Policy was a "paper tiger" which only reminded Plaintiffs of their second-class status in DWM. Until the custom and practice of racial discrimination became public, the

EEO Policy: (1) was never a topic of meaningful training for supervisors or rank-and-file employees; (2) was not meaningfully enforced; (3) had ineffective reporting/investigatory mechanisms; and (4) lacked confidential mechanisms to report misconduct, creating a chilling effect among all employees (black <u>and</u> white alike) too afraid to report racist behavior for fear of retaliation.

Fear of retaliation by DWM employees was genuine and perpetuated the custom or practice of harassment. Would-be whistle-blowers were labeled "rats" and anyone wanting to report workplace discrimination genuinely feared being subjected to career-ending retaliation, as confirmed when Defendant reduced discipline for a white DWM management staffer (Luci Pope-Anderson) <u>whose years-long silence fueled DWM's racist culture</u>. A jury could find that if white bigots were too scared to report racism, then the same was true for its black victims.

Compounding the situation, per Chicago Municipal Ordinance, final decision-making authority to enforce the City's EEO Policy, to accept <u>or</u> reject disciplinary proposals made by the DHR, and to implement numerous other procedures governing day-to-day activities was delegated to the DWM Commissioner. Defendant's ordinances made Barrett Murphy, whose work pastime included exchanging "nigger jokes" and engaging in racist banter in the commissioner's office, a "fox guarding the hen house."

As it did in *Abreu v. City of Chicago,* the City chooses, again, to ignore the obvious reasonable inferences that a jury could make: if these same predmoninantly white DWM senior management staff flouted Defendant's EEO Policy, then their racist attitudes likely manifested in other behavior and infected other employment practices such as hiring, promotions, work assignments, assignment of overtime, or discipline. A jury could infer those senior managers' behaviors <u>perpetuated</u> the general toxic, racist banter and, at times, violence that permeated

DWM's work environment.

The attitudinal indifference and utter disregard for well-known federal anti-discrimination laws by the City is revealed by the Rule 30(b)(6) testimony of EEO Officer Mark Pando whose damning testimony reveals that the City's Department of Human Resources ("DHR") was no avenue of recourse for Black employees because complaints about workplace hostile work environment, harassment and discrimination were effectively ignored for lack of investigatory vigor or diligence, where complaints took years to complete. Even if DHR concluded an employee could satisfy the oft-cited *McDonnell-Douglas* proof method, it often rubber-stamped complaints "not sustained," choosing to believe DWM even when it gave no explanation for its actions. The City's catastrophic failure to enforce its workplace anti-discrimination rules only served to embolden perpetrators to continue in their outrageous misconduct against each of the Plaintiffs. Or so a jury could reasonably conclude.

Once <u>all</u> of the evidence is considered, a jury could reasonably conclude that: (1) there existed a *Monell* widespread custom and practice of race-based discrimination and harassment at DWM; (2) it was created and perpetuated by DWM Commissioner Murphy, who was a "final policymaker" by virtue of powers over employment practiced delegated to him by Chicago Municipal Code; and (3) the widespread custom and practice was the "but for" cause of Plaintiffs' injuries.

Moreover, Plaintiffs assert claims for intentional discrimination with respect to denial of overtime, denial of promotional opportunities, and disciplinary actions, among other adverse actions. When combined with the racially hostile work environment outlined above, a jury -- once instructed on the law set forth in Seventh Circuit Pattern Instruction No. 3.03 -- could reasonably conclude those acts resulted in a pattern-or-practice of racial discrimination under *Teamsters v.*

*United States*, 431 U.S. 324 (1977).

Finally, Plaintiffs' evidence proves Defendant used criteria or methods of administration that had the effect of discriminating against African Americans with respect to overtime, discipline and promotion from which a jury could reasonably conclude the Defendant is additionally (or alternatively) liable for discrimination under the Illinois Civil Rights Act. Summary judgment should therefore be denied.

## LEGAL STANDARDS

### A. Defendant must establish Plaintiffs cannot prevail as a matter of law.

"The burden rests squarely with the party moving for summary judgment to demonstrate that there is an absence of evidence to support the nonmoving party's case." *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir. 1994) (noting "added scrutiny" applied in discrimination cases because "intent and credibility" are involved) (*citing Celotex Corp v. Catrett*, 477 U.S. 317, 325 (1986)). *Joll v. Valparaiso Cmty. Sch.*, 953 F.3d 923, 928 (7th Cir. 2020) ("[T]he court must try to focus on the most persuasive story possible on the non-movant's behalf when asking whether a verdict in her favor would be reasonable."). The Court "must construe all facts in the light most favorable to the non-moving party and draw all reasonable and justifiable inferences in favor of that party." *Bellaver v. Quanex Corp.*, 200 F.3d 485, 492–93 (7th Cir. 2000) (*citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)) (emphasis added).

The Court's "role is not to evaluate the weight of the evidence or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact." *Doe*, 42 F.3d at 443 (*citing Anderson*, 477 U.S. at 249). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge; thus, **"although the Court should review the record as a whole, <u>it must disregard all evidence</u>

favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 150-151 (2000) (emphasis added); *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) (holding only a jury can assess witness credibility, weigh conflicting evidence and decide the ultimate truth of the matter).

All evidence must be considered in determining what inferences that can be drawn, not just any one piece or part of it. *Walker v. Bd. of Regents of Univ. of Wisconsin Sys.*, 410 F.3d 387, 394 (7th Cir. 2005) ("The key consideration is the totality of these 'pieces of evidence [,] none conclusive in itself'") (emphasis added). "In fact-intensive cases, credibility traps abound, and courts must be alert to avoid them." *Hackett v. City of S. Bend*, 956 F.3d 504, 507 (7th Cir. 2020); *Coleman v. Donahoe*, 667 F.3d 835, 858 (7th Cir. 2012) (reversing summary judgment in employment discrimination case; explaining selective enforcement of company policy can establish pretext).

### B. Plaintiffs need only address arguments Defendants raise.

At this stage, Plaintiffs need not prove their claims. Rather, Plaintiffs need only address arguments in Defendant's memorandum – not every possible defense Defendants could have raised. *See Malhotra v. Cotter & Co.*, 885 F.2d 1305, 1310 (7th Cir. 1989) ("When a party moves for summary judgment on ground A, his opponent is not required to respond to ground B—a ground the movant might have presented but did not."); *Sublett v. John Wiley & Sons, Inc.*, 463 F.3d 731, 736 (7th Cir. 2006) ("As a general matter, if the moving party does not raise an issue in support of its motion for summary judgment, the nonmoving party is not required to present evidence on that point, and the district court should not rely on that ground in its decision"). As noted below, Defendant's flawed arguments fail to establish they are entitled to judgment on all of Plaintiffs' claims.

**C. Plaintiffs need not address arguments directed at claims they do not assert.**

Much of Defendant's memorandum attacks claims Plaintiffs do not assert, effectively creating straw men Defendant easily vanquishes. Plaintiffs concede (as Defendant argues at 93) they cannot pursue disparate impact claims under Section 1981 or Section 1983 and never asserted them. Nor do they assert claims based on violations of the Due Process Clause for denial of a substantive due process right (which Defendants address at 96-97). Plaintiffs' reference to the Due Process Clause in their complaint was intended solely to acknowledge the fact that the Equal Protection Clause bars intentional race discrimination by state and local entities like Defendant because it has been incorporated into the Fourteenth Amendment's Due Process Clause. Plaintiffs note where Defendant failed to raise other arguments below.

## SUMMARY OF MATERIAL FACTS

There is an astoundingly large volume of evidence of the outrageously racist harassment and discrimination that occurred during the Commissioner's watch too voluminous to be exhaustively recounted in its entirety in this brief. Instead, the Plaintiff directs the Court to Plaintiffs' Response to Defendant's Statement of Facts and Plaintiffs' Statement of Additional Facts. Defendant's Local Rule 56.1(b)(1) Statement of Facts is cited herein as "SF¶__." Plaintiffs' Rule 56.1(b)(2) Response to Defendant's Statement of Fact is cited herein as "RSF¶__." Plaintiffs' Local Rule 56.1(c) Statement of Additional Facts is cited herein as "SAF¶__."

## ARGUMENT

**I. Defendant's Statement of Facts Fails To Comply With Rule 56 And Local Rule 56.1 By Identifying Admissible Evidence To Support Facts It Claims Are Undisputed.**

Faced with significant evidence (including admissions) of a racially discriminatory workplace culture at DWM, Defendant argues Plaintiffs were not affected or impacted by it. To

make that claim, however, Defendant disregards its Rule 56 obligations not only procedurally, by combining multiple facts into one "paragraph" in violation of Local Rule 56.1, but also substantively. Rather than present evidence in the light most favorable to Plaintiffs, Defendant offers argumentative characterizations of evidence, hearsay and repeatedly asks the Court to draw inferences in its favor. The Court should decline Defendant's invitation to grant it summary judgment based on those grounds.

**A. Defendant mischaracterizes evidence, including Plaintiffs' testimony.**

Rule 56.1 is clear that statements of fact are supposed to be that: facts, not argumentative characterizations of witness testimony. The City repeatedly breaks that rule. Illustrative examples include:

• **SF 153-155** The City asserts Plaintiff Cooper's schedule changing from three 12-hour shifts to 5-eight hour shifts could not have impacted his overtime based on a rule preventing employees from working more than 16 hours per day, despite testimony from Plaintiff that he had worked in excess of 16-hours per day in violation of the rule (RSF¶¶ 153-155).

• **SF 289** The City asserts Plaintiff Glenn admitted that he never complained about harassment. The full context of Glenn's testimony was -- like Luci Pope-Anderson -- Glenn and DWM employees were too scared to report racism "because everyone was so worried about retaliation," which was a genuine fear because they "couldn't report it because everyone I talk to they was the ones I had the problems with." (DX 15: Glenn Dep. Tr. 158:1-159:19).

• **SF 293** The City asserts Plaintiff Glenn testified that Deputy Commissioner John Pope called Glenn "nigger" just once while Pope "asked" Glenn to sign a petition regarding something and that Pope told Glenn he had to sign the petition or be written up. This grossly mischaracterizes Glenn's testimony, where he made it abundantly clear that Pope called him a nigger while using implicitly threatening mannerisms ("talked to [Mr. Glenn] like [Pope] wanted to jump me or something") and how Glenn was so scared he signed the document without reading the document "didn't even read the paper . . . it could have been something for me cosigning for him a car. I just – I was done with." (DX 15: Glenn Dep. Tr. 38:1-39:24) The City also asserts that Glenn testified that Pope never called Glenn a nigger again. What Glenn *actually* said was that Pope never gave Pope another chance to do so by actively avoiding him "as much a possible." (DX 15: Glenn Dep. Tr., 41:12 - 23.).

Mischaracterizations like these are the foundation for the City's argument that there is no basis for liability under a hostile work environment theory for Plaintiffs' failure to report

harassment. To the contrary, when viewed in context, this demonstrates that: (1) often harassment was perpetrated by supervisors (such as Pope), making the City strictly liable for the harassment *McPherson v. City of Waukegan*, 379 F.3d 430, 439 (7th Cir. 2004)("When a supervisor is the harasser, the employer is strictly liable for his or her conduct"); and, (2) the City's EEO Policy was not effectively enforced to protect DWM employees, causing them to remain silent to protect themselves from retaliation as was confirmed by DWM Commissioner Randy Conner. (SAF ¶46)

These are only a few examples – innumerable more exist. The following Statements of Fact should be ignored for the same basis: SF ¶¶53, 59, 110, 158-159, 162, 174, 178, 207, 237, 240-241, 251, 253, 255, 259, 262, 286, and 288-289.

**B. Accepting facts described in Defendant's exhibits as true requires drawing inferences against Plaintiff and making credibility determinations.**

The City relies on numerous DWM records -- *e.g.*, forms concerning transfers, discipline, payrates, etc. -- as substantive evidence. (*See* DX 50-52, 55-63, 65, 71-73, 75-76, 78, 80-84, and 99) Defendant attempts to authenticate the vast majority of them with the declaration of DWM Supervisor of Personnel Administration Marisol Santiago, who attempts to lay a foundation under Fed. R. Evid. 901(a). She does not attempt to describe contents of virtually any of the documents under Rule 1007, because she lacks personal knowledge required by Rule 602. Indeed, Santiago's declaration shows she lacks personal knowledge of the facts, particularly *subjective* descriptions of incidents/circumstances relied upon by DWM as the *factual* basis(es) for its purported legitimate non-discriminatory reasons for it actions (*e.g.*, Defendant's alleged assessment of applicants' alleged qualifications for promotions or whether employees engaged in misconduct).

Rather than offer testimony from decisionmakers or witnesses, Defendants repeatedly ask this Court to draw inferences about ambiguous explanations in or – worse – inferred from documents Santiago, Doyle or others authenticate (*see, e.g.,* RSF ¶¶59-61, 63-68, 70-72) referring

to Santiago's declaration instead of decsionmaker testimony).  At this stage, that is something this Court cannot do – particularly in light of conflicts in testimony permitting a jury to reject *all* of Defendant's witnesses' testimony. *See Reeves*, 530 U.S. at 134; *see also* Seventh Circuit Pattern Instruction 1.13 (allowing jury to accept or reject testimony).

Indeed, Plaintiffs dispute all of Santiago's attempts to use any records to establish legitimate non-discriminatory reasons for Defendant's conduct.  Santiago testified[1] in 2018 that scores of her "very high up" DWM co-workers engaged in past racist behavior. The records Defendant offer show only that someone at DWM memorialized their version of a disputed incident in a DWM document.  But that is not evidence of the events Defendant asks this Court to accept as true; it is not a basis on which the Court can grant summary judgment. *See Reeder-Baker v. Lincoln Nat. Corp.*, 649 F. Supp. 647, 658–659 (N.D. Ind. 1986), *aff'd,* 834 F.2d 1373 (7th Cir. 1987) (finding after bench trial that the defendant's explanation for disciplining the plaintiff for disrupting her work unit was "simply not worthy of credence" because the defendant offered no testimony from anyone with first-hand knowledge of disruption).

Even if the Court were willing to draw such inferences against Plaintiffs, doing so would require relying on inadmissible hearsay, as Plaintiffs explain.

### C.  Defendant offers inadmissible hearsay, including so-called "business records," which the Court may properly disregard as inadmissible evidence.

#### 1.  Defendant fails to satisfy Rule 803(6)(A)-(D).

Defendant's documents themselves constitute hearsay and often contain multiple levels of hearsay within them.  For the documents themselves to be admissible, Defendant must satisfy the

---

[1] Including former DWM Commissioner Barrett Murphy, Deputy Commissioner William Bresnahan, Luci Pope-Anderson, General Foreman of Plumbers Thomas Durkin, North District Superintendent Paul Hansen, South District Superintendent John "Jack" Lee, Assistant District Superintendent Daniel Misch, Assistant to Commissioner (Bresnahan) Jennifer Izban, Foreman of Water Pipe Construction Stanley DeCaluwe, David McKinney and Nobert Mikalunas. (*See* PX37*; See* also DX 156)

requirements of Fed. R. Evid. 803(6). Specifically, Rule 803(6)(D) requires testimony from a qualified witness showing that "the record was made at or near the time" of the act, event or condition and that it was made "by – or from information transmitted by – someone with knowledge." Fed. R. Evid. 803(6)(A). Defendant must also provide testimony from a qualified witness that "the record was kept in the course of a regularly conducted activity" and "making the record was a regular practice of that activity." Fed. R. Evid. 803(6)(B) & (C). Notably, Defendant must make this showing for each business record on which it relies.

With the exception of records regarding timekeeping, Santiago's declaration offers none of the information required by Rule 803(6)(D). Indeed, with the exception of Defendant's time-keeping process, Defendant's declarations offer no description of the activities involved, how records are kept generally as part of those activities, nor any of the facts necessary to show the records were prepared near the time of events by someone with knowledge (even knowledge transmitted to them by another). (*See* DX 4, ¶5; DX 32, ¶9).

For ease of reference, Plaintiffs have prepared a summary chart of the records whose admissibility Plaintiffs challenge, specifying the basis for their inadmissibility, as Exhibit 1.

### 2.  Defendant's records lack trustworthiness required by Rule 803(6)(E).

Moreover, here, the totality of the circumstances indicates that "the source of information or the method or circumstances of preparation indicate a lack of trustworthiness" required by Rule 803(6)(E). The records cannot be admitted if Plaintiffs show "the source of information or the method or circumstances of preparation indicate a lack of trustworthiness." Thus, even when supported by first-hand testimony from the author, business records are often considered inadmissible hearsay. *See Lust v. Sealy*, 383 F.3d 580, 587-588 (7th Cir. 2004)(affirming exclusion of memos authored by decision-maker in employment discrimination case -- "[a] memo

normally is hearsay . . . being offered to prove the truth of a statement made out of court; and unlike some other forms of hearsay, the argument for excluding it from evidence unless it falls within one of the exceptions to the hearsay rule is compelling . . . [s]uch notes have no warrants of reliability."); *Sommerfield v. City of Chicago*, 254 F.R.D. 317, 323 (N.D. Ill. 2008) ("where the records are prepared by a party rather than a clerical or professional employee there may be a strong motive to falsify" to render them insufficiently trustworthy to be considered).

Here, the fact the records come out of a department with a culture the Mayor admitted was racially discriminatory and Commissioner Connor could not change is sufficient to cast doubt on their trustworthiness. If Santiago did not know her close colleagues were bigots, then she is an equally unreliable source for measuring the trustworthiness of statements authored by lower-wrung DWM interested witnesses who, *according to the City itself*, have been credibly alleged of engaging in similar racist behavior. (SAF ¶¶32-47; 62-78)

Risk of embellishment, exaggeration or outright dishonesty render scores of the City's exhibits inherently unreliable at summary judgment. Many witness narratives contained in documents were authored by *other* DWM employees who have been credibly linked as active participants in the creation of the racially toxic working conditions that are the basis for Plaintiffs' *Monell* hostile work environment or were interested witnesses to underlying acts of workplace misconduct, rendering them inherently unreliable. This includes John Pope, Nick Devers, Joseph Lynch, William Bresnahan and Mike Szorc, among others.

All these individuals have been the subject of allegations of racial discrimination, and Defendant itself determined *many* of them engaged in racial discriminatory behavior. That evidence renders documents they prepared untrustworthy, because at summary judgment, the Court may only credit "evidence supporting the movant that is uncontradicted and unimpeached,

at least to the extent that that evidence comes from disinterested witnesses." *Reeves*, 530 U.S. at 151 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 300 (1986)). Here, the Court can reject this evidence as untrustworthy (and therefore inadmissible hearsay) because it does <u>not</u> come from disinterested witnesses. The documents are unreliable and should be ignored, as Plaintiffs explain with respect to each exhibit they challenge as inadmissible in Exhibit 1 attached hereto.

3. <u>Defendant cannot overcome hearsay within hearsay.</u>

Even if Santiago's declaration satisfies 803(6) to address the first layer of hearsay, the City still cannot provide an independent hearsay exception for the witness statements, summaries or other narrative information that is hearsay within those documents. *See Berberena v. Pasquino*, 03-557-CJP, 2006 U.S. Dist. LEXIS 82214, at *3 (S.D. Ill. Nov. 9, 2006) ("Plaintiff also argues that the reports are admissible . . . under Rule 803(6) . . . [t]his . . . does not do away with the double hearsay problem. The witness statements and summaries . . . cannot be properly admitted for their truth unless they can be shown independently to fall within a recognized hearsay exception."). Illustrative examples include:

**DX 51** contains a memo authored by John Pope, where he purportedly gives a narrative recitation of what he and other meeting participants claim transpired during a January 26, 2017 staff meeting. Pope ultimately concludes that the alleged chain of events provides a factual basis to suspend Plaintiff Ealy. The memo's content is rank hearsay. The out-of-court statements being related by Pope and others are being offered to prove the truth of the matter asserted, *i.e.*, that Ealy engaged in insubordination, which if true, means her suspension and/or the process to seek her suspension, itself, was not discrimination.

