**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **DERRICK EDMOND, KATHERINE EALY, EDDIE COOPER, JR., VICKI HILL, ROBERT T. LAWS, JR., ANTON GLENN, VERONICA SMITH, DONALD ANDERSON, and DAVID HENRY,** | ) ) ) ) ) ) | |
| **Plaintiffs,** | ) ) | |
| **vs.** | ) ) | **Case No. 17 C 4858** |
| **THE CITY OF CHICAGO,** | ) ) | |
| **Defendant.** | ) ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

MATTHEW F. KENNELLY, District Judge:

The plaintiffs in this case are current and former employees at the City of Chicago's Department of Water Management (DWM). They sued the City of Chicago and multiple individual defendants on behalf of a putative class for violations of 42 U.S.C. §§ 1981 and 1983 and the Illinois Civil Rights Act of 2003 (ICRA). The plaintiffs' claims include allegations under *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978), that the City's policies or customs caused violations of the plaintiffs' constitutional rights.

On November 15, 2018, Judge Joan Gottschall, to whom the case was then assigned, granted the defendants' motion to dismiss in part. *See Edmond v. City of Chicago*, No. 17 C 4858, 2018 WL 5994929 (N.D. Ill. Nov. 15, 2018). Following Judge's Gottschall's order, the plaintiffs voluntarily dismissed their claims against the individual

defendants and moved to certify various classes under Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3). On June 6, 2023, this Court denied the plaintiffs' motion for class certification. *See Edmond v. City of Chicago*, No. 17 C 4858, 2023 WL 3847098, at *1 (N.D. Ill. June 6, 2023) (Kennelly, J.).

The remaining claims are as follows. Count 1 of the plaintiffs' third amended complaint is alleged as a "hostile work environment" claim under section 1983, asserting violations of the Constitution's Equal Protection and Due Process Clauses. Count 2 asserts a claim on the same theory, but under section 1981 "via" section 1983. Count 3 asserts a discrimination claim under the Fourteenth Amendment and section 1983, and Count 4 asserts the same allegations as a claim under section 1981 via section 1983.

## Background

Plaintiffs Derrick Edmond, Katherine Ealy, Vicki Hill, Robert T. Laws, Jr., Eddie Cooper, Jr., Anton Glenn, David Henry, Veronica Smith, and Donald Anderson filed the present lawsuit alleging that they were subject to racial discrimination and a hostile work environment during their tenure as DWM employees. All nine plaintiffs are African American. The following facts are undisputed unless otherwise noted.[1]

---

[1] Both parties allege that certain facts they present should be deemed admitted due to the other party's failure to comply with Local Rule 56.1. Pls.' Resp. to Def.'s Mot. for Summ. J. at 7-14; Def.'s Reply at 4 n.3. But "the decision whether to apply the rule strictly or to overlook any transgression is one left to the district court's discretion." *Higbee v. Sentry Ins. Co.*, No. 97 C 1349, 2003 WL 22220161, at *3 (N.D. Ill. Sept. 24, 2003) (Kennelly, J.) (quoting *Little v. Cox's Supermarkets*, 71 F.3d 637, 641 (7th Cir. 1995)). The Court opts not to penalize either party for noncompliance with Local Rule 56.1.

**A.     The Department of Water Management[2]**

DWM is tasked with the production and delivery of drinking water to the Chicago area as well as the delivery of sewage and storm water to the Metropolitan Reclamation District.  The DWM employs approximately 2,000 people across five bureaus: the Bureau of Administrative Support (BAS), the Bureau of Meter Services (BMS), the Bureau of Operations and Distribution (BOD), the Bureau of Engineering Services (BES), and the Bureau of Water Supply (BWS).  DWM operates two water treatment plants: the Jardine water purification plant (JWPP) and the Sawyer water purification plant (SWPP).

DWM is headed by a Commissioner.  The First Deputy Commissioner reports to the Commissioner.  Two managing deputies report to the First Deputy Commissioner. A deputy commissioner oversees each bureau and reports to the managing deputies. Tom Powers served as the DWM commissioner, and Barrett Murphy served as the First Deputy Commissioner from 2011 to 2016.  In 2016, Murphy was appointed Commissioner and served in that role until his resignation in 2017.  William Bresnahan served as one of the Managing Deputy Commissioners from 2011 until his resignation in 2017.  During the time period relevant to this suit, Julie Hernandez-Tomlin served as the other Managing Deputy Commissioner, Alan Stark served as a deputy commissioner of BWS, and Dwayne Hightower served as a deputy commissioner of BOD.  Powers, Murphy, Bresnahan and Stark are white.  Hightower is African American.

---

[2] In 2002, three City of Chicago departments merged to create the new Department of Water Management.  For clarity's sake, this Court refers to the pre-2002 iterations of the Department of Water Management as DWM.

### 1. Personnel policies and practices

As a department of the City of Chicago, DWM is subject to the City's personnel rules and hiring plan. The City's hiring plan addresses employment actions including hiring, transfers, and "acting up," a process by which an employee temporarily works in a higher-graded position. Def.'s L.R. 56.1 Stmt. ¶ 84. The City's personnel rules "prohibit discrimination on the basis of race, color, sex, and other protected classifications." *Id.* ¶ 85. The City's Department of Human Resources (DHR) includes an Employment Services Division that oversees the City's hiring processes and monitors compliance with the City's hiring plan.

Applicants apply to DWM positions through Taleo, the City's online job application system. The City asserts that hiring involves a multi-step process. During the first two steps, called "screening and scoring," DHR removes unqualified applicants from the candidate pool. Applicants who pass the "scoring" step reach the "referral" step. Depending on the position, the referral step can include interviews, tests, or a lottery. Interviewers provide one of three ratings for all candidates: "recommended, recommended with some reservations, or do not recommend." *Id.* ¶ 88. Candidates with "recommended" ratings are considered "prequalified" for the position. For bid positions, prequalified candidates are ranked based on seniority; for non-bid positions, the interviewers exercise their discretion to selected which candidates to offer the position.

DWM employees are represented by several labor unions and are organized into collective bargaining units. Each union has a collective bargaining agreement that governs discipline, overtime, and promotion procedures for its members. For DWM

employees, the disciplinary process begins with a notice of pre-disciplinary hearing (NPDH).  An employee who swipes into work late three times within one month receives an NPDH.  NPDHs for issues other than tardiness are issued at a supervisor's discretion.  The City contends that an NPDH "is not a 'formal accusation' or actual discipline"; it characterizes NPDHs as "a notice that a supervisor believed an employee committed an infraction and that a pre-disciplinary hearing . . . will be scheduled to discuss the issue."  Def.'s L.R. 56.1 Stmt. ¶ 48.  The plaintiffs dispute this description and contend that an NPDH constitutes a formal accusation of wrongdoing.  Pls.' Resp. to Def.'s L.R. 56.1 Stmt. ¶ 48.  Following a disciplinary hearing, an employee may receive no discipline, a non-disciplinary action such as a warning, or a disciplinary action.  An employee who receives a disciplinary action may appeal the decision.

At DWM, overtime pay, shift assignments and acting up opportunities are assigned based on a variety of factors.  According to the City, "[d]istribution of overtime is highly situation-specific and is carried out by individual supervisors based on employees' job titles, seniority, locations, the applicable CBAs, and differences in the circumstances requiring overtime."  Def.'s Mot. for Summ. J. at 49.  An employee may challenge an allegedly improper overtime denial through the union grievance process.  Shift assignments are regulated by collective bargaining agreements and are generally based on seniority.  As for acting up, DWM prepares a list of employees eligible for acting up opportunities and submits the list to DHR on an annual basis.  Employees are generally selected to act up based on seniority.  The plaintiffs dispute that the City followed its stated policies in assigning overtime, shift assignment, and acting up opportunities.

## 2.    Anti-discrimination policies

The City's DHR includes an Equal Employment Opportunity (EEO) Division.  The EEO division is tasked with enforcing the City's EEO policy, which prohibits discrimination on the basis of race.  Each City employee is required to sign a form acknowledging receipt of a copy of the City's EEO policy.  Each City department is required to appoint an EEO liaison, who is responsible for reporting discriminatory conduct and referring discrimination complaints to the EEO division.  During the relevant period, Maureen Egan served as DWM's EEO liaison.

EEO complaints may be submitted through a referral by the EEO liaison, department personnel, the City's Office of Inspector General (OIG), or the mayor's office.  An employee may also submit a complaint directly, by phone, or by e-mail.  The EEO investigation protocols provide that after a complaint is filed, an investigator will review the allegations and determine how to proceed with the investigation.  An EEO investigation may involve interviewing witnesses and requesting relevant documentary evidence, such as photographs and surveillance footage.  Once the investigation is complete, OIG prepares a summary report that describes its findings and recommendations.  The EEO office reviews the report and then sends it to the head of the relevant department.

In 2014, a DHR deputy commissioner sent an e-mail to multiple department EEO liaisons, including Egan, noting the importance of EEO training for supervisors and suggesting that liaisons communicate this to department leadership.  Pls.' L.R. 56.1 Stmt. ¶ 119.  Egan forwarded this e-mail to Powers, Murphy and Hernandez-Tomlin and added a message stating that "[t]here does not seem to be much of a plan in place for

6

cycling every supervisor through this training." *Id.* ¶ 120. In 2017, DWM implemented a mandatory annual EEO DHR-led training for all employees.

### 3. OIG investigation

Sometime before 2017, OIG initiated an investigation into allegations of discrimination at DWM. During the investigation, the OIG discovered e-mails containing racially offensive language and photos that had been shared among DWM employees. Multiple members of DWM's leadership team, including Murphy, Bresnahan, and Hansen, authored or were copied on several of the e-mails. In particular, Hansen authored a large share of the e-mails. Murphy testified during his deposition in this case that it was the "general custom" within DWM to allow Hansen to share these racially offensive messages without consequence. Pls.' L.R. 56.1 Stmt. ¶¶ 22-23.

OIG filed a report based on its investigation on July 15, 2017. The report revealed that OIG had "found egregious, offensive racist and sexist e-mails distributed by and among employees of the Department of Water Management." *Id.* ¶ 42. The OIG report noted that the e-mails "extended to senior levels of department management" and "suggested the existence of an unrestricted culture of overtly racist and sexist behavior and attitudes within the department." *Id.* Following the OIG investigation, nearly a dozen DWM employees were fired or forced to resign, including Hansen, Powers and Murphy. Mayor Rahm Emanuel promised to "reset" the culture at DWM, and the City hired a new DWM Commissioner, Randy Conner. Pls.' L.R. 56.1 Stmt. ¶ 33.

**B.      The plaintiffs**

**1.      Edmond**

Edmond's employment with DWM began in 1991.  As of the time of his retirement in 2017, he was working as an Operating Engineer-Group A (OE-A).  Edmond testified that during his tenure at DWM, deputy commissioner Joseph Lynch routinely referred to African American employees as "you people."  Pls.' L.R. 56.1 Stmt. ¶ 159.