**DX 81, 82 and 84** purport to be the investigatory report of the workplace violence cross-complaints made by Plaintiff Donald Anderson and Mike Szorc, respectively. Anderson claims, under oath, that Szorc goaded Anderson into a fight by calling him "nigger." The City's investigatory file is precisely the type of record that is inadmissible as a business record under *Lust*, *i.e.*, where interested witnesses gave their version of disputed events, not under oath, to prove the truth of what they are saying. In this instance, what Anderson and Szorc did (or did not) say or do during the incident.

The circumstances and context of what happened in the numerous incidences purportedly "summarized" or "described" in these exhibits hinge on the declarants' *credibility*, which is the province of the jury. The City should not be allowed to hide behind an unknowing corporate recordkeeper (Santiago) to backdoor hearsay statements of a suspected racist who used racial slurs at Jardine (SAF¶¶160; 172), asking the Court to accept version of disputed events as true.

For these reasons, and the reasons outlined in Plaintiffs' Exhibit 1, attached, the following exhibits should be disregarded for purposes of summary judgment: DX 50-52, 55, 57-60, 62-63, 65, 71, 75, 76, 78, 82-84, and 140. Exhibits purportedly authenticated by Acting DHR Commissioner Kathleen Doyle Deane -- DX 102, 109, 111-121, 123-126, 129, 139, 141, and 163 -- are likewise inadmissible to the extent that they attempt to introduce double-hearsay.

## II.     Disputed Facts Preclude Summary Judgment On Plaintiffs' *Monell* Claims.

As a general matter, there is no *respondeat superior* theory liability under §1983 and employers cannot be vicariously liable for their employees' actions. *Thomas v. Cook Cnty Sheriff's Dep't.*, 604 F.3d 293, 303 (7th Cir. 2010). However, a municipality can be held liable for its own conduct. Plaintiffs can establish municipal liability by showing that the unlawful conduct was caused by a governmental practice or custom that, although not officially authorized, is widespread and well- settled, <u>or</u> an official with final policy-making authority." *Thomas*, 604 F.3d at 303 (explaining that to show a widespread, well-settled practice, the plaintiff must show "policymakers were 'deliberately indifferent as to [the] known or obvious consequences," *quoting Gable v. City of Chicago*, 296 F.3d 531, 537 (7th Cir. 2002); *Calhoun v. Ramsey,* 408 F.3d 375, 380 (7th Cir. 2005)("If the same problem has arisen many times and the municipality has acquiesced in the outcome", the court may "infer that there is a policy at work.").

In applying the widespread custom and practice *Monell* prong to DWM, the *Abreu* Court observed:

> "The usual way in which an unconstitutional policy is inferred, in the absence of direct evidence, is by showing a series of bad acts and inviting the court to infer from them that the policymaking level of government was bound to have noticed what was going on and by failing to do anything must have encouraged or at least condoned, thus in either event adopting, the misconduct of subordinate officers. The Seventh Circuit has not established any bright-line rules for how frequently such conduct must occur before labeling it a "practice," though it has held that there "must be more than one instance." *See Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010).

*Abreu,* 2022 U.S. Dist. LEXIS 85501, at *54-62 (holding a jury could find sufficient evidence of a widespread pattern sufficient for *Monell*).  Under *Monell*, when seeking to impose liability under the widespread custom or practice prong, where, as here, the City has notice of a risk of a constitutional or §1981 violation, the City is also liable for failing to act with deliberate indifference to this risk.  *J.K.J. v. Polk Cnty.*, 960 F.3d 367, 378-81 (7th Cir. 2020).

Here, Plaintiffs have three theories for *Monell* liability.  First, the City is liable for DWM's widespread custom and practice of permitting and condoning racially-harassing language and behavior in the DWM workplace, constituting a racially-hostile work environment throughout all of DWM.  The racist culture creating the hostile work environment manifested itself in other discrimination throughout DWM, including denial of overtime, promotions, transfers and direct infliction of racial invectives upon individual Plaintiffs during the course of their employment at DWM.

Second, the City is liable for its inaction in the face of a known and obvious risk that DWM employees would be subjected to racial discrimination and harassment, including: (1) failing to discipline DWM employees for engaging in racist behavior in the workplace; (2) failing to train DWM employees concerning the EEO Policy; and (3) failing to implement an effective EEO

complaint system, including chronic understaffing of the EEO Division that delayed investigations for years, without any mechanism for protecting vulnerable employees while the complaints languished for years.

Third, the City is liable under a final policymaker theory for former Commissioner Barrett Murphy's conduct by: (1) creating and perpetuating a Culture of Racism within DWM; and (2) failing to discipline racist misconduct within DWM, despite being delegated the power to do so pursuant to the Chicago Municipal Code.

Each of Plaintiffs' *Monell* theories are freestanding sources of liability, but also work together to help show there was a wide-spread custom or pattern of race discrimination at DWM (acknowledged by the Mayor's admissions about DWM's culture). Pervasive racist attitudes and behaviors exhibited by former Commissioner Murphy and other senior-level DWM personnel -- Bresnahan, Lynch, Pope-Anderson, Pope, Durkin, Lee, DeCaluwe, and Izban – <u>alone</u> suffices for *Monell* liability (under both widespread custom and failure to discipline theories), but is also a mirror of DWM's broader racist culture.

In a workplace that <u>genuinely</u> cared about preventing racial discrimination and harassment, as professed in Defendant City's "paper tiger" EEO Policy, Commissioner Murphy and his racist henchmen would have been fired long before their forced departures in 2017 after the Hansen email scandal was broadly publicized in media outlets. Instead, for years, Commissioner Murphy received multiple promotions, ultimately becoming Commissioner, whilst engaging in racist vitriol whose toxicity infected the lower ranks of DWM, because they: (1) followed Murphy's example; and (2) knew that the City's EEO policy was a "paper tiger" that was never effectively enforced. Likewise, that the City trained just 15 of DWM's approximately 2,000 employees on its EEO Policy during Murphy's tenure, is sufficient evidence for a jury to reasonably conclude a

standalone *Monell* custom and practice existed. It also evidences the City's deliberate indifference towards preventing racial discrimination and harassment in DWM.

The City asserts the Court should grant summary judgment on the *Monell* claims, arguing only the City Council and the DHR Commissioner can be official policymakers for purposes of allegedly unlawful employment practices at DWM (Dkt. 292, at 68). Next, the City assumes (erroneously) that because Murphy was not the final policymaker, then Plaintiffs' *Monell* claim fails because an express policy prohibiting workplace discrimination and harassment did not exist. Defendant contends its mere existence precludes a jury from concluding a widespread custom and practice of discrimination also existed, but Plaintiffs provide evidence it did (as Defendant admitted elsewhere). In short, the City ignores the overwhelming evidence of widespread systemic racism in DWM, that Judge Pallmeyer, in *Abreu*, found involved questions of fact and credibility that were within the exclusive province of the jury to decide.

> **A. The City is liable under *Monell* for DWM's Culture of Racism and Widespread Custom and Practice of Permitting Racially-Offensive Language and Conduct in the DWM Workplace, Which Emboldened Other Employees to Engage in Department-Wide Racist Behavior Towards African-American Employees.**

The Seventh Circuit has not "adopt[ed] any bright-line rules in defining 'widespread custom or practice.'" *Thomas*, 604 F.3d at 303 (7th Cir. 2010). Nor has it adopted any one method of proof. One common method is to identify a "series of bad acts," from which the jury may infer "the policymaking level of government was bound to have noticed what was going on and by failing to do anything must have encouraged or at least condoned, thus in either event adopting, the misconduct of subordinate [employees]." *Woodward v. Corr. Med. Servs. of Ill., Inc.*, 368 F.3d 917, 927 (7th Cir. 2004). "[T]here is no clear consensus as to how frequently such conduct must occur to impose *Monell* liability" using this method of proof, "except that it must be more than

one instance, or even three." *Thomas*, 604 F.3d at 303. Even "repeated actions directed at one person" are sufficient if they evince the existence of a policy. *Thomas v. Sheahan*, 499 F.Supp.2d 1062, 1095 (N.D. Ill. 2007), *aff'd, Thomas*, 604 F.3d at 303-05 (affirming *Monell* verdict).

While proving a series of bad acts is sufficient under *Monell* – from this circumstantial evidence, a jury may infer a widespread custom – it is just one approach. If there is other proof of widespread custom, such as evidence of "a culture that permitted and condoned violations of policies that were designed to protect [Plaintiffs]," the plaintiff's injury alone is enough. *Woodward*, 368 F.3d at 919. *Monell* requires only a widespread custom that caused the plaintiff's injury, not a widespread custom that caused widespread injuries. *Davis v. Carter*, 452 F.3d 686, 695 (7th Cir. 2006); *Thomas*, 499 F.Supp.2d at 1095.

Both methods of proof are satisfied here. First, for decades, DWM propagated a culture of racism that included widespread use of racist language in the workplace.

**B. The City is liable under *Monell* for failing to act in the face of a known and obvious risk that DWM employees would be subjected to racial discrimination and harassment**.

At its core, *Monell* liability premised on a "failure to act" follows from a showing of constitutional or §1981 violations "caused by a municipality's deliberate indifference to the risk of such violations." *J.K.J.*, 960 F.3d at 381. "Sometimes the notice will come from a pattern of past similar violations.; other times it will come from evidence of a risk so obvious that it compels municipal action." *J.K.J.*, 960 F.3d at 381. The key issue is showing a "conscious decision not to take action," which can be proven with a series of violations, but also can be show with "[a] single memo or decision showing that the choice not to act is deliberate." *Glisson v. Ind. Dep't of Corr.*, 849 F.3d 372, 381 (7th Cir. 2017). Where a plaintiff establishes a known or obvious risk, moreover, it takes "but a small inferential step for a jury to find causation." *J.K.J.*, 960 F.3d at 384.

For example, in *J.K.J.*, a jury found Polk County liable under *Monell* for the sexual assault of two women by a correctional officer. 960 F.3d at 371-75. Although the plaintiffs did not present evidence of other assaults, the Seventh Circuit held that the county had notice of the risk. *Id*. at 381-84. Aside from the inherent power dynamics between correctional officers and prisoners, the court held that evidence of lesser misconduct should have been alerted the county to the risk of more serious harm. *Id*. First, the jury heard evidence that the effective warden of the jail knew that guards engaged in sexually inappropriate banter called "tier talk," and admitted to participating in it himself at times. *Id*. at 382. "The tier talk spoke volumes about the jail's culture," the Seventh Circuit reasoned, and "[a] reasonable jury could have viewed the jail's denigrating culture as confirming the undeniable risk that a guard would grow too comfortable, lose his better angels, and step over the clear line marked in Polk County's written policies." *Id*. Second, notice to Polk County "became undeniable" when an inmate alleged in a letter to the warden that a correctional officer had pursued her sexually, albeit without progressing to forcible sexual assault. *Id*. at 382. A reasonable jury could have viewed this letter "as sounding the institutional alarm, making it 'highly predictable,' if not certain, that a male guard would sexually assault a female inmate if the County did not act." But "with red lights flashing, Polk County chose the one unavailable option- doing nothing." *Id.* at 383. The jail "did not change its sexual abuse policy, institute a training, inquire of female inmates, or even call a staff meeting." *Id*. at 383. Polk County's failure to act in the face of an obvious risk, the Seventh Circuit held, was sufficient to affirm the jury's *Monell* verdict. *Id*. at 384.

As demonstrated in the previous section, Plaintiffs present sufficient evidence to proceed under *J.K.J.'s* framework. The City, through Commissioner Murphy, had extensive notice of DWM's racist culture and the corresponding "highly predictable" risk of racial discrimination and

harassment. The City also had notice of the risk that numerous high and mid-level DWM managers -- Murphy, Bresnahan, Pope-Anderson, Hansen, Lynch of the risk that they and others would subject subordinates to discrimination and harassment. Commissioner Murphy acknowledged that he and DWM's senior-level officials (including its EEO liaison, Maureen Egan) were aware of the racist conduct by Paul Hansen (Murphy as early as 2008), that he and DWM's senior-level officials (again, including its EEO liaison) had a custom of allowing Hansen to violate the EEO Policy, and that Murphy himself had personally observe Hansen and other senior staff engage in racially discriminatory conduct, including referring to the most senior-level African-American staffer, Dwayne Hightower, by the derogatory name "Diddy." (SAF¶¶14-34; 43-50) For the seven years that Hansen served as Superintendent, he sent racist e-mails to senior-level officials and other DWM employees, including Murphy; both Alderman Moore and Commissioner Murphy testified that these emails should have alerted senior-level DWM officials of the risk that African-American DWM employees would be subjected to discrimination and harassment. (SAF ¶14-34)

But despite these known risks, the City did nothing. DWM officials did not report Hansen's emails and/or their personal involvement in those numerous email exchanges, never sought to discipline themselves to DHR, or make any meaningful attempt to curb this behavior.

### C. The City is also liable under a final policymaker theory.

The City, alternatively, is liable under a *Monell* final policymaker theory, based on the acts and omissions to act by disgraced Commissioner Murphy in creating the Culture of Racism that the City admits pervaded the DWM for at least seven years. (SAF¶¶14-34; 43-50; 82-83; 137-203) Whether a person has final policymaking authority" for purposes of §1983 is determined by state and local law. *Waters v. City of Chicago*, 580 F.3d 575, 581 (7th Cir. 2009).

The municipal code empowers DWM's Commissioner with "management and control of

all matters and activities pertaining to the department." Chi. Municipal Code. §2-106-020; *see also* §§ 11-12-620, 11-16-300 & 2-106-010. It also gives the Commissioner authority to "promulgate and enforce rules" pertaining to any provision of the municipal code administered by DWM, and "do any and all other acts which may be necessary or advisable for the implementation of the powers conferred on the commissioner and department." *Id.* §2-106-040(m). While DHR promulgates the EEO Policy, it delegates final policymaking authority for implementing and enforcing the Policy to the DWM Commissioner. (SAF ¶111) The DWM Commissioner may institute additional policies related to implementing and enforcing the EEO Policy (provided that they do not conflict with EEO Policy), and the DWM Commissioner is the final policymaker for these additional policies. Chi. Municipal Code §2-106-020; *see also* §§11-12-620, 11-16-300 & 2-106-010; *Vodak v. City of Chicago*, 639 F.3d 738, 747-50 (7th Cir. 2011) (noting that, in determining whether an official is the final policymaker, the court should consider "whether the official's decision on the issue in question is subject to meaningful review," among other factors); *Deloughery v. City of Chicago*, No. 02 C 2722, 2002 U.S. Dist. LEXIS 29049, at **6-8 (N.D. Ill. Nov. 25, 2002) (observing that *Auriemma* permits final policymaker theory where, by custom and practice, the City delegated final policymaking authority over personnel matters).

The DWM Commissioner's final say on whether to implement the EEO Division's discipline recommendations provides further evidence of final policymaking authority. When the EEO Division sustains a complaint against a DWM employee, it makes a disciplinary recommendation to the DWM Commissioner, who decides whether to follow it, take some other action, or none at all. (SAF¶¶114-115) The EEO Division cannot appeal the DWM Commissioner's decision, though the City Council might question the DWM Commissioner during "budgeting season" about disciplinary decisions. (SAF ¶115) In other words, the DWM

Commissioner has final policymaking authority to determine how the EEO Policy's general prohibitions are actually enforced in the DWM. For example, if Commissioner Conner -- as he decided here -- determines as a general policy that Luci Pope-Anderson's alleged fear of retaliation from superiors caused her to refrain from reporting racist conduct of Murphy, Bresnahan, Hansen justified her refusal to report the conduct, then he may (as he did) reject DHR's recommendation to discipline Pope-Anderson for her active personal participation in racist conduct at DWM. (SAF ¶46) DWM Commissioner Barrett Murphy was therefore a final policymaker for purposes of implementing the EEO Policy in the DWM. *Vodak,* 639 F.3d at 747-50 (in determining whether an official is the final policymaker, the court should consider "whether the official's decision on the issue in question is subject to meaningful review," among other factors); *Thompson v. District of Columbia*, 832 F.3d 339, 347-5- (D.C. Cir. 2016); *Deloughery,* 2004 U.S. Dist. LEXIS 29049 at *8 (N.D. Ill. Nov. 25, 2002)(Kennelly, J.) ("evidence as suggesting that the Board 'as a matter of policy . . . did not intervene in employment decisions' of the department . . . along with other evidence, was sufficient to allow a [jury] to determine whether that Board delegated the authority to make employment policy decisions, not simply the authority to hire and fire.").

### D. The City Trained Only 15 of DWM's Approximately 2,000 employees, consciously disregarding the importance of EEO training for preventing racial discrimination and harassment.

The DWM Commissioner has absolute discretion to decide whether to train DWM employees in the EEO Policy. (SAF ¶84) At least as early as October 2014, the City was aware of a risk that, absent EEO training, supervisors would not enforce the EEO Policy. (SAF ¶¶117-119) In an email to all departmental EEO liaisons, DHR underscored the importance of EEO training, because DHR had "learned from past training sessions that supervisors are sometimes unaware of the extent of their obligations in this area, and the importance of responding appropriately to

employee concerns related to harassment and discrimination." (SAF ¶120) DHR also emphasized that "[a]nyone who holds a supervisory role should attend, regardless of title." (SAF ¶119)

But DWM did not heed these warnings. DWM's liaison at the time, Assistant Commissioner Maureen Egan, forwarded this email to DWM's top officials -- Murphy and Bresnahan – with the note:

> Good grief. There does not seem to be much of a plan in place for cycling every supervisor through this training. Let me know how you want to handle this. Maybe send a few of us in Admin in November and then see if they come up with a better plan for training every supervisor?

(SAF ¶120) The City devised a better training plan and the fact that Egan never attended the training – despite being EEO liaison – and her dismissive "good grief" email, are evidence of DWM's deliberate indifference. (SAF ¶120) *J.K.J.*, 960 F.3d at 383 (holding that jury could view officials "tizzy email" as evincing dismissive attitude toward training).

Further evidence of deliberate indifference is the fact that, during Murphy's tenure as Assistant Commissioner and Commissioner, EEO training was virtually nonexistent at DWM. Just 15 of DWM's approximately 2,000 employees received EEO training. (SAF ¶122) No high-level employees received EEO training during (SAF ¶122).

By 2016, "red lights [were] flashing" about the need for EEO training, but DWM continued to choose "the one unavailable option – doing nothing." *J.K.J.*, 960 F.3d at 383. Then, in October 2016, the EEO Division sent Commissioner Murphy a memorandum about a series of complaints alleging that a foreman in the South District had used racial slurs like "nigger." (SAF ¶¶118-122) Based on its investigation of these complaints, the EEO Division recommended EEO training for all South District employees, which Commissioner Murphy disregarded (ordering only the alleged violator to EEO training), eliminating any doubt that DWM's general failure to train its employees was a deliberate decision, not mere oversight. In 2017, after the "email scandal" was reported in

media outlets and Murphy was terminated, DWM finally instituted mandatory EEO training in June 2017, which the City's Rule 30(b)(6) designee admitted was intended to address, in part, past issues concerning the Culture of Racism within DWM. (SAF ¶¶74; 79; 119-123)

### E. The City failed to implement an effective EEO complaint system, evincing deliberate indifference to preventing workplace discrimination and harassment at DWM.