**2.      Ealy**

DWM hired Ealy in July 1999.  She worked as an OE-A from 2002 to 2011, a Training Assistant Chief Engineer (ACOE) from 2011 to 2017 and a Chief Operating Engineer (COE) from 2017 until her resignation in 2019.  Ealy received a five-day suspension on November 28, 2018.  Managing deputy commissioner Marisol Santiago issued this suspension to Ealy after a nursing subordinate employee claimed that Ealy had failed to provide a key to a lactation room.  The suspension allegedly was also due to Ealy's claimed failure to comply with the City's acting up policy.  Ealy testified during her deposition that the subordinate employee lied when she claimed Ealy failed to provide a key to the lactation room.  Ealy does not dispute that she violated the City's acting up policy, but she testified that she denied acting up opportunities to certain employees due to their work performance issues.

Ealy applied for promotion to a COE position in April 2014, 2015, and 2016. After her 2014 application, Ealy was rated "highly qualified" along with five other candidates.  The six highly qualified candidates were ranked by seniority; Ealy was ranked fifth.  The City contends that the position was awarded to the two most senior applicants.  In 2015, Ealy passed the first step of the promotion process along with

about twenty other applicants.  The City contends that Ealy did not reach the interview stage because she failed a written test administered on September 22, 2015.  Andre Holland, an African American man, received the promotion.

In 2016, Ealy was one of nineteen applicants to reach the second stage of the COE hiring process.  She passed the written test along with eight other applicants.  The interviews for the position were conducted by Lynch, a white man, Daryl Materre, an African American man, and Eduardo Salinas, a Hispanic man.  Salinas also served as the hiring manager for this position.  After the interviews, Ealy received "recommend" ratings from Lynch and Materre and a "do not recommend" rating from Salinas. Thomas Barrett, a white male applicant who ultimately received the position, received a "recommend" rating from Materre and "recommend with some reservations" ratings from Lynch and Salinas.  The City contends that Barrett received the promotion because he had the highest seniority of the prequalified applicants.

Ealy testified that she left DWM due to the "harassment" and "racial discrimination" she was subject to as an employee, as well as DWM leadership's failure to "erase the racial tension" or address the "culture" at DWM.  Pls.' L.R. 56.1 Stmt., Ex. 6 at 18:4-19:5.  Ealy testified that while she worked at DWM, white co-workers called her "Black bitch" rather than her name.  *Id*. at 279:13-24.  She also testified that she heard multiple DWM employees use language that she considered racially derogatory when referring to African Americans.  Ealy testified that she heard John Pope, a deputy commissioner, Stark, and Lynch use the phrase "you people" to refer to African American employees, *id.* at 265:11-16, and that multiple white ACOEs called male

African American employees "boys." *Id.* at 279:5-24.[3] Ealy also testified that

employees saw nooses in the filter building "[a] couple of times." *Id.* at 251:17-24.

### 3. Cooper

Cooper has worked as a water chemist for DWM since 1994. He was appointed

as a water chemist II in January 1996. Cooper is a member of the American Federation

of State County and Municipal Employees (AFSCME) bargaining unit. He applied for

promotions to a water chemist III position in 2013 and 2019. In 2013, Cooper was

interviewed for the position, along with ten other candidates, by Jimmie Julion, an

African American DWM employee and Mohammed Alam, an Asian DWM employee.

Julion and Alam both gave Cooper a "recommended with reservations" rating. Joseph

Washington and Lovely Jacob, who identify as African American and Asian,

respectively, ultimately received recommendations for the promotion. All three

interviewers for the 2019 water chemist III position were African American. Cooper was

not among the four applicants who were rated prequalified for selection. Two African

American employees, one Hispanic employee, and one Asian employee were selected

for the position.

In September 2018, Pope issued Cooper an NPDH for tardiness. At a pre-

disciplinary hearing for his tardiness issues, Cooper called Pope a "dumb ass" and a

---

[3] In the plaintiffs' statement of additional facts Ealy claims that she also heard
Bresnahan use the phrase "you people." Pls.' L.R. 56.1 Stmt. ¶ 154. But Bresnahan is
not mentioned in the cited portion of Ealy's deposition testimony. *See id.*, Ex. 6 at
265:6-265:16. "A court should not be expected to review a lengthy record for facts that
a party could have easily identified with greater particularity." *Ammons v. Aramark Unif.
Servs., Inc.*, 368 F.3d 809, 817–18 (7th Cir. 2004). This Court will consider the contents
of the plaintiffs' Local Rule 56.1 Statement only to the extent that they are supported by
accurate citations to admissible evidence.

"dummkopf," a German word that translates to "dumb head." Def.'s L.R. 56.1 Stmt., Ex. 13 at 92:21-93:7. Cooper received a 29-day suspension for his conduct at the pre-disciplinary hearing.

Cooper testified that he believed certain DWM employees held "racist attitudes." Pls.' L.R. 56.1 Stmt., Ex. 4 at 136:13-137:10, 147:1-12. Cooper also testified that a co-worker, Joe Jones, said he was called an "effing n----- " by multiple DWM employees. *Id.* at 270:22-272:22. Cooper further testified that he saw KKK and swastika symbols in various areas at JWPP. *Id.* at 213:12-21. Cooper also stated that filtration engineer V Frank Skiadopoulos consistently used the term "boy" and "you people" to refer to African American employees, and testified he was told on multiple occasions that Skiadopoulos used the n-word in conversation with other employees. *Id.* at 197:15-19, 200:1-11. Cooper testified that African American DWM employees heard the n-word and other racist language "every day for a long time." *Id.* at 268:1-6.

### 4. Hill

DWM hired Hill as a clerk in 1984. On January 1, 1999, Hill transferred to a staff assistant position. She worked as the staff assistant for engineer Mark O'Malley at JWPP from approximately 2005 until her retirement on June 30, 2015.

Hill contends that while at DWM she witnessed multiple instances of racist conduct involving Murphy and Bresnahan. She testified that on one occasion she overheard the n-word being used during a conversation between Murphy, Bresnahan and an unidentified individual in Murphy's office.[4] Pls.' L.R. 56.1 Stmt., Ex. 11 at

---

[4] Hill contends in the plaintiffs' response brief that this individual referred to African American DWM employees as the "n-----s in the South district," but the cited portion of

174:16-24; *id.* at 177:3-24. She further testified that she overheard Bresnahan tell other employees stories about how he would "beat or harass" African American men while serving on the Chicago police force. *Id.* at 181:14-182:18. Hill described the stories as "very disturbing." *Id.*

Hill testified that she heard Stark use the n-word during a telephone conversation in his office. Pls.' L.R. 56.1 Stmt., Ex. 11 at 38:4-39:21. The parties dispute whether Hill's deposition testimony indicates that she heard Stark use the n-word once or multiple times. During her deposition, the questioning attorney asked Hill "[w]hat was the second time you heard [Stark] say the n-word?" *Id.* at 38:18-20. Hill responded "[t]hat was the third time I heard him." *Id.* But then, when asked if she heard Stark say the n-word "one time," Hill responded "[t]hat's correct." *Id.* at 38:21-23. Hill said that over the course of her employment "several" employees informed her that they had heard Stark use racially offensive language. *Id.* at 203:18-204:2. Hill also testified that she believed Stark held racial animus due to the "nasty tone" in which he spoke to her. *Id.* at 37:19-24.

Hill also stated that she observed the exchange of racist e-mails among DWM leadership. She testified that Bresnahan once forwarded an e-mail from an African American woman to other employees and that she then heard Bresnahan mocking the woman's "very ethnic name." *Id.* at 179:12-180:7. Hill also testified that deputy commissioner Luci Pope-Anderson showed her an e-mail that contained a racially derogatory comment about Hightower. *Id.* at 185:10-187:16. Hill noted during her

---

her testimony does not contain this language. *See* Pls.' Resp. to Def.'s Mot. for Summ. J. at 38; Pls.' L.R. 56.1 Stmt., Ex. 11 at 177:13-179:11.

deposition that although she could have stayed in her position longer in order to receive a higher pension, she choose to retire because she "could not stay another day under the circumstances" of the DWM working environment. *Id.* at 129:11-23.

**5. Laws**

Laws began working for DWM in August 1988. Since 2006, he has worked for DWM as a construction laborer. Laws is a member as of the Laborer's Local 1092 bargaining unit. In 2018, Laws applied for a caulker position. The City contends that the position was limited to members of Local 130, a plumbers union, of which Laws was not a member. Laws contends that white employers who were not Local 130 members received promotions to the caulker position. Pls.' L.R. 56.1 Stmt. ¶ 265.

Laws testified that at DWM, African American employees were called the n-word and other racially derogatory names such as "Black motherfucker" consistently during their "day-to-day duties." Pls.' L.R. 56.1 Stmt., Ex. 12 at 70:11-71:1. Laws also recalled multiple instances where co-workers called him the n-word or a "Black stupid ass," *id.* at 71:9-71:20, and also stated that there had been "a ton of instances" where he heard white supervisors calling other African American employees the n-word or racially offensive terms such as "spook" or "monkey." *Id.* at 71:21-72:9, 86:2-14. Laws also stated that he heard Norman Clark, a driver foreman, mock an African American employee's skin tone and instruct the employee to stand next to a door "to see if it was painted black." *Id.* at 88:6-20. Laws testified that he heard rumors about Murphy and Bresnahan using the n-word to refer to African American employees. *Id.* at 148:9-149:24. Laws also stated that he observed a noose hanging from a white driver's truck. *Id.* at 74:1-12.

13

6.    **Glenn**

Glenn began his tenure at DWM in August 1986.  He became a foreman of station laborers in October 1998.  As a foreman, Glenn and his team of station laborers were responsible for cleaning sedimentation basins at SWPP.  Station laborer Glenda Shorter-Thomas, an African American woman, filed a complaint against Glenn claiming that he had harassed her based on her gender.  DHR investigated Shorter-Thomas's complaint and concluded that Glenn had violated the City's EEO policy by "telling Shorter-Thomas that her work suffered when she was wearing makeup, calling her 'GI Jane,' and calling her 'McThirsty' over an intercom."  Glenn's supervisor, Ealy,[5] and DHR recommended a one-day suspension.  A one-day suspension was issued in September 2017.

During his deposition, Glenn stated that he retired early due to the "hostility" that he experienced while working at DWM.  Pls.' L.R. 56.1 Stmt., Ex. 8 at 204:15-24.  Glenn testified that he recalled multiple instances where he or his African American co-workers were called names that he considered racially derogatory.  When he was hired in 1986, Glenn's co-workers gave him the nickname "homie" despite Glenn's objections to being called that name.  *Id.* at 66:2-19.  Glenn testified that Pope called him the n-word at a meeting.  *Id.* at 38:12-24.[6]  Glenn also testified that his co-worker Joe Jones told him that Lynch called Jones the n-word.  *Id.* at 143:9-18.  Glenn further testified that he observed racist graffiti on the wall of a corridor at a plant in 2014 or 2015.  *Id.* at 158:1-

---

[5] Ealy is also a plaintiff in this case.
[6] Glenn asserts that during this meeting People also stated "I'm so sick and tired of you n-----s," but the deposition exhibit Glenn cites does not include this language.  *See* Pls.' L.R. 56.1 Stmt. ¶ 172; *Id.*, Ex. 8 at 38:8-41:11.