The City has acknowledged that an effective, adequately-staffed EEO complaint system is essential for preventing harassment in the workplace, as it stops harassment from continuing to occur and, by signaling that the EEO Policy is being enforced, deters harassment more broadly. (SAF ¶¶79-82; 91) However, the City's EEO Division was severely understaffed with investigators. (SAF ¶¶91-92) In 2016, The EEO Division at times employed only three investigators (and no more than six) for the entire City. (SAF ¶92)  From January to April 2017, the City employed no EEO Officer and only three EEO investigators for the entire City; from April to May 2017, it employed just one investigator. (*Id*.) The City admitted that at least 10-15 EEO investigators were needed to promptly investigate EEO complaints and that the understaffing likely prevented the EEO Division from investigating meritorious claims. (*Id*.)  Alderman Moore, who served on the City Council's Budget Committee in 2106, testified further that the City could have increased the budget to meet the need for investigators, and has a duty to provide an effective EEO complaint process, which it failed to meet. (SAF ¶93)

The City's understaffing of the EEO Division, alone, is sufficient to establish *Monell* liability. *See, e.g., Roland v. Dart*,14-CV-10161, 2016 U.S. Dist. LEXIS 106073, at **19-20 (N.D. Ill. Aug. 11, 2016) (Pallmeyer, J.) (evidence that defendant understaffed nurses, which may have delayed medical care, sufficient for *Monell*); *Doe I v. City of Chicago*, 18-CV- 3054, 2020 U.S. Dist. LEXIS 41988, at **7-8 (N.D. Ill. Mar. 11, 2020)(Guzman, J.) (denying summary judgment

on *Monell* hostile work environment claim – "[P]laintiffs also present evidence of a longstanding workplace culture of [discrimination] at the Chicago Fire Department . . . over the span of many years . . . the prevalence of employees' unchecked use of [explicit language]; a 'code of silence' that perpetuates [discrimination]; and instances of retaliation against and ridicule of individuals . . . which plaintiffs say in turn create a fear of reporting.").

But there are other serious problems with the City's EEO complaint system. First, although the EEO Division "relies upon the support of departmental liaisons for effective implementation" of the EEO Policy, the City fails to train these liaisons and, before 2020, did not even give them written guidelines. (SAF ¶95)  Second, except in cases of physical violence, the City does not have procedures for protecting employees from further harassment while their complaints are being investigated, which, as a practical matter, means months or years of additional harassment, given the EEO Division's backlog of complaints. (SAF ¶¶97-108)  This risk is further heightened by the lack of confidentiality afforded to DWM employees making complaints. (SAF ¶¶47; 106-107)  This obvious gap in the City's EEO complaint system is also sufficient for *Monell* liability. *See Doe I*, 2020 U.S. Dist. LEXIS 41988, at *5 (noting department's "failure to completely separate complainants and their alleged harassers while investigations took place").

Adopting an effective EEO complaint system may have helped instill "a zero-tolerance culture in which [Commissioner Murphy and the senior-level DWM managers] would not have felt free to openly [engage in racist workplace behavior emboldening their underlings to do likewise]" in the first place. *J.K.J.*, 960 F.3d at 385.  A jury could find that an effective EEO complaint system could have prevented the documented behaviors of Murphy, Bresnahan, Hansen, Pope-Anderson, Izban and Lynch, which created the Culture of Racism that Mayor Emanuel, Commissioner Conner, Alderman Moore and the City's Rule 30(b)(6) designees have admitted, to

25

one degree or another, existed at DWM. (SAF ¶¶62-78)

**F. The City's post-May 2017 actions to "reset" DWM help prove deliberate indifference toward preventing discrimination and harassment at DWM**.

After the OIG's investigation of DWM came to public attention in May 2017, Commissioner Murphy, Managing Deputy Commissioner Bresnahan and Superintendent Paul Hansen resigned. (SAF ¶62) But simply installing Randy Conner as new Commissioner did nothing to break DWM's Culture of Racism. A noose was found in DWM truck five months after their resignations, causing Alderman Moore to convene City Council hearings. (SAF ¶70) Prior to the hearing, Alderman Moore expressly requested that DWM, DHR, and the Mayor's Office send officials to testify about steps taken to address DWM's Culture of Racism, but not a single City official appeared. (SAF ¶¶71-73) The only information provided to the Committee was a seat-of-the-pants, single-page document submitted at the last minute, which Alderman Moore described as "more high level bullet points" than a detailed plan for eliminating racism in DWM. (SAF ¶¶73-74) Alderman Moore stated that the Committee was "deeply troubled that not one representative from the administration appeared to testify about what is being done to address the problem." (SAF ¶73)

Shortly after the hearing, Alderman Moore introduced a resolution (sponsored by 11 members of City Council) and stated that "testimony before the Committee on Human Relations . . . . revealed a complicated and convoluted [EEO] complaint process involving conflicting and prohibitively complicated avenues of complaint intake and review." (SAF ¶74-76; 96) It called for a hearing "before the Committee on Human Relations to address official procedures regarding intake, process and investigation and resolution of complaints concerning any form or aspect of workplace discrimination and harassment." (SAF ¶76) Rather than attempt to fix the problems with City's EEO complaint system, the City Council buried the resolution in the Rules Committee

to prevent a hearing from taking place. (SAF ¶74-76; 96)

### III. Defendant's Failure To Address Plaintiffs' "Pattern-or-Practice" Theory Dooms Its Motion On All Plaintiffs' Intentional Discrimination Claims.

As Defendant notes, Plaintiffs assert claims for intentional discrimination with respect to denial of overtime, denial of promotional opportunities, and disciplinary actions, among other adverse actions. Plaintiffs assert that, when combined with the racially hostile work environment outlined above, those acts resulted in a pattern-or-practice of racial discrimination. Defendant waived any argument to the contrary by failing to raise it in its initial memorandum. *See Lores v. Sailpoint Technologies, Inc.*, No. 18-cv-3910, 2019 U.S. Dist. LEXIS 51416, at *3 (N.D. Ill. Mar. 27, 2019) (finding "[failure to raise an argument in the first instance constitutes waiver of that argument" and noting the rule baring raising issues for the first time on reply was "to avoid unfairness to a non-movant who is denied the opportunity to respond").

Here, Defendant's memorandum indisputably fails to address one of Plaintiff's central theories of liability – the pattern-or-practice theory under *Teamsters v. United States*, 431 U.S. 324 (1977). The words "pattern-or-practice" (or any derivative of them) simply do not appear. Plaintiffs have provided ample evidence from which a jury could infer a pattern-or-practice of discrimination existed at DWM. *See, e.g., Mozee v. American Commercial Marine Service Co.*, 940 F.2d 1036, 1042-43 (7th Cir. 1991) (explaining statistical evidence supports unintentional and intentional discrimination claims, and combined with anecdotal evidence can support pattern-or-practice theory). The disputed issues of material fact giving rise to questions for trial under *Monell* suffice. Thus, Defendant's failure to address that theory of recovery (asserted by each Plaintiff), the Court should deny Defendant's motion and permit Plaintiffs to proceed to trial on that theory of proof (among others, discussed below).

Defendant may have assumed, based on a footnote in the Court's class certification decision, that the Court would not entertain that theory of liability. (ECF# 266, p.12, n.3.) There, the Court stated "'[t]he pattern and practice analysis is only relevant to statutory schemes which utilize the *McDonnell-Douglas* burden shifting framework, like Title VII, and thus it cannot be used' for section 1983 equal protection claims." (*Id.*, citing *Chavez v. Ill. State Police*, 251 F.3d 612, 638 n.8 (7th Cir. 2001)). Plaintiffs believe Defendant (and therefore the Court) misconstrued *Chavez* based on the argument and authority stated in their class certification reply memorandum, which Plaintiffs hereby incorporate as though fully stated herein. (ECF #264, pp. 10.)

Regardless, Defendant's own arguments show Plaintiffs *do* assert claims that utilize the *McDonnell Douglas* burden shifting framework. Defendant's memorandum (at 13) correctly states that statutory claims under Section 1981 and Plaintiffs' Equal Protection Clause claims (both asserted through Section 1983) are analyzed using that framework, just like statutory claims under Title VII. *See Morris v. BNSF Ry. Co.*, 969 F.3d 753, 758 (7th Cir. 2020) (affirming trial verdict for plaintiff, and explaining "[w]e can consider Morris's claims under Title VII and Section 1981 together, though, because both statutes have the same liability standards") (internal quotation omitted).

Nothing about the fact Section 1981 claims are pursued through Section 1983 changes that fact. "[T]he same standards for proving intentional discrimination apply to Title VII and § 1983 equal protection claims." *Hildebrandt v. Ill. Dep't of Natural Res.*, 347 F.3d 1014, 1036 (7th Cir. 2003) (alteration in original) (internal quotation marks omitted); *see also Williams v. Seniff*, 342 F.3d 774, 787-88 (7th Cir. 2003) (applying *McDonnell Douglas* to a § 1983 equal protection employment discrimination claim).

Thus, Defendant's memorandum (at 13, 20, 26-27, 34, 48-49) is littered with arguments about why the Court should dismiss Plaintiffs' Section 1981 and 1983 claims based on the *McDonnell Douglas* burden-shifting framework (*e.g.,* because a Plaintiff was not meeting the City's legitimate expectations – part of the *prima facie* showing required by that framework). Given its arguments, Defendant should be estopped from arguing Plaintiffs cannot rely on the *Teamsters* theory under *Chavez*.

Indeed, this Circuit's pattern jury instructions for Title VII *and* Section 1981 make clear the pattern-or-practice theory can be pursued by individuals like Plaintiffs. *See* Seventh Circuit Pattern Civil Jury Instruction No. 3.03, including Committee Comment b (advising how to instruct the jury in an "individual pattern or practice claim"):

### 3.03  PATTERN OR PRACTICE

Plaintiff claims that Defendant had a pattern or practice of discriminating against [*protected class*]. To succeed on this claim, Plaintiff must prove by a preponderance of the evidence that [*protected class*] discrimination was Defendant's regular practice, rather than something unusual. If you find that Plaintiff has not proved this, you must find for Defendant.

If you find that Plaintiff has proved that Defendant had a pattern or practice of discriminating, then you must answer another question: Did Defendant prove by a preponderance of the evidence that it would have [*adverse employment action*] Plaintiff even if it had not made a regular practice of [*protected class*] discrimination? If you find that Defendant has proved this by a preponderance of the evidence, your verdict should be for Defendant. If you find that Defendant has not proved this, your verdict should be for Plaintiff.

#### Committee Comments

a.  **Authority:** *Adams v. Ameritech Services, Inc.*, 231 F.3d 414, 422 (7th Cir. 2000) (quoting *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 336 (1977)); *King v. General Elec. Co.*, 960 F.2d 617 (7th Cir. 1992).

b.  **Class Actions:** In a class action claim, a court should provide only the first paragraph, as the second paragraph will be provided during the damages phase of the trial. If this is an individual pattern or practice claim, then the court should provide both paragraphs to the jury.

Given the disputed facts and additional facts Plaintiffs present, all of Plaintiffs' claims should be permitted to trial under that theory, so a jury can determine whether discrimination was Defendant's regular practice (as Plaintiffs' statistical and anecdotal evidence suggests), rather than something unusual, or whether Defendant can prove it would have engaged in the adverse actions against Plaintiffs even if it had not made a regular practice of race discrimination. Defendant's failure to *attempt* to explain why Plaintiffs cannot satisfy that standard doom its motion as to Plaintiffs' disparate treatment claims.

Any attempt by the City to address this theory on reply should be summarily rejected by the Court. *See White v. United States*, 8 F.4th 547, 552-53 (7th Cir. 2021) (explaining arguments raised for the first time on reply are waived "because they leave no chance to respond"). Plaintiffs' claims should proceed to trial under this theory.

## IV.  Defendants Cannot Establish As A Matter Of Law That No Racially Hostile Work Environment Existed At DWM.

Plaintiffs allege the continuing pattern of discrimination from 2011 onward that gives rise to *Monell* liability and created a pattern-or-practice of discrimination under *Teamsters* also resulted in a racially hostile work environment. Each suffered actionable harassment as part of that overall pattern. Defendant's attempt to show it did not is based on mischaracterizations (and occasional misrepresentations) of disputed material facts. Considering the evidence in context – the racially discriminatory culture the Mayor, former Commissioner Connor and the City's own OIG admitted existed – a jury could find in each Plaintiff's favor on their harassment claims.

To prevail on a hostile work environment claim, "Plaintiffs' evidence need not show a descent into the Inferno" or conduct leading to a "nervous breakdown." *Gates v. Bd. of Educ. of Chi.*, 916 F.3d 631, 633-637 (7th Cir. 2019) (reversing summary judgment on racially-hostile work environment claim, noting "the hellish standard . . . is not a standard a plaintiff must satisfy.").

Rather, to prevail on a hostile work environment claim, Plaintiffs must show: (1) they were subjected to unwelcome harassment; (2) the harassment was on the basis of race; (3) the harassment was severe <u>or</u> pervasive to a degree that altered the conditions of employment and created a hostile or abusive work environment; and (4) a basis for employer liability exists. *Robinson v. Perales*, 894 F.3d 818, 828 (7th Cir. 2018); *see also Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 982 (7th Cir. 2014).

Defendant does not contest Plaintiffs contend the environment in which they worked was subjectively hostile. With respect to certain instances, it claims (without any evidence or, at best, inadmissible hearsay), a jury could not infer the conduct was racially motivated. Plaintiffs contend a jury could draw that inference based on the ample evidence of the racist culture in which they worked. Defendant's primary focus is on the latter two elements – whether Plaintiffs can show the harassment they experienced was severe or pervasive and whether it can be held liable for the DWM's racially hostile work environment. But, in making those arguments, Defendant ignores disputed facts and misapplies legal standards determining what evidence on which Plaintiffs can rely.

### A. A four-year, not two-year, statute of limitations applies to Plaintiffs' §1981 hostile work environment and discrimination claims brought under §1983 and Plaintiffs can rely on incidents that pre-date that period.

By ignoring the foundation of Plaintiffs' *Monell* claim -- *i.e.*, that the entire DWM work atmosphere was infected with racism that affected all employees and casts a racist cloud over all employment-related practices -- the City takes other legally indefensible positions about what evidence Plaintiffs can rely upon to prove their claims. Defendant applies the wrong statute of limitations to Plaintiffs' hostile work environment claims and argues wrongly the continuing violations doctrine does not apply.

1.  <u>Defendant applies the wrong statute of limitations to Plaintiffs' harassment claims</u>.

First, the City asserts that a two-year statute of limitations applies to Plaintiffs' hostile work environment and discrimination claims brought via §1983 and, as such, the Court must ignore alleged discrimination pre-dating June 29, 2015.  The City misstates the law. (Op. Br. at 64).

Section 1981 claims such as hostile work environment and race discrimination are governed by the "catch-all" four-year federal statute of limitations.  *See* 28 U.S.C. §1658; *Jones v. R.R. Donnelly & Sons Co.*, 541 U.S. 369, 382-83 (2004); *Fane v. Locke Reynolds, LLP*, 480 F.3d 534, 539 (7th Cir. 2009) (holding claims brought under §1981 do not require exhaustion of remedies and are subject to a four-year statute of limitations); *Dandy v. United Parcel Serv., Inc.*, 388 F.3d 263, 269 (7th Cir. 2004).  This is true even when §1981 claims are brought via §1983. *See Baker v. Birmingham Bd. of Educ.*, 531 F.3d 1336 (11th Cir. 2008) (four-year statute of limitations applies to §1981 claims brought via §1983); *Barrett v. Illinois Community College Dist. No. 515*, 15-CV- 2334, 2019 U.S. Dist. LEXIS 130241, at **18-19 (N.D. Ill. Aug. 5, 2019)(Shah, J.) ("although the statute of limitations for §1983 is two years, when such a claim is brought pursuant to the substantive rights created by §1981, the §1981 four-year statute of limitations applies"); *Price v. N. Illinois Univ.*, 16-CV-9827, 2017 U.S. Dist. LEXIS 205544, at **5-6 (N.D. Ill. Dec. 14, 2017) (Lefkow, J.) (holding that "the limitations period for §1981  is an exception to the general two-year period for §1983").

Indeed, in other cases, the City conceded that the four-year statute of limitations applied to a §1983 claim alleging a violation of §1981. *See Moore v. City of Chicago*, 126 F. App'x 745, 747 (7th Cir. 2005) ("The City concedes that a four-year statute of limitations period is proper for claims under §1981"). Thus, the statute of limitations itself extends back to January 27, 2013.

2. <u>Plaintiffs can rely on the continuing violation theory for their harassment claims</u>.

In evaluating whether a hostile work environment exists, the finder of fact is not limited to conduct within the statute of limitations; a jury can evaluate the entire period of time the hostile work environment existed. *See National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002) (explaining that "the entire time period of the hostile work environment may be considered by a court for the purposes of determining liability" including acts that occurred outside of the statutory filing period). The City's memorandum incorrectly contends (Op. Br. at 64) that Plaintiffs cannot rely on the continuing violation doctrine. But the Supreme Court and the Seventh Circuit have explained that the so-called "evidentiary period" relevant to such claims <u>extends to include pre-limitations conduct</u>:

> A hostile work environment claim is comprised of a series of separate acts that collectively constitute one "unlawful employment practice." 42 U.S.C. §2000e-5(e)(1). The timely filing provision only requires that a . . . Plaintiff file a charge within a certain number of days after the unlawful practice happened. It does not matter, for purposes of the statute, that some component acts of the hostile work environment fall outside the statutory time period. **Provided that an act contributing to the claim occurs within the filing period, the entire period of the hostile work environment may be considered by a court for the purposes of determining liability.**

*Morgan*, 536 U.S. at 117 (2002); *see also Pruitt v. City of Chicago*, 472 F.3 925, 927 (7th Cir. 2006) (explaining that the inclusion of pre-limitations conduct for hostile work environment applies equally to Title VII and §1981 claims); *Isaacs v. Hill's Pet Nutrition, Inc.*, 485 F.3d 383, 385 (7th Cir. 2007)("The Supreme Court treats a hostile work environment as one unlawful employment practice . . . [t]he employee may complain about any of the constituent acts no matter how long ago they occurred"); *King v. Acosta Sales & Mktg., Inc.*, 678 F.3d 470, 472 (7th Cir. 2012)("[W]hen an assertedly unlawful employment practice occurs as a pattern over time rather than in one discrete act, it does not matter when the individual deeds contributing to the pattern

occurred, if the patterns continued into the [limitations period]").[2]

The City ignores the fact that Plaintiffs' §1981 claim, like their §1983 claim, is based on a *Monell* hostile work environment theory of liability encompassing the period from 2011 onward. Thus, while the hostile work environment Plaintiffs' experienced existed long before 2011, Plaintiffs are entitled to rely on the entire period from 2011 onward to establish liability on their hostile work environment claims under the continuing violation doctrine.

### B. Hostile work environments are proven with severe *or* pervasive conduct.

"Whether harassment was so severe <u>or</u> pervasive as to constitute a hostile work environment is generally a question of fact for the jury." *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 900-01 (7th Cir. 2018) (emphasis added). The "severe or pervasive" requirement for hostile work environment "is <u>disjunctive</u>—one extremely serious act of harassment could rise to an actionable level as could a series of less severe acts." *Id.* at 219.