13.

### 7.    Smith

DWM hired Smith as a laborer in August 1988.  DWM appointed her to a construction laborer position in May 2008.  Smith applied for promotions to foreman positions in 2012, 2013 and 2018.  The City contends that the hiring process for the 2012 foreman position was stalled and that Smith did not reapply when the position opened later in the year.  Regarding the 2013 position, the City asserts that Smith, along with six other applicants, failed part two of the prerequisite test for the position. The City further states that Anthony Smithy, a white applicant, received the position because he passed all three parts of the test and was rated the most qualified applicant. In 2018, Smith applied for a position as a foreman of construction laborers.  Smith, along with eighteen other applicants, was interviewed by Dariuz Panaszec, a white employee, and Wallace Davis III, an African American employee.  Neither interviewer recommended Smith for the position.  Mark Sabala, a Hispanic employee, and Christine Miller, an African American employee, were appointed to the position.  Smith alleges that a foreman position in her department opened in 2017, but that she was "denied the opportunity to apply."  Pls.' Resp. to Def.'s Mot. for Summ. J. at 68.  Smith retired on December 31, 2022.

Smith testified that she once observed a racially offensive symbol on DWM property.  Specifically, she stated that she saw a monkey "hanging on the wall" of the driver's room in 2004.   Pls.' L.R. 56.1 Stmt., Ex. 23 at 127:18-128:6.  Smith also testified that upon meeting Bresnahan in 2013, he did not introduce himself to her, and another employee told her that he was a "racist."  *Id.* at 160:17-162:1.

15

### 8.     Anderson

DWM hired Anderson as a plumber in July 1994.  In September 1998, he became a foreman of water pipe construction.  He worked as an assistant superintendent from October 1, 2018 until his retirement on January 31, 2023. Anderson received a five-day suspension in 2017.  The suspension arose from a physical altercation between Anderson and his white co-worker Mike Szorc.  Anderson filed a violence in the workplace complaint alleging that Szorc had instigated the incident.  Szorc also filed a violence in the workplace complaint alleging that Anderson had pushed him to the floor.  Szorc also alleged that Anderson had raised his fist and threatened to kick and kill him during the altercation.

DWM investigated Anderson and Szorc's complaints and interviewed multiple witnesses.  Anderson alleges that during the altercation, Szorc called him the n-word. Pls.' L.R. 56.1 Stmt. ¶ 131.  The City disputes this allegation, contending that neither Anderson's initial complaint nor any witness statements mention any use of any racial epithets by Szorc.  Def.'s Reply at 9.  After the investigation was completed, DWM concluded that Anderson was responsible for the altercation and issued him a suspension.  Anderson asserts that Szorc was not disciplined for the altercation. Anderson filed a grievance appealing his suspension; Santiago denied the appeal.

Anderson states that he applied for promotions to multiple positions in 2014, 2017, and 2019.  The City contends that Anderson failed part one of the prerequisite test for the ADS position for which he applied in 2014.  The City also contends that Anderson started, but did not complete, two applications for superintendent positions in 2017 and an application for a general superintendent position in 2019.

Anderson testified that he believed he was subject to racist working conditions while at DWM. He testified that African American workers were consistently sent to work on the west side of Chicago, despite being "shot at," while white workers were not. Pls.' L.R. 56.1 Stmt., Ex. 1 at 52:14-53:6. He further testified that he heard Bresnahan and Williams make jokes that included the use of the n-word, and that Chris Williams, his supervisor, called him and other African American employees the n-word.[7] Def.'s L.R. 56.1 Stmt. Ex. 17 at 176:19-177:3, 177:7-178:2, 178:23-179:5.

### 9. Henry

Henry became a plumber at DWM in November 1999. He applied for promotions to superintendent positions in 2017, 2017, and 2018. The City contends that Henry did not receive these positions because DHR determined he did not have "sufficient supervisory experience." Def.'s Mot. for Summ. J. at 48.

Henry testified that a co-worker informed him that Jack Lee, his supervisor, once said that "as soon as John Sanders," an African American superintendent, "retires," "that n----- David Henry ain't getting shit." Pls.' Resp. to Def.'s L.R. 56.1 Stmt., Ex. 9 at 66:17-67:3. Henry also testified that while working below Lee, he did not receive overtime opportunities but that after Lee left he was able to receive overtime under a new supervisor. *Id.* Henry also testified that he saw racist imagery while working at DWM, including a racist e-mail that was circulated among DWM staff. The e-mail

---

[7] Anderson asserts that he was subject to various additional forms of racial harassment during his tenure at DWM, such as observing racist graffiti on bathroom walls, seeing a noose in a DWM truck, and hearing other African American employees referred to as the n-word, "you people" and "monkeys." Pls.' L.R. 56.1 Stmt. ¶¶ 132, 136-139. But in support of those assertions, he cites to pages in his deposition testimony that were not included in the exhibit the plaintiffs cited.

included a picture of a group of DWM employees with a photo of a gorilla's face covering the face of the only African American employee in the photo. *Id.* at 111:17-112:4. Henry testified that he observed a noose hanging from the truck of a driver. *Id.* at 114:14-115:5. He further testified that he heard African American employees referred to multiple times as "spook" and "boy," both of which he considered racially offensive. *Id.* at 159:2-14.

The City has moved for summary judgment on all of the plaintiffs' claims.

## Discussion

Summary judgment is appropriate if the moving party demonstrates that "there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating a summary judgment motion, the Court construes all facts and draws all reasonable inferences in the nonmoving party's favor. *Frakes v. Peoria Sch. Dist. No. 150*, 872 F.3d 545, 550 (7th Cir. 2017). A court's role in deciding a summary judgment motion is "not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Rather, a court's "only" task is to decide "whether there is any material dispute of fact that requires a trial." *Id.* "The parties, in turn, bear a concomitant burden to identify the evidence that will facilitate this assessment." *Id.*

To avoid summary judgment, the plaintiffs must "identify[] specific, admissible evidence showing that there is a genuine dispute of material fact for trial." *Johnson v.*

18

*Advoc. Health & Hosps. Corp.*, 892 F.3d 887, 894 (7th Cir. 2018). "[C]onclusory statements, not grounded in specific facts, are not sufficient to avoid summary judgment." *Lucas v. Chicago Transit Auth.*, 367 F.3d 714, 726 (7th Cir. 2004). "There is no requirement that the moving party support its motion with any evidence [affirmatively] negating the opponent's claim." *Johnson*, 892 F.3d at 896.

## A.    Evidentiary disputes

Before addressing the merits of the defendant's motion for summary judgment, the Court must address the parties' various evidentiary disputes. The plaintiffs argue in their response brief that the DWM records submitted by the defendant, including discipline and payroll records, constitute "inadmissible hearsay" and do not qualify as business records under Federal Rule of Evidence 803(6). *See* Pls.' Resp. to Def.'s Mot. for Summ. J. at 9-14. The plaintiffs primarily take issue with declarations submitted by DWM Supervisor of Personnel Administration Marisol Santiago and DHR Acting Commissioner Kathleen Doyle Deane. Specifically, the plaintiffs contend that these declarations are improper because Santiago and Doyle lack personal knowledge of the events described in the records they reference.

The City argues that the disputed evidence is admissible under the "business records" exception to the hearsay rule found in Rule 803(6). "A party establishes a foundation for admission of business records when it demonstrates through the testimony of a qualified witness that the records were kept in the course of a regularly conducted business activity, and that it was the regular practice of that business to make such records." *United States v. Reese*, 666 F.3d 1007, 1017 (7th Cir. 2012) (citation omitted). A qualified witness must have "personal knowledge of the procedure

used to create and maintain the document"; personal knowledge of the events described in the document is not required.  *Id.*; *United States v. Given*, 164 F.3d 389, 394 (7th Cir. 1999) ("A qualified witness does not need to be the person who prepared the records or have personal knowledge of the information contained . . . .").  Santiago and Doyle sufficiently explain that the referenced records were developed through DWM's ordinary course of business as well as their knowledge of the process involved in creating the records.  Def.'s L.R. 56.1 Stmt., Ex. 4 ¶ 9; *id.*, Ex. 32 ¶ 32.  Their explanation is sufficient to meet the requirements of Rule 803(6).

The plaintiffs also argue that the City's records lack "trustworthiness" because they "come out of a department" with a culture that they allege was "racially discriminatory."  Pls.' Resp. to Def.'s Mot. for Summ. J. at 12.  But the Court can, and does, "presume the reliability of business records based on the lack of deceitful incentive and the habitual accuracy implicit within regularity."  *Igasaki v. Ill. Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 956 (7th Cir. 2021).  The alleged presence of racist employees within DWM is not sufficient to overcome the presumption of reliability for its records of regularly conducted activity; rather it is a matter of the weight to be given to those records by the finder of fact.  In the case that the plaintiffs cite in support of this argument, *Lust v. Sealy, Inc.*, 383 F.3d 580 (7th Cir. 2004), the Seventh Circuit excluded the evidence because it was not developed in the course of the party's regular business activity, not because it lacked trustworthiness.  *See id.* at 588 (holding documents created for purpose of disputing liability in lawsuit did not qualify as business records).  The Court therefore overrules the plaintiffs' request to exclude DWM's employment and personnel records.

The plaintiffs also object to the admissibility of the City's March 4, 2022 answers to interrogatories because they were "not signed and verified by a person with personal knowledge of any of the matters asserted therein." Pls.' Resp. to Def.'s L.R. 56.1 Stmt. ¶ 143 (citing *Johnson v. Holder*, 700 F.3d 979, 982 (7th Cir. 2012)). The City concedes that the copy of the March 4, 2022 answers to interrogatories attached to its Local Rule 56.1 Statement did not include a verification page. But it contends that the verification pages were provided to the plaintiffs when it initially served the answers, and it also contends that it later produced a copy of the verified supplemental interrogatory answers. Def.'s Reply at 3-4. This does not appear to be disputed. The Court therefore overrules the plaintiffs' request to exclude the City's statements of fact that cite to the March 4, 2022 answers to interrogatories.

For its part, the City objects to the plaintiffs' references to the contents of various OIG reports, including e-mails sent and statements made by DWM employees, as "inadmissible hearsay." *See* Def.'s Reply at 41. But because these reports were produced in the context of an authorized OIG investigation, they fall within the hearsay exception for "factual findings from a legally authorized investigation." FED. R. EVID. 803(8)(A)(iii). When the criteria for admissibility under that rule are met, as they are in this case, the record is admissible unless the opposing party "show[s] that the source of information or other circumstances indicate a lack of trustworthiness." *Id.* Because the City has not raised an issue regarding trustworthiness, the Court overrules its objection to these reports.