Four factors are considered in determining whether the standard is satisfied. Whether conduct is "'sufficiently severe or pervasive to alter the conditions of employment' ... depends on 'the severity of the allegedly discriminatory conduct, its frequency, whether it is physically threatening or humiliating or merely offensive, and whether it unreasonably interferes with an employee's work performance." *Gates*, 916 F.3d at 640 (7th Cir. 2019).

Certain conduct in the workplace may be so severe, little else may be required to warrant a trial. As this Court explained in *Brand v. Comcast*, 302 F.R.D. 201 (N.D. Ill. 2014):

---

[2] *Riordan v. Kempiners*, 831 F.2d 690, 698-99 (7th Cir. 1987)("The judge excluded all evidence of events subsequent to [Plaintiff's] filing of her claim for discrimination in December 1983 — even though she didn't quit the Department till August 1984. Proximity in time to the alleged discrimination is a proper consideration in assessing probative value; but given the importance of circumstantial evidence in proving (and, equally, disproving) employment discrimination, a blanket exclusion of evidence of events that occurred before or after the discrimination is arbitrary.")

The Seventh Circuit has been fairly consistent in concluding that the severe or pervasive use of racial epithets can on its own create an objectively hostile work environment. *See Rodgers v. W.-S. Life Ins. Co*., 12 F.3d 668, 675 (7th Cir. 1993) (Perhaps no single act can more quickly alter the conditions of employment and create an abusive working environment than the use of an unambiguously racial epithet such as 'nigger' by a supervisor in the presence of his subordinates.).

*Id.* at 218 (internal quotation marks and citation omitted). Context of use an historical implications matter. *See Cole v. Bd. of Trustees of N. Ill. Univ*, 838 F.3d 888, 896 (7th Cir. 2016) ("given the status of a hangman's noose as a visceral symbol of death of thousands of African-Americans at the hands of lynch mobs we do not flatly reject as insufficiently severe" a single incident of a noose hanging in the workplace that was not directly observed by the plaintiff); *see also Johnson*, 892 F.3d at 903 (collecting cases discussing the "highly disturbing impact" use of the word "ni**er" can have on the listener given American history – so disturbing the Court did not use not use it) (internal quotation and citation omitted).

Nor must racially discriminatory language be used by supervisors or about the Plaintiffs in question. Those are factors for a jury to consider in weighing the four factors outlined above to determine whether a hostile work environment exists. *See Gates*, 916 F.3d at 638 (noting the Court has "repeatedly treated a supervisor's use of racially toxic language in the workplace as much more serious than a co-worker's," but collecting and citing cases explaining that "repeated use of such highly offensive terms ... may create an objectively hostile work environment, even if they are heard secondhand.").

### C. Plaintiffs can rely on each others' and other African American's experiences to establish the racially hostile work environment.

Notably absent from Defendant's memorandum or statement of facts is any discussion of how African Americans *other* than Plaintiffs were treated. The City entirely ignores an entire swath of evidence a jury could rely upon to find a hostile work environment for African Americans

existed at DWM.  Defendant's memorandum (at 73-74) argues racially offensive emails it concedes "constituted a clear violation of City policy" are irrelevant because Plaintiffs did not receive them.  Defendant cites a 2000 decision to support its claim Plaintiffs must "know of the comments" for them to be relevant.  In the nearly two decades since that decision, however, legal standards have evolved.

Even before the "racial awakening" in the wake of George Floyd's murder, the Seventh Circuit has explained Plaintiffs can prove the discrimination and harassment with "me too" evidence.  As the Seventh Circuit explained "[c]omments made to non-plaintiff co-workers carry less weight in the evaluation of a hostile environment claim, but they are not irrelevant."  *See Johnson v. Advocate Health & Hospitals Corp.*, 892 F.3d 887, 902 (7th Cir. 2018); *Harris v. FedEx Freight, Inc.*, 110 F.Supp.3d 805, 817-18 (N.D. Ill. 2015)(Blakey, J.) (denying summary judgment -- "the record contains testimony from other minority employees who allege they too experienced racial discrimination . . . [a]t trial, this might constitute appropriate circumstantial evidence to show a hostile work environment").

At this stage, the Court must assume a jury will credit that evidence in Plaintiffs' favor.  And there is good reason to believe it will, given the how egregious some of the conduct and comments at DWM were.  With respect to conduct like the nooses and the n-word, even if Plaintiffs did not see them or Defendant did not direct them towards Plaintiffs, like other comments and annecdotes that circulated within the DWM, they are evidence of "the fact that employees understood their environment to be one in which derogatory statements [or conduct] were pervasive."  *See Johnson,* 892 F.3d at 903 (explaining whether such evidence is more prejudicial than probative should be weighed before trial, but that even "rumors" when "coupled with other evidence … might have relevance in a hostile work environment claim").

When considered collectively, instead of in isolation, there is abundant evidence African Americans at DWM were called niggers, spooks, and monkeys – and treated by DWM as though its leadership thought of them as such. As explained in *Johnson v. Advocate*, the fact that supervisors and managers used such language is evidence a jury could rely upon to find for Plaintiffs. *See also Gates*, 916 F.3d at 636 ("we have repeatedly treated a supervisor's use of racially toxic language in the workplace as much more serious than a co-worker's … use of the N-word by supervisors has a particularly severe impact on work environments").

That remains true even if a jury only infers – as Defendant's own OIG did – that the widespread use of it by managers sent signals to lower-level employees such language was acceptable and likely led to use by other managers or employees (an inference proven accurate by Plaintiffs' other evidence).

### D. All the conduct Defendant claims does not constitute an "adverse act" is evidence that supports Plaintiffs' hostile work environment claim.

With virtually every Plaintiff, Defendant argues that certain conduct Plaintiffs claim is discriminatory does not constitute an "adverse action" and, therefore, cannot be a basis for liability. The most prominent example is Plaintiffs being accused of disciplinary actions, being subjected the disciplinary process, facing potential suspension or removal, but then having charges against them dropped. (SAF ¶¶50; 179-183; 191; 208; 242) Hill, who participated in the disciplinary process by scheduling pre-disciplinary hearings, observed that Stark, Bresnahan, Pope and Lynch (among others) would initiate disciplinary actions against African Americans to retaliate or prevent them from protesting harassing conditions – and wrote up African Americans in far greater numbers than other races. (SAF¶184; DX 106, Hill Answer to Interrogatory No. 6.)

Each of those situations, like the other events Defendant claims are not actionable, also comprise part of Plaintiffs' evidence of a hostile work environment, because Defendant made

efforts to hide misconduct when Caucasians were involved. Combined with the overt discriminatory comments, Defendant's admissions of a racist culture in DWM, and statistical evidence showing how African Americans were disadvantaged, a jury could find those acts were part of Defendant's means of intimidating Plaintiffs and other African Americans and otherwise denying them equal terms and conditions of employment by subjecting them to a hostile work environment.

### E.  Each Plaintiff suffered harassment as part of DWM's hostile work environment.

The City's primary argument is that the bulk of the alleged harassment occurred outside the relevant statute of limitations because the Plaintiffs do not satisfy the continuing violation doctrine" and that the evidence of racial harassment within what the City purports is the relevant time period involving the Plaintiffs involves "stray remarks," and/or were isolated incidents. With the benefit of the continuing violation doctrine, each Plaintiff need only show they experienced some harassment while the hostile work environment existed. *See Abreu*, 2022 U.S. Dist. LEXIS 85501, at *46-47 (N.D. Ill. May 10, 2022 ("The Seventh Circuit has since applied the continuing violation doctrine to hostile work environment claims.") (citing *National Railroad Passenger Corp.* and *Bright v. Hill's Pet Nutrition, Inc.*, 510 F.3d 766, 768 (7th Cir. 2007)).

#### 1.  Defendant's key leaders created a racially hostile work environment.

*Barrett Murphy*, the First Deputy Commissioner and then Commissioner, helped create the hostile work environment Plaintiffs experienced. Hill heard Murphy, Bresnahan or someone in Murphy's office refer to DWM's African American employees as the "niggers in the South District." (SAF¶186) Laws heard rumors about Murphy and Bresnahan discussing "niggers." (SAF¶198) When Ealy saw Murphy, she would always say "good morning" or "good afternoon" (adding "sir" because of her military experience) and Murphy would make eye contact, but he

would walk directly past her; when he encountered whites, however, he would talk, joke and laugh. (SAF¶154); *Gates*, 916 F.3d at 639. ("A jury would likely have a difficult time concluding that a supervisor calling his employee the 'N-word' and threatening to write up 'his black ass' were not examples of harassing comments motivated by race. Although [harasser's] conduct was relatively infrequent and not 'physically threatening' or 'humiliating' in a public setting, it was severe and humiliating. A reasonable jury could also find that it did interfere with [Plaintiff's] work performance.").

*William Bresnahan*, Deputy Commissioner, also participated in creating the hostile work environment. Hill observed him send an email joke mocking an African American's ethnic name and saw the email. (SAF¶ 187) Hill heard and heard of other incidents involving Bresnahan, including how he took great joy in telling stories about arresting, beating, roughing up and harassing African Americans when he was on the Chicago police force. (*Id*.) Hill also witnesses Bresnahan and Luci Pope-Anderson exchange emails that made fun of black people, including a Deputy that worked in their division (Dwayne Hightower). (SAF¶187) Ealy heard Bresnahan refer to African Americans as "you people." (SAF¶152); *Gates*, 916 F.3d at 639.

In 2013, Bresnahan did not introduce himself to Smith when arriving where she worked; when Smith asked another African American who he was, that employee described Bresnahan as a "racist prick." (SAF¶201) In approximately 2017, Bresnahan spoke with Anderson on the phone, referred to African Americans as "you people," directed him to go for a drug test, and explained he was going to "write [his] black ass up" for a problem caused by an engineer because (per Bresnahan) Anderson's "black ass is responsible for the crew." (SAF¶201) Laws heard rumors about Bresnahan using racial slurs against African Americans from Caucasians and African Americans. (SAF¶198).

*Alan Stark*, Managing Deputy Commissioner, one of Defendant's key leaders, helped perpetuate the hostile work environment, including by talking to Hill in a nasty tone and dismissively and using the N-word in the office multiple times, including in Hill's presence between 2010 and 2015.  (SAF¶182); *Gates*, 916 F.3d at 639.  Several other employees also told Hill that Stark use racially offensive language, including a black male who told Hill Stark used the "n-word." (*Id*.)  Hill described that behavior as "the norm." (*Id*.)  Ealy heard Stark refer to African Americans as "you all" on a daily basis in morning meetings. (SAF¶155)

Hill described how Stark initiated a pre-disciplinary hearing against her – purportedly for absenteeism – after forcing Hill to come to work to complete paperwork, despite the fact she was approved for leave to tend to her hospitalized mother on life support.  (SAF¶183).  Stark did not treat whites with whom he worked like he treated Hill.  (*Id*.)  Glenn also described how Stark was overly critical and would cut him off during their meetings, which he did not do to other supervisors, and denied Glenn and the predominantly non-white employees he supervised safety equipment.  (SAF¶171)

*John Pope*, a former Alderman who joined DWM as a Deputy Commissioner, also helped create DWM's hostile work environment, including by calling Glenn a "nigger" to his face in 2016 or 2017.  After Glenn refused to sign paperwork about events at work on a day Glenn was on vacation; Pope said "I'm so sick and tired of you niggers" and told Glenn to sign the paper or his "ass [was] getting written up." (SAF¶172); *Gates*, 916 F.3d at 639; *Rodgers*, 12 F.3d at 675 ("Perhaps no single act can more quickly alter the conditions of employment and create an abusive working environment than the use of an unambiguously racial epithet such as 'nigger' by a supervisor in the presence of his subordinates.").

 Pope spoke to Ealy differently as a black person, too; one occasion in approximately 2016

or 2017, his voice became threatening and he pointed his finger and yelled at Ealy, telling her she better do it what she was told. (SAF¶157); *Gates*, 916 F.3d at 639.

Ealy also heard Pope refer to African Americans as "you people." (SAF¶152) When Ealy questioned Pope about having employees sign forms (as her white counterparts had done), Pope got upset, raised out of his chair, pointed his finger at Ealy and threatened to write her up. (SAF¶155) Pope reacted negatively by harassing Cooper and another African American; Pope needled the employee with questions and became "incensed" when Cooper exercised his authority as Union steward to prevent a technical employee from performing duties outside her job description. (SAF¶89)

*Joe Lynch*, who previously kept a black-face doll in an office he shared with Operating Engineers even after receiving complaints about it, also helped perpetuate the hostile work environment. (SAF¶192) African American Joe Jones told Glenn that Lynch called Jones a "nigger," and Glenn also heard that rumor. (SAF¶164); *Gates*, 916 F.3d at 639. Ealy heard Lynch refer to African Americans as "you people" and, unlike with whites (with whom he joked), Lynch would belittle and talk down to Ealy and other African American engineers. (SAF¶152) Lynch also initiated a verbal altercation with Ealy by disrespectfully questioning her for checking sign in sheets for work assignments, which Lynch allowed whites to do. (*Id.*)

Lynch raised his voiced and hollered at Glenn even though Glenn was a supervisor; he also repeatedly refused to assist Glenn, telling him to "quit [his] fucking whining, which he did not do with whites. (SAF¶163) Ealy also saw Lynch yell at African Americans, but not whites, and other African Americans described Lynch as racist and how Lynch mistreated them to Ealy. (SAF¶152)

In 2017, Lynch tried to physically assault Cooper because Cooper spoke to him rudely, which Cooper attributed to race based on Lynch's prior aggressive actions towards African

Americans based on what Cooper described as a culture where African Americans were punished for challenging whites' authority.  (SAF¶149)

> 2.  <u>Other managers and supervisors harassed African Americans, including Plaintiffs.</u>

Others managers and supervisors at DWM followed these managers' lead.  In March 2017 Michael Szorc, a white foreman, called Plaintiff Anderson a "nigger" in the context of a physical altercation Szorc started before goading Anderson to hit him; Anderson had his fist cocked to punch Szorc, but refrained knowing he would lose his job.  (SAF¶133); *Gates*, 916 F.3d at 639. After the incident, Anderson was forced to stay and work and take a drug test, but Szorc was allowed to go home and was still paid for the day of work.  (*Id*.)  Plaintiff Anderson reported the incident to ADS Andy Anderson, who did not care, so Plaintiff Anderson filed a police report. (*Id*.)  Defendant still determined Anderson was the aggressor, and suspended him instead of Szorc (as discussed in in connection with discriminatory discipline, below).

Chris Williams (white) also called Plaintiff Anderson nigger at least five times, including as recently as 2017 when he referred to Anderson as "that nigger" in a conversation with Bresnahan shortly after Williams was made Plaintiff Anderson's supervisor.  (SAF¶136); *Gates*, 916 F.3d at 639.  Bresnahan did not appear bothered by Williams' use of that word; Anderson observed that afterwards they went into the office and finished talking "like it was status quo." (*Id*.)

Szorc, Williams and others ("quite a few folks"), including Jack Lee, also called Plaintiff Anderson "nigger" and other names, including when he worked at South District; Anderson also heard Williams refer to others as "nigger."  (SAF¶137); *Gates*, 916 F.3d at 639. When they worked together at South District, Anderson heard Lee referring to African Americans as "monkeys" and niggers.  (Anderson Dep. 304:12-307:9).  In 2009 or 2010, Lee told Anderson he "would be leaving" after not being pleased with what Anderson told him; shortly afterwards, Anderson was

transferred from South District to Central District.  (SAF¶137)

Anderson also observed that Williams tried to discipline or terminate black members of his crew in 2016 and 2017. (SAF¶139)  Around the same time (2016 or 2017), a black truck driver (John McGee) had the break lines cut on his brand new service truck, leaving McGee lucky to be alive because of the load he was carrying; McGee and Anderson told Chris Williams and Andy Anderson, who were upset but did not investigate the incident.  (*Id.*)

Laws described coworkers and supervisors calling him or other African American coworkers "nigger," "black motherfucker," or "spook."  (SAF¶195); *Gates*, 916 F.3d at 639.  Laws described events he observed between 2014 and 2017 where foreman Norman Clark:  (a) called an African driver a "half-breed" and "nigger" as he was getting into an altercation; (b) threatened a driver with reassignment by saying he could "take your black ass … to the Central District. You're not going to work here anymore" and use the "N-word;" (c) tell multiple drivers "if you don't go along with what I say, you can get your black ass sent somewhere else;" and (d) *jokingly* told an African American to stand next to paint, saying "you're so dark.  Why don't you stand next to this door?"  (SAF¶197); *Gates*, 916 F.3d at 639.

Laws also described other African Americans telling him about Clark and call them "black this or black that" or "monkey" or other names.[3]  (SAF¶197)  Anderson saw the word "nigger"

---

[3] The hostile-environment issue is not whether the comments were specifically directed at the individual, but whether plaintiff fell within the "*target area* of offending conduct." *Yuknis v. First Student, Inc.*, 481 F.3d 552, 554 (7th Cir. 2007) (rejecting "second-hand" harassment label as "belittling," serving "no analytic function," and thus "better avoided") (emphasis added). *Musa–Muaremi v. Florists' Transworld Delivery, Inc.*, No. 09 C 1824, 2011 WL 4738520, at *13 (N.D. Ill. Oct. 5, 2011) (denying summary judgment based in part on "comments to other employees that were offensive to women generally"); *EEOC v. WRS Infrastructure and Env't, Inc.*, No. 09 C 4272, 2011 WL 4460570, at *10 (N.D. Ill. Sept. 27, 2011) (noose discovered on one Black employee's truck created actionable HWE for all Black employees in unit); *Johnson v. Indiana*, No. 3:09-cv-385, 2011 WL 4348148, at *8-9 (N.D. Ind. Sept. 16, 2011) ("repeated use of the racial 'jokes and slurs in Plaintiff's presence, even though not directed at Plaintiff, is objectively offensive and likely altered the conditions of the working environment").

and "coon" on bathroom walls in the Central District Garage, the same bathrooms supervisors (including Bresnahan) used there, for a couple years around 2013. (SAF¶132); *Gates*, 916 F.3d at 639. Ealy heard ACOE's refer to African American men as "boy" or "y'all" or "you people" instead of their name; they called Ealy "bitch" or "black bitch." (SAF¶152)

### 3. Plaintiffs experienced intimidating and physically threatening racial harassment.

Many of Plaintiffs' experiences were physically intimidating or threatening or involved that type of imagery. Cooper described seeing Ku Klux Klan symbols and swastikas at the Sawyer facility throughout his employment. (SAF¶148) Glenn saw KKK symbols on the walls in "galleries" (walkways inside the plant at different elevations) as recently as 2014 or 2015, but could not say if they were removed because he stopped going by it. (SAF¶169) Anderson described how another coworker called Anderson a "black motherfucker," told him "you black motherfuckers … get what you deserve," to try to intimidate Anderson by telling him to beware of the package on his porch, which ADS Andy Anderson refused to address. (SAF¶138)

In approximately 2017, Laws saw a noose hanging from a white driver's City truck, openly parked in the yard where employees punch in and out, for several days. (SAF¶196) Henry also saw the noose hanging from white motor truck driver after being asked to look at it by a foreman. (SAF¶176) Henry was disgusted and in disbelief at what he saw. (*Id.*) Laws described it as part of "the culture" because the employee's supervisor (Norm Clark) saw the noose and did not take disciplinary action. (SAF¶196) Anderson had seen a noose in a truck as well, but in approximately 2009 or 2010. (SAF¶138) Ealy saw nooses in the Filter building when she worked at Jardine and, in the Chemical Application section, saw two American flags arranged crisscross to look like Confederate flag, which reappeared after being removed. (SAF¶153)

Andy Anderson and Chris Williams reassigned Plaintiff Donald Anderson's parking spot

(which he used for seven years) to a location with no video surveillance closer to Szorc's spot; three days later, Anderson's vehicle was scratched.  (SAF¶140)  Around the same time, the City truck Anderson drove had several flat tires within a week. (*Id*.)