The City also objects to much of the plaintiffs' evidence, including alleged statements made by the plaintiffs' co-workers, on hearsay grounds. *See* Def.'s Reply at

25-28.  But these statements are admissible for the non-hearsay purposes of establishing the plaintiffs' understanding of the severe or pervasive nature of workplace conduct and/or evaluating the impact the statements had on the plaintiffs' subjective evaluation of their work environments.  *See Johnson*, 892 F.3d at 903.  Additionally, the Court will consider statements made by the plaintiffs' co-workers in the context of hiring and disciplinary decisions for these purposes.  *See id.* at 901; *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 575 (7th Cir. 2021).

The City also contends that the plaintiffs did not properly disclose Bernard Siskin and Charles Gallagher as expert witnesses as required by Federal Rule of Civil Procedure 26(a)(2).  Siskin developed statistical models based on the City's overtime, disciplinary and hiring data in support of the plaintiffs' contention that the City's employment practices produced "patterns of unfavorable treatment of African Americans."  Pls.' Resp. to Def.'s Mot. For Summ. J. at 58.  Gallagher, a sociologist, opined that the City's "predominantly white leadership created a hostile work environment for African Americans."  Pls. L.R. 56.1 Stmt. ¶ 270.  Following the denial of the plaintiffs' motion for class certification, the Court set a September 23, 2023 deadline for Rule 26(a)(2) disclosures.  Dkt. No 277.  The plaintiffs have not provided a justification for their failure to submit Siskin and Gallagher's reports as expert disclosures for summary judgment purposes before this Court's deadline.  But because excluding this evidence will not impact the Court's decision, the Court will consider the plaintiffs' expert reports to the extent they are relevant to their individual discrimination claims.

## B. State law race discrimination claims

The Court turns next to the plaintiffs' state law claims.  The City argues that ICRA does not apply to the plaintiffs' employment discrimination claims.  ICRA provides that no governmental entity shall "exclude a person from participation in, deny a person the benefits of, or subject a person to discrimination under any program or activity on the grounds of that person's race, color, national origin, or gender."  740 ILCS 23/5(a).  The defendant contends that ICRA operates as a state law parallel to Title VI of the Civil Rights Act of 1964.  *See* Def.'s Mot. for Summ. J. at 18 (citing *Weiler v. Vill. of Oak Lawn*, 86 F. Supp. 3d 874, 889 (N.D. Ill. Mar. 31, 2014) (Kennelly, J.)).  A plaintiff cannot maintain an employment discrimination claim against a government entity receiving federal funding under Title VI unless "(1) providing employment is a primary objective of the federal aid, or (2) discrimination in employment necessarily causes discrimination against the primary beneficiaries of the federal aid."  *Ahern v. Bd. of Educ. of City of Chicago*, 133 F.3d 975, 978 (7th Cir. 1998) (quoting *Trageser v. Libbie Rehab. Ctr., Inc.*, 590 F.2d 87, 89 (4th Cir. 1978)).

In their response brief, the plaintiffs assert that the City "claims the Illinois Civil Rights Act does not apply to any 'program or activity' involving employment."  Pls.' Resp. to Def.'s L.R. 56.1 Stmt. at 81.  That is not quite right.  The City does not argue that ICRA does not apply to *any* employment discrimination claims.  Instead, it contends that ICRA only applies to employment discrimination claims brought against a government entity that meets the *Ahern* test for Title VI claims.  The City further argues that the plaintiffs cannot satisfy the *Ahern* test because they have not offered evidence that would permit a finding either that employment is a "primary objective" of the DWM

23

or that DWM's allegedly discriminatory practices impact the primary beneficiaries of the federal funding it receives.  *See Agbefe v. Bd. of Educ. of Chicago*, 538 F. Supp. 3d 833, 838 (N.D. Ill. 2021) (dismissing plaintiff's Title VI employment discrimination claims for failure to satisfy the *Ahern* test).

The plaintiffs do not dispute that their ICRA claims should be evaluated under the Title VI standard the City cites, nor do they attempt to establish that they meet either prong of the *Ahern* test.  Thus they have effectively forfeited the ICRA claims.  That aside, the evidence in the record—including the plaintiffs' own allegations—reflects that the primary objective of the federal funding DWM receives is the provision of water and sewage services, not employment.  *See* Pls.' Third Am. Compl. ¶ 46 ("The primary function of the Water Department is the purification and transmission of potable water to the homes and business [sic] within Chicago and 126 suburban communities.").  For these reasons, the City is entitled to summary judgment on the plaintiffs' ICRA claims.

## C.    Federal race discrimination claims

The plaintiffs assert race discrimination and hostile work environment claims under the Civil Rights Act of 1866, which is codified at 42 U.S.C. § 1981, via 42 U.S.C § 1983.  Section 1981 guarantees "the right to be free of racial discrimination in the making and enforcing of contracts," including employment contracts.  *Morgan v. SVT, LLC*, 724 F.3d 990, 995 (7th Cir. 2013).  Section 1983 "provides the exclusive federal damages remedy for the violation of the rights guaranteed by § 1981 when the claim is pressed against a state actor."  *Campbell v. Forest Pres. Dist. of Cook Cnty.*, 752 F.3d 665, 666 (7th Cir. 2014) (quoting *Jett v. Dall. Indep. Sch. Dist.*, 491 U.S. 701, 735 (1989)).  Section 1981/section 1983 claims of this sort are analyzed under the same

standard as Title VII employment discrimination claims.  *Alexander v. Wis. Dep't of Health & Fam. Servs.*, 263 F.3d 673, 682 (7th Cir. 2001); *Williams v. Seniff*, 342 F.3d 774, 788 (7th Cir. 2003).

"[T]he singular question that matters in a discrimination case" is "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race . . . caused the discharge or other adverse employment action." *Johnson*, 892 F.3d at 894 (internal quotation marks omitted).  One way that a plaintiff can organize the evidence supporting a discrimination claim is via the burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  To withstand summary judgment under the *McDonnell Douglas* test, the plaintiffs must establish a prima facie case of discrimination by presenting evidence from which a reasonable factfinder could determine that they "(1) are members of a protected class; (2) performed reasonably on the job in accord with their employer['s] legitimate expectations; (3) were subjected to an adverse employment action despite their reasonable performance; and (4) similarly situated employees outside of the protected class were treated more favorably by the employer." *Johnson*, 892 F.3d at 895.  "[I]f a plaintiff successfully makes out a prima facie case, the employer must then present a legitimate, non-discriminatory reason for the allegedly unlawful action." *Alexander*, 263 F.3d at 682.  If the employer satisfies that burden, the plaintiff must demonstrate—actually, in the summary judgment context, present evidence that would support a finding—that "the employer's stated reason is merely a pretext for discrimination." *Id.*

If a plaintiff seeks to establish a race discrimination claim without utilizing the *McDonnell Douglas* framework, the plaintiff must provide either direct or circumstantial

evidence that would permit a reasonable factfinder to draw an inference of intentional discrimination. *Joll v. Valparaiso Cmty. Schs.*, 953 F.3d 923, 929 (7th Cir. 2020) (citing *Ortiz v. Werner Enters. Inc.*, 834 F.3d 760, 764-65 (7th Cir. 2016)). Circumstantial evidence includes "ambiguous or suggestive comments or conduct; better treatment of people similarly situated but for the protected characteristic; and dishonest employer justifications for disparate treatment." *Joll*, 963 F.3d at 929. The plaintiffs reference both the *McDonnell Douglas* test and the *Ortiz* circumstantial evidence standard in their response brief. This Court will evaluate the claims of each plaintiff under the *McDonnell Douglas* standard and will also consider any circumstantial evidence of discrimination that the plaintiffs present.

The plaintiffs contend that the City employed racially discriminatory promotion, overtime, shift assignment and acting up policies. The plaintiffs also assert that they have been "humiliated, harassed, denied opportunities for advancement and additional pay, and threatened daily" due to the hostile work environment that they contend the City created and encouraged. Pls.' Third Am. Compl. ¶ 76.

### 1. Discipline

Ealy, Cooper, Glenn, and Anderson contend that they were unfairly disciplined because of their race. All four plaintiffs assert that they were disciplined more harshly than white employees. In determining whether a proposed comparator was similarly situated, the Seventh Circuit has stated that as a general rule the plaintiff must adduce evidence that the alleged comparators "(1) dealt with the same supervisor, (2) were subject to the same standards, and (3) engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the

employer's treatment of them." *Coleman v. Donahoe*, 667 F.3d 835, 847 (7th Cir. 2012) (internal quotation marks omitted). But *Coleman* also makes clear that "[t]his is not a magic formula, . . . and the similarly-situated inquiry should not devolve into a mechanical, one-to-one mapping between employees." *Id.* (internal quotation marks omitted); *Muhammad v. Univ. of Chi.*, No. 16 C 9998, 2019 WL 13075598, at *3 (N.D. Ill. Mar. 31, 2019) (noting that comparators with different supervisors can be similarly situated to the plaintiff).

The Court starts with Ealy, who challenges her five-day suspension in 2018. The City says that Ealy was suspended by Managing Deputy Commissioner Marisol Santiago for insubordination, relating to Ealy's alleged refusal to provide a female custodian who was a nursing mother with a key to a lactation room, and for violating the City's policy regarding "acting up" with respect to several custodians. The City contends that Ealy actually committed the misconduct, but that is not dispositive; if an employer suspends an African-American employee for a particular infraction but gives a white employee a pass for a similar infraction, that may be unlawful even if it is undisputed that the African-American employee actually committed the infraction. In this regard, Ealy says that her coworkers Edward Salinas and Joe Lynch, neither of whom is African American, were not disciplined after "operating the Jardine [Plant] without a nursing room for 2 years after the City implemented a requirement to have one." Pls.' L.R. 56.1 Stmt. ¶ 238. The City disputes Ealy's statement on evidentiary grounds, Def.'s Resp. to Pls.' L.R. 56.1 Stmt. ¶ 238, but its contention on that front is not discussed in its brief and is persuasive, at least for purposes of the present motion. The City contends in its brief that what Salinas and Lynch allegedly did is different, largely because Ealy's

claimed infraction involved a specific employee who needed access to a lactation room. *See* Def.'s Reply at 6-7. But what is required is "conduct of *comparable* seriousness," *Coleman*, 667 F.3d at 851 (emphasis added), not necessarily identical conduct. A reasonable jury could find the infractions sufficiently similar to allow a reasonable inference of discriminatory mistreatment.