　　　　4.　Racially derogatory language towards others was commonplace.

References to African Americans as "you people" and attempting to group, demean or dehumanize them were commonplace.  Stark referred to African Americans as "y'all" and "you all" to Glenn "a lot," and Pope also used the term. (SAF¶165)  Henry heard African Americans referred to as "spook" and "boy a lot of times" which he found offensive. (SAF¶178)

Cooper heard Frank Skiadopoulos refer to African Americans as "boy" as a "common thing" and referred to them as "you people" when telling him African Americans were "always doing" things like leaving a child in a dumpster. (SAF¶146)  Per Cooper, Skiadopoulos made "racial attacks on black people on a constant basis;" another African American told Cooper that Skiadopoulos once asked him "what you doing up here, nigger boy?"  (SAF¶147); *Gates*, 916 F.3d at 639. Cooper explained he heard comments like that "every day for a long time."  (*Id*.)

Henry saw "a picture floating around" of DWM leaders formally dressed ("about 30 bosses, they all had suits") but with "a gorilla face" covering the face of Hightower; another African American female employee at South District saw it, too.  (SAF¶176)  Henry worked hard to avoid exposure to incidents like that, the noose he saw and comments he heard to avoid confrontation.  (SAF¶176)

Cooper observed that it was common knowledge that a Black employee (Joe Jones) was referred to as an "effing nigger" on a daily basis and other employees experienced similar epithets.  (SAF¶148)  One white employee referred to Plaintiff Hill as "sister" or "soul sister" when getting coffee and would ask "are you going to have some chicken for us to eat today?" which Hill

considered racist, but something she was "used to" because at DWM racist behavior was "the norm." (SAF¶191)  From Laws' experience, disparate treatment and racially derogatory language was "happening on a day-to-day basis" and "was part of Water Department culture." (SAF¶200)

5. <u>DWM's "Jim-Crow" culture treated African Americans as second-class citizens.</u>

Plaintiffs described the harassment they experienced as part of DWM's "Jim Crow" culture where African Americans were treated as second-class citizens with respect to working conditions and interactions, as well as opportunities to earn and advance.

Glenn described how majority-Black station laborers were forced to work in dark, muddy conditions, while majority-white construction laborers were not – and the white workers even told Glenn they were "too good to clean – to work in the mud."  (SAF¶171) Defendant (at 52) criticizes Plaintiff Glenn needlessly over the racial makeup of his team (none of whom were white).  But Plaintiff Glenn acknowledged Stark made "the Latinos and the blacks … go down there and work in that mud" (just not whites). (*Id*.)  Glenn also explained how he and his team at the Sawyer facility were denied necessary warm weather equipment, and routinely received second-hand equipment, unlike employees at Jardine. (*Id*.)

According to Hill, it was common practice for mixed-race crews to force the African American to dig a ditch, while whites would sit in the truck and refuse to do menial or harder jobs. (SAF¶186)  Anderson described how he and his crew of African American workers were always sent to work on the west side, even after they were shot at there. (SAF¶132)

Plaintiff Donald Anderson described how in 2017 ADS Andy Anderson initiated discipline resulting in verbal counseling for an accident on a day Plaintiff Donald Anderson was not working (which Anderson considered harassment); the all-white "special crew" (not Plaintiff Anderson hit a fiber optic while working overtime, backfilled it, covered it up, and went home -- something

Anderson indicated happened frequently. (SAF¶141) While acting up as foreman, Smith was also asked to write up a black laborer for something a white employee had done; once that was discovered, the white employee did not face discipline. (SAF¶203)

Plaintiff Henry observed how African Americans had difficulty getting overtime or getting promoted, while white individuals received those opportunities and advanced quickly even when unqualified to do so. (SAF¶178) Anderson also noticed whites receiving more overtime opportunities. (SAF¶132) Smith, in contrast, could not advance and was required to perform duties outside her job classification, including making decisions and advising white supervisors and foreman, many of whom she trained (just without the accompanying pay and titles). (SAF¶204)

Cooper also observed that African Americans did not get overtime or preferential assignments and that, in his observation, DWM leadership had total disregard for the work environment of African Americans in the laboratory where he worked. (SAF¶144) Cooper also described a policy by which Alan Stark refused to let African Americans in the South Plant laboratory have the opportunity to "act up" in a higher job classification. (SAF¶145) Smith discussed the lack of opportunities for advancement with black coworkers frequently in the context of recognizing complaining about it would be useless. (SAF¶204)

Glenn described his interactions with Stark, Pope and Lynch as different than Stark's interactions with whites; unlike with them, Stark was "authoritative" with Glenn, treating him like he was a child and Pope refusing to say good morning, how are you or how's the family (like he did with others). (SAF¶164) Even after Ealy's promotion, she was not afforded the same respect as white chiefs by management; she would have information relayed to her through others instead of being informed directly. (SAF¶¶157-158; 238-239) Similarly, Hill observed that after she

trained a white employee, she was ignored and not acknowledged. (SAF¶189) Smith also described being excluded from meetings and communications with supervisors. (SAF¶204) Ealy's subordinates were allowed to circumvent Ealy's authority by going directly to Pope or Stark to get overtime when Ealy denied it. (SAF¶157) Ealy heard people snickering and saying she would not be around for long. (*Id*.)

Hill's Supervisor, Mark O'Malley, often refused to talk to Plaintiff and called her a stupid bitch. (SAF¶190) O'Malley admitted not wanting to have dealings with Hill and did not want Hill to be his assistant; from Hill's observations of how O'Malley treated her, his mannerisms and the way he acted with other African Americans, it was clear O'Malley (from Bridgeport) had a problem with Hill being black. (SAF¶190) O'Malley essentially ignored Hill for the seven or eight years he supervised Hill, and when he looked at her he looked as though he "couldn't stand" her. (*Id*.)

After Stark sent Debra Kodzoman to supervise Plaintiff Hill, Kodzman told Plaintiff "I don't know why they can't control you … but I know how to handle you people, and you're going to be working for me." (SAF¶191) Kodzoman tried to monitor and supervise Plaintiff, even though O'Malley was her supervisor. (*Id*.) Defendant also allowed whites performing duties she performed (including Kodzoman) to use City vehicles to travel to disciplinary hearings, while she was required to use her personal vehicle despite making repeated requests. (SAF¶192)

For Ealy, the Jim-Crow culture meant having separate rules where whites could "do whatever it is they want" (like come to work drunk on a regular basis or smoke in City buildings) while African Americans were told what to do and to get back to work, and if African Americans complained (like Ealy did), they were told to "shut up" and "mind your business" (like Ealy was) (SAF¶159)

Laws described the culture as one where it was "understood" overtime and promotions went to white people (which he observed) and that "you had no one to complaint to" and that "you're to be grateful that you're here and that you have a job" (which supervisors and union reps told him) – whites in certain groups were simply privy to certain things African Americans did not get  (SAF¶201)  Stark also told Glenn to be thankful he had a job. (SAF¶225)  When Anderson questioned not being promoted, the union also told him "to be glad [he] had a job."  (SAF¶254)

Because of Hill's role and knowledge, many African Americans shared their stories of discrimination and harassment with her:

```
1    do you remember what complaints they made about
2    harassment that you think caused them to be
3    disciplined?
  4    A.      They said that they were called out of
5    their name.  They were called niggers.  They said
6    that they were denied overtime.  They said that
7    they were denied promotions.  They said that they
8    were given harsher job duties that -- unfavorable
9    job duties.  That's the word I'm looking for.  They
10   were -- they felt that they weren't protected when
11   they were accosted by some white employees.  They
12   felt that when they complained about things that
13   nothing was done and therefore if they did that,
14   that they would be either subjected -- for
15   instance, like their time would be monitored or
16   anything that they did that they could find -- like
17   say something minor like say time or they say you
18   came back three minutes late from lunch or where
19   were you?  They were monitored and they were
20   affected because they complained about their
21   conditions or they complained about a particular
22   employee that was white.
```

(SAF¶195)

Even white employees admitted to Hill how they benefited by Defendant's culture, including overtime and jobs.  (SAF¶189)  Hill described how a white employee on the same level

(Sharon Regula) received favorable treatment, which she acknowledged by telling Hill "too bad you're not one of us" (referring to being white) and pointing to her hand. (SAF¶184)

If Hill had remained employed a few months longer, she would have received a higher pension, but she left "six to nine months early because [s]he couldn't take it;" she "could not stay another day under the circumstances [s]he was working under." (SAF¶189) Glenn retired before he planned to because of "all the hostility" he experienced from Stark and Pope because he was African American. (SAF¶174) Ealy repeatedly requested transfers out of the Sawyer Plant because the harassment she experienced (being lied upon, being questioned about authority by whites) "was constant" and "was just basically always involving race," as others told her. (SAF¶154) Eventually, Ealy resigned (not retired) because of the "stress due to the harassment" she experienced "because [she] was a black woman" and could not operate the same way others had "because of my skin" and the "racial tension." (*Id.*)

As the forgoing establishes, Plaintiffs experienced pervasive harassment based on a culture that affected them daily, in addition to experiencing some conduct which, without more, would be considered severe. Because each Plaintiff's claims rely on a series of pervasive acts and "include at least one act within the time period," the continuing violation theory allows the Plaintiffs to challenge the entirety of the hostile work environment they experienced since 2011. *Abreu,* 2022 U.S. Dist. LEXIS 85501, at *47. Accordingly, each Plaintiff's harassment claims should proceed tot rial.

### F. Plaintiffs' expert evidence supports their hostile work environment claim.

Plaintiffs' expert Charles Gallagher (Professor and former Chair, Department of Sociology and Criminal Justice, La Salle University, Philadelphia) concluded that – from a sociological perspective – Defendant's predominantly white leadership created a hostile work environment for

African Americans.  Specifically, he opined that "[w]hat appears to have happened at DWM was a style of management where racism and use of racial stereotypes was not only permitted but promoted by senior management." (SAF¶272)  As Dr. Gallagher noted:

> For those in management positions who were aware of racist or discriminatory behavior but turned a blind eye there is, as Chatterjee and Toffel put it, "the risk of silence, which may be viewed as a sign of tacit approval" (in Krause and Miller p. 1317, 2020). That appears to have happened here, as figurative and literal messages sent by the Water Department's nearly exclusive White senior management (Murphy, Bresnahan and Stark) were being received by predominantly White middle and lower management (e.g., superintendents, assistant superintendents, chief operating engineers, and foremen) ([Defendant's] Supplemental Response to Interrogatory No. 19) … **In short, senior management's overt acts (racist emails and language, discriminatory behavior) and management who did nothing to stop that and other behavior created a workplace hostile to African-Americans and signaled to White workers there would be few or no consequences for engaging in racist behavior, creating a culture where treating African-Americans like second-class citizens was acceptable.**

(*Id.*, p. 10, emphasis added.)  (*Id.*)

Defendant contends the Court should ignore this conclusion, along with the evidence on which it is based.  It should not.  Consistent with Seventh Circuit authority, a jury could reach the same conclusion Dr. Gallagher reached – that Plaintiffs knew they and other African Americans worked in a hostile work environment:

> the collective evidence is sufficient to infer that all of these co-workers knew that their supervisors were repeatedly using racist language towards many employees to define the working environment for all of them. And, it is also sufficient to infer that these supervisors were using racist language in a pervasive way to establish racial and hierarchical dominance in the workplace.

*Johnson v. Advocate Health & Hospitals Corp.*, 892 F.3d 887, 904 (7th Cir. 2018).

### G. A jury could find Defendant did not take steps to prevent racial harassment.

Defendant's memorandum (at 69-73) highlights its policies, protocols and – quite boldly – its training efforts in claiming (without citation to any legal authority) those facts somehow bar

Plaintiffs' claims. But many of its so-called "facts" are disputed. Moreover, as discussed in detail above in conjunction with *Monell* liability, a jury could find Defendant failed to take adequate steps to prevent racial harassment, and instead condoned it. The parties' disputed evidence must be weighed by a factfinder at trial, as the Seventh Circuit explained in *Johnson*.

There, the Seventh Circuit found the fact that one accused harasser did not attend anti-harassment training and dispute about whether another attended sufficient to warrant reversal of summary judgment because "the question as to whether an employer's response was reasonably likely to end the harassment is fact specific and must be analyzed according to the totality of the circumstances." *Johnson*, 892 F.3d at 908. Here, those circumstances include an environment where virtually *no one* was trained on the City's EEO policy from 2011 to 2017. Given the lack of training, the well-known culture of racial discrimination, and innumerable examples of Plaintiffs' failed attempt to address the harassment and discrimination they experienced, a jury could infer that additional complaints would be futile (or worse, result in retaliation). (SAF¶¶108)

No one was ever disciplined for wide-spread use of racially derogatory comments (until the Inspector General's investigation) because DWM's senior leaders were involved in it. (*Id.*) Indeed, Commissioner Connor's admitted racism was so ingrained in DWM culture, he could not change it during his tenure. Given these facts, a jury could (and arguably must) conclude Defendant's efforts to remedy the hostile work environment were not sufficient to shield it from liability.

**H. Defendant's arguments go to weight or damages, not liability, because whether conduct the harassment they experienced was severe or pervasive is a question for the jury.**

For events it simply cannot ignore, Defendant attempts to minimize the impact or effect on Plaintiffs. But, when there is evidence of racially offensive language by supervisors directed at

Plaintiffs, the Seventh Circuit has explained it is not this Court's role to decide. Rather, "[w]hether harassment was so severe or pervasive as to constitute a hostile work environment is generally a question of fact for the jury." *Johnson*, 892 F.3d at 901 (citing authority from the Seventh, Fourth and Tenth Circuits in reversing entry of summary judgment); *see also Robinson v. Perales*, 894 F.3d 818, 828 (7th Cir. 2018) (also reversing summary judgment and explaining that use of the n-word, combined with subjecting employees to heightened scrutiny, created issues of fact warranting a trial).

Consistent with *Johnson*, a jury should determine whether it was objectively so. The jury's ability to do so is particularly important as our nation grows to better comprehend how past racial inequality persists in present-day injustices. In conclusion, Defendant has not established as a matter of law that any Plaintiff was not forced to work in a racially hostile work environment. Thus, Plaintiffs' hostile work environment claims should proceed to trial.

## V.     Each Plaintiff Can Prevail On Disparate Treatment Claims.

Defendant painstakingly attempts to show no Plaintiff can prevail on any of the discriminatory acts alleged. But in doing so Defendant isolates and compartmentalizes evidence, assuming a jury could not consider the context (described above) as evidence to help it decide whether Plaintiffs would have suffered the adverse actions they allege but for their race.

Worse, in virtually no instance does Defendant offer sworn testimony from *any* decisionmaker explaining Defendant's purportedly legitimate non-discriminatory reason for the actions Plaintiffs challenge. Rather, the City's Rule 56.1 Statement of Facts is riddled with numerous "facts" that rely on the City's "version" of disputed events, too often hinging on inadmissible hearsay (discussed above). As explained below, each Plaintiff offers evidence from which a jury could conclude an adverse action he or she experienced was because of his or her

race.

**A.  Race Discrimination under §§1981 and 1983 can be proven in multiple ways.**

In *Ortiz v. Werner Enters., Inc.*, the Seventh Circuit held that the ultimate issue in an intentional discrimination claim is whether the preponderance of *all of the evidence* (including evidence of context) supports a finding that the adverse employment action in question (failure to promote, assign overtime, subjecting to discipline, etc.) was motivated by the plaintiff's race.  834 F.3d 760, 764 (7th Cir. 2016).  When using the *Ortiz* approach, courts ask only "whether the totality of the evidence shows discrimination, eschewing any framework or formula." *Igasaki v. Ill. Dep't of Prof'l Regulation*, 988 F.3d 948, 958 (7th Cir. 2021); *Sommerfield v. Knasiak*, 967 F.3d 617, 622 (7th Cir. 2020)("Though *Ortiz* arose under [§1981], we clarify that the same standard applies to cases brought under [§1983]"); *Smith v. Bray*, 681 F.3d 888, 899 (7th Cir. 2012) ("In general, the same standards govern intentional discrimination claims under Title VII, §1981 and §1983").

The Seventh Circuit abandoned the concept of "direct" and "indirect" evidence in explaining a plaintiff in a discrimination case need only provide evidence from which a jury could infer race motivated Defendant's adverse action.  *Ortiz*, 834 F.3d at 766.  Even after *Ortiz*, however, the familiar burden-shifting framework created by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed. 2d 668 (1973), remains one of the "means of organizing, presenting, and assessing circumstantial evidence in frequently recurring factual patterns found in discrimination cases."  *David v. Bd. Of Trs. Of Cmty. Coll. Distt. 508*, 856 F.3d 216, 224 (7th Cir. 2017).

Under either method, a jury can rely on a wide variety of circumstantial evidence, including ambiguous oral or written statements, behavior toward or comments directed at other employees in the protected group, evidence (though not only statistical evidence) that similarly situated

employees outside the protected class received systematically better treatment, evidence the employer's stated reason for a decision or difference in treatment is unworthy of belief, evidence that an employer is engaged in a pattern-or-practice of discrimination, and evidence of a culture, work environment, or supervisor that is biased or engages in stereotypes. *See generally Hasan v. Foley & Lardner LLP*, 552 F.3d 520, 527–28 (7th Cir. 2008), *as corrected* (Jan. 21, 2009); *Mattenson v. Baxter Healthcare Corp.*, 438 F.3d 763, 770–771 (7th Cir. 2006); *Paz v. Wauconda Healthcare & Rehab. Ctr., LLC*, 464 F.3d 659, 665–66 (7th Cir. 2006); and *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 737 (7th Cir. 1994).

Likewise, evidence an employer failed to take steps designed to prevent discrimination that most employers take (which the employer promised or was obligated to take) is evidence from which a jury can infer it intended to permit it. *See, e.g., Yatvin v. Madison Metro. Sch. Dist.*, 840 F.2d 412, 416–17 (7th Cir. 1988) (evidence an employer failed to comply with voluntary affirmative action plan, although not a violation, could be evidence of a discrimination); *Mozee v. Jeffboat, Inc.*, 746 F.2d at 374 (whether employer "lived up to its affirmative action obligation … will need to be addressed at a new trial" as part of evidence about racial discrimination in discipline).

Such evidence is circumstantial evidence a jury can rely on either to infer discriminatory intent and, therefore, to reject a proffered legitimate non-discriminatory reason. Thus, as noted in *Ortiz*, discrimination cases are "factually complex and require sifting through ambiguous pieces of evidence." *Ortiz*, 834 F.3d at 765. And, in evaluating the evidence Defendant presents, the Court must view it with the same critical eye a juror might, and resolve all ambiguities in Plaintiffs' favor. And, as the Seventh Circuit has explained:

> A case of discrimination can likewise be made by assembling a number of pieces of evidence none meaningful in itself, consistent with the proposition of statistical

55

theory that a number of observations each of which supports a proposition only weakly can, when taken as a whole, provide strong support if all point in the same direction: "a number of weak proofs can add up to a strong proof." *Mataya v. Kingston*, 371 F.3d 353, 358 (7th Cir. 2004).