As far as the "acting up" issue is concerned, Ealy says she did not believe the employees in question should be allowed to act up due to conflicts among them and because they did not "exhibit the behavior to be supervisors," but that deputy commissioner Pope rejected her explanation. Pls.' Resp. to Def.'s Mot. for Summ. J. at 60. On this point, Ealy does not cite any allegedly comparable DWM employees who she says were treated less harshly. Instead she relies on Pope's involvement in the process. Ealy argues that the absence of any discussion in Pope's declaration of his refusal to accept her justification for denying acting up opportunities "is a fact a jury could consider to infer his testimony would have been helpful to Plaintiffs." Pls.' Resp. to Def.'s Mot. for Summ. J. at 60. But the case Ealy cites in support of her argument, *Miksis v. Howard*, 106 F.3d 754, 763 (7th Cir. 1997), is inapposite. In that case the Seventh Circuit discussed the standards for missing-evidence jury instructions, not the moving party's evidentiary burden at the summary judgment stage. *See Miksis*, 106 F.3d at 763. Here no adverse inference appropriately may be drawn from the City's failure to submit a sworn statement by Pope explaining his conduct. There is at least some evidence in the record, however, suggesting a racial animus on Pope's part, and Ealy is entitled to argue that this affected his input into the disciplinary decision and thus the decision itself. This, and the lack of clarity in how much of a role the "acting up"

28

issue (as opposed to the lactation room issue) played in Ealy's discipline, precludes entry of summary judgment on her discriminatory discipline claim.

Next is Cooper, who challenges a twenty-eight-day suspension that resulted from an incident during which he called his supervisor, Pope, a "dumbass" and a "dummkopf" (the German term for "dumb head").   At issue here is not—or at least not just—whether Cooper committed an infraction,[8] but rather the imposition of punishment and the severity of the punishment.   By way of a comparison, Cooper cites evidence showing DWM employees, and supervisory personnel, referring to subordinates or co-workers with racial epithets, including the n-word, without being subjected to discipline.   These incidents are not identical—for example, the Court has not located any evidence of an incident involving a subordinate referring to a supervisor with a racial epithet—and for that reason the City argues that the comparable incidents are too dissimilar to support an inference of discrimination.   The Court disagrees.   Though one would not condone telling one's supervisor he is a "dumbass," many—indeed, likely most—reasonable people would find calling a co-worker or a subordinate "n-----" considerably more inappropriate and deserving of sanction.   The Court also notes that Cooper's infraction was punished, in part, under the headings of "discourteous treatment" and "conduct unbecoming," *see* Pls.' L.R. 56.1 Stmt. ¶ 62, which is equally true of the allegedly unpunished incidents involving racial epithets.   In sum, the incidents are similar enough that it is appropriately left to a jury to decide whether the differential treatment gives rise

---

[8] In the plaintiffs' response brief Cooper contends that "none of the hearsay records Defendant offers . . . suggest Cooper called anyone a 'dumbass.'"  Pls.' Resp. to Def.'s Mot. for Summ. J. at 61.   But Cooper admitted during his deposition that he called Pope both a "dumb ass" and a "dummkopf" during his disciplinary hearing.  Def.'s L.R. 56.1 Stmt., Ex. 13 at 92:21-93:5; *id.* at 93:6-7.

to an inference of discrimination.

The Court reaches the same conclusion regarding the discriminatory discipline claim asserted by Glenn, who challenges a one-day suspension in 2017 that resulted from a co-worker making a complaint against him for sexual harassment. This, too, is sufficiently similar to unpunished incidents of *racial* harassment—including the use of racial epithets—to permit a reasonable inference of discriminatory imposition of discipline.

The last plaintiff who asserts a claim of racially discriminatory discipline is Anderson. As discussed earlier, Anderson was given a five-day suspension in 2017 after a physical and verbal altercation with a white co-worker named Szorc. Anderson contends that Szorc instigated the altercation and called him the n-word; Anderson responded by pushing Szorc; and a physical fight ensued. *See* Pl.'s L.R. 56.1 Stmt. ¶ 131. After the incident, Anderson was subjected to drug testing and was ultimately suspended; Szorc was not disciplined. Anderson suggests that Szorc is an appropriate comparator; he does not cite any other incidents or situations that he contends are comparable.

The problem with Anderson's contention is that, during DWM's investigation of the incident, multiple witnesses reported that Anderson started the altercation by pushing Szorc first. *See* Def.'s L.R. 56.1 Stmt., Ex. 84 at 086089, 086094, 086099. Anderson has a different view of the matter, but that is not enough to give rise to a genuine factual dispute requiring a trial: the question is whether the decisionmaker, or, at least, those who provided the input that may have influenced the decisionmaker, had a discriminatory animus. *See Alexander*, 263 F.3d at 684. Anderson offers no

evidence in this regard.  Specifically, he points to no evidence that the witnesses who reported that he started the altercation were racially biased or that the decisionmaker(s) who relied on the witnesses' accounts were racially biased.  Nor does he point to evidence that would permit a finding that a five-day suspension was out of line for an incident involving workplace violence.  Without such evidence, Anderson's claim regarding discipline cannot survive summary judgment.

In summary, the City is entitled to summary judgment on Anderson's discriminatory discipline claim, but the claims of plaintiffs Ealy, Cooper, and Glenn will proceed to trial.  The plaintiffs agree that none of the other plaintiffs can maintain a viable claim of discriminatory discipline.

### 2.    Promotions

Ealy, Cooper, Laws, Smith, Anderson, and Henry allege that the defendant denied them promotions based on their race.  To establish a prima facie case of discriminatory failure to promote, the plaintiffs must produce evidence that (1) they are members of a protected class; (2) they were qualified for the position sought; (3) they were rejected for the position; and (4) the position went to an individual outside of the protected class who was not better qualified for the position.  *Riley v. Elkhart Cmty. Sch.*, 829 F.3d 886, 892 (7th Cir. 2016).

Each failure to promote claim involves an alleged denial of promotion based on race.  But none of the plaintiffs have adduced evidence that would allow a reasonable factfinder to conclude that the candidates promoted over them were not better qualified for the positions they sought.  In the plaintiffs' response brief, Cooper and Laws do not identify the individuals who were promoted over them.  *See* Pls.' Resp. to Def.'s Mot. for

Summ. J. at 65-67. A plaintiff's failure to identify an individual outside of the protected class who received the promotion dooms a claim of discriminatory failure to promote. *Jordan v. City of Gary*, 396 F.3d 825, 833 (7th Cir. 2005).

As for Henry, Ealy, Smith, and Anderson, the information they offer about the candidates who were selected provide no evidence from which a reasonable jury could conclude that they (the plaintiffs) were denied promotions due to race discrimination.

Henry asserts that he had "equivalent experience training others," but he does not identify which individual(s) he believes his experience was equivalent to, and he does not provide information about the supervisory experience of any other candidates. Pls.' Resp. to Def.'s Mot. for Summ. J. at 69. "[A]n employee's own subjective belief that [he] is as qualified or more qualified than another applicant"—which is all Henry is left with—is insufficient to avoid summary judgment. *Stephens v. Erickson*, 569 F.3d 779, 788 (7th Cir. 2009). Anderson contends that the white candidate selected for the 2019 general superintendent position for which he applied "had only been with the City for a few years." Pls.' Resp. to Def.'s Mot. for Summ. J. at 69. The City contends, however, that Anderson did not submit an application for this position. Anderson says he testified about his application for this position during his deposition, but the pages he cites from his testimony are not included in the plaintiffs' exhibit containing excerpts from his deposition. *See* Pls.' L.R. 56.1 Stmt. ¶ 255; *id.*, Ex. 1. Furthermore, the only information Anderson provides about the candidate selected for that position is that he was white and "the son of another superintendent." Pls.' Resp. to Def.'s Mot. for Summ. J. at 69. Similarly, Smith notes that the 2013 pipe salvage yard foreman position she applied for ultimately went to "a white construction laborer" who appeared to have a

close relationship with Bresnahan. *Id.* at 68. But employment decisions based on personal relationships do not provide evidence of discrimination in the hiring process. *Briggs v. SMG Food & Beverage, L.L.C.*, No. 20 C 1733, 2022 WL 2915634, at *3 (N.D. Ill. July 25, 2022).

Rather than meaningfully argue that the promoted candidates were lesser qualified, the plaintiffs instead dispute the admissibility of the hiring records the defendant provided and contend that the defendant's failure to provide detailed explanations for its promotional decisions raises an inference of discrimination. First, as discussed above, the interview notes and other documents the defendant provided related to the plaintiffs' applications for promotions qualify as admissible business records. Second, the plaintiffs' arguments regarding the adequacy of the defendant's justifications "put[] the pretext cart before the prima facie horse." *Brummett v. Lee Enters., Inc.*, 284 F.3d 742, 744 (7th Cir. 2002). Under the *McDonnell Douglas* standard, the burden is on the plaintiff, not the defendant, to present evidence of a proper comparator. *Johnson v. Beach Park Sch. Dist.*, 103 F. Supp. 3d 931, 938 (N.D. Ill. 2015) (granting summary judgment in favor of employer due to plaintiff's failure to present evidence regarding the qualifications of candidate hired over her). The plaintiffs must first satisfy every element of a prima facie case of discrimination before the defendant is expected to offer a non-discriminatory reason for promoting the selected candidate. *Brown v. Shinseki,* 892 F. Supp. 2d 1019, 1031 (N.D. Ill. 2012). In other words, it is initially the plaintiff's burden to establish that the selected candidate was less qualified, not the defendant's burden to prove that the selected candidate was more qualified.

33

Ealy, Smith, and Anderson each challenge the City's contention that they failed a written test during the hiring process, asserting that the City has not adequately explained the test requirements. *See, e.g.*, Pls.' Resp. to Def.'s Mot. for Summ. J. at 64. But the plaintiffs have not suggested that any candidates that also failed the written test received a promotion, or produced any evidence that the written test requirement was applied differently to African American applicants. And the plaintiffs' disagreement with their employer's evaluation of their qualifications for the position alone is insufficient to create a genuine issue of material fact. *Cardoso v. Robert Bosch Corp.*, 427 F.3d 429, 436 (7th Cir. 2005). Ealy also notes that the City did not provide notes from the decisionmakers for the April 2014 COE position. Ealy's only evidence of discrimination related to that position, however, is that the defendant failed to provide an explanation for how it choose between two other candidates with identical seniority dates. Pls.' Resp. to Def.'s Mot. for Summ. J. at 64. But the City says both candidates were white, *see* Def.'s Reply at 11, and it is unclear how its failure to explain how it chose between two white candidates could support Ealy's race discrimination claim. Furthermore, Ealy has not presented any evidence to suggest either of these candidates were less qualified for the position than she was at the time.