*Sylvester v. SOS Children's Vills Illinois, Inc.*, 453 F.3d 900, 903 (7th Cir. 2006). Applying these standards, each Plaintiff has claims that should proceed to trial.

### B. The Court must not consider each Plaintiff's evidence in isolation.

Contrary to the forgoing, Defendant ignores entirely the racist culture in which Plaintiffs worked. But, consistent with *Ortiz* and its progeny, this Court cannot. It must look to the entire body of evidence – including how Defendant treated other African Americans.

The Seventh Circuit has explained that Defendant's treatment of others within the protected class is evidence a jury can rely on in deciding whether Plaintiffs would have suffered adverse actions but for their race. *See Vega v. Chicago Park District*, 954 F.3d 996, 1005 (7th Cir. 2020)(denying post-trial JMOL – "the jury heard testimony that the Park District mistreated other Hispanic employees . . . as we have explained, 'behavior toward or comments directed at other employees in the protected group' is one type of circumstantial evidence that can support and inference of discrimination'"), *citing Hasan v. Foley & Lardner LLP*, 552 F.3d 520, 529 (7th Cir. 2008)("Foley's treatment of other Muslims in the Business Law Department . . . is one type of circumstantial evidence that can support an inference of discrimination").[4] Indeed, by its nature, *Monell* mandates that Plaintiffs present evidence of discrimination others similarly suffered to establish the existence of a widespread custom and practice.

### C. Arguments regarding Defendant's "legitimate" expectations are red herrings.

Plaintiffs have provided substantial evidence Defendant held African Americans to

---

[4] "[I]ncidents directed at others and not the plaintiff . . . do have some relevance in demonstrating the existence of a hostile work environment. . . ." *Yancick v. Hanna Steel Corp.*, 653 F.3d 545 (7th Cir. 2011) (internal citations omitted).

different standards than their white counterparts. Dr. Siskin's conclusions that African Americans were over-charged in the disciplinary process supports that conclusion. But a jury need look no further than the fact Defendant's senior leadership engaged in and allowed others to engage in conduct (*e.g.*, engaging in racially discriminatory behavior, in addition to misuse of Defendant's IT infrastructure) to conclude Defendant was willing to turn a blind eye towards misconduct by Caucasians.

Notwithstanding that evidence, Defendant's memorandum repeatedly contends Plaintiffs' claims must fail under the *McDonnell Douglas* framework because they cannot show they were meeting Defendant's purportedly legitimate expectations. The Court can and should disregard those arguments regardless of the framework used to analyze Plaintiffs' claims. This Circuit has long understood the futility of an element requiring a showing of "satisfactory job performance" in cases like this one. *See Curry v. Menard, Inc.*, 270 F.3d 473, 477–78 (7th Cir. 2001) ("where the issue is whether the plaintiff was singled out for discipline based on a prohibited factor, it makes little sense ... to discuss whether she was meeting her employer's reasonable expectations") (internal quotation omitted); *see also Oest v. Ill. Dep't of Corr.*, 240 F.3d 605, 612 n. 3 (7th Cir. 2001) (explaining that the "legitimate expectations" prong of the prima facie test is not necessary to the analysis, where the people judging the plaintiff's performance were the same people she accused of discriminating against her). Indeed, "[w]hen a black employee produces evidence that he was disciplined more severely than white employees who shared similar shortcomings, the second and fourth elements of the indirect method merge." *Rodgers v. White*, 657 F.3d 511, 517 (7th Cir. 2011) (reversing grant of summary judgment based on evidence others engaged in similar or worse conduct).

### D. Plaintiffs' evidence of patterns of discriminatory treatment bolster their individual claims.

Plaintiffs' anecdotal evidence is not the only circumstantial evidence the Court (or a jury) may consider in inferring Defendant's discriminatory intent. Dr. Siskin's conclusions based on statistical evidence also support those conclusions. For nearly three decades, the Seventh Circuit has held that pattern evidence or statistical evidence is one form of circumstantial evidence a jury can rely upon it to infer discriminatory motive. *See Rudin v. Lincoln Land Community College*, 420 F.3d 712, 721 (7th Cir. 2005) (noting "'evidence, whether or not rigorously statistical, that employees similarly situated to the plaintiff … received systematically better treatment'" as one form of such evidence) (quoting *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994)). That is because for over 50 years, such pattern evidence has a basis for rejecting the purported legitimate non-discriminatory explanations Defendant attempts to proffer (through hearsay records, not testimony). *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 804-05 (1973) (explaining that patterns of treatment of those individuals within the protected class is evidence that can establish pretext).

Thus, Dr. Siskin's conclusions with respect to overtime, disciplinary actions and promotions (like many of Defendant's own expert Dr. White's analyses) show patterns of unfavorable treatment of African Americans. Even if the Court finds them less than "rigorously statistical" a jury could rely on them in concluding Plaintiffs would not have suffered the adverse actions they challenge but for their race. Dr. White's criticisms of Dr. Siskin's conclusions do not entitle Defendant to relief; rather, they only operate to create disputed issues of material fact to be resolved at trial. Thus, even if the Court admits Defendant's evidence of its purported legitimate non-discriminatory reasons – virtually all of which are based on hearsay instead of decisionmaker testimony – the Court can still find those decisions were pretextual given Plaintiffs' statistical

evidence and Plaintiffs' other evidence of widespread racism within DWM.

**E. Discriminatory discipline claims should proceed to trial for Ealy, Cooper, Glenn and Anderson.**

Defendant's memorandum (at 21) concedes that, at least for purposes of Plaintiffs' 1981 claims, they can challenge racially discriminatory adverse actions on or after June 29, 2013. Plaintiffs do not dispute Defendant's contention (at 23) that oral and written reprimands do not constitute adverse actions.[5] That conduct does, however, support Plaintiffs' hostile work environment claims as described above. For example, Cooper described being subjected to unjustified discipline by Pope because he defied stereotypes for African Americans. (SAF¶241)

With respect to timely suspensions, Defendant fails to show it is entitled to judgment as a matter of law, in part because Defendant failed to subject individuals who engaged in more egregious offenses to discipline.

1. A jury could find Ealy's 2018 suspension was discriminatory.

Defendant argues (at pp. 25-27) that a jury could not find Ealy's 2018 5-day suspension was discriminatory, but the facts underlying the incident are disputed. Ealy testified a subordinate employee lied when she claimed Ealy failed to tell her where the nursing room was and where to

---

[5] Plaintiffs concede the following do not constitute adverse actions or cannot proceed or cannot constitute separate claims for trial because they are untimely:

- Edmond's oral reprimand in May 21, 2012 (pp. 23-24);
- Ealy's April 2, 2013 NDPH from Dever for making an employee work 24 hours consecutively (pp. 24-25);
- Ealy's January, 2017 NDPH from Pope for insubordination (pp. 25);
- Cooper's 2011, 2012, 2013, 2014 and 2019 NDPH's for tardiness (p. 27-28);
- Hill's verbal counseling for tardiness (p. 29);
- Laws' 2014 NPDH for tardiness (pp. 29-30);
- Glenn's 2011 verbal counseling, 2012 written reprimand and 2017 NDPH (p. 31);
- Smith's claim for discriminatory discipline (p. 31);
- Anderson's 2008 oral reprimand, 2012 verbal counseling, 2014 NPDH's for absenteeism/tardiness, and 2017 verbal counseling for work performance (p. 32); and
- Henry's claim for discriminatory discipline (pp. 34-35).

get the keys. (SAF¶238)  When asked, Plaintiff Ealy did put together a nursing room and told the employee where it was.  (SAF¶239)  Defendant's own evidence shows that:  (a) Ealy only gave the key to the person at Sawyer who "handle[s] all keys" after making daily efforts to give the employee the key because "every time she saw me coming into the Chlorine building for my morning meeting she would turn away with a nasty look on her face and walk away" (SAF¶239); and (b) after learning that Santiago did not raise concerns with the key – she only instructed  Ealy to make sure "she is informed of the room."  (*Id.*) Contrastingly, Defendant allowed Edwards Salinas (Hispanic) and Joe Lynch (white) to operate the Jardine Plaint without a nursing room for 2 years after the City implemented a requirement to have one and never faced discipline. (SAF¶239)

Defendant also claims Santiago issued the suspension for Ealy's violating the City's "acting up" policy.  Plaintiff Ealy explained she did not want certain employees to receive the opportunity to act up because of conflicts among them and because they did not "exhibit the behavior to be supervisors" but that Pope rejected her justification, notwithstanding his knowledge of performance issues among the custodians.  (RSF¶59)  But Pope's declaration (DX 136) is silent as to these events.  Defendant's failure to have him explain why he rejected Ealy's justification or why he sought disciplinary action for it (or simply not be called at all) is a fact a jury could consider to infer his testimony would have been helpful to Plaintiffs.  *See Miksis v. Howard*, 106 F.3d 754, 763 (7th Cir. 1997) (analyzing and collecting cases in stating "it should be enough that there is evidence that a party would surely have introduced had it been helpful, permitting an inference that the evidence would instead have helped his opponent").

That inference is certainly reasonable given evidence of Pope's discriminatory treatment of Ealy and others (SAF¶¶151, 156, 157, 161, 166, 169), permitting a jury to find the purported

justification for suspension pretextual. That's particularly true here in light of other evidence showing others violated Defendant's "acting up" policies by denying opportunities to Plaintiffs without facing disciplinary action (discussed below).

Given the forgoing, a jury must weigh the evidence regarding Ealy's suspension to determine whether she would have been suspended but-for her race. *See Morris*, 969 F.3d at 763–64 (a biased individual's role initiating the path of formal discipline was sufficient to establish causation for discrimination claim).[6] The same is true with respect to Ealy's allegations her treatment was retaliatory – something made more likely by the fact Pope was named as Defendant in the action earlier in 2018.

### 2. A jury could find Cooper's 2018 29-day suspension was discriminatory.

Defendant claims (at 28-29) that Plaintiff Cooper cannot prove his 29-day suspension in 2018 was discriminatory because he admitted engaging in the misconduct in question (calling Pope a "dumb ass" or "dumb head"). Pope initiated the NDPH resulting in the suspension. (DX65, DWM-Edmond-KLD00006512.) But Defendant does not identify who made the decision to suspend Cooper or why. And none of the hearsay records Defendant offers (DX65) suggest Cooper called anyone a "dumbass," as Defendant contends, raising questions about whether Defendant's supposed justification is pretextual.

Even if the Court accepts Defendant's justification, under *Ortiz*, however, that does not end the inquiry. A jury must ask whether he would have been suspended for 29 days (or at all), given the significant body of evidence Defendant's own leaders referred to individuals using far

---

[6] "[A] 'biased report may remain a causal factor if the independent investigation takes it into account without determining that the adverse action was, *apart from the supervisor's recommendation*, entirely justified.'" *Vega*, 954 F.3d at 1007 (emphasis added) (affirming Title VII verdict and explaining that regardless of who is the final decisionmaker, "the dispositive question is whether the discriminatory animus" of others was a "proximate cause of the termination decision") (quoting *Staub v. Proctor Hosp.*, 562 U.S. 411, 422 (2011)).

more derogatory terms than "dumbass" or "Jackass" – all without any consequences from DWM leadership. (SAF¶¶42-54)  Evidence shows worse behavior in a disciplinary hearing was not punished (*e.g.*, a white woman showing up high on drugs and apologizing for it was allowed to go home without being drug-tested or using drugs at work). (SAF¶¶243)

### 3. A jury could find Glenn's 2017 1-day suspension was discriminatory.

Defendant claims (at 30-31) it is entitled to summary judgment on Glenn's claims that his 2017 1-day suspension was discriminatory and retaliatory, even though Defendant's alleged "facts" regarding the suspension are unsupported by admissible evidence and disputed.  (RSF¶¶66-67).  Even if the Court credits the alleged misconduct by Glenn, a jury could find Defendant only chose to enforce its EEO Policy against Glenn because of his race based on the many examples of Defendant refusing to discipline whites who engaged in as severe or worse conduct. (SAF¶¶23, 26-32, 70, 86-90, 98, 101 125)   That inference is reasonable given that Glenn raised problems he was having with Shorter-Thomas directly with Stark and Stark refused to intervene by transferring the problematic employee, as he had for a white supervisor.  (SAF¶240)  From this evidence, a jury could infer Glenn would not have been discipline but-for his race.

### 4. A jury could find Donald Anderson's 2017 5-day suspension was discriminatory.

Defendant argues (at 33) that Anderson's claim his 2017 5-day suspension was discriminatory does not warrant a trial notwithstanding the fact virtually all of the facts surrounding the altercation between Anderson and Szorc (white) – someone who had previously called Anderson "nigger" in the past (SAF¶¶131-139)  Anderson explained that Szorc started it, and when Anderson tried to push him, Szorc dropped to the floor saying "hit me" and calling Anderson a "nigger;" Anderson also explained that after the incident, Szorc was able to leave work that day without being required to take a drug test like Anderson.  (RSF¶78; SAF¶134)

Defendant offers no evidence about who made the decision to suspend Anderson, much less why. Nor does Defendant explain why Szorc received no discipline, even though Defendant's own records show both men engaged in the dispute (DX84, DWM-Edmond-086094), noting "Mike pushed back and they started to argue". The fact Szorc was not disciplined and that the incident itself was overtly racial is evidence a jury could rely upon to conclude Plaintiff would not have been suspended but for his race.

### F. Discriminatory promotion claims should proceed to trial for Ealy, Cooper, Smith, Anderson and Henry.

Defendant's failure to provide testimony from decisionmakers is most problematic with respect to Plaintiffs' claims they were denied promotions. Instead of evidence, Defendant offers multiple layers of hearsay which this Court need not accept, particularly given Plaintiffs' evidence Defendant manipulated the promotion process to disadvantage African Americans.[7]

1. <u>A jury could find Ealy's 2014, 2015 and 2016 denials of promotion to COE were discriminatory.</u>

Defendant (at 38) asks this Court to rely on hearsay records and inference in granting

---

[7] Plaintiffs concede they cannot assert the following as actionable adverse actions because they would be untimely, because Plaintiff received the position sought, because acceptance of it would not have been a promotion, or because Plaintiff failed to satisfy an objective requirement for the position sought:

➤ Ealy's 2012 application to CEO (p. 38) and 2017 promotion to COE (pp. 39-40);
➤ Cooper's 2011 application to FEII (p. 40) and 2012 application to SEII (p. 41), 2014 application to FEII (p. 42) and 2016 application to FEII (p. 42);
➤ Hill's claim for discriminatory promotion to (p. 43);
➤ Laws' 2018 application for Emergency Crew Dispatcher (p. 44);
➤ Smith's 2012 application to Foreman of Construction Laborers (pp. 44-45), 2012 application to General Foreman of Construction Laborers (p. 45), 2017 application to Laborer Apprentice (p. 45);
➤ Anderson's 2011 application to ADS (p. 46), 2013 application for ADS (p. 46), 2013 application (p. 46), 2018 promotion to ADS (p. 57); and
➤ Henry's 2011 application to ADS (p. 48), 2012 application to Foreman of Pipe Construction (p. 48), 2012 application to ADS (p. 48).

Plaintiffs' concession with respect to objective qualifications is in no way intended to waive their objection to Defendant's attempt to rely on inadmissible evidence or evidence which requires the Court to draw inferences against Plaintiffs to credit.

summary judgment against Ealy relating to her April 2014 promotion to Chief Operating Engineer. But the records Defendant provides for the April 2014 position (DX94) do not include "Candidate Assessment Forms" (which should be completed by all interviewers for all interviewed applicants), nor "Consensus Meeting Notes" (which are required for titles where interviews are conducted). (*Compare* DX94 with DX95 with DX96.). Defendant claims the two most senior candidates Highly Qualified candidates were selected, but fails to explain why Highly Qualified candidate #2 (Joe Lynch) was chosen over Highly Qualified candidate #3 (Vince Nally) when both have identical seniority dates (November 16, 2006). Ealy's observations that seniority was manipulated to advantage whites and how whites preferred their own also casts doubt on that justification. (SAF¶257) The absence of these records and explanations evidence policy deviations and suspicious circumstances that, combined with Plaintiffs' other evidence, allows a jury to reject Defendant's proffered justification.

Despite passing all tests and being rated as "Highly Qualified" in 2014, Defendant contends (at 39) (based on inadmissible evidence) Ealy failed a written test for the same COE position in 2015. (RSF¶95.) In the absence of explanation of differences between the written tests or other circumstances that might explain Ealy's negative performance, a jury could reject that explanation as not being credible. As the Supreme Court explained, "[p]roof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive." *Reeves*, 530 U.S. at 147 (noting "[s]uch an inference is consistent with the general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as affirmative evidence of guilt")(internal quotation omitted). Ealy also testified one candidate who would be promoted was known and discussed in advance. (SAF¶257)

Likewise, given Ealy's 2014 rating, a jury could reject Defendant's claim that Salinas excluded her from the 2016 list of qualified candidates as pretextual. Again, without some explanation of why requirements of the position changed, that explanation is incredulous. Further supporting that conclusion is: (a) Ealy's testimony that Salinas held her to a double-standard and ignored her as her supervisor further (SAF¶158); (b) the fact none of the candidates selected from these three COE requisitions were African American; and (c) the fact Ealy was *again* deemed qualified only months later. (RSF¶¶95-98.) Given these disputed facts and other evidence, Ealy's claims regarding denial of the COE promotions should proceed to trial.

2.   A jury could find Cooper's 2013 and 2019 denials of promotion to Water Chemist III were discriminatory.

Defendant claims (at 41-42) that Cooper cannot show his 2013 or 2019 denials of promotion to Water Chemist III were discriminatory, but does not claim either promotion is time-barred. Rather, Defendant focuses on the fact that – per its hearsay records, at least – black and non-white evaluators recommended or selected black or non-white candidates. But Defendant's "facts" do not describe *why* any of those candidates were rated more highly than Plaintiff. (RSF¶¶104, 107-08.)

Absent that evidence, the Court should decline to draw the inference Plaintiffs did not suffer discrimination based on the fact another African American may have overcome DWM's racist culture. As the Seventh Circuit explained in the context of Title VII, anti-discrimination statutes "would have little force if an employer could defeat a claim of discrimination by treated a single member of the protected class in accordance with the law. ... Discrimination against one Hispanic employee violates the statute, no matter how well another Hispanic employee is treated." *Diaz v. Kraft Foods Global, Inc.*, 653 F.3d 582, 587-88 (7th Cir. 2011); *see also Bostock v. Clayton Cty.*, ___ U.S. ____, 140 S. Ct. 1731, 1741 (2020) ("It's no defense for the employer to note [in a

gender discrimination case] that, … he gives preferential treatment to female employees overall").