The plaintiffs have not produced evidence from which a reasonable jury could conclude that they have established a prima facie case of discrimination under *McDonnell Douglas*. Furthermore, the plaintiffs have not adduced circumstantial evidence of discrimination in the DWM promotion process. They assert that the City "manipulated the promotion process to disadvantage African Americans." Pls.' Resp. to Def.'s Mot. for Summ. J. at 63. But at the summary judgment stage, the burden is on

the nonmoving party to respond to a properly-supported motion with "specific facts showing that there is a genuine issue for trial." *Spierer v. Rossman*, 798 F.3d 502, 507 (7th Cir. 2015). The plaintiffs have not met this burden. Ealy contends that "seniority was manipulated to advantage whites." *Id.* at 64. But in the portion of her testimony that she cites to support of that contention, Ealy does not discuss the DWM seniority system or any alleged "manipulation." Pls.' L.R. 56.1 Stmt. ¶ 265; *id.*, Ex. 6 at 40:20-43:17. Ealy testified that she believed that white employees were at an advantage regarding promotions "because their fathers, their cousin, somebody is already in the system." *Id.*, Ex. 6 at 43:1-17. But she presented no evidence to support this belief, and "[s]peculation is no substitute for evidence at the summary judgment stage." *Bass v. Joliet Pub. Sch. Dist. No. 86*, 746 F.3d 835, 841 (7th Cir. 2014).

Smith asserts that she was "denied the opportunity to apply for a foreman position." Pls.' L.R. 56.1 Stmt. ¶ 262. Smith stated in her deposition that she did not apply for that position, but provides no information about how she was "denied" this opportunity or who was involved with this denial. Pls.' L.R. 56.1 Stmt., Ex. 23 at 49:21-24. And the evidence in the record that Smith points to indicates that twenty-six candidates were considered for that promotion, not that the position was "given" to a candidate. *See* Pls.' L.R. 56.1 Stmt., Ex. 92. Laws asserts that he was told that he was not eligible for a promotion to a caulker position because he was not a member of the Local 130 bargaining unit but that white members of his union were promoted to caulker positions. Pls.' Resp. to Def.'s Mot. for Summ. J. at 66. But the portion of Laws' testimony that he cites in support of this assertion contains no discussion of white employees being promoted to the caulker position. *See* Pls.' L.R. 56.1 Stmt. ¶ 265; Pls.'

L.R. 56.1 Stmt. Ex. 12 at 32:7-36:16.

The City is entitled to summary judgment on Ealy, Cooper, Laws, Smith, Anderson, and Henry's claims for discriminatory denial of promotions.

### 3. Shift assignment

Ealy contends that she "was denied the day shift and desired work locations, while Caucasian employees with less seniority were given preference for shifts and locations." Third Am. Compl. ¶ 160. But she does not offer the names, positions, supervisors, or any other identifying information about the employees she contends were treated more favorably. Instead Ealy alleges that the shift assignment records the City produced were created in March 2018 and therefore are not contemporaneous with the relevant events. *See* Pls.' Resp. to Def.'s Mot. for Summ. J. at 78. Assuming that is so, a plaintiff does not show the existence of a genuine factual dispute or otherwise defeat summary judgment simply by pointing to deficiencies in the defendant's evidence. "[T]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Brown*, 892 F. Supp. 2d at 1031 (quoting *Vitug v. Multistate Tax Comm'n*, 88 F.3d 506, 515 (7th Cir. 1996)). Furthermore, "the prima facie case must be established and not merely incanted." *Grayson v. O'Neill*, 308 F.3d 808, 818 (7th Cir. 2002). Ealy's assertion that employees outside of her protected class were "given preference," with no evidentiary support at all, is insufficient to withstand summary judgment. Based on the record before the Court, no reasonable jury could find that Ealy was subject to discrimination in the distribution of shift assignments.

### 4.    Overtime

In support of their claims of discriminatory denial of overtime, Hill, Laws, Glenn, Anderson, and Henry assert that the City "failed to provide any records showing overtime was equitably assigned for any position for any period of time." Pls.' Resp. to Def.'s Mot. to Summ. J. at 70. But to avoid liability on the plaintiffs' overtime claims, the City does not bear the burden of demonstrating that overtime was equitably assigned. Instead, the burden is on the plaintiffs to produce evidence that would permit a reasonable jury to find they were denied overtime opportunities based on their race.

Hill, Laws, Glenn, Anderson, and Henry each testified that they observed white employees routinely being assigned overtime while African Americans were consistently denied overtime opportunities. *See* Pls.' Resp. to Def.'s Mot. for Summ. J. at 70-75. But they offer nothing specific; they "did not submit affidavits from white [comparators], records of assignments, pay, or any other scintilla of evidence of how similarly situated white employees were treated." *Johnson*, 892 F.3d at 897. Hill references one white employee, Sharon Regula, who she asserts received "favorable treatment." Pls.' L.R. 56.1 Stmt. ¶ 183. But the portion of the deposition exhibit Hill cites in support of that assertion contains no mention of Regula. *Id.*, Ex. 11 at 222:17-224:15.

That aside, the City describes the overtime assignment process as "situation specific," and the plaintiffs have not pointed to any specific situations where they were denied overtime and a white employee got it. The plaintiffs dispute the admissibility of the documents the City cites to support its description of the overtime assignment process, but aside from this they do not challenge the City's description of this process. None of the plaintiffs have adduced evidence of a proper comparator for the distribution

of overtime opportunities.  On the record before the Court, no reasonable factfinder could conclude that they have established a prima facie case of discrimination for their overtime claims.

The only plaintiff who provides circumstantial evidence to support an overtime claim, aside from the referenced non-specific allegations, is Henry.  Henry says a co-worker told him that his supervisor, Lee, said that "as soon as John Sanders [Plaintiff's] then-supervisor, who was African American] retires, . . . that [n-----] David Henry ain't getting shit."  Pls.' Resp. to Def.'s Mot. for Summ. J. at 75.  Henry argues that Lee's comment would allow a reasonable jury to find that Henry's inability to gain overtime opportunities from Lee was race-based.  The Seventh Circuit has held that evidence of an employer's racially charged comment, proximate to an adverse employment action, is sufficient to permit a plaintiff to withstand summary judgment.  *Darchak v. City of Chicago Bd. of Educ.*, 580 F.3d 622, 631-32 (7th Cir. 2009).  But Henry offers no information about the temporal proximity between Lee's alleged comment and any of the overtime opportunities he says he was denied.

The plaintiffs also argue that the Court should infer that the City's overtime process was tainted by discrimination because it "fails to offer virtually any testimony from decisionmakers involved in assigning overtime."  Pls.' Resp. to Def.'s Mot. for Summ. J. at 75.  But before any of the plaintiffs "can benefit from a favorable view of evidence, [they] must first actually place evidence before the courts."  *Montgomery*, 626 F.3d at 389.  No reasonable jury could find the overtime assignment process discriminatory based solely on the City's alleged deficiencies in producing evidence regarding the assignment of overtime shifts.  Based on the evidence in the record, no

reasonable jury could find that the plaintiffs were subject to discrimination in the distribution of shift assignments.

### 5.    Acting up

Cooper, Smith, Hill, Anderson, and Ealy's acting up claims also lack evidentiary support.  Cooper concedes that he was not eligible for the acting up opportunity he sought due to the City's rule that employees are only eligible to act up in the position one level above their current position, but he argues that an "exception" could have been made for him.  *See* Pls.' Resp. to Def.'s Mot. for Summ. J. at 76.  The only employee he identifies as having potentially received an exception, however, is Ealy, who is also African American.  To be an appropriate comparator for establishing a prima facie case of discrimination, the similarly situated employee must present evidence of "similarly situated individuals who were *not* members of a protected class."  *Hirsch v. Cognizant Tech. Sols. U.S. Corp.*, No. 21 C 161, 2023 WL 3320285, at *6 (N.D. Ill. May 9, 2023) (emphasis added).  Evidence that another African American employee was treated more favorably provides no support for Cooper's claim that he was denied acting up opportunities based on his race.

Cooper also testified that in April 2017, while his supervisor was on vacation, he was not offered the opportunity to "act up" into his supervisor's position despite allegedly being the only one qualified to do so.  Pls.' L.R. 56.1 Stmt., Ex. 11 at 81:22-82:22.  Cooper believes that his inability to act up was due to his race because, he says, the acting up policy implemented by Stark systematically deprived African Americans of acting up opportunities.  *Id.* at 83:2-23.  But Cooper provides no evidence of this "systemic" deprivation of acting up opportunities other than his own perception

39

that he was denied overtime acting up opportunities that he believes he was entitled to. "Bare allegations not supported by specific facts are insufficient in opposing a motion for summary judgment." *Schroeder v. Lufthansa German Airlines*, 875 F.2d 613, 620 (7th Cir. 1989).

Smith asserts that DWM employees "bent or changed rules to the disadvantage of African Americans," but her evidence in support of this assertion is that management ceased to assign acting up opportunities based on seniority after she became the most senior employee at her work site. Pls.' Resp. to Def.'s L.R. 56.1 Stmt. ¶ 187. A plaintiff's assertion that a workplace policy was implemented to her detriment is not evidence of discriminatory animus unless "the plaintiff can point directly to a discriminatory reason for the employer's action." *Cole v. Bd. of Trs. of N. Ill. Univ.*, 838 F.3d 888, 900 (7th Cir. 2016). Here, Smith has offered no evidence other than her own speculation that the acting up policy was modified to provide fewer opportunities to African American employees.

Hill does not argue that she was denied a specific acting up opportunity. She testified, however, that as a staff assistant she was asked to perform the duties of higher-paying positions without fair compensation. Assuming that Hill is correct that this "informal acting up" constitutes "a form of discrimination," she offers no evidence that other similarly situated non-African American individuals either were not asked to perform the duties of other positions or were compensated for such "informal acting up" tasks. *See* Pls.' Resp. to Def.'s Mot. for Summ. J. at 76. "For summary judgment purposes, [a plaintiff] cannot create a factual dispute by stating that his job responsibilities ought to have been something other than what the company expected."

*Widmar v. Sun Chem. Corp.*, 772 F.3d 457, 464 (7th Cir. 2014). And "[g]uessing at an employer's hidden animus or inner prejudice . . . is not enough to defeat summary judgment." *Brooks v. Avancez*, 39 F.4th 424, 436 (7th Cir. 2022). Hill's assertion that she was entitled to higher pay based on her work responsibilities provides no support for her claim that she was denied pay because of her raise.

In the plaintiffs' response brief and their statement of additional facts, Anderson asserts in support of his acting up claims, that "whites . . . were treated more favorably," but he offers no accompanying details. Pls.' Resp. to Def.'s Mot. for Summ. J. at 77; Pls.' L.R. 56.1 Stmt. ¶ 136. In the statement of additional facts, Anderson cites to a deposition exhibit that does not include the page numbers that he cites in support of his acting up claims. Pls.' L.R. 56.1 Stmt. ¶ 136; *see id.* at Ex. 1. Because Anderson has presented no evidence in support of his acting up claims, no reasonable juror could conclude that he was denied acting up opportunities based on his race.