It is the jury's province, not the Court's, to decide what – if any – weight to give Defendant's evidence it allowed other African Americans to advance. The scant evidence of favorable treatment Defendant raises – the bulk of which occurred *after* Defendant's admittedly racist leaders were removed – may mean nothing to a jury in light of former Commissioner Connor's testimony about his inability to change the racist culture. (SAF ¶¶13;17;35-41) Certainly it is not sufficient grounds to grant summary judgment in Defendant's favor on Cooper's promotion claims, given he has worked as Water Chemist II since 1996, has demonstrated his expertise within DWM. (SAF¶263) A jury could conclude, as Cooper testified, that Defendant chose two African Americans "to make themselves not look too bad" while still discriminating against the other African Americans, including himself, with greater seniority and experience. (*Id*.)[8]

3. A jury could find Laws' 2018 denial of promotion to Caulker was discriminatory.

Defendant claims (at 42) Laws cannot show he was denied promotion to Caulker in 2018 because of his race based on the fact the position was limited to members of Local 130 (Plumbers). Laws conceded he was rejected from the position, allegedly for that reason, on multiple occasions throughout his career but applied in 2017 again anyway, only to be told the same thing. (SAF¶265) But Laws then saw that White members of his union (not Local 130) received those promotions. (*Id*.) The fact Defendant re-posted the position without the Local 130 membership requirement –

---

[8] Defendant makes these same throughout their brief (*e.g.*, Anderson's application to ADS, at p. 47; Ealy's recommendation of a suspension of Glenn, at p. 31). This is exactly the type of credibility trap referenced in *Hackett* that the Court must avoid. Indeed, in the context of a racial culture like the one that existed at DWM, Defendant's argument only serves to highlight the Catch-22 situation African Americans like Ealy faced. If she and others like her did not enforce Defendant's policies to the letter, they faced potential disciplinary action for failing to do so. Unlike their white counterparts, they could not exercise discretion to enforce rules subjectively (as white managers at DWM did) – as Ealy's disciplinary action for administration of acting-up opportunities evidence.

the one used to disqualify Plaintiff – shows that requirement was not necessary in the first place, raising questions about why it existed in the first place. Given the lack of any evidence of who made the decision to re-post the position without the requirement or why, or what steps were taken to notify employees who were disqualified (like Plaintiffs) after the position had been re-posted, a jury could find for Laws on this claim based on Plaintiffs' other evidence of race discrimination at DWM.

4. <u>A jury could find Smith's 2013 denial of promotion to Pipe Salvage Yard Foreman, promotion to foreman in 2017, and promotion to Foreman of Construction Laborers in 2018 was discriminatory.</u>

A jury could find Smith's denial of promotion in 2013 to Foreman of Pipe/Salvage Yards was racially discriminatory given the suspicious circumstances she described regarding her attempts at promotion. In her 2012 attempt to be promoted to Foreman, after raising concerns about being denied interviews, Plaintiff was invited to interview the day before interviews were to take place via an unsigned, undated letter placed in her home mailbox. (SAF¶260) After interviewing, Defendant's employee Victor Villasenor (Hispanic White), who had been involved in interviewing Plaintiff, told her "it's a shame that you can't give the job to the person who's the most qualified." (*Id.*) Ultimately, Smith was informed she failed that interview process. (*Id.*) Smith was so frustrated with her experience applying for promotions at DWM she applied for positions outside the Department to justify her mental state. (*Id.*)

With respect to the 2013 Pipe Salvage Yard Foreman position, Defendant's records (SAF¶261) show Smith, but did not pass Part III of the screening process – a written test. (*Id.*) But Defendant's record of who was most qualified contains no scores for any steps of the promotion process – just the conclusion of who the three top candidates (none of whom were African American) was "most qualified." (SAF¶261; RSF¶120.) Ultimately, the position went to

a white construction laborer who worked around the corner from Smith whom Bresnahan had described as his "number one guy." (*Id.*) Combined with the lack of scores, Bresnahan's and Villasenor's comments are evidence a jury could rely upon to infer the promotion process was a rouse with a pre-determined outcome to favor Bresnahan's preferred outcome (and exclude African Americans).

Plaintiff Smith also was denied the opportunity to apply for a foreman position in her department in 2017 which was not posted and was filled with a white Hispanic. (SAF¶262) Defendant filled that position with someone from the prior requisition. (*Id.*). Doing so was inconsistent with the City's Hiring Plan.

Defendant claims (at 46) that certain facts are true with respect to Smith's 2018 Foreman of Construction Laborers in 2018, but the "facts" Defendant presents constitute inadmissible hearsay as set forth above. Accordingly, Defendant has not satisfied its burden to show no disputed facts exist for Smith's promotion claims.

5. A jury could find Anderson's 2014, 2017 and 2019 denials of promotion were discriminatory.

Defendant argues (at 47) Anderson cannot prove his denial of promotion to Assistant District Superintendent was discriminatory. Defendant claims (based on hearsay) that Anderson failed the test, without explaining any details or information about it, nor any information about what skills necessary for the position Defendant's test measured. (RSF¶¶128-129.) Contrastingly, Anderson testified his exam results may have been altered and was told he failed an exam because he did it in pencil. (SAF¶254) The fact that inconsistent explanation was provided to Plaintiff is evidence a jury could rely upon to reject Defendant's proffered explanation, particularly given Plaintiffs' other evidence.

Eventually, Anderson was promoted to ADS in 2018, but even then the fact a white person

was hired as ADS without having to be a foreman, and without having to go through the application process because he was returning from leave delayed that promotion and would not have occurred but for his race. (*Id*.)

Defendant argues (at 47-48) Anderson's 2017 application to General Superintendent and Superintendent of Construction Maintenance and his 2019 application for General Superintendent of Water Management cannot be the basis for any claim because those applications were not completed. But Anderson testified that for more than one of the positions, his application was completed. (SAF¶255) Anderson also explained that virtually all of the General Superintendents were white, and the candidate selected for General Superintendent of Water Management was white and had only been with the City for a few years (and was the son of another superintendent). (*Id*.) Given all Plaintiffs' evidence about the myriad ways white candidates received preferential treatment, a jury could reject could find that Anderson would have been promoted to one of the positions but for his race.

6. A jury could find Henry's 2014, 2017 and 2018 denials of promotion were discriminatory.

Defendant claims (at 48-49) that Henry's claims for denial of promotion to District Superintendent of Water Distribution in 2014, to Superintendent of Construction & Maintenance in 2017 and to Assistant District Superintendent all must fail because, with each, DHR determined he did not meet minimum qualifications (including supervisory experience). Notably, however, Defendant fails to cite the the job postings identifying requirements for the position, nor how other candidates fared. (RSF¶¶139-141.)

While perhaps not having formal supervisor experience, Henry did have equivalent experience training others, including individuals who went on to hold the positions he sought (SAF¶264) Ultimately, the absence of that experience was due to Defendant's pattern of

discriminating against African Americans. Prior to applying for these promotions, Henry had became so frustrated about his and another African American plumber's performance on oral interviews and seeing people he knew were less qualified get promoted that he did not apply to many jobs. (*Id.*)

## G. Discriminatory denial of overtime claims should proceed to trial for Hill, Laws, Anderson, Glenn and Henry.

Defendant's arguments regarding Plaintiffs' claims they were denied overtime opportunities grossly mis-applies the parties' statistical analyses and is severely undermined by Defendant's failure to retain records. Here, too, Defendant fails to offer virtually any testimony from decisionmakers involved in assigning overtime (and do not challenge any Plaintiffs' claims on grounds they are untimely). As discussed below, Plaintiffs' testimony about what they observed with respect to overtime, combined with Plaintiffs' statistical analyses and other evidence of racial discrimination, warrants trial on their denial of overtime claims.[9]

### 1. Defendant mischaracterizes output from Dr. Siskin's analyses in asking the Court to draw inferences against Plaintiff.

Defendant repeatedly argues each Plaintiff received more (or at least as much) overtime than Dr. Siskin's statistical model predicted he or she would have received. Defendant compares a Plaintiff's actual overtime to output from Dr. Siskin's statistical modelling (excerpted as part of Dr. White's rebuttal), without acknowledging Dr. Siskin's modelling is based on disputed facts. Dr. White repeatedly claims Dr. Siskin's models are flawed because they do not sufficiently account for variation. (SAF¶213) Thus, before crediting Defendant's purported "facts," a jury

---

[9] Plaintiffs concede Plaintiffs Edmond and Smith cannot pursue claims based on denial of overtime as discrete acts challenged at trial and that Plaintiffs Ealy and Cooper can only pursue claims related to overtime lost in connection with discriminatory denials of opportunities to act up.

must decide whether Dr. Siskin's model is accurate *and*, assuming the jury accepts Dr. Siksin's models, weigh the facts Defendant attempts to highlight against Dr. Siskin's other conclusions (*i.e.*, that Blacks received a statistically significant smaller share of overtime and more lucrative overtime from 2011 onward outside of the Bureau of Water Supply – and that the likelihood of outcomes he observed occurring absent race being a factor was less than 1 in 388 billion). (SAF¶214)

But comparing individual actual overtime to a hypothetical overtime model misuses statistics in a manner even Defendant's own expert concedes is inappropriate. (SAF¶213)

       2.   <u>Defendant's failure to preserve records dooms its motion.</u>

Defendant asks this Court to decide, as a matter of law, that Plaintiffs received their fair share of overtime notwithstanding the fact Defendant failed to provide *any* records showing overtime was equitably assigned for any position for any period of time. Defendant did not because it could not, as its own OIG found when attempting to audit Defendant's overtime practices. (SAF¶216) Defendant's failure to preserve records continued even after Plaintiffs filed this lawsuit alleging inequitable distribution of overtime. Based on Defendant's failure to retain and produce records exclusively within Defendant's control, a jury could draw the inference that such records would not have been helpful to Defendant and – instead – would have corroborated Plaintiffs' allegations overtime was assigned in a racially discriminatory manner. *See Miksis*, 106 F.3d at 763. Notably, too, Defendant's failure to maintain these records violates City policy (*See* DX 44, 2014 Personnel Rules, DWM-Edmond-008075–DWM-Edmond-008076 -- "The Commissioner of Human Resources **shall** establish and maintain a system of personnel records . . . which shall include, but not be limited to the following . . . [a] master employee record . . . employment lists and certifications . . . action reports and records to cover appointments,

promotions, separations and other personnel actions . . . examination records . . . *payroll-related records*).

### 3. Disputed facts regarding Hill's denial of overtime claim warrant a trial.

Defendant argues (at 51) that Hill cannot assert a denial of overtime claim, but ignores Hill's testimony supporting her claim completely. Hill described specific overtime opportunities she was denied (*e.g.*, the HAZMAT program), but also testified she was denied opportunities to work overtime throughout the last five or six years of she retired (on June 30, 2015), while "all of the white employees on [her] floor were given overtime." Hill also testified that, unlike her coworkers, she was not paid overtime when required to work after hours (often 12-16 hour days) to complete her duties. (SAF¶225)

Defendant focuses almost exclusively on an instance where, three years after working overtime, Hill eventually received compensation after pursuing a grievance. (RSF ¶¶ 158-159.) But Defendant ignores the fact Hill had already submitted *the same paperwork* and only received payment money *after* she retired. (*Id.; see also* SAF¶225) Hill's testimony, combined with all the other evidence in the record, shows that a jury could infer this denial was racially discriminatory. The fact that she eventually received the wages does not render her claim moot; it shows Defendant should have paid her in a timely fashion in the first instance and is evidence a jury could rely on to determine Defendant treated her as a second-class citizen of DWM – a claim that entitles her to far more than just lost wages.

### 4. Disputed facts regarding Laws' denial of overtime claim warrant a trial.

Defendant argues (at 51) Laws' claim cannot succeed because he failed to identify a specific *White* employee who received more overtime (because the person he identified as White, according to City records, is Hispanic). But that evidence is not required under *Ortiz* – all that

matters is whether a jury could find Laws would have received more overtime but for his race. The White Hispanic comparator Defendant concedes he identifies(at 51), combined testimony Defendant ignores, suffices. Laws testified he observed that overtime assignments were unfairly distributed by manipulating the overtime distribution list, causing construction labor crews that were mostly White to receive more overtime. (SAF¶218) Laws overheard African Americans asking the White foreman who assigned overtime why they had not been called for an opportunity. (*Id*.) Laws also recounted instances where Whites got more over-time than Blacks and explained it happened so often management had to be aware of the situation. (*Id*.) From this evidence, combined with Plaintiffs' other evidence, a jury could infer Laws would have received additional overtime opportunities but for his race.

     5.   <u>Disputed facts regarding Glenn's denial of overtime claim warrant a trial.</u>

     Defendant argues (at 52) Glenn's claim for denial of overtime fails, but Defendant ignores Glenn's evidence that Stark denied him and other African American station laborers overtime. Prior to Stark's appointment, Glenn and his team received overtime opportunities. (SAF¶224) After Stark's appointment, however, those opportunities largely dried up and when Glenn raised concerns, Stark told Glenn to "be thankful you got a job." (*Id*.) Glenn also described how majority-White construction laborers – and particularly two White construction laborers – were assigned overtime opportunities Defendant (specifically, Alan Stark) could have assigned to station laborers at lower wages, impacting Glenn financially and emotionally. (*Id*.)

     Defendant claims (at 52) the changes were intended to "reduce the amount of time Station Laborers were required to work in the basins." (RSF ¶167.) Glenn explained, however, that Stark told him he would not assign the majority-White construction laborers to work in the basins cleaning them because that would mean Glenn (an African American foreman) would be in charge

of them.  (SAF¶224)  Stark still insisted Glenn's team meet unattainable deadlines, then deny them overtime opportunities necessary to complete the work. (*Id.*)  Based on this and Plaintiffs' other evidence (including evidence regarding Stark engaging in or turning a blind eye towards racially discriminatory behavior), a jury could find Glenn would have received more overtime opportunities but for his race.

6.  Disputed facts regarding Anderson's denial of overtime claim warrant a trial.

Defendant argues (at 53) that Plaintiff Anderson's denial of overtime claim cannot succeed because he has no evidence Andy Anderson assigned overtime to predominantly White crews based on race.  Plaintiff Anderson described how throughout the period from 2011 until approximately 2018, overtime was routinely assigned to an "all-White" crew known as "the downtown crew" that repeatedly and routinely took lucrative overtime.  (SAF¶221)  A jury could infer that the same all-white crew repeatedly and routinely being assigned overtime was inconsistent with Defendant's policy and, therefore, a pretext for race discrimination – even without considering Plaintiff Anderson's testimony about the overt racial harassment (including threats) he experienced which Andy Anderson participated in, but also refused to address, resulting in Anderson filing an EEOC charge.  (SAF¶142)  A jury should hear and weigh that evidence to support Anderson's claims, along with Plaintiffs' other evidence.

7.  Disputed facts regarding Henry's denial of overtime claim warrant a trial.

Defendant argues (at 54) that Plaintiff Henry's claim does not warrant a trial, but only by ignoring evidence about his supervisor Jack Lee's conduct (the same Jack Lee whom Defendant concedes violated its EEO Policy).  Henry testified that when Lee became his superintendent in approximately 2010 or 2011, Lee denied him overtime opportunities until Lee was fired.  (SAF¶233)  Henry could not recall names of individuals who received overtime because, in his

words, the overtime distribution list "was fictional" (he never saw it posted).  (SAF¶223)  But they were all White, because there were no Black plumbers on day shift.  (*Id.*)

Even if the jury ignores other evidence of Lee's racial animus, a jury could infer Lee's denial of overtime to Henry was racially motivated.  Prior to becoming Plaintiff Henry's supervisor, Lee told a coworker that "as soon as John Sanders [Plaintiff's then-supervisor, who was African American] retires, … that nigger David Henry ain't getting shit." (*Id.*)

### H. Discriminatory denial of acting-up opportunities should proceed to trial for Ealy, Cooper, Smith, Hill and Anderson.

Defendant also seeks to dismiss all Plaintiffs' claims regarding opportunities to act up (which Defendant does not contend is not an adverse act because of the economic impact on wages associated with working in a higher position).  But some Plaintiffs' claims regarding acting up should proceed to trial, as well.[10]

Defendant argues (at 55) that its (inadmissible) records show Ealy got *some* opportunities to act-up means that Ealy received all acting up opportunities to which she was entitled.  But, as Defendant notes, Ealy's recollection conflicts with DWM records (RSF ¶¶ 182-183.).  Thus, a jury must decide which is more believable.  Even if the Court credits DWM's records as admissible, it does not prove – as a matter of law – that Ealy received all acting-up opportunities to which she was entitled.  The Court should not draw any inference in Defendant's favor from evidence Stark may have sought to extend the time for her to act-up, particularly given evidence that:  (a) Guzman told Ealy he was forced to be ACOE to keep Ealy from getting the position; and (b) Joyce told Ealy Devers said there was not "going to be another black person sitting in that office" after Wilson.  (SAF¶257)  Accordingly, those claims should proceed to trial.

Cooper's claims regarding the ability to act-up also warrant a trial.  Defendant argues (at

---

[10]  Plaintiffs concede Plaintiffs Edmond, Laws, Glenn, and Henry cannot pursue acting-up claims.

55-56) that its "rule" about acting-up one level precluded him from doing so. Stark's actions with Ealy show Defendant could have sought exceptions on Cooper's behalf – particularly given undisputed evidence he "essentially performed those duties." (RSF ¶185.) Here again, crediting the "rule" as the basis for denying Cooper the opportunity to act-up requires drawing inferences against Plaintiffs. To adopt Defendant's position, the Court must assume, based on the mere existence of the rule, that: (a) the rule was followed in this particular instance; and (b) that the CBA in question did not permit the Water Chemist II to act-up for a Water Chemist IV; and (c) that whomever applied the rule to Cooper's detriment was not using the rule as a pretext for discrimination.

Smith's experience with acting-up shows Defendants bent or changed rules to the disadvantage of African Americans, warranting trial on her claims about that conduct. (RSF ¶¶ 187-188.) When Pat Lannon – a white employee who began working for the City before enactment of the Civil Rights Act of 1964 – finally retired, Defendant changed how acting-up was assigned in the Meter Shop from a seniority-based assignment to a rotating assignment. (RSF ¶¶ 187-188.) The change, which Defendant does not explain, resulted in Smith receiving few opportunities. Considering evidence of the racist culture at DWM, a jury could find this inexplicable deviation from what the City claims was its standard policy was a pretext for discrimination. *Perez v. Thorntons, Inc.*, 731 F.3d 699, 704-05 (7th Cir. 2013) ("A jury might buy [the employer's explanation], but we cannot resolve that issue on summary judgment . . . at the end of the day, both of these infractions involved [violations of policy]").

Defendant challenges Hill's claim regarding acting up (at 57) by claiming that acting up without the pay designation does not describe a denial of the opportunity to act up. But being asked to do a job with higher pay and not being compensated at the higher rate (*i.e.*, the informal

acting up Plaintiff described) is a form of discrimination. *Palmer v. Indiana Univ.*, 31 F.4th 583, 591 (7th Cir. 2022); *Riordan*, 831 F.2d at 698-99 ("an employer cannot avoid [liability] by the simple expedient of loading extra work duties on its [employees] unless it pays them more."). Hill testified that as a staff assistant was asked to perform duties of a project administrator, project coordinator or even commissioner-level work without being paid at the pay rate for those positions. SAF¶269)

Defendant argues (at 57) Anderson did not disclose a claim regarding acting up. But Defendant questioned Anderson at his deposition about his allegation in the Second Amended Complaint regarding acting up, and described how Whites (including Chris Williams' nephew) were treated more favorably. (SAF¶136) Accordingly, his claim regarding acting-up should proceed to trial along with those of Smith, Hill, Cooper and Ealy.