In response to Ealy's acting up claims, the City provided records showing that Ealy "consistently acted up from June 2015 through September 2015 and July 2016 through September 2016." Def.'s Reply at 20. Ealy argues that her acting up claims nonetheless should proceed to trial because her "recollection" of her acting up opportunities conflicts with the City's records. Pls.' Resp. to Def.'s Mot. for Summ. J. at 75. But her unsupported contention that the records are wrong is insufficient to withstand summary judgment. *See Turner v. The Saloon, Ltd.*, 595 F.3d 679, 691 (7th Cir. 2010) ("Although [plaintiff] disputes the accuracy of [employer]'s records, his mere assertions are insufficient to create a jury issue.").

For the reasons described, the Court concludes that the City is entitled to

summary judgment on the plaintiffs' disparate treatment claims.

## D.    Hostile work environment

The plaintiffs' hostile work environment claims in this case involve alleged racially offensive conduct by different DWM employees against different individual plaintiffs.  To demonstrate that they were subject to a hostile work environment, each plaintiff must show that (1) he or she was subject to unwelcome harassment; (2) the harassment was based on race; (3) the harassment was severe or pervasive; and (4) there is a basis for employer liability.  *Johnson*, 892 F.3d at 900.  The alleged conduct must be "sufficiently severe or pervasive to alter the conditions of employment."  *Scruggs v. Garst Seed Co.*, 587 F.3d 832, 840 (7th Cir. 2009).  "[T]he standard may be met by a single extremely serious act of harassment or by a series of less severe acts."  *Robinson v. Perales*, 894 F.3d 818, 828 (7th Cir. 2018).  Whether the alleged conduct meets this standard also depends on factors such as the "severity of the allegedly discriminatory conduct, its frequency, whether it is physically threatening or humiliating or merely offensive, and whether it unreasonably interferes with an employee's work performance."  *Id.* "Whether harassment was so severe or pervasive as to constitute a hostile work environment is generally a question of fact for the jury," unless the court concludes that no reasonable jury could find the alleged conduct severe or pervasive.  *Johnson*, 892 F.3d at 901.

The City argues that the plaintiffs' hostile work environment claims are time-barred because they rely on conduct that allegedly occurred outside the limitations period.  Specifically, the City contends that any allegedly discriminatory employment actions that took place prior to June 29, 2013 for the plaintiffs' section 1981 claims or

prior to June 29, 2015 for their section 1983 claims are time-barred because they occurred outside of the four-year limitations period for section 1981 claims or the two-year period for section 1983 claims. *See* Def.'s Reply at 28 n. 2. But for hostile work environment claims, "[p]rovided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered for the purposes of determining liability." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002). In *Morgan*, the plaintiff "presented evidence from a number of other employees that managers made racial jokes, performed racially derogatory acts, made negative comments regarding the capacity of blacks to be supervisors, and used various racial epithets." *Id.* at 120. The Supreme Court concluded that because the "very nature" of hostile work environment claims involves "repeated conduct," a factfinder can hold a defendant liable for the "entire time period of the hostile environment." *Id.* at 115, 117. Under this continuing violation doctrine, a "claim for hostile work environment is timely as long as any act falls within the statutory time period, even if the claim encompasses events occurring prior to the statutory time period." *Barrett v. Illinois Dep't of Corrs.*, 803 F.3d 893, 899 (7th Cir. 2015) (cleaned up).

The plaintiffs contend that the racially hostile environment at DWM existed at least "from 2011 onward." Pls.' Resp. to Def.'s Mot. for Summ. J. at 30. They have adduced evidence that over the course of multiple years, they were subject to racially derogatory comments, racist jokes, the presence of racially offensive symbols, and racially-charged nicknames. Similar to the plaintiff in *Morgan*, all of these acts are used to support the plaintiffs' claim of a work environment where they were repeatedly subject

to racist conduct over an extended period of time. Thus these racially offensive incidents are all appropriately considered, collectively, as a single hostile work environment claim. *See Elliott v. Bd. of Educ. of City of Chicago*, No. 20 C 2706, 2022 WL 874649, at *4-5 (N.D. Ill. Mar. 24, 2022) (concluding that co-workers' repeated offensive comments gave rise to a single hostile work environment claim). To the extent the plaintiffs are able to establish that one of these acts occurred during the relevant statutory period, and that the acts are sufficiently related to constitute the same hostile work environment claim, the acts, and thus the plaintiffs' claims, are not time-barred.

Several plaintiffs contend that DWM employees used the n-word either in their presence or in the presence of other African American employees. The use of the n-word in a workplace is strong evidence of a hostile work environment. The Seventh Circuit has noted that "in light of its threatening use throughout American history, this particular epithet can have a highly disturbing impact on the listener." *Robinson*, 894 F.3d at 828 (collecting cases). "Comments made to non-plaintiff co-workers carry less weight in the evaluation of a hostile environment claim, but they are not irrelevant." *Johnson*, 892 F.3d at 902. Comments that plaintiffs did not hear directly but were told about by a co-worker are the "weakest evidence" in support of a hostile work environment claim, but "coupled with other evidence this testimony might have relevance." *Id.* at 902, 903.

The Court finds that the evidence Glenn, Henry, Hill, Anderson, Laws, Ealy, and Cooper have produced regarding the severe and/or pervasive use of the n-word at DWM is sufficient to withstand summary judgment on their hostile work environment

claims. Glenn says that his supervisor, Pope, called him the n-word during a meeting in 2016 or 2017. Henry learned from a co-worker that his supervisor had called him the n-word. Hill testified that she heard her supervisor, Stark, use the n-word on at least one occasion between 2010 and 2015, and that she heard an individual use the n-word during a meeting in Murphy's office. Anderson heard his supervisor, Williams, call him the n-word in 2017. Laws was repeatedly called the n-word by co-workers. Ealy, Laws, Cooper and Anderson consistently heard either their supervisors or their co-workers use the n-word to refer to other African American employees. "A plaintiff's repeated subjection to hearing [the n-word] could lead a reasonable factfinder to conclude that a working environment was objectively hostile." *Id.* at 903.

Additionally, each of these plaintiffs has adduced evidence of racist conduct and/or harassment outside of the severe or pervasive use of the n-word in their work environments. Cooper saw KKK symbols and swastikas at the Sawyer facility throughout his employment, and Glenn observed racist graffiti, including KKK imagery, on DWM property in 2014 or 2015. *See Cerros v. Steel Techs., Inc.*, 398 F.3d 944, 951 (7th Cir. 2005) (concluding evidence of racist graffiti at workplace supported hostile work environment claim). Laws saw a noose on DWM property in 2017. *See Cole*, 838 F.3d at 896 ("Given [the noose's] disturbing history and status as a symbol of racial terror, we have no difficulty assuming that the harassment could be treated as based on race."). Anderson overheard two superiors, including his supervisor, sharing racist jokes. Henry saw a printout of an e-mail shared among DWM employees that included a photo with a gorilla's face superimposed on the body of the highest ranking African American employee at DWM at the time. Hill also viewed an e-mail that included a

45

racially derogatory comment about an African American employee. Ealy testified that over several years, multiple co-workers repeatedly referred to her as "Black bitch." Pls.' L.R. 56.1 Stmt., Ex. 6 at 279:13-24; *Chaney v. Plainfield Healthcare Ctr.*, 612 F.3d 908, 912 (7th Cir. 2010) (denying employer's summary judgment motion where plaintiff was called "Black bitch" among other racial epithets by co-workers over a three-month period).

The City argues that only conduct that is directed at the plaintiffs themselves can be used to support their hostile work environment claims. *See generally* Def.'s Reply at 31-40. But the Seventh Circuit has stated that the treatment of a plaintiff's co-workers is relevant evidence that may support a hostile work environment claim. *Johnson*, 892 F.3d at 902 (noting knowledge of racist conduct directed towards co-workers may have impacted plaintiffs' working environments). A reasonable jury could find that the racist conduct that was aimed at African American co-workers, especially conduct as severe as the use of the n-word and the display of nooses, impacted the work environment of the Black plaintiffs who were the direct targets of this conduct as well as those who witnessed it. *See Yuknis v. First Student, Inc.*, 481 F.3d 552, 554 (7th Cir. 2007) ("[O]ne could be in the target area because a group of which one was a member was being vilified, although one was not singled out."); *see also E.E.O.C. v. WRS Infrastructure & Env't, Inc.*, No. 09 C 4272, 2011 WL 4460570, at *10 (N.D. Ill. Sept. 27, 2011) (concluding presence of noose at workplace supported hostile work environment claim for all African American plaintiffs regardless of whether they observed the noose firsthand). Glenn, Henry, Hill, Anderson, Laws, Ealy, and Cooper have adduced sufficient evidence to permit a reasonable jury to find they were subjected to a hostile

work environment.

Edmond and Smith, however, have not presented evidence to support a hostile work environment claim. Curiously, Edmond's individual claims are not mentioned at all in the plaintiffs' response brief. And the only information about the allegedly hostile work environment Edmond faced that is in the plaintiffs' statement of facts is Edmond's assertion that Lynch referred to African American employees as "you people." Pls.' L.R. 56.1 Stmt. ¶ 159. Without further details or context, there is no basis for the Court to conclude that Lynch's use of the phrase was racially derogatory. *Winston v. Dart*, No. 18 C 5726, 2021 WL 3633918, at *13 (N.D. Ill. Aug. 17, 2021) (Kennelly, J.) (concluding lack of contextual evidence precluded finding that employee's use of the term "you people" was race-based).

As for Smith, she testified that she once observed what she considered a racially offensive symbol hanging on the wall of a driver's room at DWM. But this incident occurred in 2004, well before the start of the plaintiffs' chosen statutory period, which begins in 2011. The only other evidence Hill presents in support of her hostile work environment claim is that in 2013, Bresnahan failed to introduce himself to her. This slight falls far below the level of severity required to support an actional hostile work environment claim. *See McKenzie v. Milwaukee Cnty.*, 381 F.3d 619, 625 (7th Cir. 2004) (holding plaintiff's claim that supervisor failed to greet her did not establish hostile work environment); *Patton v. Indianapolis Pub. Sch. Bd.*, 276 F.3d 334, 339 (7th Cir. 2002) (holding plaintiff's allegations that her supervisors were rude and ignored her suggestions did not rise to the level of an actionable hostile work environment claim).

The evidence provided by Glenn, Henry, Hill, Anderson, Laws, Ealy, and Cooper

is sufficient to suggest that their supervisors and co-workers "were using racist language in a pervasive way to establish racial and hierarchical dominance in the workplace." *Johnson*, 892 F.3d at 904. A reasonable jury could conclude that these plaintiffs were subject to a hostile work environment. The Court therefore denies summary judgment on these plaintiffs' hostile work environment claims. The Court grants summary judgment in favor of the City, however, on the hostile work environment claims of Edmond and Smith.