## I. Ealy's shift assignment claim should proceed to trial.

Defendant claims no Plaintiffs' claims regarding discretionary shift assignments can proceed to trial, despite Defendant's failure to retain or produce evidence regarding shift assignments. Defendant's arguments fail with respect to Plaintiff Ealy.[11]

Defendant argues (at 58-59) that Ealy cannot challenge her watch assignment as ACOE, but fails to provide admissible evidence to support its explanation for its conduct. John Pope's declaration – purporting to authenticate two self-serving, after-the-fact explanations for conduct

---

[11] Plaintiffs concede they cannot assert the following as actionable adverse actions because they would be untimely, because Plaintiff never asserted a claim based upon it or because Plaintiffs' requests were granted:

➤ Edmond's request to transfer to JWPP in approximately 2011 (p. 58);
➤ Ealy's 2014 transfer to Training ACOE on Day Crew (p. 59);
➤ Hill's alleged request to transfer to a position in the field (p. 60); and
➤ Anderson's 2009 transfer from South District to Central District (p. 60).

Plaintiffs also concede Plaintiffs Cooper, Hill, Laws, Glenn and Henry cannot pursue claims they were denied shifts or work location transfers as discrete acts they challenge at trial.

Plaintiffs challenge as discriminatory – proves only that Defendant has no contemporaneous documentation of the reasons for its discretionary actions.  (RSF ¶ 196.)  Defendant's records explaining watch assignments were not created until after Plaintiffs raised allegations of discrimination.  DX 139 and 141 have footers suggesting they were prepared in March 2018 – after this lawsuit was filed – for defense of an internal EEO complaint originally filed in 2015 (2015 EEO 037).  (SAF¶270)

Regardless, the facts are disputed.  Defendant claims (at 58) Ealy was "satisfied with Stark's explanation" but without testimony from Ealy.  (RSF ¶ 196).  Stark's failure to explain the basis for his actions – and Defendant's attempt to have Pope do so instead – is evidence a jury could rely on to reject Defendant's purported justification.  Ealy testified she initially asked for a transfer outside the formal transfer request process, which she had seen granted for white male counterparts, and Pope refused and told her to use the formal process.  (SAF¶154)  A jury could find those facts suspicious, and – consistent with its role of evaluating credibility – reject both Pope's explanation, particularly given other evidence (discussed above) both engaged in racially discriminatory behavior they deny in other circumstances.

J.  **Dr. Gallagher's unrebutted conclusions help show Defendant's intent.**

Dr. Gallagher saw an organization where Whites who were over-represented in supervisory and management positions:  (1) engaged in typical expressions of White superiority (*e.g.*, name-calling, stereotyping and/or demeaning language) and (2) treated Blacks as different or "other" (referencing distinctive food, clothing, music, etc. or referring to Blacks as "you people"), noting the combination of these "feelings of superiority and distinctiveness can easily give rise to feelings of aversion and antipathy." (SAF¶273) Dr. Gallagher explained that: (3) "the dominant group [Whites] feels entitled to valued social and economic resources" (here, positions, overtime, not

being subject to capricious discipline) and (4) Whites perceived threats to losing access to those resources. (*Id.*)

Given the presence of those four factors, Dr. Gallagher wrote that "[t]he racist and discriminatory **actions at the DWM is exactly the outcome social sciences would predict would occur in an environment where systemic racism has been normalized**." (*Id.*)  He concluded **"all the ingredients for racist discriminatory behavior by White management and some White workers to take place at DWM were present."** (*Id.*)

Based on the forgoing, the disparate treatment claims addressed above should proceed to trial for each Plaintiff.

## VI. Plaintiffs Can Prevail On Their Illinois Civil Rights Act Claims Challenging Employment Discrimination Under Section 5(a)(1) And Section 5(a)(2).

Plaintiffs allege claims under the Illinois Civil Rights Act for both intentional and unintentional discrimination based on race.  Defendant's memorandum (at 16-20) contends that statute does not apply to employment discrimination claims.  For reasons explained below, the Court should reject Defendant's novel and unsupported contention that the Illinois Civil Rights Act claim does not apply to employment discrimination claims.

Alternatively, for Plaintiffs' intentional discrimination claims, Defendant argues standards for discrimination under Title VII or the Equal Protection Clause claims apply and have not been satisfied.  Plaintiffs agree that the Court should analyze their intentional discrimination claims under the Illinois Civil Rights Act's Section 5(a)(1) using the same legal standards outlined above for their intentional discrimination claims under Section 1981 and 1983.  Plaintiffs contend, however, that trial is warranted on those claims for the reasons set forth above.

Defendants also argue (at 94) that the ICRA incorporates the burdens of proof set forth in Title VII's statutory definition of "disparate impact," notwithstanding the fact those words appear

nowhere in the state statute. Plaintiffs contest the legal standards applicable to Plaintiffs' unintentional discrimination claims. Applying the plain meaning of the words used in the statute, Plaintiffs have created genuine disputes of material fact about whether Defendant used methods or criteria that had the same effect as discrimination. Accordingly, trial is warranted on claims for unintentional discrimination under the Illinois Civil Rights Act (Section 5(a)(2)).

### A. ICRA applies to Plaintiffs' employment discrimination claims.

Plaintiffs' Third Amended Complaint ("TAC") alleges a claim for <u>intentional</u> discrimination (disparate treatment) under ICRA. (ECF# 194). As the parties have also made clear through briefing, Plaintiffs also allege <u>unintentional</u> discrimination in violation of the Illinois Civil Rights Act. (ECF#194, ¶¶238-243). The City's memorandum erroneously argues (at 16-17) that "ICRA does not apply to" employment discrimination claims. That is simply incorrect.

By its plain text, ICRA encompasses both intentional discrimination (*i.e.*, disparate treatment) and unintentional discrimination claims. 740 ILCS 23/5(a)(1) and (2). Section 5(a)(1) expressly prohibits governmental entities like Defendant from "subject[ing] a person to discrimination under any program or activity on the grounds of that person's race, color . . . or gender." Section 5(a)(2) prohibits governmental entities like Defendant from "utilize[ing] criteria or methods of administration that have the effect of subjecting individuals to discrimination . . ." 740 ILCS 23/5.

Applying the plain meaning of the statute, courts in the Northern District of Illinois have held that ICRA does apply to intentional and intentional employment discrimination claims. *See Cary v. Ne. Ill. Reg'l Commuter R.R. Corp.*, 19-CV-3014, 2020 U.S. Dist. LEXIS 49102 (N.D. Ill. Mar. 22, 2020) (Chang, J.) ("by its plain text, [ICRA] encompasses both disparate treatment and disparate impact claims"); *Rao v. Gondi*, 14-CV-66, 2014 U.S. Dist. LEXIS 151105 (N.D. Ill. Oct.

23, 2014) (Kendall, J.) (denying employer's motion to dismiss employment discrimination claim, finding ICRA's plain language "broadly prohibits discrimination on the basis of race, color, national origin, or gender" under both disparate impact and disparate treatment theories of liability); *Nelson v. Pace Suburban Bus*, 17-CV-7697, 2023 U.S. Dist. LEXIS 51443, at *11 (N.D. Ill. Mar. 27, 2023) (Leinenweber, J.) (holding ICRA created new venue in which plaintiff-employees could pursue disparate treatment and disparate impact claims against defendant-employers in state court that had previously been available to them in federal court).

Defendant's memorandum (at 16-19) suggests those cases were wrongly decided and claims the Illinois Civil Rights Act does not apply to any "program or activity" involving employment. In short, Defendant would have the Court *re-write* the Illinois Civil Rights Act like this:

**other than employment**

```
(740 ILCS 23/5)
Sec. 5. Discrimination prohibited.
    (a) No unit of State, county, or local government in
Illinois shall:
        (1) exclude a person from participation in, deny a
    person the benefits of, or subject a person to
    discrimination under any program or activity on the grounds
    of that person's race, color, national origin, or gender; or
        (2) utilize criteria or methods of administration
    that have the effect of subjecting individuals to
    discrimination because of their race, color, national
    origin, or gender.
```

The City would have this Court re-write the statute notwithstanding the Illinois Constitution's Bill of Rights Section 17's (entitled "No Discrimination in Employment And the Sale Or Rental Of Property") express statement that the right to be free from discrimination on the basis of race in employment is "enforceable without action by the General Assembly, but the General Assembly by law may establish reasonable exemptions relating to these rights."

In short, Defendant asks this Court to *infer* a statutory exemption from the absence of language in a law that – by its terms – makes it unlawful for Defendant to "subject a person to

discrimination under *any* program or activity" (emphasis added).

In support of its novel interpretation, Defendant offers no judicial authority adopting it. Rather, Defendant provides a long recitation of what federal rights existed under Title VI of the Civil Rights Act of 1964 when the Illinois Civil Rights Act was passed in 2003. Defendant argues that is relevant based on statements of individual legislators during floor debates. Courts, however, generally discount the value of such statements as the weakest form of legislative history because they represent one legislator's thoughts (not that a committee report or stated policy) *and* were made in the context of legislators trying to convince each other to vote for a bill.

The Court need not follow Defendant down this interpretive garden path. Instead, the Court should interpret the statute based on the plain meaning of the words actually in it. *See Illinois v. CSL Plasma, Inc.*, 635 F. Supp. 3d 645, 650 (N.D. Ill. 2022) (explaining "Courts interpret a statute by first looking to its plain language. [citations omitted] If a statute's plain meaning is unambiguous, the 'inquiry ends there,' *United States v. Melvin,* 948 F.3d 848, 852 (7th Cir. 2020), and the Court enforces 'the plain meaning of the language …' [citation omitted]"); *see also Bostock v. Clayton Cty.*, ___ U.S. ____, 140 S.Ct. 1713, 1737 (2020) ("When the express terms of a statute give us one answer and extratextual considerations suggest another, it's no contest. Only the written word is the law, and all persons are entitled to its benefit"). Illinois courts interpreting their own statutes apply the same principles. *See Hobby Lobby Stores, Inc. v. Sommerville*, 2021 IL App (2d) 190362, ¶ 20, (explaining "[t]he best indicator of the legislature's intent is the plain language of the statute" and that "[w]hen the statute's language is clear, it will be given effect without resort to other aids of statutory construction" (quotation omitted)).

Here, none of the words in the Illinois Civil Rights Act are ambiguous, particularly those in Section 5(a)(1). "Activity" has a plain meaning – it is a thing one does, or behavior or actions

of a particular kind. Employment, including setting the terms and conditions thereof, discipline, promotion, and assignment of overtime, are all activities. Discrimination is equally unambiguous. *See Bostock,* __ U.S. ___, 140 S.Ct. at 1740 (meaning of "discrimination" did not change from 1964 to 2020). It unquestionably includes creating a hostile work environment. Thus, employment discrimination of the type Plaintiffs allege is barred by Section 5(a)(1) of the Illinois Civil Rights Act by the statute's plain meaning.

To the extent the Court finds any ambiguity, the Court should interpret the statute broadly, consistent with the Illinois Constitution Bill of Rights expressing the state's policy against employment discrimination. Either way, Defendant's novel interpretation should be rejected.

### B. Plaintiffs ICRA claims for intentional discrimination should proceed to trial.

As Defendant suggests (at 20), Plaintiffs' intentional discrimination claims under the Illinois Civil Rights Act are subject to the same standards as Plaintiffs' other intentional discrimination claims. The only difference is that Plaintiffs need not establish *Monell* liability. Liability is direct based on the statute. Thus, even if the Court finds Plaintiffs cannot satisfy *Monell*, it should permit Plaintiffs' intentional discrimination claims for disparate treatment and harassment (discussed in Sections III-V above) to proceed to trial under the Illinois Civil Rights Act. Under the federal discrimination standards Defendant contends should apply, Plaintiffs have demonstrated disputed material facts warranting trial on those intentional discrimination claims under the federal standards for disparate treatment and harassment.

### C. Plaintiffs' unintentional discrimination claims also should proceed to trial.

1. The Illinois Civil Rights Act's plain language prohibits unintentional discrimination without incorporating Title VII's burdens of proof.

Plaintiffs also assert claims for unintentional discrimination under Section 5(a)(2) of the Illinois Civil Rights Act, which Defendant refers to as "disparate impact" claims. In seeking

dismissal of these claims, Defendant asks this Court to ignore the statute's plain meaning in a different way. Defendant asks the Court write more – and substantially different – words into the state statute to establish Plaintiffs' burden of proof.

Specifically, based on the weak legislative history referenced above, Defendant claims (at 94) the Illinois Civil Rights Act "must be applied consistent [sic] federal disparate impact law." Defendant claims (at 95) Plaintiffs cannot meet that standard for employment discrimination because they "have not identified a particularly employment practice" much less one that "created an alleged disparate impact." Defendant relies on the burdens of proof established by amendments to Title VII. *See* 42 U.S.C. § 2000e-2(k)(1) (defining burdens of proof for Title VII disparate impact claims).

However, none of the requirements Defendant asks this Court to borrow from Title VII and add to the Illinois Civil Rights Act appear in the state law. To find those requirements exist, the Court must again ignore the plain meaning of the words the legislature chose and add words (indeed, a whole sub-section) that the Illinois legislature could have chosen to enact but did not.

Unlike Title VII, Section 5(a)(2)'s plain language focuses on outcomes for individuals (plural), not any one particular individual. *See* 42 U.S.C. § 2000e-2(k)(1)(A)(i) (identifying what "a complaining party" must demonstrate). Additionally, Section 5(a)(2)'s plain language prohibits use of "criteria" (plural) *or* "methods [plural] of administration" that have the effect of discrimination, not just a singular, isolated practice like Title VII. *Id.* (requiring plaintiff to show defendant "uses *a particular* employment practice that causes a disparate impact" and noting employer defenses") (emphasis added). Further, unlike Title VII, nothing in Section 5(a)(2) suggests Plaintiffs are required to isolate an "employment practice" that causes the discriminatory effect. *Id.* The Illinois statute's prohibition is on the use of "methods criteria or methods of

administration."

In short, the Illinois Civil Rights Act does not contain the words "particular employment practice" or "disparate impact" upon which Defendants rely so heavily in arguing for dismissal. That is true even though the amendments to Title VII describing the burden of proof in disparate impact cases was enacted long before the Illinois Civil Rights Act of 2003.

If the Illinois legislature intended to limit the Illinois Civil Rights Act to federal disparate impact law in place at that time, it presumably would have used those words – or at least some reference to a claim based on "disparate impact" – somewhere in the statute. *See People v. Johnson*, 2019 IL 123318, ¶ 42, 160 N.E.3d 31 ("When the legislature acts to pass a statute, such as the retail theft statute, it is presumed to act with full knowledge of all existing and prior statutory and case law."). The fact it chose different words with plain meaning (not technical terms like "disparate impact") suggest the legislature intended to adopt a different standard, notwithstanding a few legislators' comments.

Plaintiffs recognize that here, they are asking the Court to interpret the Illinois Civil Rights Act in a novel way. They acknowledge (as the Court did in denying class certification, ECF#266, p.15) that other decisions have interpreted the Illinois Civil Rights Act as not creating any new rights, and only permitting parties to pursue federal claims in state courts. But that interpretation renders entire portions of the Illinois Civil Rights Act superfluous. If that was the Illinois legislature's intent, it did not need to specify that an aggrieved party could pursue claims for violations of Section 5(a) *in federal court* or that such claims would act as a *supplemental claims* to the existing federal causes of action:

```
        (b) Any party aggrieved by conduct that violates subsection
(a) may bring a civil lawsuit, in a federal district court or
State circuit court, against the offending unit of government.
Any State claim brought in federal district court shall be a
supplemental claim to a federal claim. This lawsuit must be
brought not later than 2 years after the violation of subsection
(a). If the court finds that a violation of paragraph (1) or (2)
of subsection (a) has occurred, the court may award to the
plaintiff actual damages. The court, as it deems appropriate,
may grant as relief any permanent or preliminary negative or
mandatory injunction, temporary restraining order, or other
order.
```

Those words in the statute – and particularly the words "supplemental claim to a federal claim" – only have meaning if the Court interprets Section 5(a)(2)'s language using its plain meaning, *i.e.,* as a broad prohibition against governmental entities using methods of administration that have the effect of discrimination (Section 5(a)(2)).

Courts concluding the act merely created a new venue *in state court* for conduct already made illegal under federal law ignored the statute's plain, unambiguous language. They chose to rely on the same weak form of legislative history Defendant offers, contrary to the Supreme Court's guidance in *Bostock* and principles Illinois courts would use in interpreting their own statute. *See Hobby Lobby Stores, Inc.*, 2021 IL App (2d) at ¶ 20 (explaining "'[o]ne of the fundamental principles of statutory construction is to view all provisions of an enactment as a whole,' and thus 'words and phrases must be interpreted in light of other relevant provisions of the statute'") (quoting *J.S.A. v. MH*, 224 Ill. 2d 182, 197, 863 N.E.2d 236, 309 Ill. Dec. 6 (2007)).

Consistent with *Bostock* and Illinois authority, this Court should reject prior courts' interpretations given the statute's plain meaning. The Court should find the Illinois Civil Rights Act permits Plaintiffs to prevail by showing Defendant utilized "criteria *or* methods of administration" that had the effect of subjecting individuals to discrimination based on race. 740 ILCS 23/5(a)(2); *Bostock*, ___ U.S. ___, 140 S.Ct. at 1740.

2. <u>Plaintiffs' evidence proves Defendant used criteria or methods of administration that had the effect of discriminating against African Americans</u>.

Consistent with what is required under the plain meaning of the state statute, Plaintiffs' expert, Dr. Siskin, demonstrated that the with respect to overtime, discipline and promotion Defendant utilized criteria or methods of administration that had the effect of discrimination on the basis of race.  (SAF¶¶206-217)  Plaintiffs' evidence reveals outcomes that have the same effect as discrimination (*i.e.*, statistically significant disparities), as well as the methods of administration that created those effects (*i.e.*, permitting a racist culture and hostile work environment to infect discretion exercised in employment decisions). (SAF¶¶15-47; 62-78)  Under the plain language of Section 5(a)(2), Plaintiffs can prevail if that evidence is credited (as the Court must at this stage). Defendant's authority applying Title VII's "disparate impact" burdens of proof to Plaintiffs' Illinois Civil Rights Act claims is entirely inapplicable given the statute's plain meaning. Accordingly, Plaintiffs' claims for unintentional discrimination under Section 5(a)(2) should proceed to trial with their claims under Section 5(a)(1).

**CONCLUSION**

For the reasons above, Plaintiffs request the Court deny Defendant's Motion for Summary

Judgment and that a trial be convened in this matter on June 3, 2024 pursuant to the Court's order

dated July 24, 2023. (Dkt. 277)

                                        Respectfully submitted for Plaintiffs


                                        By: /s/ *Devlin Joseph Schoop*
                                        One of Plaintiffs' Attorneys

Victor P. Henderson
Christopher W. Carmichael
Devlin Joseph Schoop
HENDERSON PARKS, LLC
140 S. Dearborn St., Suite 1020
Chicago, Illinois 60603
Tel: (312) 262-2900
vphenderson@henderson-parks.com
ccarmichael@henderson-parks.com
dschoop@henderson-parks.com

J. Bryan Wood
THE WOOD LAW OFFICE, LLC
303 W. Madison St, Ste. 2650
Chicago, Illinois 60606
Tel: (312) 554-8600
bryan@jbryanwoodlaw.com

Charles R. Watkins
GUIN, STOKES & EVANS, LLC
805 Lake Street, #226
Oak Park, IL 60301
Tel: (312) 878-8391
cwatkins@gseattorneys.com

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on December 1, 2023, a copy of the foregoing PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT was filed with the Clerk of the United States District Court for the Northern District of Illinois using the CM/ECF system, which also electronically serves a copy upon all attorneys of record in this matter.

By: <u>*/s/ Devlin Joseph Schoop*</u>