### E. *Monell*

The plaintiffs' claims against the City of Chicago must be evaluated under the standard for municipal liability established in *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978).[9] "[U]nits of local government are responsible only for their policies rather than misconduct by their workers." *Fairley v. Fermaint*, 482 F.3d 897, 904 (7th Cir. 2007). To sustain a *Monell* claim against the City the plaintiffs must adduce evidence of "(1) an express policy that, when enforced, causes a constitutional deprivation; (2) a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the final force of law; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority." *Lewis*, 496 F.3d at 656 (citation omitted). *Monell* liability may arise from a "city's 'policy of inaction' in light of notice that its program will cause constitutional violations." *J.K.J. v.*

---

[9] To establish municipal liability under *Monell*, the plaintiff must demonstrate an underlying constitutional violation. *See Pyles v. Fahim*, 771 F.3d 403, 412 (7th Cir. 2014). Because Edmond and Smith did not withstand summary judgment on their hostile work environment or disparate treatment claims, the Court's *Monell* liability analysis applies only to the remaining plaintiffs.

*Polk County*, 960 F.3d 367, 378 (7th Cir. 2020) (quoting *Connick v. Thompson*, 563 U.S. 51, 61 (2011)).

The plaintiffs present three arguments in support of establishing *Monell* liability: 1) "the City is liable for DWM's widespread custom and practice of permitting and condoning racially-harassing language and behavior in the DWM workplace," 2) "the City is liable for its inaction in the face of a known and obvious risk that DWM employees would be subjected to racial discrimination and harassment," and 3) "the City is liable under a final policymaker theory for former Commissioner Barrett Murphy's conduct." Pls.' Resp. to Def.'s Mot. for Summ. J. at 14-16.

To establish the existence of a custom or practice, at the summary judgment stage, "it is enough that a plaintiff present competent evidence tending to show a general pattern of repeated behavior (i.e., something greater than a mere isolated event)." *Davis v. Carter*, 452 F.3d 686, 694 (7th Cir. 2006). The evidence in the record is sufficient to permit a reasonable jury to find that multiple plaintiffs experienced consistent, repeated and sometimes daily racial harassment through the placement of racist symbols and the use of racial slurs, epithets and insults by supervisors and co-workers. *See, e.g.*, Pls.' L.R. 56.1 Stmt. ¶¶ 137, 197, 222. This alleged racial harassment took place at multiple different DWM plants and locations, and it involved employees at various levels of management, including those at the highest levels of DWM leadership. *See* Pls.' Resp. to Def.'s Mot. for Summ. J. at 38-40. Given the duration, frequency, and severity of the racial harassment the plaintiffs allege, a reasonable jury could find there was a widespread practice of condoning and facilitating racial harassment at DWM. *See Barth v. Village of Mokena*, No. 03 C 6677, 2006 WL

49

862673, at *28 (N.D. Ill. Mar. 31, 2006) ("[T]he length of time and numerous players in the alleged harassment could support a reasonable factfinder's conclusion that a departmental custom was sufficiently widespread for § 1983 liability.").

The racist e-mails shared among DWM staff, as well as the OIG's 2017 report, also support the plaintiffs' widespread practice or custom theory.[10]  The OIG's investigation revealed "egregious, offensive racist and sexist e-mails distributed by and among employees . . . that extended to senior levels of department management."  Pls.' L.R. 56.1 Stmt., Ex. 45 at DWM-Edmond-086876.  The OIG also found that these e-mail messages "suggested the existence of an unrestricted culture of overtly racist and sexist behavior and attitudes within the department."  *Id.*

The City argues that the OIG report, and the accompanying e-mails, are irrelevant because "none of the e-mails pertained to or were sent to the individual Plaintiffs in this case."  Def.'s Reply at 41.  First, at least two plaintiffs, Hill and Henry, testified that they had viewed racially offensive e-mails sent by DWM employees, which indicates that the contents of these e-mail messages were at times shared beyond the direct recipients.  *See* Pls.' Resp. to Def.'s Mot. for Summ. J. at 39, 45.   Second, even if no plaintiffs viewed the e-mail messages directly, the fact that multiple DWM employees composed, shared, and replied to egregiously racist e-mail messages could be indicative of how those employees may have condoned or participated in the alleged

---

[10] Rather than directly challenge the plaintiffs' arguments regarding a widespread custom or practice of discrimination at DWM, the City asserts that the evidence the plaintiffs rely on to support their argument, specifically the contents of the OIG reports, amounts to inadmissible hearsay.  Def.'s Reply at 41.  But as discussed earlier, the contents of the OIG report appear to be admissible under Federal Rule of Evidence 803(8)(A)(iii).

culture of racial harassment at DWM or turned a blind eye to the racist treatment that other employees received. *See Abreu v. City of Chicago*, No. 19 C 2161, 2022 WL 1487583, at *18 (N.D. Ill. May 10, 2022) ("It is enough that the e-mails evince a culture of racism at DWM that could lead to—and allegedly did lead to—an employee's experiencing a hostile work environment."). EEO officer Mark Pando testified that EEO division policy provides that failing to report potential EEO violations is equivalent to condoning that conduct, and he noted that failure to discipline an employee for racist conduct could "empower" that employee to continue. Pls.' L.R. 56.1 Stmt., Ex. 20 at 104:11-24. In sum, the plaintiffs have produced sufficient evidence to submit a reasonable jury to find that the City had a widespread custom or practice of condoning racial harassment at DWM.

A genuine factual dispute also exists regarding whether the City disregarded a known and obvious risk that the plaintiffs could be subject to racially discriminatory treatment. The City challenges the plaintiffs' contentions regarding inefficiencies in the EEO reporting process. *See* Def.'s Reply at 42. But the testimony of DWM leadership and EEO personnel, considered in the light most favorable to the plaintiffs, would permit a reasonable finding that there were wide gaps in DWM's anti-discrimination policies and procedures and that DWM personnel had knowledge of those gaps. For example, despite communication from an EEO Division employee highlighting the importance of EEO training for supervisors and the DWM EEO liaison's acknowledgement of deficiencies in the department's EEO training process, DWM did not implement mandatory EEO training until 2017. Def.'s L.R. 56.1 Stmt. ¶ 225. Murphy testified that he believed one DWM employee who authored racially offensive e-mail messages, Paul

Hansen, had "no reason" to anticipate that he would be subject to discipline under the City's EEO policy. Pls.' L.R. 56.1 Stmt. ¶ 23. Furthermore, the City's EEO Division itself had severe resource constraints that impeded its ability to fully investigate discrimination claims. EEO officer Pando testified that due to understaffing, around 2015 to 2017, the EEO Division was forced to put cases on hold regardless of whether it believed that the complaint had merit. Pls.' L.R. 56.1 Stmt. ¶ 81. Given the awareness of deficiencies in DWM's EEO training policies as well as the EEO division's inability to properly evaluate discrimination complaints, a reasonable jury could find that the City disregarded an obvious risk that employees could be subject to racial harassment and discrimination. *See Polk County*, 960 F.3d at 379 (sustaining jury verdict on *Monell* liability finding due to evidence of deficiencies in municipality's sexual abuse prevention program).

The City notes that various plaintiffs testified that they did not they file EEO complaints regarding the racist treatment they allegedly faced. *See* Def.'s Reply at 41. But the plaintiffs repeatedly stated that they did not report the racist conduct in part due to confusion surrounding the EEO reporting process. For example, Glenn testified that he did not feel comfortable reporting discrimination because he believed a discrimination complaint would need to be filed with the very individuals who had engaged in the racist conduct he would be reporting. *See* Pls.' L.R. 56.1 Stmt., Ex. 8 at 158:17-24. A reasonable jury could find that if EEO training had been properly implemented at DWM, the plaintiffs would have been appropriately informed of their options for reporting the discriminatory conduct they faced as well as of the safeguards that were in place to protect them from retaliation due to their reporting.

To support their "final policymaker" theory under *Monell*, the plaintiffs identify Murphy, the former commissioner of DWM, as the official with final authority over DWM's EEO policy. "Whether an entity has final policymaking authority is a question of state or local law." *Milestone v. City of Monroe, Wis.*, 665 F.3d 774, 780 (7th Cir. 2011). The Seventh Circuit has stated that for a government official to be considered a final policymaker for *Monell* purposes, that official must be in charge of "*making* policy" rather than "merely implent[ing] legislative policy." *Gernetzke v. Kenosha Unified Sch. Dist. No. 1*, 274 F.3d 464, 468 (7th Cir. 2001) (emphasis added) (citing *Auriemma v. Rice*, 957 F.2d 397 (7th Cir. 1992)).

The Chicago Municipal Code provides that the commissioner of human resources is responsible for issuing personnel rules. CHI. MUNICIPAL CODE § 2-74-050. It is undisputed that "DHR promulgates the EEO Policy" and the task of "implementing and enforcing" the policy is delegated to the City department heads, including the DWM commissioner. Pls.' Resp. to Def.'s Mot. for Summ. J. at 21. But Murphy's role as the individual in charge of implementing the EEO policies established by another government entity is insufficient to permit a reasonable jury to find that he had final authority over EEO policymaking. *See Lovette-Cephus v. Village of Park Forest*, 30 F. Supp. 3d 754, 761 (N.D. Ill. 2014) ("[A] person with solely executive power does not have policymaking authority under Section 1983."). In addition, another factor used to determine whether an official can be considered a final policymaker is "whether the official is constrained by policies of other officials or legislative bodies." *Valentino v. Village of South Chicago Heights*, 575 F.3d 664, 676 (7th Cir. 2009). As the plaintiffs acknowledge, the commissioner's authority to implement and enforce DHR's EEO policy

is constrained by the City's mandate that department actions not conflict with existing DHR policies.  *See* Pls.' Resp. to Def.'s Mot. for Summ. J. at 21.  Based on the evidence in the record, no reasonable jury could conclude that Murphy had final policymaking authority under *Monell*.

The Court concludes that the plaintiffs have adduced sufficient evidence that the City had a custom or policy of condoning racial harassment and discrimination at DWM as well as inaction in the face of a risk of potential constitutional violations.  This is sufficient for their claims under *Monell* to withstand summary judgment.

## Conclusion

For the foregoing reasons, the Court grants the City's motion for summary judgment [dkt. no. 291] on the plaintiffs' claims of discrimination involving denial of promotion, overtime pay, shift assignment, and acting up; Anderson's discriminatory discipline claims; and Edmond and Smith's hostile work environment claims. The Court denies the City's motion for summary judgment on Ealy, Cooper, and Glenn's discriminatory discipline claims and the remaining plaintiffs' hostile work environment claims.  Those claims will proceed to trial.  Counsel are directed to promptly confer regarding the anticipated witnesses and anticipated length of trial given the dismissal of a number of claims, and they are to file a joint status report in this regard by no later than April 19, 2024.  The Court notes that it likely will be moving the start date for the trial to Wednesday, June 5, 2024.  A telephonic status hearing is set for April 22, 2024 at 9:00 a.m., using call-in number 888-684-8852, access code 746-1053.

Date:  April 11, 2024

_____
MATTHEW F. KENNELLY
United States District Judge

54